UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY SIBILIA,<br><br>    Plaintiff,<br><br>    v.<br><br>JOHN SNOW, SECRETARY OF THE<br>DEPARTMENT OF THE TREASURY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 05-10096-PBS

## THE DEFENDANT'S MEMORANDUM IN SUPPORT
## OF HIS MOTION FOR SUMMARY JUDGMENT

John Snow, Secretary of the Department of the Treasury ("defendant"), by his Attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, hereby submits this Memorandum of Law in support of his Motion for Summary Judgment. For the reasons set forth below, the undisputed material facts show that the defendant is entitled to judgment in his favor as a matter of law.

### I.   INTRODUCTION

The plaintiff's allegations of harassment, hostile work environment and disparate treatment in Count I, based on retaliation, should be dismissed for failure to timely file an EEOC complaint.

The defendant has provided legitimate non-discriminatory reasons for the plaintiff's allegations of harassment and hostile work environment based on retaliation in Count II.

No causal connection can be made given the lengthy time period between the plaintiff's EEO filing and his allegations in

are at issue, "if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." LeBlanc, 6 F.3d at 842, quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Because the plaintiff's claims do in fact rest solely upon "conclusory allegations, improbable inferences, and unsupported speculation," the defendant is entitled to summary judgment.

## IV. ARGUMENT

### A. The Plaintiff's Allegations of Harassment, Hostile Work Environment and Disparate Treatment In Count I, Based on Retaliation, Should be Dismissed for Failure to Timely File an EEOC Complaint.

"To make out a prima facie case for retaliation, a plaintiff must show (1) that he engaged in a protected action ...; (2) that he suffered an adverse employment action ...; and (3) that there was some possibility of a causal connection between the employee's protected activity and the employer's adverse employment action, in that the two were not wholly unrelated." Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 336 n.10 (1st Cir. 2005).

In the employment discrimination context, a continuing violation is "composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate wrong actionable under [the discrimination laws]." Sabree v. United Brotherhood of Carpenters and Joiners Local, 921 F.2d 393, 400 (1st Cir. 1990); Jensen v. Frank, 912 F.2d 517, 522 (1st Cir. 1990). To be

3

actionable, a continuing violation "requires the complaining party to demonstrate that some discriminatory act transpired within the limitations period." Id. (emphasis in original; internal quotation marks and brackets omitted).[1]  The First Circuit has used the following factors to determine whether the wrongs which allegedly took place within the limitations period were a continuing violation:

1.  Did the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation?

2.  Were the alleged acts reoccurring ... or more in the nature of an isolated work assignment or employment decision? and

3.  Did the act have the degree of permanence which should trigger an employee's awareness of the duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependant on a continuing intent to discriminate?

Smith v. Bath Iron Works Corporation, 943 F. 2d 164, 166 (1st Cir. 1991); Sabree, supra at 401-402; Berry v. Board of Supervisor of L.S.U., 715 F.2d 971, 981 (5th Cir. 1983).  Under Title VII, in order for a plaintiff to reach back and recover for discriminatory acts outside the 45 day limitations period, a "substantial relationship" between the timely and untimely acts must be proven.  Desrosiers v. The Great Atlantic and Pacific Tea Company, Inc., 885 F. Supp. 308, 312 (D. Mass. 1995).  The First

---

[1]    Here, for a federal employee such as the plaintiff, the applicable time period for the plaintiff to raise his claim is within 45 days of the discriminatory event (see: 29 C.F.R. § 1614.105(a)(1)).

4

Circuit in Sabree, supra at 402, determined that the most important factor was the degree of permanence which would trigger an employee's awareness and duty to assert his rights. See also Berry, supra at 981. "Permanence" of allegedly discriminatory acts triggering an employee's awareness and duty to assert rights is basically an inquiry into whether the employee knew or should have known at the time of the allegedly discriminatory act(s) that he was being discriminated against. Civil Rights Act of 1964, §706(d, g), as amended, 42 U.S.C.A. § 2000 e-5(e, g); Jensen, 912 F.2d at 522 (citing Olson v. Mobil Oil Corp., 904 F.2d 198, 203 (4th Cir. 1990).

Similar to the issues noted in Desrosiers, supra at 311, and Sabree, supra at 401, the issue here is "not whether there is an act sufficient to support a violation that occurred within the limitations period, but whether the acts outside of the limitations period may be relied upon in awarding a remedy."

The First Circuit noted that if the acts outside the limitations period had a requisite degree of permanence, then they are not substantially related to the act or acts which occurred within the limitations period and there can be no continuing violation. Desrosiers, supra at 312. Thus, if the plaintiff knew he was being discriminated against, he had a duty to assert his rights. Id.; Sabree, supra at 402 (A plaintiff who knowingly fails to pursue his claim timely is barred by the [45] day limitation imposed by Congress); See also Roberts v. Gadsden Memorial Hospital, 850 F.2d 1549, 1550 (11th Cir. 1988)("A

5

knowing plaintiff has the obligation to file promptly or lose his claim.")

### (1) The Alleged Discriminatory Atmosphere was Apparent to Plaintiff Some Three Years Prior to Filing His EEO Complaint

Here, such as in Sabree, supra at 402, Bath Iron Works Corp., supra at 166, and Desrosiers, supra at 312, according to the plaintiff, he was allegedly told first hand that "he had an ethics problem" and that if he had done the same thing to Fred Aufiero (Aufiero), as he did to Donato Niro (Niro), the plaintiff would have been at a desk outside of Aufiero's office so that Aufiero could keep an eye on the plaintiff (see Complaint, ¶ 14). Allegedly, as a result of Aufiero's inactions and humiliation tactics relative to Niro's actions, the plaintiff filed an EEO complaint on or about November 12, 1996 (Complaint ¶ 15). The complaint was subsequently dismissed by the EEOC as failing to state a claim (Complaint ¶ 19), and the plaintiff failed to file an appeal. Despite the fact that Niro retired, Aufiero still remained in a supervisory capacity over the plaintiff.

Count I of the plaintiff's Complaint alleged numerous retaliatory activities between January, 1997 through May 24, 2000. Given the plaintiff's prior EEO involvement and his alleged discriminatory encounters with Aufiero, who remained in his supervisory chain of command, the plaintiff failed to file an EEO complaint until October 25, 2001. Paragraphs 26 - 38 of the Complaint all allege acts of disparate treatment from January, 1997 - May, 2000, yet the plaintiff did not seek counseling with

6

an EEO counselor until October 25, 2001 (Complaint ¶ 40).

Here, such as in Sabree, supra at 402, the plaintiff should have known that he was being treated disparately years prior to seeking EEO counseling.[2]  The First Circuit was clear in stating that this type of plaintiff has an obligation to file promptly or lose his claim.  Sabree, supra at 402.  It has long been established by the First Circuit that both employers and employees have the right to "procedural safeguards in the precincts patrolled by Title VII."  Jensen, 912 F.2d at 522.  The plaintiff essentially slept on his rights since January, 1997, until contacting the EEO Counselor on October 25, 2001, and thus all alleged discriminatory acts prior to September 10, 2001, (45 days prior to October 25, 2001) should be barred.  See Sabree, supra at 405; Kale v. Combined Ins. Co. of America, 861 F.2d 746, 753 (1st Cir. 1988)(Short filing period is to provide the government an opportunity to conciliate while the complaint is fresh and to give ... early notice to the employer of possible litigation).

> **(2)  The Defendant's Decision not to Re-assign the Plaintiff to a Post of Duty in Brockton was Based on a Legitimate Non-Discriminatory Reason of Seniority and Was Not An Adverse Employment Action.**

Lastly, the only allegation of discrimination within the statutory time period occurred on October 11, 2001 when the plaintiff was allegedly non-selected for re-assignment to a Post

---

[2]     The defendant denies that the plaintiff was treated disparately.

7

of Duty in Brockton, Massachusetts. At this time, Aufiero had already retired and the Assistant Special Agent in Charge, Michael Lahey (ASAC Lahey) testified he was unaware of any prior EEO involvement that the plaintiff had. ASAC Lahey also stated that his decision as to which employees would be transferred to Brockton was based primarily on seniority, and the three individuals selected were more senior than Plaintiff (IF, Tab 11). There is also no evidence that the defendant's legitimate non-discriminatory reason was a pretext for retaliation.

Also, under Title VII, an adverse employment action must result in a materially adverse change in the terms and conditions of employment. Weeks v. New York State, 273 F.3d 76, 85 (2nd Cir. 2001). A "materially adverse" change in working conditions might be indicated by, for example, a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation. Id. The First Circuit's standard for identifying a materially adverse employment action was established in Blackie v. State of Maine, 75 F.3d 716, 725-726 (1st Cir. 1996), and focuses on whether the action "(1) take[s] something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, ... or (2) withhold[s] from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for a

8

promotion after a particular period of service." Id. (citations omitted). Therefore, the adverse act necessary to support Plaintiff's retaliation claim must have been substantial enough to result in a material disadvantage to him with respect to salary, grade or other objective terms and conditions of employment. Connell v. Bank of Boston, 924 F.2d 1169, 1179-80 (1st Cir. 1991); see also Tang v. State of Rhode Island, 163 F.3d 7, 12-13 (1st Cir. 1998).

Here, the plaintiff was not denied a significant term or condition of employment. Based on the plaintiff's failure to file a timely EEO complaint and the legitimate nondiscriminatory decision for not choosing plaintiff for a re-assignment to a Post of Duty in Brockton, coupled with the lack of an adverse change in employment, the defendant submits that Count I of the plaintiff's Complaint should be dismissed.

### B. The Defendant's Legitimate Non-Discriminatory Reasons for the Plaintiff's Allegation of Harassment and Hostile Work Environment Based on Retaliation in Count II.

Despite the numerous allegations that the plaintiff avers in Count II, the only allegations that were accepted for investigation by the EEOC occurred between June 2002 and January 2003. These allegations are as follows:

       1.     "On June 11, 2002 the Assistant Special Agent in Charge (ASAC) questions you about the presence of newspaper reporters at the mandatory firearms training site;

       2.     On June 17, 2002 the ASAC questions your possession of a membership pass to the firearms training facility;

9

3.  On June 24, 2002 a Supervisory Special Agent (SSA) (#1) referred to your Special Agent Report (SAR) as a "piece of crap";

4.  On August 5, 2002 SSA (#2) failed to complete your application package for vacancy announcement #CIM-02-LDP-ELP for the Leadership Development Program (LDP) which prevents you from competing for consideration for upcoming supervisory positions;

5.  On August 7, 2002 and January 30, 2003 the ASAC and SSA (#2) subjected you to negative comments and/or statements regarding your conduct and work performance;

6.  On December 12, 2002 the ASAC and SSA (#2) did not certify your eligibility for participation in the Leadership Candidate Identification Program (LCIP);

7.  On December 12, 2002 you were issued written counseling by SSA (#2) regarding parking your GOV in the basement of the JFK building and submitting false/inaccurate monthly reports;

8.  On January 29, 2003 SSA (#2) informed you that he would not be certifying you for the current LDP; and

9.  On January 21, 2003 you were issued written counseling by SSA (#2) regarding seized currency and coin."

(Exhibit 1, Investigation File pp. 3-4).

### 1.   McDONNELL DOUGLASS BURDEN SHIFTING STANDARD UNDER TITLE VII

Title VII claims are analyzed under the test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and two subsequent Supreme Court cases, Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981); and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993). Where, as here, there is no direct evidence of discrimination, McDonnell Douglas's well-known burden-shifting analysis applies. See, e.g., Mesnick, 950 F.2d at 823.

The employee bears the initial burden of raising an

10

inference of discrimination by making a prima facie showing of
four standardized elements suggestive of possible discrimination.
McDonnell Douglas, 411 U.S. at 802-805.  If an employee can make
such a prima facie showing, it is presumed that the employer
engaged in impermissible discrimination and the burden of
production shifts to the defendant.  St. Mary's Honor Center,
supra, 509 U.S. at 507; Udo v. Tomes, 54 F.3d 9, 12 (1st Cir.
1995); LeBlanc, 6 F.3d at 842.

The employer must then articulate a legitimate non-
discriminatory reason for the challenged conduct.  Texas Dept. of
Community Affairs v. Burdine, 450 U.S. at 255-256; Woods  v.
Friction Materials, Inc., 30 F.3d 255, 260 (1st Cir. 1994).  At
this stage, the employer's burden is merely one of production; in
discrimination cases, the burden of persuasion remains with the
plaintiff at all times.  St. Mary's Honor Center, 509 U.S. at
502; Woods, 30 F.3d at 260.

If the employer articulates a legitimate non-discriminatory
reason for its proposed suspension, the presumption established
by the prima facie showing "drops out of the picture."  St.
Mary's Honor Center, 509 U.S. at 507; Udo, 54 F.3d at 12.  At
that stage,

> to avoid summary judgment, the plaintiff must
> introduce sufficient evidence to support two
> findings: (1) that the employer's articulated
> reason is a pretext, and (2) that the true reason
> is discriminatory. ... While the plaintiff may
> rely on the same evidence to prove both
> pretext and discrimination, the evidence
> must be sufficient for a reasonable factfinder
> to infer that the employer's decision

11

. was motivated by discriminatory animus.

Udo, 54 F. 3d at 13 (citation omitted).

2. **The Defendant's Legitimate Non-discriminatory Reason for the Challenged Conduct.**

> **Allegation 1: On June 11, 2002, the Assistant Special Agent in Charge (ASAC) Peter Benevento questioned plaintiff about the presence of newspaper reporters at the mandatory firearms training site.**

The defendant herein incorporates Paragraph 15 of his Statement of Material Facts. ASAC Benevento's inquiry was warranted for maintaining an office protocol for the media. His desire to have the front office informed of all media activity is a legitimate non-discriminatory practice for any organization. It should also be noted that the plaintiff was not disciplined regarding this event.

> **Allegation 2: On June 17, 2002, ASAC Benevento questioned Plaintiff's possession of a membership pass to the firearms training facility.**

The defendant herein incorporates Paragraph 16 of his Statement of Material Facts. Once again, ASAC Benevento counseled the plaintiff on the proper office protocol for informing the front office before acting. The defendant contends that this type of counseling was legitimate and done in a non-discriminatory manner. The plaintiff was also not disciplined regarding this incident.

> **Allegation 3: On June 24, 2002, Supervisory Special Agent (SSA) Edward Delehanty[3] allegedly referred to**

---

[3]     SSA Delehanty was Plaintiff's acting supervisor during the last week of June 2002 (Ex. 1, IF p. 121)

12

**Plaintiff's Special Agent Report as a "piece of crap."**

The defendant herein incorporates Paragraph 17 of his Statement of Material Facts.  Although the plaintiff took exception to the criticism of his work, SSA Delehanty identified significant deficiencies and substandard aspects of the plaintiff's work.  The defendant submits that this type of critical feedback is essential in any organization, and was legitimate and non-discriminatory.

> **Allegation 4:** **On August 5, 2002 SSA Bruce Traina failed to complete and submit plaintiff's application package for vacancy announcement #CIM-02-LDP-ELP for the Leadership Development Program (LDP) which prevented the plaintiff from competing for consideration for upcoming supervisory positions.**

The defendant herein incorporates Paragraph 18 of his Statement of Material Facts.  The defendant submits that SSA Traina provided the plaintiff with a full explanation as to why submitting an application to a supervisor with less than one business day before it was due was unacceptable.  The plaintiff failed to allow sufficient time for his supervisor to adequately review his application, and thus the defendant would submit that the plaintiff's tardiness resulted in a legitimate non-discriminatory reason for the application not being approved.

> **Allegation 5:** **On August 7, 2002 ASAC Benevento and SSA subjected plaintiff to negative comments and/or statements regarding his conduct and work performance.**

The defendant herein incorporates Paragraph 19 of his

13

Statement of Material Facts. The defendant contends that the meeting held by SSA Traina and ASAC Benevento was to discuss the plaintiff's unprofessional and insubordinate behavior. The plaintiff was given concrete examples of how his behavior was inadequate. The reason for the meeting was to discuss performance issues, and these were legitimate non-discriminatory reasons for the meeting.

> **Allegation 6: On December 12, 2002, ASAC Benevento and SSA Traina did not certify plaintiff for eligibility for participation in the Leadership Candidacy Identification program (LCIP).**

The defendant herein incorporates Paragraph 20 of his Statement of Material Facts. The plaintiff's failure to be certified by SSA for eligibility for participation in the Leadership Candidacy Identification Program (LCIP) is a further indication of the plaintiff's tardy work ethic. The defendant has incorporated the his 56.1 Material Facts as further evidence of the shortcomings identified by the plaintiff's supervisors. The defendant submits that these areas identified by the plaintiff's supervisors are legitimate, non-discriminatory and well documented critiques of the plaintiff's work product.

> **Allegation 7: On December 12, 2002, plaintiff was issued written counseling by SSA Traina regarding parking his government owned vehicle (GOV) in the basement of the JFK building and submittingfalse/inaccurate monthly reports.**

The defendant herein incorporates Paragraph 21 of his Statement of Material Facts. The plaintiff was issued a

14

counseling memorandum because he deliberately ignored a directive
prohibiting him from parking his vehicle in the basement of the
JFK building, and because he incorrectly identified his license
plate number on his vehicle report for months. The defendant
contends that the action taken against the plaintiff was a
legitimate non-discriminatory decision based on the plaintiff's
non-compliance.

> **Allegation 8: On January 29, 2003, SSA Traina informed
> plaintiff that he would not be certifying him for the
> current LDP.**

The defendant herein incorporates Paragraph 22 of his
Statement of Material Facts. Given the various lapses in
judgment and documented disciplinary issues, the defendant
contends that he made a legitimate non-discriminatory
determination that the plaintiff was not suitable for management
as of January 29, 2003.

> **Allegation 9: On January 31, 2003, plaintiff
> was issued written counseling by SSA Traina
> regarding seized currency and coin.**

The defendant herein incorporates Paragraph 23 of his
Statement of Material Facts. The defendant counseled the
plaintiff for inappropriately handling currency and coins by not
informing his supervisor of the currency in an expeditious
fashion. Also, the plaintiff stored a large sum of currency at
his home over the weekend. It was determined that this course of
action by the plaintiff placed himself at risk for an Inspector
General investigation if the uncounted currency was either stolen

15

or destroyed by fire.  SSA Traina identified these practices as
being unacceptable.  The defendant contends that this type of
counseling is legitimate and necessary to maintain the integrity
of the Department of the Treasury.

**C.  Count III Alleging Disparate Treatment Based on
    Retaliation Cannot Be Sustained Because No Causal
    Connection Can Be Assumed Given The Lengthy Temporal
    Period Between The Protected Activity And The Alleged
    Adverse Employment Action.**

Under Title VII, the McDonnell Douglas burden-shifting
scheme governs a court's assessment of whether an employer may be
found liable for adverse actions taken against an employee
allegedly in retaliation for that employee's engaging in
protected activity.  Ruffino v. State Street Bank and Trust Co.,
908 F. Supp. 1019, 1044 (D. Mass. 1995);  McDonnell Douglas Corp.
v. Green, 411 U.S. 792, 802-804 (1993).  Under the three-stage
analysis established in McDonnell Douglas Corp., the plaintiff
must demonstrate, by a preponderance of the evidence, that a
rational factfinder could conclude that the adverse action was
taken for retaliatory reasons.  McDonnell Douglas Corp., 411 U.S.
at 802-804; Hazel v. U.S. Postmaster General, 7 F.3d 1, 3 (1st
Cir. 1993).

First, the plaintiff must make out a prima facie case of
retaliation demonstrating that: (1) he engaged in a protected
activity, known to the employer; (2) he suffered an adverse
employment action; and (3) there was a causal connection between
the protected activity and the adverse employment action.  Hazel,

16

7 F.3d at 4; Ruffino, 908 F. Supp. at 1044.

In the present case, to support his allegations of retaliation, the plaintiff states in Count III his Complaint that on diverse dates from April 19, 2004 through May 21, 2004 his application package for an ad hoc supervisory assignment was not reviewed; he was not reassigned to the Brockton Post of duty; he was denied a short-term supervisory acting assignment; and was preventing from participating in the LDP for supervisory positions.[4] The plaintiff had previously filed an EEO complaint on August 15, 2002, some twenty (20) months prior to these allegations.

Under the third requirement to establish a prima facie case of retaliation, the plaintiff must demonstrate a causal connection between the protected activity and the adverse employment action. McDonnell Douglas Corp., 411 U.S. at 802-804; Hazel, 7 F.3d at 3. An inference of retaliation may arise where "a showing of adverse action ... soon after the employee engages in protected activity specifically protected by section 704(a) of Title VII ... is indirect proof of a causal connection between the adverse action... and the activity because it is strongly suggestive of retaliation." Ruffino, 908 F. Supp. at 1044; Oliver v. Digital Equipment Corp., 846 F.2d 103, 110 (1st Cir. 1988).

---

[4]   It should be noted that the plaintiff is now alleging retaliatory behavior by different individuals including ASAC David Bergan and SSA Robert Howe.

17

The temporal period between the protected activity and the adverse employment action must not be lengthy, and if it is, no inference of causation is created. Woods v. Bentsen, 889 F. Supp. 179, 187 (E.D. Pa. 1995); Parrott v. Cheney, 748 F. Supp. 312, 318 (D. Md. 1989), aff'd, 914 F.2d 248 (4th Cir. 1990). The First Circuit has found time periods of nine months and two years as being too lengthy for a causal connection to be inferred. Other courts have held that if a time period of four months has elapsed after the protected activity without employer reprisal, no inference of causation is created. Woods, supra at 187; Mesnick v. General Electric Company, 950 F.2d 816, 828 (1st Cir. 1991)(nine months since plaintiff first enlisted the EEOC to the time he was fired was too long for a finding of causal connection); Hughes v. Derwinski, 967 F.2d 1168, 1174 (7th Cir. 1992)(disciplinary letter issued four months after discrimination charge filed not causally linked to employer action); Lees v. Case-Hoyt Corp., 779 F. Supp. 717, 727 (W.D.N.Y. 1991)(suspension four months after filing of discrimination complaint not causally linked to adverse employment action). Juarez v. Ameritech Mobile Communications, Inc., 746 F. Supp. 798 (N.D. Ill. 1990)(almost six months does not support an inference), aff'd, 957 F.2d 317 (7th Cir. 1992); Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986)(discharge four months after filing of discrimination charge not causally linked to adverse employer action); Jones v. Flagship International, 793 F.2d 714 (5th Cir. 1986)(no finding of causal connection even though plaintiff

18

terminated 10 weeks after filing EEO charge).

Here, the plaintiff filed a formal EEO complaint on August 15, 2002. These latest allegations occurred some twenty (20) months following his EEO complaint and involve new supervisors. The First Circuit has held that no causal connection can be drawn from adverse actions accruing nine months after the protected activity, let alone for a period of twenty months. Mesnick, 950 2d. at 828. Based on the lengthy temporal period between the protected activity (the plaintiff filing his EEO complaint) and the retaliatory allegations in Count III of the Complaint, no inference of retaliation can be drawn.

**CONCLUSION**

WHEREFORE, based on the arguments and authorities cited herein, the defendant's Motion for Summary Judgment should be allowed.

> JOHN SNOW, SECRETARY OF THE
> DEPARTMENT OF THE TREASURY,
>
> By his attorneys,
>
> MICHAEL J. SULLIVAN
> United States Attorney
>
> By:  /s/ Rayford A. Farquhar
>      RAYFORD A. FARQUHAR
>      Assistant U.S. Attorney
>      1 Courthouse Way, Suite 9200
>      Boston, MA 02109
>      (617) 748-3100

<u>CERTIFICATE OF SERVICE</u>

Suffolk,  ss.                    Boston, Massachusetts
                                 March 6, 2006

I, Rayford A. Farquhar, Assistant U.S. Attorney, do hereby certify that I have served a copy of the foregoing upon Anthony P. Sibilia, Pro Se, 10 Dean Street, Mansfield, MA 02048.

> /s/ Rayford A. Farquhar
> RAYFORD A. FARQUHAR
> Assistant U.S. Attorney

## Responses and Replies
1:05-cv-10096-PBS Sibilia v. Snow

### United States District Court

### District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Farquhar, Rayford entered on 3/6/2006 at 5:04 PM EST and filed on 3/6/2006

**Case Name:**       Sibilia v. Snow
**Case Number:**     1:05-cv-10096
**Filer:**           John W. Snow
**Document Number:** 27

**Docket Text:**
MEMORANDUM in Support re [26] MOTION for Summary Judgment filed by John W. Snow. (Attachments: # (1) # (2) # (3) # (4))(Farquhar, Rayford)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=3/6/2006] [FileNumber=1338831-0]
[77d8b9f95d0af5c1ba34bf015e5133c27c1b07e9fd4d200834ff896e0037aab04cad
0a2f60a22cacbd7ba080ccc5cc16080bbb3f5f82da83b7f7c0db3d7759d4]]
**Document description:**
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=3/6/2006] [FileNumber=1338831-1]
[60d2801a8fe633ccfcd80598ac0ec0736eb5c0ca1f06bc9398f96b56f1616ba9249c
63b317b4688375f30402c7fe691ef1085a74eee94b68449d33f1784e9774]]
**Document description:**
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=3/6/2006] [FileNumber=1338831-2]
[2519294dd3e32b33950acf4a668d461d9e065ff6ca415a4519e95af5d2391e48cec1
a2021362234625882496bd7a1956e99cdb74bea307ce96c6b8f6fe47da5e]]
**Document description:**
**Original filename:**yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=3/6/2006] [FileNumber=1338831-3]
[0615b343b4c68f35d1c189a16cfbe8d1226fb708ad85478d35becb23e445d9f72d3e
e8beaa05577468bab64b2eb76bb0480be2e8385d8afad5cffec20e8792d4]]
**Document description:**
**Original filename:**yes
**Electronic document Stamp:**

[STAMP dcecfStamp_ID=1029851931 [Date=3/6/2006] [FileNumber=1338831-4]
[da9e1b687aa157ec7df273a263b6954a55e88318451a912760627f18aca1abd17a4a
6d10474f34f02f0977b7edc54adedfedee0a3d0bc0f6e814af3661626776]]

**1:05-cv-10096 Notice will be electronically mailed to:**

Rayford A. Farquhar     rayford.farquhar@usdoj.gov, usama.ecf@usdoj.gov; ellen.souris@usdoj.gov

**1:05-cv-10096 Notice will not be electronically mailed to:**

Anthony P. Sibilia
10 Dean St
Mansfield, MA 02048

Leo Sorokin

# EXHIBIT 1

Complaint of Anthony Sibilia and
John W. Snow, Secretary of the Treasury
TD Case Number: 02-3230

## II.    DESCRIPTION OF INVESTIGATION

A. Name and Address of EEO Investigator

    Christine Reynolds, EEO Investigator
    Michael Reich, EEO Investigator (amendment)
    Treasury Complaint Center
    55 East Monroe Street-Suite 1735
    Chicago, IL  60603

B. Date(s) Case Received By EEO Investigator

    09/27/02 and 1/23/03

C. Date Investigative File Submitted By EEO Investigator

    11/4/02 and 2/3/03

D. Place(s) of Investigation

    Boston, MA

E. Dates of Investigation:

    October 2002 and January 2003

F. Issue(s) for Investigation:

    Whether you were subjected to harassment in retaliation for your prior EEO involvement. In support of your claim, you cite the following incidents which allegedly occurred between June 2002 and January 2003:

    1. On June 11, 2002 the Assistant Special Agent in Charge (ASAC) questioned you about the presence of newspaper reporters at the mandatory firearms training site;

    2. On June 17, 2002 the ASAC questioned your possession of a membership pass to the firearms training facility;

    3. On June 24, 2002 a Supervisory Special Agent (SSA) (#1) referred to your Special Agent Report (SAR) as a "piece of crap";

    4. On August 5, 2002 SSA (#2) failed to complete and submit your application package for vacancy announcement #CIM-02-LDP-ELP for the Leadership Development Program (LDP) which prevents you from competing for consideration for upcoming supervisory positions;

**PG 3**

Complaint of Anthony Sibilia and
John W. Snow, Secretary of the Treasury
TD Case Number: 02-3230

5. On August 7, 2002 and January 30, 2003 the ASAC and SSA (#2) subjected you to negative comments and/or statements regarding your conduct and work performance;

6. On December 12, 2002 the ASAC and SSA (#2) did not certify your eligibility for participation in the Leadership Candidate Identification Program (LCIP);

7. On December 12, 2002 you were issued written counseling by SSA (#2) regarding parking your GOV in the basement of the JFK building and submitting false/inaccurate monthly reports;

8. On January 29, 2003 SSA (#2) informed you that he would not be certifying you for the current LDP; and

9. On January 21, 2003 you were issued written counseling by SSA (#2) regarding seized currency and coin.

## SUMMARY OF INVESTIGATION

COMPLAINANT:       Anthony Sibilia

TD CASE NUMBER:    02-3230

ISSUE:         Whether the Complainant was subjected to harassment in retaliation for his prior EEO involvement. In support of his claim, he cites the following incidents which allegedly occurred between June 2002 and January 2003:

1) On June 11, 2002 the Assistant Special Agent in Charge (ASAC) questioned the Complainant about the presence of newspaper reporters at the mandatory firearms training site;

2) On June 17, 2002 the ASAC questioned the Complainant's possession of a membership pass to the firearms training facility;

3) On June 24, 2002 a Supervisory Special Agent (SSA) (#1) referred to the Complainant's Special Agent Report (SAR) as a "piece of crap";

4) On August 5, 2002 SSA (#2) failed to complete and submit the Complainant's application package for vacancy announcement #CIM-02-LDP-ELP for the Leadership Development Program (LDP) which prevents him from competing for consideration for upcoming supervisory positions;

5) On August 7, 2002 and January 30, 2003 that ASAC and/or SSA (#2) subjected the Complainant to negative comments and/or statements regarding his conduct and work performance;

6) On December 12, 2002 the ASAC and SSA (#2) did not certify the Complainant's eligibility for participation in the Leadership Candidate Identification Program (LCIP);

7) On December 12, 2002 the Complainant was issued written counseling by SSA (#2) regarding parking his GOV in the basement of the JFK building and submitting false/inaccurate monthly reports;

8) On January 29, 2003 SSA (#2) informed the Complainant that he would not be certifying him for the current LDP; and

9) On January 31, 2003 the Complainant was issued written counseling by SSA (#2) regarding seized currency and coin.

- The Complainant states he began his employment with the Internal Revenue Service (IRS) in July 1992. He states he has been in his current position as a GS-1811-13 Special Agent (SA) for a little over one year. The record shows that the Complainant works in the Criminal Investigation (CI) – Boston Field Office in Group 04-05. IF Vol. 1, Exhibit 9 & IF Vol. 2, Exhibit 20.

...ia Anthony P        (ATTACHMENT A)

From:        Delehanty Ed
Sent:        Wednesday, July 03, 2002 10:01 AM
To:          Sibilia Anthony P
Cc:          Benevento Peter R; Bellingreri Stephen A; Monahan Michael K; Traina Bruce R
Subject:     RE: ▇▇▇ SAR

Dear Tony:

I never called your report a "piece of crap". I did say it was not really an SAR at all, and basically useless except as an overview of the gambling charges that constitute the SUA.

I also didn't care about all of the reasons you have that the report was deficient in so many ways, and never asked you for excuses or explanations. I still don't care about that. I'm not going to be here long enough to have any input whatsoever into your annual evaluation. All I wanted was to have it in sufficient shape to get it approved before I left.

Anyway, thanks for making it your top priority now, and please get it to either me, Steve, or Bruce (depending upon who's the SSA at the time) as soon as you can.

        Ed Delehanty
        Supervisory Special Agent
        (617) 719-3604


        ——Original Message——
From: Sibilia Anthony P
Sent: Wednesday, July 03, 2002 9:25 AM
To: Delehanty Ed
Cc: Benevento Peter R; Bellingreri Stephen A; Monahan Michael K
Subject: RE:▇▇▇ SAR


Ed,

I understand the review process for a direct referral, I did not understand your statement that..."this SAR is supposed to go through the normal review process, and the SAR will need a lot more work." I wanted clarification that you understood my report was a direct referral, which obviously you do.

I recently talked to Steve regarding your comments below. Steve told me (for the first time) that he had the same concerns as you, regarding my report, although he stopped short at telling me my report was a "piece of crap" as you put it. Steve also told me that in order to support a money laundering conspiracy, I had to show deposits being made into various bank accounts, which I disagreed.

I e-mailed my plea-SAR to you on Monday morning at 8:26am, while I was on my way to the US Attorney's office, and on the first day of my vacation, which I spend (rent) at the Cape, which I lost (as I also did on Thursday). At 10:53am you sent me an e-mail addressing several issues that you had with my report (it seems you did a lot of review in just a little over two hours of work, I give you credit, did you have my report prior to 06/24/02?). When I contacted you on the telephone shortly thereafter, I explained to you that I intended for my report to be an informative narrative of my case, what I did not expect was to be told that my report was a "piece of crap" among other negative statements. Your original e-mail to me, was the first time I had been informed that "this SAR doesn't really address money laundering or a money laundering conspiracy at all." If Mike and/or Steve had similar problems with my plea-SAR (as it seemed, according to them, that they did) then I should have had the opportunity to address those issues, without the verbal accusations.

I would like some clarification on the following:

(1)What do you mean by a "financial analysis". Steve said that I have to show deposits into various bank accounts in order to prove a money laundering conspiracy. My evidence supporting the forfeitures (and likewise, money laundering) consists mainly of testimony.

(2)I do not understand your statements that..."For starters, the SAR not only doesn't address the elements of the conspiracy, it doesn't address the elements of any substantive offense. All the SAR does is list the elements of the conspiracy and says *the defendants conspired*. It doesn't describe how any of their actions or plans relate to a conspiracy at all." and "Basically, we all agree that this document is not really an SAR...it does not address the elements of the offense, and it does not introduce (or in this case even reference) any evidence of money laundering or a money laundering conspiracy. Nor does it contain any financial analysis, or even indicate how the amounts for the forfeiture were determined. It does serve as a general overview of the gambling operation, and does provide evidence of the specified unlawful activity."

1

point out in my plea-SAR, the elements of a money laundering conspiracy need not be explicit and the proof need not direct. The same is true for the proof of participation, proof of participation in the conspiracy may consist of circumstantial evidence and jurors are "neither required to divorce themselves from their common sense." The evidentiary testimony that I included in my report shows through circumstantial evidence that ▮▮▮▮ and ▮▮▮▮ were involved in an illegal gambling operation (the SUA) and furthermore, they attempted to conceal and disguise their illegal gambling operation (because of the clandestine nature of their illegal money laundering conspiracy no records were maintained).

I prepared my plea-SAR based on the testimony I had at that time. Importantly, I did not have the time to establish evidence relating to the forfeitures for the following reasons:

　　　1. The forfeiture amount originally agreed to by the defense was an amount determined by the AUSA, without my input.

　　　2. Their was a need to submit the AUSA's information regarding the charges because of forfeiture deadlines, as a result I did not have the testimony necessary for the agreed to forfeiture amount.

　　　3. As a result of the plea being dropped, there was a rush to bring several important witnesses before the grand jury to establish the forfeiture amounts, which had to be done by 06/28/02 the deadline regarding the forfeitures. We spent up till 06/28/02 accumulating such evidence.

(3)Your timetable of July 8th for the completion of the report is unrealistic to me, in that, I have not had any time to start such a task, I spent Monday and a good portion of yesterday addressing the needs of the AUSA's regarding the forfeitures, which have been completed. The report as you request will take several days to accomplish and will have to be done at the AUSA's office, as all of the evidence is located in the Strike Force offices. I will make the report my first priority and I will complete it as soon as possible. For your information, I will be on A/L on Friday, I will also need time next week to address/update an ongoing EEO issue.

　　　　　　　　　　　　　　　　　　Tony

----Original Message----
From: Delehanty Ed
Sent: Thursday, June 27, 2002 5:59 PM
To: Sibilia Anthony P
Cc: Benevento Peter R; Bellingreri Stephen A; Monahan Michael K
Subject: RE: ▮▮▮▮ SAR

Dear Tony:

　　　The normal review process for a direct referral like this is through the SSA, ASAC & SAC. I spoke to Pete about this and told him you already had obtained an indictment on money laundering this afternoon and were going to issue lis pendens & restraining orders on the accounts on Monday morning. Pete said he would like to see an SAR addressing the elements of the offense and supporting the forfeiture, and outlining the evidence you've developed. He'd also like to see a copy of the indictment.

　　　At your suggestion, I talked to Pete and Steve about their impressions of your SAR. Steve said he had previously expressed the same concerns to you about the SAR that I did, and Pete had no recollection of saying the SAR was fine except for the forfeiture section. In fact, he said that he had Mike Monahan look it over, and Mike also had the same problems with it that Steve and I had. I confirmed this with Mike.

　　　Basically, we all agree that this document is not really an SAR...it does not address the elements of the offense, and it does not introduce (or in this case even reference) any evidence of money laundering or a money laundering conspiracy. Nor does it contain any financial analysis, or even indicate how the amounts for the forfeiture were determined. It does serve as a general overview of the gambling operation, and does provide evidence of the specified unlawful activity.

　　　This SAR you must write doesn't have to be lengthy or exceptionally detailed, nor does it have to have any exhibits mounted, but it does have to:

　　　1.　　Address each and every element of the conspiracy, with reference to the evidence supporting each of these elements;

　　　2.　　Address each and every element of the underlying money laundering offense (what they conspired to do), with reference to the evidence supporting each of these elements;

　　　3.　　Contain a financial analysis suporting the amounts to be forfeited.

　　　I would imagine that you should be able to accomplish this in 5 to 10 additional pages of narrative, plus the financial analysis.

2

Since you testified about these issues before the grand jury today and are thoroughly familiar with the case, this wouldn't take you very long. Please make this your top priority and try to complete this task by July 8th, if possible. Thanks.

Ed Delehanty
Supervisory Special Agent
(617) 719-3604

----Original Message----
From: Sibilia Anthony P
Sent: Thursday, June 27, 2002 7:49 AM
To: Delehanty Ed
Subject: RE: ████ SAR

ED,

As I told you on Monday, at approximately 12:30pm, this SAR was originally intended as a plea agreement, as the SAR notes. However, subsequent to the submission of this SAR, the plea is off. I sent you the plea-SAR as an informative narrative of the case, since you are not familiar with this grand jury investigation and because I was not going have the time to sit with you this week. As I also told you, I intended to discuss with you time constraints that will inhibit my submitting a more complete SAR prior to indictment.

I would like to know what you mean by "this SAR is suppose to go through the normal review process", as I understand it, since this case is a Title 18, non tax, it does not go through the normal review process, rather, all that is needed is the SAIC's approval/signature.

                                                    Tony

----Original Message----
From: Delehanty Ed
Sent: Monday, June 24, 2002 10:53 AM
To: Sibilia Anthony P
Subject: FW: ████ SAR

De a r Tony:

Reference is made in a couple of places in the SAR to a plea agreement, specifically in the introduction and later in the asset forfeiture section. If there is indeed a signed plea agreement, then we need to address the elements of the offense, create an appendix listing the amount of money laundered (or that the defendants will stipulate to laundering) and cite some actual evidence.

Assuming the AUSA has the original evidence, or the grand jury transcripts or MOIs from you and the other law enforcement agencies are sufficient to support money laundering charges, it is probably not absolutely necessary to submit all of these exhibits and cite them by witness/exhibit number in a plea case.

However, if there is not a signed plea agreement, then this SAR is supposed to go through the normal review process, and the SAR will need a lot more work.

For starters, the SAR not only doesn't address the elements of the conspiracy, it doesn't address the elements of any substantive offense. All the SAR does is list the elements of the conspiracy and says the defendants conspired. It doesn't describe how any of their actions or plans relate to a conspiracy at all. Furthermore, 1956(h) states "Any person who conspires to commit any offense defined in this section or section 1957...". This means that we have to address the elements of that underlying offense in the SAR. For example, if 1956(a)(1)(A)(i) were the underlying offense, we'd have to have some evidence that the proceeds from the illegal VPMs (the SUA) were used to promote the illegal gambling operation, such as through the purchase of additional VPMs.

In fact, this SAR doesn't really address money laundering or a money laundering conspiracy at all. It merely describes the state gambling charges and various ancillary actions unrelated to money laundering.

If the AUSA wants to indict on Thursday and is willing to go with money laundering based on actual evidence that is not discernable from the SAR, then I guess that's up to him. However, the information contained in the SAR doesn't seem to support indictment.

Ed Delehanty
Supervisory Special Agent
(617) 719-3604

3

7 ┌┐ 8     ℕ) 58 6

─────inal Message──
. Sibilia Anthony P
.r: Monday, June 24, 2002 8:26 AM
ว: Delehanty Ed
Subject: FW: ████████ SAR

Ed, these documents relate to ████████ and ████████. The USAO's office intends to indict ████████ and ████ this Thursday. I sent this e-mail to Steve a couple weeks for approval and Pete wanted additional info. regarding the forfeitures. Although I am on vacation this week, I have to meet today and Thursday with the AUSA, regarding the indictments/forfeitures. I will contact you with more information, or you can call me if you want, 617-719-3625  Tony

PG 52

Lisa Culpepper, EEO Specialist

In re: TD-02-3230

Lisa, as we discussed over the telephone, I would like to amend my claim, TD-02-3230, that is currently assigned to you, which is ongoing. In particular, I would like to include two events that have taken place, which I believe shows further evidence of a continuing pattern of retaliation/harassment because of my participation in the EEO process. Importantly, these events include the same individuals/supervisors that I have named in my prior claims.

Claims:

1) Non-selection into the Leadership Candidate Identification Program (LCIP)
2) Counseling

1) Non-selection into the Leadership Candidate Identification Program (LCIP)

On 09/18/2002 the following announcement was announced via e-mail:

As you know, an integral part of the Leadership Development Program (LDP) is the Leadership Candidate Identification Program (LCIP). The purpose of this program is to identify and develop Criminal Investigation (CI) employees so that they can compete for entry-level management positions. This is the group from which one day CI will select its future leaders.

This Open Season Announcement will close on October 15, 2002.

SUBJECT:                              Open Season for Leadership Candidate Identification Program

During February of 2002, the Leadership Candidate Identification Program (LCIP) was established and an Open Season was announced. The purpose of this memo is to announce the second Open Season for this Program. Those Agents who applied and were accepted during the first Open Season need not reapply at this time.

**Opening Date: 09/16/02**

**Closing Date: 10/15/02**

This is an announcement for all Special Agents who have performed satisfactorily at the GS-13 level for a minimum of one (1) year and are interested in participating in the Criminal Investigation Leadership Candidate Identification Program. The purpose of this program is to identify and develop candidates to successfully compete for an entry-level management position in CI.

On 10/11/2002 I sent my completed application for entry into the LCIP to my supervisor, Bruce Traina, as required. A few days later I informed Traina that I had e-mailed my application for the LCIP for him to process. During that conversation, Traina told me that he wasn't sure what my motivation was for applying into the LCIP. He told me that I have had a lot of problems with other managers, including him. And informed me that he had met with Christine Reynolds regarding my EEO complaint as did the Peter Benevento, which he then concluded was my motivation for entry into the LCIP.

On 12/02/02 I sent Traina an e-mail asking him for the status of my LCIP application, since prior to that date I had been given no information relative to the status of my application. As a result, on 12/12/02, I had a prearranged meeting with SSA Traina

Rebuttal to Counseling Letter Dated 01/31/03

I would first like to memorialize the fact that I currently have two ongoing EEO complaints, which are in various stages of investigation, one is assigned to an EEO Administrative Judge in Washington D.C., and the other, in the formal investigation stage, with the EEOC in Chicago. Importantly, these complaints center around harassment and retaliation and identify my current SSA, Bruce Traina, as one of the individuals responsible for such discriminatory actions. Additionally, my repeated requests for transfer out of Traina's group, in an attempt to end the harassment and retaliation, have been refused. As a result, I find myself in a vulnerable position through no fault of my own, all because I participated in the EEO process.

I believe the reason I have received this letter, along with the other various negative actions recently taken against me by Traina, center around my participation in the EEO process. That is, I believe Traina is harassing me and retaliating against me because of my participation in the EEO process. The following time-line demonstrates my participation in the EEO process as well as what I believe, is a clear pattern of discriminatory actions:

06/03/02 - SSA Traina provides a statement to an EEO official relative to an EEO claim that I had filed in 10/2001. At this time Traina is not my supervisor.

07/09/02 – I file an EEO complaint against Traina, regarding among other things, negative statements that he made about me to an EEO official on 06/03/02.

07/28/02 - Traina becomes my supervisor.

08/01/02 - I inform Traina that I had filed an EEO complaint against him and that I did not want to be supervised by him.

08/05/02 - Traina fails to submit a package that I had submitted to him, for my participation into the Leadership Development Program (LDP), for supervisory positions. Traina informs me that he has not been my supervisor long enough to evaluate me for said program.

08/07/02 - During a meeting with Traina and Peter Benevento, ASAC, Traina insults and humiliates me, he stated that I am rude, inconsiderate, insubordinate, out of line and immature.

During this meeting I told Benevento that I could not work for Traina under the current conditions and that I did not want to be supervised by Traina. Benevento did not respond to my request, nor did he address my concerns.

08/13/02 - I have a meeting with Joseph Galasso, SAC. I had asked for the meeting to discuss the negative actions/harassment taken against me by Traina and Benevento. I

1

asked Galasso to be transferred from out of the direct supervision of Traina and Benevento. SAC Galasso informed me that he believes these negative actions are "petty issues" and tells me that he will discuss some of the "heavy handed tactics" that some of his supervisors may be using, with all of his supervisors. SAC Galasso tells me that no one was out to fire me and that if they were he has 51% of the vote, so it couldn't happen without his approval. SAC Galasso told me that he was not inclined to transfer me at this time without first trying to find out what the problem is between Traina, Benevento and myself. He added that he does not want to set a precedent of transferring agents without knowing the underlying problems, in order to try and resolve those problems.

12/12/02 - Traina does not certify my application for entry into the Leadership Candidate Identification Program (LCIP). He stated that I am not meeting the minimum standards to be considered for entry into that program.

12/12/02 - During my discussion with Traina on 12/12/02, he repeatedly insulted me, stating that I do not act like a grade 13 agent, I show animosity towards others and that I do not conduct myself in a professional manner.

12/12/02 - I receive a formal counseling letter from Traina for two work related issues, (1) Parking my government auto in the basement of the JFK without permission and (2) Filing inaccurate monthly administrative reports, because I transposed some of the numbers of my license plate on those effected reports.

01/30/2003 - Traina makes the following statement, which is heard by various individuals: I'm "just dealing with shitty agents." Traina makes that statement to a fellow agent, when asked how things were going. The agents that heard Traina's remarks believe he was referring to me, as do I.

01/31/2003 - Current formal counseling letter.

It should be noted that prior to SSA Traina becoming my supervisor on 07/28/02, I have never received a formalized counseling letter from any of my prior supervisors. Additionally during the last six years, I have consistently received above average performance appraisals from my supervisors, to include two performance awards and a manager's award.

As I have stated, I believe the true reason I received this counseling letter, as well as the other negative actions taken against me by SSA Traina, are due to the fact that I participated in the EEO process. It is apparent to me that as a result of my participation in the EEO process, Traina has taken a course of discriminatory actions against me, to include harassment and retaliation, in an attempt to punish and hurt me.

In regards to SSA Traina's counseling letter, I want to point out some important fact, it appears that Traina either intentionally failed to include these facts in his letter, or mistakenly neglected to include them.

2

First, the currency at issue was part of a large seizure (approximately $1,900,000.00) that the Weymouth P.D. executed, which was later adopted by CI/IRS in 1992. On two separate occasions I converted the majority of the seized currency into bank checks (totaling approximately $1,000,000.00). These transactions were accomplished at a bank that the Weymouth P.D. used for business. The remaining $7,068.75 had been stored at the Weymouth Police Department, the seizing agency, since approximately 07/1991. The $7,068.75 was not directly related to the other monies seized and therefore, I had thought that this money would not be adopted by the CI/IRS.

Although the $7,068.75 was part of the original seizures, it was not adopted by CI until sometime in late 1992. At that time, I was told by Supervisory Special Agent (SSA) Phil Hall, the Asset Forfeiture Coordinator, that CI was finally able to take control of the remaining currency and that I should start making arrangements to secure said currency. SSA Hall provided me no time frame or guidance for taking control of the money. At all relevant times, I kept SSA Hall and Chad Walker, an asset forfeiture assistant, apprised of any actions taken by me regarding the money in question. When I picked up the currency from the Weymouth P.D., I notified SSA Hall and Chad Walker that I had the money and that it was being stored in the shotgun safe next to my office/cubicle. At no time did SSA Hall and/or Chad Walker inform me that I should not be storing the currency in the safe or that the currency should be moved to the asset forfeiture safe. Additionally, on at least five different occasions during a span of weeks, I had separate conversations with SSA Hall and Walker, in which I specifically informed them, that the currency remained in the safe and that I had not converted it into bank checks. Again, at no time prior to converting the currency into checks, did SSA Hall and/or Walker inform me that I should not have stored the currency in the shotgun safe, or that there was an immediacy to convert the currency into checks. On the contrary, shortly after I stored the currency in the safe, I was told by Walker, that for asset forfeiture tracking reasons, he wanted me to obtain two checks for the currency instead of one, which delayed the transaction.

Additionally, on the date that I converted the currency into bank checks, I contacted SSA Hall and asked him, if he could give me the name of a bank that I could use to convert the currency into bank checks. I had been previously made aware that I could not convert currency into bank checks without first depositing the currency into an account. SSA Hall told me that he had no policy for converting currency into bank checks and only advised me to go to the bank that the Weymouth P.D. had previously used to convert the other currency. I ultimately had to contact Anne Dolaher, a budget analyst, on my own, who then had to contact someone at headquarters in order to get the proper approval to deposit the currency into one of CI's account in order to convert the currency into checks.

SSA Traina's letter makes it a point to state repeatedly among other things, that I have experience in the area of asset seizure and forfeiture. The forfeitures in question are the first seizures/forfeitures that I have conducted relative to my casework since I commenced my employment in 1992. Additionally, when I had previously converted the related currency into bank checks, it was accomplished with the assistance of the Weymouth P.D., at a bank where the currency was being stored, in a safe-deposit box.

3

Those transactions were conducted with the assistance of bank officials as a professional courtesy to the Weymouth P.D.

In SSA Traina's letter, he points out that I stored the currency in a shotgun safe and by doing so, I put the individuals that have access to said safe at risk of an inspector general investigation, if the uncounted currency and coin did not equal the amount that I had signed for. The safe in question contains several shotguns as well as ammunition, and the same logic that Traina uses can hold true to any equipment that is stored in that, or any other safe that has multiple users. In regards to this issue, I would like to address an incident that occurred several months ago, concerning similar circumstances. In particular, I was contacted by one of the BFO's ASAC's who told me that some CI agents from New York accompanied by U.S. Customs Special Agents needed to store gold, that was seized in their district. The ASAC informed me that SSA Hall was informed of the situation and it was determined that the gold would be stored in the pistol safe in the armory, instead of the asset forfeiture safe. Special Agent James Donahue and I are the only individuals that I know of, who have access to the safe in question. I did as I was instructed by the ASAC and later that day, I accompanied all of the agents and the ASAC to the armory, so that the gold could be stored over-night in the pistol safe, which it was. The gold was contained in a black duffel-type bag. Before the bag containing the gold was placed in the safe, it was opened/unzipped. The gold was contained in several clear plastic bags, each bag contained hundreds of small gold beads. The gold was never weighed and/or counted prior to placing it in the safe, nor was it weighed and/or counted when it was removed. Additionally, in regards to the chain-of-custody relative to the storage of the gold, no receipts were procured or requested by any of the parties involved. My participation regarding this incident was limited to what I was instructed to do, that is, provide the ASAC access to the pistol safe, which I did. It now appears to me that I too, may have been unknowingly put in a situation that was in violation of various policies/procedures as outlined in SSA Traina's letter. Likewise, I have been informed that similar situations may have occurred in the past that have also gone unnoticed.

I will now separately address each of the issues documented by Traina.

1.    Traina states that on 11/15/02, he was, for the first time informed that I had obtained $7,068.75 in currency from the Weymouth P.D. As a result, he states that at a minimum, this will negatively impact my evaluation.

I would like to submit an entry that Traina recorded on 10/22/02, regarding Form 6083, concerning the case in question.

10/22/2002 - CASE REVIEW. Cash (approximately $1 million) is in possession of CI. The case was obtained from state and local law enforcement authorities. SA Sibilia has contacted forfeiture employee Chad Walker concerning this issue. To date, only about $4,000 remains in the custody of the Weymouth Police Department. SA Sibilia has spoke to Chad Walker about the forms needed by the other agencies to make sharing requests. Nothing will happen to the case until the Costely and Case A SCIs are resolved.

4

PG 96

As you can see in Traina's entry on 10/22/02, I had previously informed him of the currency in question (I provided Traina with an approximate currency amount). Additionally, Traina's entry on this date is not specific and only provides the reader general information. The reason for this is because, at all relevant times, I had been dealing with the asset forfeiture coordinator, SSA Phil Hall, who was supervising the entire forfeiture process. Prior to 12/17/02, Traina had never asked me for any specific information dealing with any of the other currency that I converted. It wasn't an issue, because I was dealing directly with SSA Hall, as well as providing him (Traina) with general updates. Importantly, Traina became my supervisor on 07/28/02, according to his entry on Form 6083, on 10/22/02, it would appear that from 07/28/02 up until 10/22/02, I had no discussion with him relative to any of the forfeiture currency, or the case for that matter, which obviously is not the case. I have always kept Traina appraised of this case, as I have done with all of my other casework.

Additionally, I made an diary entry relative to the events that transpired on 11/15/02, which reported that I went to the Weymouth P.D. for monies seized. I did not conceal this information from anyone.

2.      Traina states that on 11/15/02 I picked up $7,068.75 in currency, which I didn't count, from the Weymouth P.D., which I signed for and received a property receipt. As a result, he states that at a minimum, this will negatively impact my evaluation.

The case in question is a joint case that is being conducted by CI, the FBI and primarily the Weymouth P.D. When I picked up the currency at the Weymouth P.D., the evidence custodian and the Capt. of the Detectives were also present and had informed me that the money had just been counted. The currency was contained in several letter-sized envelopes (each envelope was sealed), in a large brown paper bag. Each envelope had an amount and a letter designation on it. Out of professional courtesy I did not count the currency, instead we verified that the amounts listed on all of the envelopes totaled $7,068.75. We then sealed the brown paper bag.

Since I did not count the money, I did not tamper in any way with the bag that contained the currency and I stored the currency in a locked/secured safe, located in CI's office space. The safe in question houses shotguns for security reasons and as such, it is not used. Although other individuals have the combination to the safe, I am the only agent that has used the safe, relative to my duties as a firearms instructor. Additionally, I intended to count the currency with a witness prior to converting the currency into a check, which is what I had previously done regarding the other currency associated with this currency.

I would like to reference the previously identified incident concerning the ASAC and the storage of seized gold, which was not counted/weighed or signed for. Although optimally I do believe you should verify something before you sign for it, practically it is not always done. For instance, you may be more likely to sign for something from a trusted/reliable source, than one that is not. I am aware that various coordinators (i.e.,

5

Tech. Agents and Use of Force) are assigned equipment, which is stored in locations/POD's throughout New England, that they sign for on their personal inventory sheets, without first verifying what they may or may not be taking control of, thus putting themselves at risk of an inspector general investigation if such equipment where lost or stolen prior to verification. I believe that no negative actions have been taken against these individuals, I am treated differently.

3.    Traina states that after reviewing my monthly reports, he concludes that I drove to my residence after I picked up the currency at the Weymouth P.D. on 11/15/02. As a result, he states that at a minimum, this will negatively impact my evaluation.

On 12/17/02, Traina contacted me by telephone and informed me that he wanted to see me as soon as I arrived in the office. He did not tell me what he wanted to see me for. Upon entering Traina's office, he questioned me about the currency in question. Traina then ordered me to get the currency, as well as any documentation regarding the currency's chain of custody. Before I left Traina's office he stopped me and told me that he and SSA Michael Monahan were going to accompany me to the safe where the money was being stored as well as to my cubicle, in order to witness all of the events. Traina told me that they would then proceed back to his office to count the currency. Traina and Monahan then proceeded to follow me from Traina's office, to the safe and watched as I opened and removed the currency. They then witnessed me obtain the document receipt and followed me back to Traina's office. At which point I was ordered to count the currency by hand, out loud, in the presence of Traina and Monahan, as well as the entire office. All of these events took place in the open and in the presence of my co-workers. Traina also kept his door open at all times during this humiliating process. Subsequent to this incident, several agents who witnessed the events questioned me as to what I had done wrong. I believe that Traina took this course of action against me in a manner that he thought would most likely humiliate me in front of my co-workers, which he succeeded. This incident was the most degrading event that I had ever had to endure in my career as a Special Agent.

As previously stated, on 12/17/02, without any warning I had to endure the most humiliating event that had ever happened to me as a Special Agent. After I counted the currency, Traina started questioning me about the currency. I told Traina that I did not recall the exact events that took place on 11/15/02. Although I tried to explain to Traina that on 11/15/02, I went to the office in the morning, he did not believe me and stated that my diary entries and other related administrative reports that I submitted to him, showed something else. I recall that on that day I went to Attleboro to return some firearms equipment, I went to Attleboro because something that I had previously scheduled was postponed and so, I had some available time and re-arranged my schedule for that day. After I went to Attleboro, I proceeded to Weymouth to pick up the currency, which I did. I told Traina that after I picked up the money, I probably went to the office, because I wouldn't have wanted to store the currency at my residence.

6

Traina concludes that I stored the money at my residence, even though I told him that I do not believe this to be the case. Additionally, I explained to Traina that I wouldn't have taken an expense (regarding parking) on 11/15/02, because I would have parked in the JFK basement, since I would have been in the office for only a short period of time, to secure the currency in the shotgun safe. Traina assumes that I stored the currency at my residence and as a result, I put myself at risk of an inspector general investigation if the currency were to be destroyed by fire or stolen. Every night I have to store my serviced issued pistol as well as my government owned auto at my residence. Likewise, I sometimes bring my computer to my residence. According to Traina, each and every night I put myself at risk of an inspector general investigation, if my pistol, auto and/or computer where destroyed in a fire or stolen.

On 08/01/02 I had a meeting with SSA Traina. Although I informed Traina that I had filed an EEO claim against him during this meeting, I made that statement at the conclusion of this meeting. Before I told Traina that I had filed an EEO complaint against him, we discussed the possibility of me working out of the Brockton POD. Although the Brockton POD was closed in 1996, the POD remained in operation and is currently in the process of re-opening. Several agents including Traina, have been working out of the Brockton POD since approximately November 2001. Although Traina is assigned to a Boston POD he routinely works out of Brockton. On 08/01/02, Traina explained to me that he didn't want to keep moving his records from one POD to another and so, since he was scheduled for the Brockton assignment, he was temporarily storing boxes of his work records at his residence, in his kitchen. I didn't realize until now, that if this is true, according to Traina, he too might be subject to an inspector general investigation, if those records are destroyed in a fire or stolen. It also now occurs to me that if in fact this is true, these records may contain personnel files and/or grand jury information, which I would guess, would put him at an even greater risk of an inspector general investigation.

It should be noted that although Traina indicated to me that I too could start working out of the Brockton POD (which he did on 08/01/02), he later recanted this approval and told me that I could not work out of the Brockton POD. On 08/07/02, Train told me that I could not work out of the Brockton POD, importantly, Traina took this negative action against me, after I informed him that I had filed an EEO claim against him.

4.    Traina states, that I first notified him that I was storing about $7,000.00 in currency in the shotgun safe on 12/13/02. As a result, he states that I have put all of the individuals who have access the safe at risk of an inspector general investigation and at a minimum, this will have a negative impact my evaluation.

As I have previously discussed, Traina made the following entry regarding Form 6083 on 10/22/02:

10/22/2002 - CASE REVIEW. Cash (approximately $1 million) is in possession of CI. The case was obtained from state and local law enforcement authorities. SA Sibilia has contacted forfeiture employee Chad Walker concerning this issue. To date, only about

$4,000 remains in the custody of the Weymouth Police Department.  SA Sibilia has spoke to Chad Walker about the forms needed by the other agencies to make sharing requests.  Nothing will happen to the case until the Case A and Case A SCIs are resolved.

As you can see in Traina's entry on 10/22/02, I had previously informed him of the currency in question (I provided Traina with an approximate currency amount).  Additionally, Traina's entry on this date is not specific and only provides the reader general information.  The reason for this is because, at all relevant times, I had been dealing with the asset forfeiture coordinator, SSA Phil Hall, who was supervising the entire forfeiture process.  Prior to 12/02, Traina had never asked me for any specific information dealing with any of the other currency that I converted (approximately $1,000,000.00).  It wasn't an issue, because I was dealing directly with SSA Hall, as well as providing him (Traina) with general updates.  Importantly, Traina became my supervisor on 07/28/02, according to his entry on Form 6083, on 10/22/02, it would appear that from 07/28/02 up until 10/22/02, I had no discussion with him relative to any of the forfeiture currency, or the case for that matter, which is not the case, I have been working this case since 1991.  I have always kept all of my supervisors appraised of my casework, including Traina.

Additionally, I made an diary entry relative to the events that transpired on 11/15/02, which reported that I went to the Weymouth P.D. for monies seized.  I did not hide this information from anyone.

Furthermore, I have previously stated, that approximately several months ago I was contacted by one of the BFO's ASAC's who told me that some CI agents from New York accompanied by U.S. Customs Special Agents needed to store gold, that was seized in their district.  The ASAC informed me that SSA Hall was informed of the situation and it was determined that the gold would be stored in the pistol safe in the armory, instead of the asset forfeiture safe.  Special Agent James Donahue and I are the only individuals that I know of, who have access to the safe in question.  I did as I was instructed by the ASAC and later that day, I accompanied all of the agents and the ASAC to the armory, so that the gold could be stored over-night in the pistol safe, which it was.  The gold was contained in a black duffel-type bag.  Before the bag containing the gold was placed in the safe, it was opened/unzipped.  The gold was contained in several clear plastic bags, each bag contained hundreds of small gold beads.  The gold was never weighed and/or counted prior to placing it in the safe, nor was it weighed and/or counted when it was removed.  Additionally, in regards to the chain-of-custody, no receipts were procured or requested by any of the parties involved.  My participation regarding this incident was limited to what I was instructed to do, that is, provide the ASAC access to the pistol safe, which I did.  It now appears to me that I too, may have been unknowingly put in a situation that was in violation of various policies/procedures as outlined in SSA Traina's letter.  Likewise, James Donahue and I may have been put at risk of an inspector general investigation if that gold where destroyed in a fire or stolen.

5.      Traina states that although I properly documented the fact that I picked up the money from the Weymouth P.D. in my diary, Traina did not receive my diary

8

entries until 12/11/02. As a result, for some unknown reason to me, he states that this is an unacceptable practice of a GS-1811-13 and at a minimum, this will have a negative impact on my evaluation.

Prior to SSA Traina becoming my supervisor in July 2002, I had never been required to submit my diaries to any of my supervisors on a monthly basis. Normally, I would submit my diary entries during a workload review, which was conducted approximately twice per year. Because I was not accustomed to sending my diary reports to Traina, I was late on one occasion. Importantly, I know of other Special Agents who have also submitted diary entry's late. I believe these agents have not been subjected to the same negative actions that I am enduring. This is because I am being treated differently that similarly situated agents.

Traina is treating me differently than other Special Agents. On 12/12/02, I received a formal counseling letter from Traina for two work related issues, (1) Parking my government auto (GOV) in the basement of the JFK without permission and (2) for filing inaccurate monthly administrative reports, because I transposed some of the numbers of my license plate on those effected reports. Traina told me that no other agents in his group park their GOV's in the basement of the JFK without his permission. I have been told by a fellow agent, that this agent has been seen by Traina parking their GOV in the JFK basement without his (Traina's) permission and importantly, Traina has not counseled this agent in any way for failing to notify him. Again, this shows that Traina is treating me differently than other agents.

6.    Traina cites events that he has previously addressed and so, I too have previously addressed these same issues. For the sake to time, I will not re-address these issues.

7.    Traina states that on 12/17/02 I purchased two bank checks totaling, $7,069.25, which he and SSA Monahan witnessed me count (regarding the currency). Traina states that this amount was fifty-cents more than what I had signed for at the Weymouth P.D. Additionally, Traina states that I told him I would have gone back to the Weymouth P.D. if the currency counted did not agree to what I had signed for, in order to get the amount of currency and coin that was missing. Traina states that this is an unacceptable practice of a GS-1811-13 and at a minimum, this will have a negative impact on my evaluation.

Traina's comment that I informed him that I would have gone back to the Weymouth P.D. if the currency counted did not agree to what I had signed for, in order to get the amount of currency and coin that was missing, is absurd and not true. Additionally, I am insulted that Traina would think that I would just go back to the Weymouth P.D. to get money that might have been missing, which in this case did not happen and so I do not know why I am being counseled relative to something that I didn't do or say.

8.    Traina states that I informed him that I did not purchase bank checks when I picked the currency up at Weymouth because I didn't know the amounts seized at

9

**PG 101**

the two different locations. Additionally, Traina points out that on the document receipt that I signed on 11/15/02, the two amounts in question were reported. Traina states that my lack of attention to detail is an unacceptable practice for a GS-1811-13 and at a minimum, it will have a negative impact on my evaluation.

Traina's statements are not true, the reason that I did not obtain a bank check subsequent to picking the currency up at Weymouth was because I did not have a witness to count the currency, as I told Traina. Additionally, shortly after securing the currency in the safe, I was informed by Chad Walker that he wanted two checks instead of one, for asset forfeiture tracking reasons, which I also told Traina.

Lastly, although I had the two amounts recorded on my copy of the document receipt, I needed the detail supporting those two figures. That is, the money was seized at two different locations, at each location different amounts were taken from different places/containers (this is why the currency was contained in several envelopes with different notations on them, each notation represented the location/container where the currency was obtained). Since I did not count the currency, I wanted to ensure that if there was an incorrect amount, I would be able to determine what money was effected and from where (the location/container). The evidence custodian at the Weymouth P.D. had that information, which is what he used to count the currency. Since two checks were now requested for tracking purposes, I determined it would be necessary to obtain the detail relating to the currency, which I requested and eventually received from Weymouth. Importantly, when I counted the currency for Traina and Monahan, we verified the amounts on the envelopes to the additional documentation subsequently provided by the Weymouth P.D.

Traina states that my lack of attention to detail is an unacceptable practice for a GS-1811-13 and at a minimum, it will have a negative impact on my evaluation. I find that I am being counseled for something I didn't do. I requested the necessary documentation to support the amounts in question. I do not understand why Traina fails to realize the importance of the supporting information requested. Traina is aware that the money came from two different locations, which he readily states, if I had not obtained the additional information and the amounts didn't agree, I would not have known what locations and/or money was incorrect. It appears to me that although I requested the proper documentation relative to the two amounts in question, I am being punished for taking the necessary precautions. Again, I am held to a different standard.

9.    Traina states that on 01/14/02, I offered him another reason why I was unable to purchase a bank checks in a timely manner. He stated that I informed him that in order to obtain a bank check, you had to first deposit the currency into an account. Therefore, because I did not notify him of that reason it was an unacceptable practice for a GS-1811-13. Traina states that this is an unacceptable practice of a GS-1811-13 and at a minimum, it will have a negative impact on my evaluation.

When I stored the currency in the shotgun safe, I notified SSA Hall and Chad Walker. I informed SSA Hall and Walker that I had picked up the currency from the Weymouth

10

PG 102

P.D. and I had placed the currency in the shotgun safe in the office. SSA Hall was aware that I had the currency in question and that I was storing that currency in the shotgun safe. I had notified SSA Hall of my actions as I had notified him of my actions relative to the other currency that I had previously obtained from the Weymouth P.D. SSA Hall was made aware off all of these actions.

In order to convert currency into bank checks, the currency has to be deposited into an open account. SSA Hall was aware that I had the currency and at no time during the storage of the currency in the safe did he provide me with any guidance relative to converting the currency into checks, or that there was any kind of time constraints. Subsequently, SSA Hall informed me that he had no policy for converting currency into bank checks. I never concealed the fact that I had obtained seized currency. In fact, I had notified the proper individuals that handle such funds, seized asset. Additionally, I stored the currency in a safe, within CI's (alarmed) office space, until I counted the currency in order to obtain bank checks. I have had no formalized training relative to asset forfeiture procedures. I assume, as the asset forfeiture coordinator, SSA Hall has received training, or at the least has experience with similar situations.

In closing, I believe the reason I have received this letter, along with other various negative actions recently taken against me by Traina, center around my participation in the EEO process. I believe Traina is harassing me and retaliating against me because of my participation in the EEO process. It is obvious to me that Traina is spending a considerable amount of time in his endeavors. I have a family and my free time (away from work) is spent with my family, which I cherish. I took a substantial amount of time away from my family this weekend in order to address the above issues, which I will never get back. Traina told me that as a GS-1811-13, I have to manage my casework and the more time that I spend addressing EEO issues, will negatively affect my performance in this area, concerning my evaluation. Traina advised me that Special Agents are on LEAP and as such, I could spend as much time as I want addressing EEO issues outside of my normal working hours. I do not want to spend my free time addressing discriminatory actions taken against me by Traina. What I do want, is to be treated the same as every other agent in this field office, so that I too can concentrate on job related duties.

11



**DEPARTMENT OF THE TREASURY**
TREASURY COMPLAINT CENTER
55 EAST MONROE STREET, SUITE 1735
CHICAGO, IL 60603

FEB 1 2 2003

Anthony P. Sibilia
10 Dean Street
Mansfield, MA  02048

Complaint of Anthony P. Sibilia and
John W. Snow, Secretary of the Treasury
TD Case Number:  02-3230

Dear Mr. Sibilia:

This letter refers to the above referenced complaint of discrimination filed on August 15, 2002.

The Equal Employment Opportunity Commission (EEOC) regulations at 29 CFR §1614.106(d) permit a Complainant to amend a pending EEO complaint to add claims that are like or related to claim(s) raised in a pending complaint or pending complaints.

On January 31, 2003 via e-mail you requested that the above-referenced complaint be amended to include additional claims.  Based on our review of your request and in accordance with EEOC regulations at 1614.106(d), I am amending the pending complaint to include the new claims.  Therefore, the issues of the complaint to be investigated are:

Whether you were subjected to harassment in retaliation for your prior EEO involvement.  In support of your claim, you cite the following incidents which allegedly occurred between June 2002 and **January 2003**:

1.    On June 11, 2002 the Assistant Special Agent in Charge (ASAC) questioned you about the presence of newspaper reporters at the mandatory firearms training site;

2.    On June 17, 2002 the ASAC questioned your possession of a membership pass to the firearms training facility;

3.    On June 24, 2002 a Supervisory Special Agent (SSA) (#1) referred to your Special Agent Report (SAR) as a "piece of crap";

4.    On August 5, 2002 SSA (#2) failed to complete and submit your application package for vacancy announcement #CIM-02-

the time.  He is also the individual who originally established the relationship with AFS and procured the AFS facility.  He is the individual who contacts AFS to schedule periodic firearms qualifications at the facility.  He is the individual who arranges payment with AFS.    He is the primary contact with AFS.

It is not normal for the media to show up at a training site.  Such contacts are to be scheduled well in advance to ensure the Service is depicted in a favorable light.  Such contact must be coordinated through the Public Information Officer (PIO) and approved by upper management.  S/A Sibilia did contact the PIO, Stephen Bellingreri, when he was informed that the media was going to be present.  I believe S/A Sibilia was informed that the media was going to be present when he arrived at the training site (AFS) on the morning of the training.  The PIO informed me that S/A Sibilia was very insistent on allowing the training to be filmed.  The PIO informed me that he initially voiced his disapproval for the reasons cited above.  The PIO stated that S/A Sibilia persisted and that he reluctantly agreed.  S/A Sibilia should have used better judgement.  He should have told AFS and the reporters that the filming cannot take place.  As the lead Firearms Instructor he should have known better.  I believe S/A Sibilia's motivation in this matter was to please the owners of AFS and not disappoint them.  He was not considering the best interests of the Service.

It should be noted that at the meeting on June 11, 2002 SA Sibilia accepted the responsibility for his poor judgement and acknowledged that it was his fault for allowing the media to film the training.  SA Landon also accepted the responsibility and admitted it was wrong.

PG 132

3 of 12

PRB

SSA Traina talked to me about receiving SA Sibilia's application on the day before it was due. Neither of us felt we could recommend SA Sibilia for management. There was no need for SSA Traina to rush to review the incomplete application, because I would not, in good conscience, have approved it based on SA Sibilia's performance, judgement and attitude.

**Allegation Five** – *The Complainant alleges on August 7, 2002 ASAC Benevento and SSA Traina subjected him to negative comments and/or statements regarding his conduct and work performance.*

*The Complainant alleges during the meeting on August 7, 2002 he was told that he was "rude", "inconsiderate", "out of line", "insubordinate", and not a "team player". Describe the circumstances surrounding this claim. Specifically, what happened? Who called the meeting? Why was a meeting called? Who made what comments?*
The purpose of this meeting was to discuss certain issues with SA Sibilia regarding his performance and other actions. Myself and SSA Traina called the meeting. With one exception the comments above were made by SSA Traina. I, however did state to SA Sibilia he was not a team player and that this was one reason he is not considered for management.

The other comments were made relative to SA Sibilia's failure to follow procedures, the manual, and his assignment of an indoor parking space that he was not entitled to or authorized to assign.

*What witnesses have first hand knowledge of this event and what knowledge do they have?*
The only individuals present at this meeting were myself, SSA Traina, and SA Sibilia.

**Harassment**

*In the complaint, the Complainant alleges a hostile working environment. He provides the specified events of this complaint as examples of the alleged events which constituted harassment by management. He alleges*

monthly GOV reports. The Complainant responded by stating:

> "I have filed monthly reports relative to this GOV since approximately May 2002. At no time has anyone told me that I have incorrectly recorded my license plate number, if they had, I would have corrected the number immediately. I did not intend to mislead anyone..."

Were you aware of the above discussion between Mr. Traina and the Complainant? If so, please describe your knowledge and what involvement, if any, you had in the incidents. Include your understanding of the purpose of the discussion, the issues involved, and the Complainant was told.

Yes, I was aware of the discussion regarding Mr. Sibilia's monthly reports. We were trying to determine whose car was taking up a space in the basement parking area. We were unable to determine whose it was because the license plates didn't match any in our monthly reports. That's when we discovered that Mr. Sibilia's monthly reports contained the wrong license plate number for his assigned vehicle. Mr. Traina was to counsel him that he needed to be more accurate on his reports. Mr. Sibilia does not appear to be contesting that his reports contained erroneous information.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___02/03/03___ at ___Boston, MA___
             (Date)                (City/State)

(Signature Below)

_Peter R. Ben_

(Name/title/address)
Peter Benevento, Assistant Special Agent In Charge
Internal Revenue Service - Boston Field Office
25 New Sudbury Street
Boston, MA  02203

Phillips Hall, a former manager of his, concerning the same issue (Exhibit NN). He states to SSA Hall, "I regret any inconvenience that this has caused and I will no longer park in unauthorized space." SA Sibilia continued to do the complete opposite of this statement. I divide my time between the Boston, MA and Brockton, MA PODs. In an attempt to defuse the situation, and as a goodwill gesture to SA Sibilia, I formally gave him permission to use my parking space since he was Group 04-05's senior SA assigned to the Boston, MA POD. On August 5, 2002, I sent an e-mail to all Group 04-05 employees, with a courtesy copy to the SAC, ASAC and Boston-based SSAs, advising that I assigned my parking spot to SA Sibilia, and that no one but SA Sibilia was to use the spot without prior approval from me (Exhibit OO). This way, if anyone saw SA Sibilia parking in the JFK Federal Building, they'd know he had authorization to use it. The next day, SA Sibilia sent an e-mail to everyone in Group 04-05 saying that he would share the spot with other SAs, and they should notify him and they could set up a schedule (Exhibit OO). I was angered by this for a number of reasons: the spot was not his to give, I assigned it to SA Sibilia so that there would not be any question as to who has the right to use it, and SA Sibilia's message went directly against my message the previous day stating that no one else was to use the parking spot without my prior approval. This was a disruptive action, and one that SA Sibilia deliberately took without consulting me first. It was just another example of SA Sibilia's habit of doing what he pleased and expecting it to go

unquestioned. In addition, it caused me to send out an additional e-mail on the subject (Exhibit PP).

I was losing my patience with SA Sibilia's behavior, and I wanted to counsel him before things got any more out of control. I would have done the same for any employee who did this. None of my other SAs or employees go to these extremes. I contacted my boss, ASAC Benevento, and said I wanted to set up a meeting with SA Sibilia to clarify some issues and to lay out some ground rules, because things that would be obvious to others did not seem to be obvious to SA Sibilia. ASAC Benevento agreed, and I notified SA Sibilia via voice mail and e-mail to attend a meeting with me and ASAC Benevento on Wednesday, August 7, 2002 (Exhibit QQ).

At the meeting I told SA Sibilia that in my judgement his behavior has been rude, unprofessional and insubordinate, and I cited some of the examples listed above to demonstrate my point, including his issuing of the e-mail about the parking space, his statements to me that my prior affidavit for EEO was "totally out of line," his response to my e-mail about his LDP application, and his failure to correct his incomplete SAR. I told SA Sibilia he should come and talk to me, be a team player like everyone else in the group, rather than avoiding contact with me or being inconsiderate by sending me last minute e-mails. ASAC Benevento asked SA Sibilia if there were other issues outside of work that were driving him to these extremes at the office. SA Sibilia's attitude was nasty and adversarial, and he didn't offer much in his own defense. I told him that I wanted to set things straight and start fresh so that we wouldn't keep having these

problems. SA Sibilia made a comment to the effect of "I know what this is all about," but he did not explain what he meant. SA Sibilia said he wanted to have a meeting with the new SAC, Galasso, and ASAC Benevento and I told him that he should request one. SA Sibilia did not seem receptive to what we were saying, but we restated that he should try to be more communicative, and he should talk to me if he had concerns. At a minimum, he should advise or consult his managers when these situations arise.

The next thing I heard was that he was filing another EEO complaint against me. I did not call this meeting or make the statements I made to harass SA Sibilia. I saw an employee with a problem, and as his new manager, I wanted to set things straight right from the outset and explain what I expect from him. My hope was that SA Sibilia would understand that a number of his actions have been inappropriate and were causing problems for him, his managers, and the Service.

**What witnesses have first hand knowledge of this event and what knowledge do they have?**
    ASAC Benevento, SA Sibilia and I were the only ones at the meeting.

**Harassment**

*In the complaint, the Complainant alleges a hostile working environment. He provides the specified events of this complaint as examples of the alleged events which constituted harassment by management. He alleges that management is harassing him as a direct result of his filing an EEO complaint. Did the Complainant demonstrate that your behavior or actions were unwelcome, harassing or unacceptable? If so, please explain.*
    Except in the case where SA Sibilia told me he was filing an EEO complaint against me (i.e. he didn't like what I said in my affidavit for his prior EEO complaint and said I was "totally out of line"), he did not indicate that he thought

20 of 24

made the statements attributed to you by the Complainant.

There are two supervisory developmental programs in CI, the LDP and the LCIP. The LDP is a national program and the LCIP is a local program that is generally announced every 6 to 12 months. CI requires that in order to be considered for entry level supervisory positions under the LDP, an applicant must be a participant in the LCIP.

I don't consider SA Sibilia's application for the LCIP to have been timely based on our prior discussions. I became SA Sibilia's supervisor on Sunday, July 28, 2002 and shortly after that, he e-mailed to me an application for the LDP, giving me only one business day to review it. At the time, I told him that this was insufficient time for me to review an application like that and he agreed in the future he would give me advance notice of his intention to apply for such a program. He also agreed to submit his applications earlier than the last day under an announcement. This issue is explained in more detail on pages 14 - 16 of the Affidavit I signed on Friday, November 8, 2002.

SA Sibilia e-mailed his application for the LCIP to me on Friday , October 11, 2002 (Exhibit XX). The following Monday was a federal holiday (Columbus Day) and the paperwork was due on Tuesday, October 15, 2002. He had done exactly what he'd agreed not to do during a meeting with my supervisor, Assistant Special Agent in Charge (ASAC) Peter R. Benevento, and me on Wednesday, August 7, 2002. On Wednesday, October 16, 2002 SA Sibilia asked if I'd seen his e-mail and application. I said that I had not and I was unaware that he had sent it to me. SA Sibilia demanded to know why I had not forwarded his paperwork considering the due date was the previous day. I told SA Sibilia he did not verbally warn me he would be e-mailing his application to me as to provide me with a "heads-up" as he had previously agreed to do. Additionally, I told him that during the past few days I was very busy, including preparing for and meeting with an EEO investigator concerning his complaint he filed against me. That would have been my only reference to his pending complaint. I told him I would review his e-mail message later that day but at this time I consider it to be a late submission. I also asked him that in order for me to better understand his written application, what was his major motivation for applying to the LCIP. SA Sibilia appeared to be offended by the question and did not answer it. I further explained to SA Sibilia that it was a question asked of myself when I first expressed an interest in a management career and I believe it to be an important question. I also reminded SA Sibilia that he and I were probably asked a similar question (So why do you want to be a SA?) when applying for employment with CI. I still did not get an answer to my question from SA Sibilia. As I stated in page 23 of the Affidavit I signed on Friday, November 8, 2002, in my judgement, SA Sibilia purposely sent the LCIP paperwork to me late in order to create another issue between us.

I often get many e-mail messages each day, but later that day I located his e-

**12, 2002 discussion I had with SA Sibilia regarding the reasons for his non-certification for the LCIP.**

> 2. Was the Complainant "certified" for the LCI Program?  Please explain why you rated the Complainant as you did for his LCIP application.

I did not give SA Sibilia written feedback on his LCIP application, but I did prepare my own notes ("Reminders") on the issues I wanted to discuss with him (Exhibit BBB).  I wouldn't normally do that, but I've found that with SA Sibilia, he tends to argue about everything, and I felt I needed to have notes so I could make sure I provided guidance to him on all the necessary points.  I have provided the EEO Investigator with a copy of my notes (Exhibit BBB).

I told SA Sibilia that his LCIP package I originally received was incomplete and when completed late, as mentioned above.  In addition I provided SA Sibilia with information and examples on why he was not certified as ready for the LCIP and went down the list of competencies on the "Certificate of Eligibility":

Adaptability - I told him his write-up for the application was good, but he has had some problems in this area.  At the time he was informed he could no longer work from the Brockton, MA POD and needed to report to his official POD of Boston, MA he blew up at me.  I didn't think this was a good example of adaptability. This issue is explained in more detail on page 2 of the Affidavit I signed on Friday, November 8, 2002.

Teamwork - I told him that he never responds to my requests on time or keeps me informed, both less than acceptable examples of teamwork.

Customer Focus - I told him that his write-up was poor and he needed to develop this item further.

Problem Solving - I told him his write-up was good but he and I were still discussing the same issues as when I became his supervisor.

Technical Credibility - I told him that the only major work of his that I'd seen was a Special Agent's Report (SAR) and I previously told him that I didn't feel it was a good example of GS-1811-13 work.

Partnering - SA Sibilia had gotten into an "e-mail war" with another SA, and I told him that I didn't think that indicated good partnering skills.  This issue is also discussed on page 17 of the Affidavit I signed on Friday, November 8, 2002.

Communications - SA Sibilia doesn't communicate with me by talking directly to me; rather he communicates almost entirely by e-mail in order to document our communications.  Nearly everything has to be in writing; I've never had an employee like this before.  I told him that we have to be able to speak with each other, that everything can't be done via e-mail.  I consider this to be a serious weakness in SA Sibilia's

performance and told him that.

Investigative Theory, Criminal Investigation, Organizational Knowledge & Tax Administration - SA Sibilia's write-up lumped these last competencies together making it difficult to address each one properly and individually. The only item I had to rely on was the above-mentioned SAR. SA Sibilia said nothing at all about Organizational Knowledge and in the five (5) months under my supervision, I don't think he did anything indicating involvement or knowledge with the other IRS Divisions and functions. Based on the lack of demonstrated ability, I couldn't certify his readiness in these competencies.

In summary, during the Thursday, December 12, 2002 meeting, I provided oral feedback to SA Sibilia on his application, including the above specifics. At the end of the discussion SA Sibilia stated to me he would never apply for management again. Subsequent to the meeting, SA Sibilia has refused to sign the "Certificate of Eligibility" (Exhibit CCC). This has prevented us from coming to an agreement on a starting point in order for me to provide SA Sibilia with additional guidance on ways to improve his performance on the required competencies.

3. The Complainant has stated that he received a counseling memo from you concerning parking and monthly reports; he submitted a "Rebuttal to Memorandum dated 12/12/02…In Regards to Parking and Monthly Reports." In his rebuttal, the Complainant denied that he had been "repeatedly informed" that he had been "ignoring a directive" issued to the employees in the group about parking GOVs. He further states that he learned of this parking policy via an email on 8/7/02 and that this was the only time he was informed of the policy.

The Complainant also states that during the counseling, you told him he could have avoided the parking problem if he had accepted your prior offer to park the Complainant's GOV in your assigned place in the JFK building. The Complainant stated:

> "SSA Traina lists a corrective action, which I need to follow to resolve this issue. SSA Traina states, 'You are prohibited from parking your assigned GOV in the basement of the JFK Federal Building with (sic) my prior permission.' This corrective action is not clear to me. Furthermore, SSA Traina has failed to follow his own directive, which states, 'The employee(s) found to be in violation of the policy will be counseled at which time I will explain to the employee(s) the penalties associated with future violations.' During my counseling, SSA Traina did not explain to me the penalties associated with future violation."

Did you have a counseling meeting with the Complainant on 12/12/02 which you confirmed with a counseling memo? If so, describe the meeting you had with the Complainant, including the purpose of the discussion, the issues involved, and what you told him. Please address the Complainant's characterization of the discussion and indicate whether or not you made the statements attributed to you by the Complainant.

Yes, I had a counseling meeting with SA Sibilia on Thursday, December 12,

inappropriate and beyond his authority and I took the parking space back from him. The following day I issued an e-mail to the same audience per my Monday, August 5, 2002 e-mail, reiterating who was authorized to park in the basement of the JKF Federal Building (Exhibit PP).

In my judgement, SA Sibilia appears to want his own way all the time and seems to thrive on turmoil. I have no other explanation as to why he behaves the way he does. His prior managers had told him about not parking in the basement of the JFK Federal Building; this was not a new issue (Exhibit NN). Other people who had permission to park in the building had told me they frequently saw him parked there.

> 4. The Complainant has stated that in the 12/12/02 counseling meeting, you told him that he has filed "false/inaccurate monthly reports." He also says that you explained that he had incorrectly listed his GOV license plate on his monthly GOV reports. He responded by stating:
>
>> "I have filed monthly reports relative to this GOV since approximately May 2002. At no time has anyone told me that I have incorrectly recorded my license plate number, if they had, I would have corrected the number immediately. I did not intend to mislead anyone…"
>
> Please describe in detail the conversation you had with the Complainant regarding the accuracy of his monthly reports.

All SAs are assigned GOVs and each person has to file two monthly reports on the GOV; one deals with expenses and the other is a vehicle log reporting instances of commuting (home to office and office to home) and the mileage associated with the commuting. Reports are all electronically submitted and filed and include the vehicle make, model, year, license plate number, and employee name.

Over a period of about five months, on different occasions I noticed a black 2002 Chevrolet Blazer (Blazer) parked in CI's area in the basement of the JFK Federal Building and it puzzled me because I didn't know anyone assigned a black Blazer besides SA Sibilia. Eventually I checked the license plate number of "4781 PY" against Group 04-05's electronic administrative files that contained the vehicle reports, but didn't find a match for any of the group's SAs. SA Sibilia reported "781IPY" on his vehicle reports. At a later date, I went to our property clerk and the employee said the license plate number didn't match any of our vehicles. A few days later, I learned that after the SAC had pulled into the basement of the JFK Federal Building and could not park his assigned GOV because all of CI's parking spaces were full, he radioed the CI office upstairs to find out what was going on. It was reported that SA Sibilia was subsequently seen bolting from the office and then seen rearranging GOVs in the basement. Upon learning of these events I requested a further search by the property clerk and the employee concluded the black Chevrolet blazer with license plate number "4781 PY" was assigned to SA Sibilia. For months, I had thought it was

someone else's vehicle and would have certainly brought up the parking issue earlier if I'd know it was his assigned GOV.

Before I prepared the counseling memorandum I contacted a CI Labor Relations (LR) specialist for guidance. Following the LR specialist's advice, I later completed the counseling memorandum and in person I provided it to ASAC Benevento for review. Upon his permission I then counseled SA Sibilia and confirmed it in writing on Thursday, December 12, 2002 (Exhibits BBB & DDD). The counseling memorandum was issued because he ignored a directive prohibiting him from parking in the basement of the JFK Federal Building and because he had incorrectly identified his license plate number on the vehicle reports for months. As a GS-13 SA, it's his obligation to file accurate reports, including GOV reports, not to wait until someone else notes an error and corrects him.

On Wednesday, December 18, 2002 I e-mailed a final copy of the counseling memorandum to the LR specialist with a "cc" to ASAC Benevento (Exhibit EEE). Shortly thereafter I was made aware of my aforementioned typographical error and corrected it with SA Sibilia on Thursday, December 19, 2002.

> 5. The Complainant has stated that in the email and a meeting 1/31/03, you will not certify his eligibility for the LDP (Leadership Development Program). Please describe the circumstances related to the Complainant's LDP application. Did you have meeting to discuss this on 1/31/03? Address the Complainant's characterization of the discussion and indicate whether or not you made the statements attributed to you by the Complainant.

In an e-mail message to me on Friday, January 24, 2003, SA Sibilia asked me if he needed to be in the LCIP in order to apply for the LDP and two other questions (Exhibit FFF). I responded to him on Wednesday, January 29, 2003 and said to him that to date, in my judgement, his level of readiness has not changed since he applied for the LCIP and that we should schedule a meeting to discuss the LDP and I answered his other two questions (Exhibit FFF). In this e-mail I also scheduled a meeting with him on Friday, January 31, 2003.

On Thursday, January 23, 2003 I sent a separate e-mail to every Group 04-05 SA, to include SA Sibilia, that contained attachments of their latest case reviews concerning their active workloads (Exhibit GGG). In response to my e-mail message, on Friday, January 24, 2003 SA Sibilia sent to me an e-mail that asked questions concerning one of his assigned investigation (Exhibit GGG). His e-mail message also contained an inaccurate interpretation of comments I recorded in Form 6083 (SSA's Investigation Progress Record) concerning the investigation in question. The comments he questioned is as follows: "SSA Traina reviewed the SAR and related paperwork, made corrections, and it [sic] submitted it to ASAC Peter Benevento for review and approval." In a follow-up to his message, on Wednesday, January 29, 2003 I sent an e-mail to SA Sibilia explaining the following issues (Exhibit GGG). I said at the close of an

February 27, 2002 via an e-mail message to all CI Boston Field Office GS-1811s from SSA Dennis J. Wlodyka, the administrator of the LCIP for the CI Boston Field Office (Exhibit III-A).

- SA Sibilia's e-mail message of January 23, 2003 - "Case Reviews" (Exhibits GGG & HHH) (Please note the date is incorrect on Exhibit HHH; the correct date is January 24, 2003 per Exhibit GGG.) I explained to SA Sibilia that he asked questions concerning my managerial oversight of a particular investigation assigned to him and I attempted to provide him with feedback in my January 29, 2003 e-mail message to him (Exhibit GGG).

- SA Sibilia's e-mail message of January 30, 2003 - "FW: Case Reviews" (Exhibits GGG & HHH). I explained to him that my managerial oversight of his assigned investigations is not harassment, that he should be spending more time on "direct investigative time," that this e-mail message to me was disrespectful and insubordinate. For example he was disrespectful because if needed my boss (ASAC Benevento) will critique my Forms 6083, not him and insubordinate because he sent a "cc" of his e-mail to SAC Galasso, my boss's (ASAC Benevento) boss. I previously asked SA Sibilia to follow the chain of command in a Thursday, December 19, 2002 e-mail message of which I provided him with a hardcopy (Exhibit JJJ). I also explained to him the message will have a negative impact on my evaluation of his performance in particular CJEs.

- Investigative issues (Exhibit HHH) - These are not germane to this Affidavit.

- Counsel SA Sibilia concerning the currency and coin issue (Exhibit HHH) - Please refer to the next section of this Affidavit for more details.

6. The complainant alleges that your memo dated 1/31/03 (Subject: Seized Currency and Coin) shows a "continuing pattern of harassment/retaliation" and that whatever he submits to you is "scrutinized and used against (him) negatively." Please address the Complainant's allegation and explain the reason for the memo.

Prior to issuing the counseling memorandum concerning the subject of "Seized Coin and Currency" to SA Sibilia on Friday, January 31, 2003 there were a number of things I needed to accomplish. I first learned that SA Sibilia had a large amount of cash in his possession on Friday, December 13, 2002. I was able to consult with ASAC Benevento on Monday, December 16, 2002 and we determined I needed to obtain all the facts concerning this very serious matter. By reviewing administrative and investigative documents and speaking to both SA Sibilia and SSA Hall at least a couple of times each I believe I was able to develop an accurate chronology of events. I concluded that SA Sibilia's

page 10 of 13 pages

Exhibit O        Bruce Traina

**Benevento Peter R**

From:       Delehanty Ed
Sent:       Wednesday, July 03, 2002 10:01 AM
To:         Sibilia Anthony P
Cc:         Benevento Peter R; Bellingreri Stephen A; Monahan Michael K; Traina Bruce R
Subject:    RE: ███████ SAR

Dear Tony;

     I never called your report a "piece of crap". I did say it was not really an SAR at all, and basically useless except as an overview of the gambling charges that constitute the SUA.

     I also didn't care about all of the reasons you have that the report was deficient in so many ways, and never asked you for excuses or explanations. I still don't care about that. I'm not going to be here long enough to have any input whatsoever into your annual evaluation. All I wanted was to have it in sufficient shape to get it approved before I left.

     Anyway, thanks for making it your top priority now, and please get it to either me, Steve, or Bruce (depending upon who's the SSA at the time) as soon as you can.

     Ed Delehanty
Supervisory Special Agent
    (617) 719-3604

-----Original Message-----
From: Sibilia Anthony P
Sent: Wednesday, July 03, 2002 9:25 AM
To: Delehanty Ed
Cc: Benevento Peter R; Bellingreri Stephen A; Monahan Michael K
Subject: RE:█████ SAR

Ed,

I understand the review process for a direct referral, I did not understand your statement that..."this SAR is supposed to go through the normal review process, and the SAR will need a lot more work." I wanted clarification that you understood my report was a direct referral, which obviously you do.

I recently talked to Steve regarding your comments below. Steve told me (for the first time) that he had the same concerns as you, regarding my report, although he stopped short at telling me my report was a "piece of crap" as you put it. Steve also told me that in order to support a money laundering conspiracy, I had to show deposits being made into various bank accounts, which I disagreed.

I e-mailed my plea-SAR to you on Monday morning at 8:26am, while I was on my way to the US Attorney's office, and on the first day of my vacation, which I spend (rent) at the Cape, which I lost (as I also did on Thursday). At 10:53am you sent me an e-mail addressing several issues that you had with my report (it seems you did a lot of review in just a little over two hours of work, I give you credit, did you have my report prior to 06/24/02?). When I contacted you on the telephone shortly thereafter, I explained to you that I intended for my report to be an informative narrative of my case, what I did not expect was to be told that my report was a "piece of crap" among other negative statements. Your original e-mail to me, was the first time I had been informed that "this SAR doesn't really address money laundering or a money laundering conspiracy at all." If Mike and/or Steve had similar problems with my plea-SAR (as it seemed, according to them, that they did) then I should have had the opportunity to address those issues, without the verbal accusations.

I would like some clarification on the following:

**PG 400**

(1)What do you mean by a "financial analysis". Steve said that I have to show deposits into various bank accounts in order to prove a money laundering conspiracy. My evidence supporting the forfeitures (and likewise, money laundering) consists mainly of testimony.

(2)I do not understand your statements that..."For starters, the SAR not only doesn't address the elements of the

conspiracy, it doesn't address the elements of any substantive offense. All the SAR does is list the elements of the conspiracy and says the defendants conspired. It doesn't describe how any of their actions or plans relate to a conspiracy at all." and "Basically, we all agree that this document is not really an SAR...it does not address the elements of the offense, and it does not introduce (or in this case even reference) any evidence of money laundering or a money aundering conspiracy. Nor does it contain any financial analysis, or even indicate how the amounts for the forfeiture were determined. It does serve as a general overview of the gambling operation, and does provide evidence of the specified unlawful activity."

As I point out in my plea-SAR, the elements of a money laundering conspiracy need not be explicit and the proof need not be direct. The same is true for the proof of participation, proof of participation in the conspiracy may consist of circumstantial evidence and jurors are "neither required to divorce themselves from their common sense." The evidentiary testimony that I included in my report shows through circumstantial evidence that ███████ and ███████ were involved in an illegal gambling operation (the SUA) and furthermore, they attempted to conceal and disguise their illegal gambling operation (because of the clandestine nature of their illegal money laundering conspiracy no records were maintained).

I prepared my plea-SAR based on the testimony I had at that time. Importantly, I did not have the time to establish evidence relating to the forfeitures for the following reasons:

      1. The forfeiture amount originally agreed to by the defense was an amount determined by the AUSA, without my input.

      2. Their was a need to submit the AUSA's information regarding the charges because of forfeiture deadlines, as a result I did not have the testimony necessary for the agreed to forfeiture amount.

      3. As a result of the plea being dropped, there was a rush to bring several important witnesses before the grand jury to establish the forfeiture amounts, which had to be done by 06/28/02 the deadline regarding the forfeitures. We spent up till 06/28/02 accumulating such evidence.

(3)Your timetable of July 8th for the completion of the report is unrealistic to me, in that, I have not had any time to start such a task, I spent Monday and a good portion of yesterday addressing the needs of the AUSA's regarding the forfeitures, which have been completed. The report as you request will take several days to accomplish and will have to be done at the AUSA's office, as all of the evidence is located in the Strike Force offices. I will make the report my first priority and I will complete it as soon as possible. For your information, I will be on A/L on Friday, I will also need time next week to address/update an ongoing EEO issue.

                        Tony

-----Original Message-----
From: Delehanty Ed
Sent: Thursday, June 27, 2002 5:59 PM
To: Sibilia Anthony P
Cc: Benevento Peter R; Bellingreri Stephen A; Monahan Michael K
Subject: RE: ███████ SAR

PG 401

Dear Tony;

      The normal review process for a direct referral like this is through the SSA, ASAC & SAC. I spoke to Pete about this and told him you already had obtained an indictment on money laundering and were going to issue lis pendens & restraining orders on the accounts on Monday morning. Pete said he would like to see an SAR addressing the elements of the offense and supporting the forfeiture, and outlining the evidence you've developed. He'd also like to see a copy of the indictment.

      At your suggestion, I talked to Pete and Steve about their impressions of your SAR. Steve said he had previously expressed the same concerns to you about the SAR that I did, and Pete had no recollection of saying the SAR was fine except for the forfeiture section. In fact, he said that he had Mike Monahan look it over, and Mike also had the same problems with it that Steve and I had. I confirmed this with Mike.

      Basically, we all agree that this document is not really an SAR...it does not address the elements of the offense, and it does not introduce (or in this case even reference) any evidence of money laundering or a money laundering conspiracy. Nor does it contain any financial analysis, or even indicate how the amounts for the forfeiture were determined. It does serve as a general overview of the gambling operation, and does provide evidence of the specified

This SAR you must write doesn't have to be lengthy or exceptionally detailed, nor does it have to have any exhibits mounted, but it does have to:

    1.      Address each and every element of the conspiracy, with reference to the evidence supporting each of these elements;

    2.      Address each and every element of the underlying money·laundering offense (what they conspired to do), with reference to the evidence supporting each of these elements;

    3.      Contain a financial analysis suporting the amounts to be forfeited.

I would imagine that you should be able to accomplish this in 5 to 10 additional pages of narrative, plus the financial analysis.

Since you testified about these issues before the grand jury today and are thoroughly familiar with the case, this shouldn't take you very long. Please make this your top priority and try to complete this task by July 8th, if possible. Thanks.

    Ed Delehanty
Supervisory Special Agent
    (617) 719-3604


-----Original Message-----
From: Sibilia Anthony P
Sent: Thursday, June 27, 2002 7:49 AM
To: Delehanty Ed
Subject: RE: ███████ SAR


ED,

As I told you on Monday, at approximately 12:30pm, this SAR was originally intended as a plea agreement, as the SAR notes. However, subsequent to the submission of this SAR, the plea is off. I sent you the plea-SAR as an informative narrative of the case, since you are not familiar with this grand jury investigation and because I was not going have the time to sit with you this week. As I also told you, I intended to discuss with you time constraints that will inhibit my submitting a more complete SAR prior to indictment.

I would like to know what you mean by "this SAR is suppose to go through the normal review process", as I understand it, since this case is a Title 18, non tax, it does not go through the normal review process, rather, all that is needed is the SAIC's approval/signature.

                                    Tony

-----Original Message-----
From: Delehanty Ed
Sent: Monday, June 24, 2002 10:53 AM
To: Sibilia Anthony P
Subject: FW: ███████ SAR

**PG 402**

De a r Tony;

Reference is made in a couple of places in the SAR to a plea agreement, specifically in the introduction and later in the asset forfeiture section. If there is indeed a signed plea agreement, then we need to address the elements of the offense, create an appendix listing the amount of money laundered (or that the defendants will stipulate to laundering) and cite some actual evidence.

Assuming the AUSA has the original evidence, or the grand jury transcripts or MOIs from you and the other law enforcement agencies are sufficient to support money laundering charges, it is probably not absolutely necessary to submit all of these exhibits and cite them by witness/exhibit number in a plea case.

process, and the SAR will need a lot more work.

For starters, the SAR not only doesn't address the elements of the conspiracy, it doesn't address the elements of any substantive offense. All the SAR does is list the elements of the conspiracy and says the defendants conspired. It doesn't describe how any of their actions or plans relate to a conspiracy at all. Furthermore, 1956(h) states "Any person who conspires to commit any offense defined in this section or section 1957...". This means that we have to address the elements of that underlying offense in the SAR. For example, if 1956(a)(1)(A)(i) were the underlying offense, we'd have to have some evidence that the proceeds from the illegal VPMs (the SUA) were used to promote the illegal gambling operation, such as through the purchase of additional VPMs.

In fact, this SAR doesn't really address money laundering or a money laundering conspiracy at all. It merely describes the state gambling charges and various ancillary actions unrelated to money laundering.

If the AUSA wants to indict on Thursday and is willing to go with money laundering based on actual evidence that is not discernable from the SAR, then I guess that's up to him. However, the information contained in the SAR doesn't seem to support indictment.

Ed Delehanty
Supervisory Special Agent
   (617) 719-3604


-----Original Message-----
From: Sibilia Anthony P
Sent: Monday, June 24, 2002 8:26 AM
To: Delehanty Ed
Subject: FW: ███████ SAR


Ed, these documents relate to ███████ and ███████. The USAO's office intends to indict ███████ and ███ this Thursday. I sent this e-mail to Steve a couple weeks for approval and Pete wanted additional info. regarding the forfeitures. Although I am on vacation this week, I have to meet today and Thursday with the AUSA, regarding the indictments/forfeitures. I will contact you with more information, or you can call me if you want, 617-719-3626. Tony

PG 403

Exhibit KK

Bruce Traina

**Traina Bruce R**

| | |
|---|---|
| **From:** | Sibilia Anthony P |
| **Sent:** | Friday, August 02, 2002 1:10 PM |
| | Traina Bruce R |
| **.oject:** | LDP Announcement #CIM-02-LDP-EL2 |

SibiliaA Annual       LDP, Form 9111.dot      LDP Narrative.doc
Evaluation6850...

Bruce, above are the required forms regarding the current LDP announcement, which closes 08/05/02.  Could you please review these documents for submission.  Thanks, Tony

1

## Management Achievement Program
## Management Resume
## Announcement #CIM-02-LDP-EL2

| Part 1 | | | |
|---|---|---|---|
| **Name** <br> Anthony P. Sibilia | | **Position/Grade** <br> Special Agent, GS13 | |
| **Office** <br> Boston Field Office - Boston | | **Telephone** <br> 617-316-2120 | **Social Security #** |
| **College/University** <br> Northeastern University, Boston, MA | | **Degree/Program** <br> B.S.-Business | **Year** <br> 1986 |

| Position/Grade/Location | Appointment Date |
|---|---|
| Special Agent/GS09/Boston | April, 1992 |
| Special Agent/GS11/Boston | April, 1993 |
| Special Agent/GS12/Boston | June, 1994 |
| Special Agent/GS13/Boston | July, 2001 |

| Relevant Projects/Responsibilities/Task Forces | Dates |
|---|---|
| Firearms Instructor - Coordinator | May, 2000 |
| Defensive Tactics Instructor | March, 1999 |

| Relevant Training/Development Activities/Details | Dates |
|---|---|
| Firearms Instructor Training | May, 2000 |
| Defensive Tactics Instructor Training | March, 1999 |

| PMRS/Special Achievement Awards (last 3 years) | Dates |
|---|---|
| Performance Award | September, 2000 |
| Keith Connelly Memorial Award - FLETC | May, 2000 |
| Managers Award | September, 2001 |

PG 492

# Management Achievement Program
# Certification of Readiness

## Part 2

| Name | Current Position /Series/Grade |
|---|---|

| Signature/Date | Division | Office |
|---|---|---|

**POSITION TITLE, SERIES AND GRADE FOR WHICH CERTIFICATION IS REQUESTED.**

| Reviewer (First Level Manager – Name/Title) | SIGNATURE | DATE |
|---|---|---|

I understand that certifying an employee for a LDP covered position signifies that I consider this individual highly qualified for the position, that is, well prepared and capable of successful performance in this position.

As the Certifying official, I have reviewed the qualification and application of

I am pleased to certify this employee for the position of

| Certifying Official (Second Level Manager) (Name/Title) | Signature | Date |
|---|---|---|

Personnel Use Only:  Certifications are good through January 31, 2003.

PERSONNEL OFFICE:  Eligibility under applicable qualification Standards, including time-in-grade, has been verified.

| NAME/TITLE) | SIGNATURE | DATE |
|---|---|---|

Exhibit LL        Bruce Train

**Traina Bruce R**

| | |
|---|---|
| **From:** | Sibilia Anthony P |
| **Sent:** | Tuesday, August 06, 2002 9:21 AM |
| **To:** | Traina Bruce R |
| **Subject:** | RE: LDP Announcement #CIM-02-LDP-EL2 |

Bruce:

The closing date for this announcement was Monday, 08/05/02, I e-mailed my package to you on Friday, 08/02/02 at approximately 1:00pm. If on Friday, you did not feel you had sufficient time to review my package I would have expected a call from you to inform me of the situation. The forms that I submitted to you were for you to forward as appropriate. I did not realize that I didn't sign the form and again, I would have expected a call from you, to inform me of such. Additionally, our face-to-face meeting was to discuss several "outstanding" issues that you told me, Pete wanted addressed, it was brief and nothing else was discussed (other than my EEO complaint against you). As far as Steve is concerned, he is aware that although I put in for the LDP during the last announcement, I was not qualified due the fact that I was a grade 13 for less than a year, something that originally was not required. I have also acted for Steve and he has had conversations with Hank and I regarding my desire for management.

I do not find your reasons acceptable and I do not feel that because I have a new SSA I should have to give you "a little more time to get to know" me and my "work product" before you can determine if I am "highly qualified for the (LDP) position."

Tony

-----Original Message-----
From:    Traina Bruce R
Sent:    Monday, August 05, 2002 5:23 PM
To:    Sibilia Anthony P
Subject:    RE: LDP Announcement #CIM-02-LDP-EL2

Tony:

One business day is insufficient time to review your qualifications for the Leadership Development Program (LDP). In addition, the Form 9111 you submitted to me was unsigned by you so I'm assuming, since you have never spoken to me about this issue, that you intended the documents submitted only to be drafts for my review.

I have been your supervisor since July 28, 2002 and prior to your e-mail you did not communicate to me that you wished to be considered for the LDP. As a matter of fact, we had a face-to-face discussion concerning many topics on Thursday, August 1, 2002 and you did not mention you would be e-mailing these forms to me.

On Thursday, July 25, 2002 I was briefed on many issues concerning Group 04-05 employees by former-Acting SSA Steve Bellingreri and he did not make me aware that you would be submitting paperwork for the LDP. Did you communicate your desire to be considered for the LPD previous to that SSA Ed Delehanty?

I suggest you and I work together over the course of the next six months to determine if you are, as stated in the Form 9111 "...highly qualified for the [LDP] position, that is, well prepared and capable of successful performance in this position." Since I have only been your supervisor for a little over a week, this will give me a little more time to get to know you and your work product.

I'll be in my office in Boston for the next three days (Tuesday - Thursday), please drop in so we can chat about this issue.

Bruce
617.316.2105

-----Original Message-----
From:    Sibilia Anthony P
Sent:    Friday, August 02, 2002 1:10 PM
To:    Traina Bruce R
Subject:    LDP Announcement #CIM-02-LDP-EL2

<< File: SibiliaA Annual Evaluation6850,9,30,01.doc >>  << File: LDP, Form 9111.dot >>  << File: LDP Narrative.doc >>

Bruce, above are the required forms regarding the current LDP announcement, which closes 08/05/02. Could you please review these documents for submission. Thanks, Tony

1

Exhibit MM    Bruce Traina

**Traina Bruce R**

| | |
|---|---|
| **From:** | Sibilia Anthony P |
| **Sent:** | Tuesday, August 06, 2002 1:13 PM |
| **To:** | Traina Bruce R |
| **Subject:** | LDP |

Bruce,

I have reviewed the guidelines regarding the LDP. In particular, certification. As I understand it, generally, to be considered highly qualified, candidates must have completed the recommended minimum tenure for their position, which I meet. Additionally, the candidate will receive specific feedback as to the reasons why they were not certified as highly qualified, which I would like.

For your information, during the last announcement for the LDP, which I applied, I was told by my SSA, Phil Hall, with the concurrence of the former SAC, Mike Lahey, I was qualified for the LDP. Unfortunately, it was subsequently announced that there was a time-in-grade requirement, which I did not meet, and so my package was removed from the application process.

Tony

1

**PG 495**

Exhibit 00     Bruce Traina

**Traina Bruce R**

| | |
|---|---|
| **From:** | Sibilia Anthony P |
| **Sent:** | Tuesday, August 06, 2002 10:24 AM |
| **To:** | *CI-NAA-BOS-GRP05 1811 |
| **Subject:** | FW: Group 04-05's JFK Parking Space |

Although I *very much* like the fact that I now can (officially) park in the JFK basement, I do not feel it is fair. Additionally, I too, expect to be splitting my time between Boston and Brockton. In my opinion, unlike most of our resources, which I believe should be distributed based on seniority, a parking spot is not really a resource, rather a result of having a GOV, therefore it should not be distributed based on seniority. Anyway, I would like to share this spot with those of you that are interested, that is, unless there are any unforeseen objections. Maybe each week it can be given to one person for their use. If you are interested please let me know so that we can come to some kind of an agreement to best utilize a government resource.     Tony

-----Original Message-----
| | |
|---|---|
| **From:** | Traina Bruce R |
| **Sent:** | Monday, August 05, 2002 10:19 AM |
| **To:** | *CI-NAA-BOS-GRP05 EMP |
| **Cc:** | Galasso Joseph; *CI-NAA-BOS SAC-STF; Hall Phillips; Monahan Michael K |
| **Subject:** | FW: Group 04-05's JFK Parking Space |

Group 04-05 Employees:

I forgot to explain the other exception to the one allocated JKF Federal Building parking space for Group 04-05. SAs Michael Gianoukos and Scott McLeod share a GOV (currently a Ford Explorer) that is officially assigned to the former. Since both individuals are residents of downtown Boston, this GOV is allowed to occupy a space in the basement. This GOV is normally at this location during business hours when field contacts are not being conducted, overnight and during the weekend.

Once again, thank you for your cooperation with this matter.

Bruce
617.316.2105

-----Original Message-----
| | |
|---|---|
| **From:** | Traina Bruce R |
| **Sent:** | Monday, August 05, 2002 9:33 AM |
| **To:** | *CI-NAA-BOS-GRP05 EMP |
| **Cc:** | Galasso Joseph; *CI-NAA-BOS SAC-STF; Hall Phillips; Monahan Michael K |
| **Subject:** | Group 04-05's JFK Parking Space |

Group 04-05 Employees:

Per my discussion with Assistant Special Agent in Charge Peter Benevento, Group 04-05 is allocated one parking space for an assigned government owned vehicle (GOV) in the basement of the John F. Kennedy (JFK) Federal Building, Boston, MA.

The parking space normally would be occupied by the supervisory special agent (SSA) of the group, however, in light of the fact that I will be splitting my time between the Boston, MA post of duty (POD) and the Brockton, MA floor space, until further notice I have assigned this parking space to Special Agent Anthony Sibilia.

Please note that no Group 04-05 employees, with the exception of SA Sibilia, are allowed to park in the basement of the JFK Federal Building without receiving prior approval from me.

Thank you for your cooperation with this matter.

Bruce
617.316.2105

1

PG 497

Exhibit PP

Bruce Traina

**Traina Bruce R**

| | |
|---|---|
| **From:** | Traina Bruce R |
| **Sent:** | Wednesday, August 07, 2002 8:41 AM |
| **To:** | *CI-NAA-BOS-GRP05 EMP |
| **Cc:** | Galasso Joseph; *CI-NAA-BOS SAC-STF; Hall Phillips; Monahan Michael K |
| **Subject:** | FW: Group 04-05's JFK Parking Space |

Group 04-05 Employees:

First of all let me apologize for sending out another message on this subject, however, facts and circumstances dictate that I must.

This is further notice and the new policy concerning Group 04-05's JFK Federal Building assigned parking spaces begins Thursday, August 8, 2002.

The new policy is the only GOVs in Group 04-05's fleet allowed to occupy parking spaces in the basement of the JFK Federal Building are the GOVs assigned to SA Mike Gianoukos (currently a Ford Explorer) and assigned to me (currently a Pontiac Grand Prix).

Any other Group 04-05 employee(s) that parks in the basement of the JFK Federal Building without prior approval from me is in violation of this policy. The employee(s) found to be in violation of the policy will be counseled at which time I will explain to the employee(s) the penalties associated with future violations.

Thank you for your cooperation with this matter.

Bruce
617.316.2105

-----Original Message-----
| | |
|---|---|
| **From:** | Traina Bruce R |
| **Sent:** | Monday, August 05, 2002 10:19 AM |
| **To:** | *CI-NAA-BOS-GRP05 EMP |
| **Cc:** | Galasso Joseph; *CI-NAA-BOS SAC-STF; Hall Phillips; Monahan Michael K |
| **Subject:** | FW: Group 04-05's JFK Parking Space |

Group 04-05 Employees:

I forgot to explain the other exception to the one allocated JKF Federal Building parking space for Group 04-05. SAs Michael Gianoukos and Scott McLeod share a GOV (currently a Ford Explorer) that is officially assigned to the former. Since both individuals are residents of downtown Boston, this GOV is allowed to occupy a space in the basement. This GOV is normally at this location during business hours when field contacts are not being conducted, overnight and during the weekend.

Once again, thank you for your cooperation with this matter.

Bruce
617.316.2105

-----Original Message-----
| | |
|---|---|
| **From:** | Traina Bruce R |
| **Sent:** | Monday, August 05, 2002 9:33 AM |
| **To:** | *CI-NAA-BOS-GRP05 EMP |
| **Cc:** | Galasso Joseph; *CI-NAA-BOS SAC-STF; Hall Phillips; Monahan Michael K |
| **Subject:** | Group 04-05's JFK Parking Space |

Group 04-05 Employees:

Per my discussion with Assistant Special Agent in Charge Peter Benevento, Group 04-05 is allocated one parking space for an assigned government owned vehicle (GOV) in the basement of the John F. Kennedy (JFK) Federal Building, Boston, MA.

The parking space normally would be occupied by the supervisory special agent (SSA) of the group, however, in light of the fact that I will be splitting my time between the Boston, MA post of duty (POD) and the Brockton, MA floor space, until further notice I have assigned this parking space to Special Agent Anthony Sibilia.

Please note that no Group 04-05 employees, with the exception of SA Sibilia, are allowed to park in the basement of the JFK Federal Building without receiving prior approval from me.

Thank you for your cooperation with this matter.

Bruce
617.316.2105

1

**PG 498**

Exhibit XX

**Traina Bruce R** [redacted]

**From:** Traina Bruce R
**Sent:** Wednesday, October 16, 2002 6:05 PM
**To:** Benevento Peter R
**Subject:** FW: LCIP

Pete:

To quote Yogi Berra - "It's deja vu all over again!"

Once again, Tony only provided me with one business day to review his paperwork (Monday, October 14, 2002 was Columbus Day). He did not speak to me in person or telephone me to give me a heads-up that he would be applying for the LCIP. This was one of the issues we discussed with him at our meeting on August 7th.

At your earliest convenience, I wish to speak with you concerning Tony's participation in the LCIP. After I send this e-mail, I will telephone you on this matter. Thanks.

Bruce
617.316.2105

-----Original Message-----
**From:** Traina Bruce R
**Sent:** Wednesday, October 16, 2002 5:47 PM
**To:** Sibilia Anthony P
**Subject:** FW: LCIP

Tony:

Unless I am doing something wrong, I am unable to open the document to the left. Please forward to me again. Per our conversation earlier today, I will speak to ASAC Pete Benevento concerning your participation in the program. Thanks.

Bruce
617.316.2105

-----Original Message-----
**From:** Sibilia Anthony P
**Sent:** Friday, October 11, 2002 11:55 AM
**To:** Traina Bruce R
**Subject:** LCIP

LCIP Form 2, A.Sibilia

LCIP Narrative, A.Sibilia.doc

Bruce, above are the required forms necessary for participation in the LCIP, can you please forward as appropriate. The open season for the LCIP ends 10/15/02. Thanks, Tony

Exhibit YY

**Traina Bruce R**

**From:** Traina Bruce R
**Sent:** Wednesday, December 11, 2002 11:51 AM
**To:** Sibilia Anthony P
**Subject:** RE: LCIP

Thanks for the confirmations.

-----Original Message-----
From: Sibilia Anthony P
Sent: Wednesday, December 11, 2002 11:20 AM
To: Traina Bruce R
Subject: RE: LCIP

Bruce,

I will be available for tomorrow.

Although I thank you for being polite, my comments below are very accurate.  Tony

-----Original Message-----
From: Traina Bruce R
Sent: Wednesday, December 11, 2002 11:08 AM
To: Sibilia Anthony P
Subject: RE: LCIP

Tony:

I am required to provide you feedback on your LCIP application.  Even if it wasn't required, as your supervisor, I should provide you with feedback.  Thus tomorrow's scheduled meeting is still on.

In addition, I have a few other items I wish to discuss with you.

Please note, the comments you attributed to me in your preceding e-mail message, to be polite, are inaccurate.

Bruce
617.316.2105

-----Original Message-----
From: Sibilia Anthony P
Sent: Wednesday, December 11, 2002 10:51 AM
To: Traina Bruce R
Subject: RE: LCIP

Bruce:

If you are asking me if I would like to discuss my LCIP application with you, I do not.  I applied for the LCIP in early October and at that time you told me that you weren't sure what my motivation was for applying, since as you put it, I have had a lot of problems with other managers, including yourself.  Furthermore, you informed me that you had met with Christine Reynolds regarding my EEO complaint as did Pete, which you concluded was my motivation for entry into the LCIP.

As I told you in October, and as I am telling you now, I applied for the LCIP because of my sincere interest in a supervisory career.  All I would like to know is whether I have been approved to participate in the LCIP or not.

Thank you for your understanding in this matter.  Tony

-----Original Message-----
From: Traina Bruce R
Sent: Wednesday, December 04, 2002 10:24 AM
To: Sibilia Anthony P
Subject: RE: LCIP

1

**PG 509**

Tony:

I wish to discuss with you your LCIP application. A good time would be on Thursday, December 12, 2002 @ 2:00PM in my office in Boston. If this is agreeable to you, please let me know.

Thank you for patience with this matter.

Bruce
617.316.2105

-----Original Message-----
From: Sibilia Anthony P
Sent: Monday, December 02, 2002 10:00 AM
To: Traina Bruce R
Subject: LCIP

Bruce, can you please give me the status of my LCIP application, whether I have been approved or not for participation. Thanks, Tony

-----Original Message-----
From:     Traina Bruce R
Sent:     Tuesday, October 22, 2002 10:28 AM
To:       Sibilia Anthony P
Subject:    RE: LCIP

Tony:

FYI - I was able to open the file.

These documents are currently being addressed. I will be speaking to you about them in the near future.

Bruce
617.316.2105

-----Original Message-----
From:    Sibilia Anthony P
Sent:    Thursday, October 17, 2002 8:56 AM
To:      Traina Bruce R
Subject:    LCIP

<< File: LCIP Form 2_.dot >>  << File: LCIP Narrative, A.Sibilia.doc >>

Bruce, I'm having problems saving the first file as a word doc. Hopefully, you will be able to open that file. Tony

2

PG 510

Exhibit 22

## Traina Bruce R

| | |
|---|---|
| **From:** | Traina Bruce R |
| **Sent:** | Monday, December 02, 2002 5:27 PM |
| **To:** | Sibilia Anthony P |
| **Subject:** | FW: Approved Revised GS-1811 Critical Job Elements and Performance Management Procedures |

| | |
|---|---|
| **Importance:** | High |

Tony:

Attached below at the very bottom of this string of e-mail messages is the new CJEs for GS-1811-12/13.

Also, I have attached the SPD for GS-1811-13 and Form 6774 (Receipt for Performance Plan).

After you have reviewed the new CJEs and SPD, please sign Form 6774 and forward to me via e-mail by COB, Monday, 12/09/2002.

If you have any questions or concerns, please see me or telephone me.  Thanks.

Bruce
617.316.2105

SA GS-1811-13     Form 6774-Receipt for
SPD.pdf          Performa...

-----Original Message-----
**From:** Traina Bruce R
**Sent:** Friday, November 22, 2002 11:49 AM
**To:** *CI-NAA-BOS-GRP05 EMP
**Subject:** FW: Approved Revised GS-1811 Critical Job Elements and Performance Management Procedures

FYI.

-----Original Message-----
**From:** Benevento Peter R
**Sent:** Thursday, November 21, 2002 2:02 PM
**To:** *CI-NAA-BOS-NORTH SSA
**Subject:** FW: Approved Revised GS-1811 Critical Job Elements and Performance Management Procedures

Attached contains a listing of the new CJEs which you can print and distribute or E-mail to the agents.  Sorry for the delay.

Pete Benevento
ASAC, Boston Field Office
617-316-2082 (Office)
617-719-3613 (Cell)
617-316-2075 (FAX)

-----Original Message-----
**From:** Galasso Joseph
**Sent:** Thursday, November 14, 2002 2:06 PM
**To:** Benevento, Peter; Sparkman, Rebecca
**Subject:** FW: Approved Revised GS-1811 Critical Job Elements and Performance Management Procedures

-----Original Message-----
**From:** Cleveland Tonya R
**Sent:** Thursday, November 14, 2002 1:13 PM
**To:** *CI HQ-SENIOR STAFF; *CI SAC
**Cc:** *CI HQ-STRATEGY-DIRECTORS; Bimbo Raymond P; Been Elaine G
**Subject:** Approved Revised GS-1811 Critical Job Elements and Performance Management Procedures

Please see the attached memorandum from the Director of Strategy regarding the above subject.

1

Exhibit AAA

**Traina Bruce R**

| | |
|---|---|
| **From:** | Benevento Peter R |
| **Sent:** | Thursday, December 05, 2002 5:48 PM |
| **To:** | Traina Bruce R |
| **Subject:** | FW: LCIP |

**Importance:**      High

Bruce, I concur.  Form signed.

Pete Benevento
ASAC, Boston Field Office
617-316-2082 (Office)
617-719-3613 (Cell)
617-316-2075 (FAX)

-----Original Message-----
**From:**       Traina Bruce R
**Sent:**       Wednesday, December 04, 2002 10:13 AM
**To:**         Benevento Peter R
**Subject:**    FW: LCIP
**Importance:** High

Pete:

As you are aware, the deadline for the LCIP was Tuesday, 10/15/2002.  As previously discussed, Tony e-mailed to me an incomplete package on Friday, 10/11/2002.  Tony sent a completed package to me on Thursday, 10/17/2002 (see below) which was after the deadline.  Even if the original package submitted was complete, I was unaware Tony would be submitting it and this would have left me with only two business days to review it.  However, Tony is expecting some feedback on his application.  Since the deadline had passed, I was waiting on the issuance of the new Critical Job Elements for the special agent position in the event of any major changes before providing feedback to Tony.

Well the new CJEs were recently issued and it is time to provide Tony with feedback concerning his LCIP application.  In my judgement, I have "Not certified" Tony for the  LCIP.  Based on my numerous conversations with you concerning Tony, I'm sure this does not come as a surprise to you.  I am forwarding the documents for your review (see below) and for your signature.  Once I receive your input and signature, I will provide the "Certificate of Eligibility" to Tony for his signature and speak to him about the reasons why he was not selected for the LCIP.  Thanks.

Bruce
617.316.2105

-----Original Message-----
**From:**       Sibilia Anthony P
**Sent:**       Thursday, October 17, 2002 8:56 AM
**To:**         Traina Bruce R
**Subject:**    LCIP

LCIP Form 2_.dot        LCIP Narrative,
                        A.Sibilia.doc

Bruce, I'm having problems saving the first file as a word doc.  Hopefully, you will be able to open that file.  Tony

**PG 513**

LEADERSHIP CANDIDATE CERTIFICATION PROGRAM (LCIP)    Attachment 2

## CERTIFICATE OF ELIGIBILITY
(Certifications are good until January 31st of each year)

I.  Name: Anthony P. Sibilia                Current Position/Series/Grade: SA/1811/13

Satisfactory or above performance at the Special Agent GS-13 level for a minimum of one year.

| Yes | No |
|-----|-----|
| ☒ | ☐ |

II.  Level of Readiness (To be completed by the First Level Manager and certified by the ASAC/SAC).

| Competencies | Currently Demonstrates Competency | Currently Demonstrates Potential for Competency* | Does Not Currently Demonstrate Good Potential** |
|---|---|---|---|
| | | **Level of Readiness** | |
| 1.  Adaptability | ☐ | ☒ | ☐ |
| 2.  Teamwork | ☐ | ☐ | ☒ |
| 3.  Customer Focus | ☐ | ☐ | ☒ |
| 4.  Problem Solving | ☐ | ☒ | ☐ |
| 5.  Technical Credibility | ☐ | ☒ | ☐ |
| 6.  Partnering | ☐ | ☒ | ☐ |
| 7.  Communication | ☐ | ☐ | ☒ |
| 8.  Investigative Theory | ☐ | ☒ | ☐ |
| 9.  Criminal Investigation | ☐ | ☒ | ☐ |
| 10. Organizational Knowledge | ☐ | ☐ | ☒ |
| 11. Tax Administration | ☐ | ☒ | ☐ |

*Further development recommended for ELDP.

☐ Certified – Applicant possesses at least good potential in all of the competencies.

☒ **Not certified – Applicant does not currently demonstrate good potential in one or more of the competencies.  I have provided feedback to the employee.

| Bruce R. Traina | *Bruce R. Traina* | 11/27/2002 |
|---|---|---|
| First Level Manager | Signature | Date |
| Peter R. Benevento | *Peter R. Benevento* | 12/05/2002 |
| ASAC/SAC | Signature | Date |
| Anthony P. Sibilia | | |
| Employee | Signature | Date |

Instructions for Certificate of Eligibility:

The applicant initiates this form.  The applicant completes Section I. only.   Applicant does not sign the Certificate of Eligibility at this time.  Applicant must attach this form to a narrative statement addressing the following First Level Leadership/Management Competencies (Adaptability, Teamwork, Customer Focus, Problem Solving, Technical Credibility, Partnering and Communication), and The Technical Competencies (Investigative Theory, Criminal Investigation, Organizational Knowledge, and Tax Administration).  The applicant forwards the package to the first level manager who will assess demonstration of the competencies.  The completed package is forwarded to the ASAC/SAC for certification.  After the ASAC/SAC

2

completes the certification process, the employee    must sign the form. The completed package is forwarded to the SSA coordinating the program.

Exhibit BBB

Reminders for Discussion with Special Agent Anthony P. Sibilia

December 12, 2002 @ 2:00PM

1. LCIP

*Point - Because new GS-1811 CJEs were just issued, current rating period extended until January 23, 2003. It will cover all events from October 1, 2001 - January 23, 2003. There were a lot of issues with you during this rating period. So upcoming performance appraisal is going to include these events. If you choose to begin cooperating during the start of the next rating period, that's fine with me. You control your career, not me! It's your choice whether or not you get into the LCIP.

*Point - Original LCIP package was incomplete. Completed LCIP was submitted late!

Adaptability - Write-up good. "Enthusiastically adapts behavior and work methods in response to changing conditions." You didn't handle the idea that you had to report to your assigned POD every day very well. Not very good start with me as your SSA since July 28, 2002. "Adjusts rapidly to new situations warranting attention and resolution." Not very good with submitting administrative paperwork on time. Did not adapt too well to previous supervisors' and my requests to change Perniola/Costley SAR.

Teamwork - You do not respond to the requests of management - too numerous to list. You do not communicate with previous supervisors or me. You have not informed me when additional firearms days were scheduled. E-mail war with SA Gianoukos is not teamwork.

Customer Focus - Write-up poor.

Problem Solving - Write-up good. However, you and I are still discussing the same problems as when I became your supervisor on July 28, 2002.

Technical Credibility - Write-up ok. However, I wasn't impressed with the Perniola/Costley SAR. I would not recommend that you teach money laundering.

Partnering - Write-up good. "Resolves conflicts and disagreements in a positive and constructive manner." Not so, e-mail war with SA Gianoukos. My personal experience with you.

Communication - Oral communication is not existent. No other employee in my managerial experience goes out of his/her way to avoid me the way you do.

PG 516

"Expresses facts and ideas clearly and in an organized manner."
Perniola/Costley SAR did not do this. A strong example of your deficiency in this
competency was yesterday's e-mail message to me where you stated you did not
want to meet with me concerning the LCIP. Also, this e-mail message contained
statements attributed to me that were not accurate.

Investigative Theory - Write-up lumps in with other technical competencies.*

Criminal Investigation - Write-up lumps in with other technical competencies.*

Organizational Knowledge - Write-up did not address this technical competency.

Tax Administration - Write-up lumps in with other technical competencies.

*Reading of originally submitted Perniola/Costley SAR showed me you do not
understand the charges of money laundering conspiracy or money laundering,
placing into doubt that you have a full understanding of the technical
competencies required for management.

2. Late administrative paperwork.

Late - TRAS, Electronic Diaries, Form 6774.

Ask why?

Ask him if he was the supervisor, if he would want an employee that did not hand
in reports on time?

If he does not have a valid excuse, discuss issue and tell him it is unacceptable.

3. GOV issues.

Ask why?

Ask him if he was the supervisor, if he would want to manage an employee that
did this?

If he does not have a valid excuse, issue memorandum and discuss it.

Tell him, it's his choice that this memorandum is being issued!

4. Investigations.

Status of Perniola/Costley trial preparation? They were indicted in June 2002.
Trial date? If you don't have, please get me the date ASAP!

You need to develop other SCIs. You need to spend more time on investigations. Your workload is not what a Grade 13 should be carrying. Why haven't you done this. Remember, LEAP is a minimum of ten hours. If you can't balance your investigations and collateral duties, maybe you should consider dropping the collateral duties. You're a Grade 13! You should be independent!



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

CRIMINAL INVESTIGATION

December 12, 2002

MEMORANDUM FOR ANTHONY P. SIBILIA
                      SPECIAL AGENT
                      BOSTON FIELD OFFICE
                      CRIMINAL INVESTIGATION CI:FO:NAA:BOS:04-05

FROM:           Bruce R. Traina  *Bruce R. Traina*  E/
                   Supervisory Special Agent
                   Boston Field Office
                   Criminal Investigation CI:FO:NAA:BOS:04-05

SUBJECT:         Parking of Assigned GOV and Associated Monthly Reports

This memorandum is being provided to you to document that I counseled you today on the issues that follow. I have informed you repeatedly that you are ignoring a directive I have issued to the employees of the group concerning the parking of assigned government owned vehicles (GOVs). In addition, you have repeatedly submitted inaccurate monthly Vehicle Logs and Vehicle Expense Reports that had made it difficult for me to identify the particular GOV you are assigned.

Listed below are the corrective actions that are necessary to resolve these issues.

1. You are prohibited from parking your assigned GOV in the basement of the JFK Federal Building ~~with~~ my prior permission. To be clear, this includes your personally owned vehicle (POV) as well. Please refer to my August 7, 2002 e-mail message to Group 04-05 Employees (attached).

2. When you submit monthly Vehicle Logs and Vehicle Expense Reports for your assigned GOV, list your correct tag number of "4781 PY", not "781IPY" as you had listed.

Effective Friday, December 13, 2002, if you continue to violate the directive outlined above and continue to submit inaccurate monthly vehicle documents, further action will be warranted.

A copy of this memorandum will be placed in your drop file.

<div align="center">1 of 2</div>

Exhibit DDD

Exhibit FFF

**Traina Bruce R**

**From:** Traina Bruce R
**Sent:** Wednesday, January 29, 2003 1:29 PM
**To:** Sibilia Anthony P
**Subject:** RE: Requests

Tony:

**Let's schedule a meeting in my JFK Federal Building office at 10AM on January 31, 2003. I also have a few additional issues I need to discuss with you. Please confirm with me if you are available.**

As for the items you raised your e-mail message below, we will discuss on Friday, but briefly:

1. I issued to you the new CJEs and your PD on 12/02/2002. You signed and returned the Performance Plan Receipt on 12/11/2002. You need to perform and I need to observe your performance under the new criteria for a minimum of 60 days. To be conservative and to be consistent with other members of the group, I'm going with a 02/15/2003 ending date for your current rating period.

2. I am currently using your EPF and Drop File in preparation for a statement I am required to give concerning the EEO complaints you have filed against me. When I am finished with them, I will make them available to you. This should be in the very near future.

3. Based on our discussion and the Certificate of Eligibility I completed concerning your most recent application to the LCIP, it must have been clear to you that in my judgement you are not ready for management. To date, in my judgement, your level of readiness has not changed. So let's discuss the LDP on Friday.

Once again, please confirm with me if you are available for the meeting. Thanks.

Bruce
617.316.2105

-----Original Message-----
**From:** Sibilia Anthony P
**Sent:** Friday, January 24, 2003 11:05 AM
**To:** Traina Bruce R
**Subject:** Requests

Bruce,

I have a few items that I would like addressed when you get a chance.

My evaluation period normally ends on 09/30. I understand new evaluation criteria has pushed that date back. I would like to know when my period of evaluation ends in order to provide you with the proper input.

I would like to have access to my drop-file/personnel file that is maintained in your office.

Lastly, I am interested in applying for the LDP. Do I have to be in the LCIP in order to apply for the LDP?

Thanks, Tony

1

**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

January 31, 2003

CRIMINAL INVESTIGATION

MEMORANDUM FOR ANTHONY P. SIBILIA
                SPECIAL AGENT
                BOSTON FIELD OFFICE
                CRIMINAL INVESTIGATION CI:FO:NAA:BOS:04-05

FROM:            Bruce R. Traina    *Bruce R. Traina*
                 Supervisory Special Agent
                 Boston Field Office
                 Criminal Investigation CI:FO:NAA:BOS:04-05

SUBJECT:         Seized Currency and Coin

This memorandum is being provided to you to document that I counseled you Friday, January 31, 2003 on the very serious issues concerning seized currency and coin. Per Internal Revenue Manual (IRM) 9.7.6.14: "...The security, budgetary, and accounting problems caused by retention of large amounts of cash has caused great concern within CI, the Department of the Treasury, and Congress...." The issues are listed below.

1. Pursuant to a subject seizure investigation (SSI) in your active workload, on Friday, November 15, 2002 you and you alone obtained $7,068.75 in currency and coin from the Weymouth, MA Police Department (Weymouth PD). You verbally informed me of this fact for the first time on Tuesday, December 17, 2002. Obtaining $7,068.75 in currency and coin is not a routine occurrence in CI. As your supervisor, you failed to inform me of your plans prior to the event. These are unacceptable practices for a GS-1811-13 Criminal Investigator (Senior Special Agent), especially one like you with experience in the area of asset seizure and forfeiture. At the minimum, this will have a negative impact on my evaluation of your performance concerning Critical Job Element (CJE) II (Customer Satisfaction - Knowledge), in particular 2B (Enforcement Activities); CJE III (Customer Satisfaction - Application), in particular 3B (Oral Communication); CJE IV (Business Results - Quality), in particular 4B (Planning Investigations and Other Activities) and 4C (Implementing Plans and Other Activities); and CJE V (Business Results - Efficiency), in particular 5A (Workload Management).

2. At the time you signed the property receipt for $7,068.75 at the Weymouth PD,

Exhibit MMM

**PG 538**

# EXHIBIT 2

## INVESTIGATIVE SUMMARY

Complainant:        Anthony Sibilia

TD Number:          02-3051

Issue(s):    Was the Complainant subjected to harassment in retaliation
             for his prior EEO involvement in the terms and conditions of
             his employment?  In support of this claim, the Complainant
             cites the following occurrences:

             1.  He was not reassigned to the Brockton, MA post of duty,
                 which he learned of on October 11, 2001; and

             2.  He was not selected for the positions of Criminal
                 Investigator, GS-1811-13, announced under vacancy
                 announcement numbers 06-10-MNCI006 and 06-10-
                 9NCI004.

At the time of the filing of the instant complaint, the Complainant was employed
by the Internal Revenue Service (Agency) as a Criminal Investigator/Special
Agent (GS-1811-13), in the Boston Criminal Investigation Field Office.  The
Complainant was assigned to the Boston, MA duty station.

### Reassignment

- The Complainant states that he has been a Special Agent since 1992.  He
  was assigned to the Brockton, MA duty station.  (IF Vol. 1, Ex. 1).

- The Complainant's prior protected activity occurred in October 1996 when he
  filed a formal complaint.  The complaint was dismissed in November 1996.
  The Complainant states that since 1997, no management official has spoken
  to him regarding an EEO complaint.  (IF Vol. 1, Ex. 5).

- In December 1996, the Brockton office closed and the Complainant, along
  with three other employees (James Donahue, Kevin Sullivan, and Richard
  Yee), were assigned to the Boston office.  The Complainant alleges that the
  former Chief, Criminal Investigations Division (retired 12/96) advised these
  four individuals that if the Brockton office ever reopened, they would be given
  first preference for reassignments back to that office.  (IF Vol. 1, Ex. 1).

- On June 9, 1997, the current Special Agent-in-Charge (SAC) of the Boston
  Field Office reported for duty.  (IF Vol. 1, Ex. 6).

7

Form No. TDF 62-03.5
(03/97 Edition)



**IDIVIDUAL COMPLAINT OF EMPLOYMENT DISCRIMINATION
WITH THE DEPARTMENT OF THE TREASURY**

| FOR OFFICE USE ONLY |
| --- |
| **DEPARTMENT CASE NUMBER** |
| 02-3051 |
| **FILING DATE** |
| 12/8/01 |

## Part I Complainant Identification

**1. Name** *(Last, First, Middle Initial)*

Sibilia, Anthony, P.

**2. Telephone/Fax** *(Include Area Code)*

Home: 508-337-8914   Fax:
Work: 617-316-2120   Fax: 617-316-2100

**3. Present Home Address** *(You must notify the Department of any changes of address while complaint is pending, or your complaint may be dismissed)*

10 Dean Street
Street Address

Mansfield, MA 02048
City        State        Zip Code

**4.** If you are a current or former employee of the Federal government, list your most recent title, series, and grade.

Special Agent    1811    GS13
Title        Series        Grade

**5. Name and Address of Organization Where You Work** *(If a Treasury Employee)*

Internal Revenue Service
Bureau

Boston Field Office
Criminal Investigation
Office and Organizational Component

JFK Federal Bldg., Room 1000
25 New Sudbury Street
Street Address

Boston, MA 02203
City        State        Zip Code

**6. Employment Status in Relation to this Complaint:**

☐ Applicant   ☐ Probationary   ☒ Career/Career Conditional

☐ Former Employee    Date Left Treasury Employment

☐ Retired    Date of Retirement

☐ Other    Specify

**7.** I certify that **all** of the statements made in this complaint are true, complete, and correct to the best of my knowledge and belief.

Anthony P. Sibilia        12/5/2001
Signature of Complainant or Attorney Representative        Date

## Part II Designation of Representative

**8.** You may represent yourself in this complaint or you may choose someone to represent you. Your representative does not have to be an attorney. You may change your designation of a representative at a later date, but you must notify the Department immediately in writing of any change, and you must include the same information requested in this Part.

"I hereby designate_____ *(Please Print Name)* to serve as my representative during the course of this complaint. I understand that my representative is authorized to act on my behalf."

**9. Representative's Mailing Address**

Firm/Organization

Street Address

City        State        Zip Code

**10. Representative's Employer** *(If Federal Agency)*

**11. Representative's Telephone/Fax** *(Include Area Code)*

Telephone        Fax

**12. Complainant's Signature        Date**

RECEIVED
DEC 10 2001
DEPARTMENT OF THE TREASURY
REGIONAL COMPLAINTS CENTER
CHICAGO, ILLINOIS

ATTACHMENT:

#15.

In or about October, 1996, I filed an EEO retaliation complaint against my supervisor at the time, Dan Niro. It was during this period that I had participated in an EEO complaint and had provided favorable statements in regards to that complaint for a co-worker, Carrie Marra, the complainant. Marra's complaint had alleged discrimination against her group manager, Niro. I had worked in the same group as Marra, which was located in the Brockton Post of Duty (POD). In regards to my complaint, I first filed an informal complaint at the district level and later filed a formal one. My formal complaint was not accepted because it did not state any adverse actions (other than verbal threats) taken against me by Niro and since Niro had then retired (in December, 1996), I did not file an appeal. It should be known that when Niro retired, December, 1996, the Brockton POD was closed and the remaining agents, Richard Yee, Kevin Sullivan, James Donahue and I were assigned to the Boston POD. I have been assigned to the Boston POD since December, 1996.

I believe that Michael Lahey, the Special Agent In Charge (SAIC) of the Boston Field Office (BFO) has retaliated against me because of my prior participation in Marra's EEO complaint as well as my retaliation complaint against Niro. **(A)** I have been passed over for promotion on four separate occasions for Grade 13 and **(B)** more recently, I have been passed over for re-assignment to a POD (Brockton) that I had originally been assigned. In each of these instances, Lahey was the selecting official. At some point during Marra's EEO complaint Lahey was the Acting Branch Chief/Branch Chief/SAIC. Additionally, Lahey was aware of my EEO complaint, he told Carol Embriano, the EEO Counselor, that although he did not see my EEO complaint, he had "peripheral" knowledge of my complaint.

In order to better understand the following information, I have included a summary of my Supervisors/SAIC's during the last nine years:

|              | Supervisor      | Chief/SAIC              |
|--------------|-----------------|-------------------------|
| 1992-1996    | Dan Niro        | Fred Aufiero            |
| 1/97-9/97    | Scott Louthan   | Fred Aufiero            |
| 10/97-9/99   | Peter Benevento | Fred Aufiero/Mike Lahey |
| 10/99-12/99  | Hank Chin       | Mike Lahey              |
| 1/00-7/01    | Phil Hall       | Mike Lahey              |
| 8/01-Present | Hank Chin       | Mike Lahey              |

**(B)**    I became a Special Agent in 4/92, and from that time, up until December 1996, I had been assigned to work out of the Brockton POD under the supervision of Niro. In 12/96, Niro retired and the Brockton POD was closed. Sometime around the end of 1996, the Chief/SAIC of CID at the time, Fred Aufiero, met with the remaining agents who were assigned to Brockton (Yee, Sullivan, Donahue and I) and advised us that if

1    *[signature]*    PG 13

Brockton were ever to re-open we would be given first preference for re-assignment. Although Aufiero stated that the Brockton POD would be closed in 12/1996, CI/IRS continued to pay rent on that space and eventually the POD was "unofficially" re-opened. I was one of several agents, who was able to justify, by work related reasons, a need to work out of the Brockton POD. From 1998 up until the present I have conducted the majority of my office work out of the Brockton POD and at all times with my supervisor(s) knowledge.

The Brockton POD formally re-opened in 11/2001. Lahey assigned four agents from the Boston POD to Brockton, Yee, Sullivan, Mary Chin and George Neal. Additionally, Lahey closed the New Bedford POD and placed those agents in Brockton as well, Carrie Marra, Paul Donnelly and Don Laporte. Out of the four agents who were originally displaced from Brockton and advised by the Chief/SAIC at the time (Aufiero), that they would be given first preference if re-opened, two did not get chosen by Lahey, Donahue and I. Importantly, out of those four agents, Donahue and I were the only agents who provided favorable comments to Marra concerning her EEO complaint. Additionally, I was the only agent who filed an EEO complaint in regards to Marra's complaint.

On or about October 2, 2001, prior to Lahey's selections for the Brockton POD, Lahey attended a group meeting that I was present. My Supervisory Special Agent (SSA) Hank Chin, held this meeting for various mandatory work related issues. During this meeting the Brockton POD was brought up to Lahey, in particular, the past statement that was made by the former Chief, Aufiero, concerning Brockton, and that, if Brockton were to re-open the agents who were displaced would be given first preference for re-assignment. Lahey stated that he would be a "hypercrate" if he did not honor a promise made by a former Chief, and at the same time expect future Chiefs to honor his promises. Lahey was referring to a statement that he had made regarding assignments to POD's, which he stated are not lifetime commitments.

On October 11, 2001, Lahey issued an e-mail to all of the agents of the Boston Field Office regarding the Brockton POD. In that e-mail, Lahey announced his selections for the Brockton POD. A portion of Lahey's e-mail is as follows:

> . As many of you are aware, the plan is to re-open Brockton as an official POD. Renovations are currently underway and we anticipate the space to be fully functional and ready for occupancy sometime around the first of the year. The Brockton POD has been a controversial subject for sometime in Boston. There are many agents who would prefer to work in Brockton as opposed to Boston, primarily to avoid the commute and the parking hassles. While it would be nice to accommodate everyone wanting to work there, that is just not possible. Also, with the number of new agents coming onboard in the coming months, it is essential that we expose them to as many agents and cases as possible.
>
> While I considered the request to have additional desks placed in Brockton to allow agents from other groups to work there, I have decided against it. There are several reasons for this. One, as mentioned above, the exposure of new agents to

experienced agents with diverse casework is essential to their development. Second, the funding we received from HQ is for only six workstations. We requested and were approved for an additional station, but there is no additional funding available for electrical, phones, computer wiring and desks. It is my opinion that the agents assigned and working there should have all of the amenities of a full office; having agents working at desks without phones and computer lines is counter-productive. While I am not opposed to agents occasionally working in outlying POD's, it should be the exception and not the rule. If an agent is planning to work in a POD other than their own, he/she must receive approval from their manager. As a courtesy, that SSA will notify the SSA who supervises the POD.

I also want to reiterate the position on tenure in POD's. Assignment to a POD is **not** a lifetime appointment. Those of you who are in a HQ POD will have opportunities to work in POD's closer to your home -and those of you in POD's today may find yourself in HQ someday. We will always try to make these assignments voluntarily. However, when business reasons surface, and volunteers don't, we sometimes have to make tough calls. This, unfortunately is one of those times.

In his e-mail, Lahey reiterates his position that POD assignments are not lifetime commitments. In making this statement Lahey is speaking for future SAIC's, yet at the same time he fails to honor an obligation that was made by the former SAIC. Additionally, Lahey states in his e-mail that he wants experienced agents in Boston in order to expose new agents to a diverse caseload for their development, it is ironic that all of the agents who were selected from Boston to go to Brockton are senior to me.

It is my opinion that the reason I was not selected for Brockton is that Lahey is punishing/retaliating against me for my participation in a prior EEO suit as well as my related EEO suit. In fact, I believe that Lahey had made his decision not to select me for Brockton several months prior to his e-mail in 10/2001. During my last workload review (conducted sometime during the spring 2001) I asked my SSA (at that time), Phil Hall, what my chances were of getting re-assigned to Brockton, when it re-opened. Hall told me that my chances were not good, less than 50%. Hall explained that he had spoke to Lahey regarding this issue in connection with my request to participate in the Leadership Development Program (LDP) and was told (by Lahey), that if I wanted to participate in this program, I would be expected to remain in Boston for exposure purposes. I asked Hall if any of the other agents' who were requesting placement into the LDC and who were not assigned to Boston were going to be expected to come into Boston in order to participate in the LDP. I was told by Hall, that he did not think so. I told Hall that I thought it was unfair that I was expected to remain in Boston in order to participate in the LDP and informed him of the obligation that Aufiero had made to me and the other agents that were displaced from Brockton. Hall provided me with no further explanation and only informed me that he would "pass on" my information to Lahey. I was later informed that the qualifications had changed for participation into the LDP, in particular, an agent had to be a grade 13 for at least one year prior to their participation and so, I was

3 *[signature]*    **PG 15**

removed from the program. I believe that Lahey did not want me in the LDP, which is why he told Hall that I probably would not get selected for Brockton if I participated in that program. I feel I had been segregated and treated differently from other agents who had requested to be in the LDP. Additionally, when it was determined that I could not participate in the program, Lahey was able to omit me for selection to Brockton.

**(A)**    In coming to the realization that I have been retaliated against by Lahey, I concluded that this has been an ongoing process. That is, I have been passed over for promotion (grade 13) on four separate occasions. On all of these occasions, Lahey was the selecting official. Specifically, during period of June, 1999, a promotion was announced for at least six grade 13's (prior to this promotion, the last grade 13 package that was conducted in the BFO was approximately one year earlier (1998) and I had made first on the Highly Qualified (HQ) list). A six-month roster was utilized for this current promotion (6/1999) and I made the Best Qualified (BQ) list. On or about July, 1999, Lahey selected four agents for promotion, I was not one of those individuals. I met with Lahey regarding his selections and in particular, for any input that he had regarding my interview for that promotion (all of the agents that made BQ were interviewed). Lahey told me that I did a good job during the interview and I did not hurt my chance for promotion. Lahey also identified two agents that he thought I was more competitive with and named these individuals, Steve Bellingreri and John O'Neil (two co-workers that were hired with me).

After the promotion of the four agents sometime around August, 1999, Lahey announced that he could promote three additional agents from the six-month roster. Instead of using the original BQ list for the three new promotions, Lahey decided to add additional names to the BQ list from those agents that had originally only made the HQ list. An announcement was also made informing those agents who had originally made the BQ list, that the next selection would be treated as a separate package, that is, if an agent on the BQ list didn't get promoted the first time, it would be the equivalent of making the BQ on a second promotion package. Shortly thereafter, sometime around 1/2000, Lahey promoted three additional agents to grade 13, again, I was not one of these individuals.

I was disappointed that I did not get promoted during the second promotion. I informed my SSA Hank Chin that I wanted to meet with Lahey regarding his decision. Chin told me, that although he was not advising me what to do, he informed me that an announcement was going to be made that might lessen my concerns regarding a promotion. As it turned out, an announcement was made by Lahey shortly after the second promotion, that five additional agents were going to be promoted to grade 13 from the current package and that likewise, additional names were going to be added to the BQ list from the HQ list. At this time, I was the senior agent on the BQ list and had been on the BQ list for what would be considered my third promotion package. Because of the number of additional promotions announced and based on the positive feedback that I had received from my supervisor, as to my chance of promotion based on my seniority on the BQ list, I decided not to meet with Lahey.

**PG 16**

It should also be noted, that when I was transferred to Boston from Brockton, I happened to be working out of the New Bedford POD because of case related issues. My supervisor at that time, Scott Louthan, told me that because I was now a Boston agent I had to stop going to New Bedford for no other reason than it was my POD. Which is also ironic, because another agent, George Neal, who was in Boston, took over my desk in New Bedford and continued to work at that POD eventhough he was assigned to Boston and eventually Neal was assigned to Brockton with the other aforementioned agents. Also, several months after reporting to Boston, Louthan called me into his office and questioned me as to the status of my EEO complaint, which I told him I had dropped. Prior to this meeting I had never discussed my complaint with any manager/supervisor in the district and nor did I understand why he wanted to know such information. I now conclude that Louthan was given such orders from my former Chief, Fred Aufiero.

Currently, I have been told that the acting ASAC, Peter Benevento, has asked why I haven't reported to Boston. The reason I haven't reported to Boston is because I am scheduled to move into office space currently occupied by Kevin Sullivan and since Sullivan hasn't moved into Brockton, I am prevented from occupying his space. I believe that Lahey is making this request through Benevento and it is not surprising to me that I am required to do things that other agents are not. Although Lahey has stated that that he does not want agents working out of unassigned offices on a continued basis, I know of one agent who is allowed to work out of an unassigned office on a continual basis. Additionally, although this agent has not been assigned to this office, I am aware that this agent has asked Lahey for assignment into that office.

In conclusion, I believe that Lahey has retaliated against me for my participation in Marra's EEO complaint as well as my original related retaliation complaint. On 10/11/2001 I came to this conclusion and decided to file an EEO retaliation complaint. I have endured financial loss, emotional distress and want to be made whole again. I have been passed over for promotion on four separate occasions and I have also been passed over to re-assignment to a POD that I was displaced.

In additional to my case related accomplishments I am also a Firearms Coordinator and a Defensive Tactics instructor for six of the groups within the Boston Field Office. I find Lahey's statement ("stepping up to the plate") disturbing at the least, in fact, when Embriano informed me of this statement, I had just completed quarterly enforcement training for the field office, which included various defensive tactics exercises that involved strikes/kicks and after four full days of allowing students/agents the opportunity to conduct various strikes on my body (even with the protective equipment), the other lead instructor and I were bruised and very sore, as far as I'm concerned I have more than "stepped up to the plate".

10 Anthony Leila 10 of 10 pages

PG 22

## CLARIFICATION OF ISSUE STATEMENT

I, Anthony Sibilia would like to state that the issues of my Individual Complaint of Employment Discrimination, TD Case Number 02-3051, are as follows:

1. Mike Lahey denied my reassignment to the Brockton, MA post-of-duty, which I learned of on October 11, 2001; and,

2. Mike Lahey did not select me on several different occasions* for the positions of Criminal Investigator, GS-1811-13, announced under vacancy announcement numbers 06-10-MNCI006 and 06-10-9NCI004.

\* The dates of my nonselections can be identified by looking at the promotion packages for VA #06-10-MNCI006 and #06-10-9NCI004.

_Anthony Sibilia_

ANTHONY SIBILIA
Complainant

01/29/2002
DATE

RECEIVED
JAN 2 9 2002
DEPARTMENT OF THE TREASURY
TREASURY COMPLAINT CENTER
CHICAGO, ILLINOIS

*PG 45*

AFFIDAVIT          State of Massachusetts          County of Suffolk

RE:    POD ASSIGMENTS

1.    Q-1  State your name, position title, series, grade, business unit, and duty location.

2.    A-1  My name is Michael Lahey.  I am Special Agent in Charge (SAC) of the Boston Field

3.    Office, GS-1811-15, Criminal Investigation, Boston, Massachusetts

4.    Q-2  Describe the process you went through in order to decide which Special Agents would be

5.    assigned to Brockton.  Did you limit consideration to Special Agents who volunteered to go

6.    to Brockton?  If so, when and how did you canvas for volunteers?  Provide a copy of the list

7.    of volunteers.  Describe which factors you considered in making your decision (such as

8.    seniority, commuting distance, work load, performance, etc.)

9.    A-2  I brought all the Supervisory Special Agents (managers) together in order to decide who

10.   would be assigned to Brockton.  I first solicited volunteers, and only those agents who

11.   volunteered were considered for transfer to Brockton.  The entire group made the decision, based

12.   primarily on seniority. S/A Jim Donahue is a CIS (computer specialist).  His equipment is in Boston,

13.   so he could not be moved, because he must have access to his equipment to do his job.  The three

14.   agents the group recommended be assigned to Brockton are all senior to Anthony Sibilia, and

15.   I agreed with that recommendation and assigned these three agents to Brockton.

16.   Q-3  Explain your reasons for choosing the Special Agents who you assigned to Brockton.

17.   A-3  Volunteers for Brockton were sought, and the decision of which agents to  transfer to

18.   Brockton was based primarily on seniority.

Initials

19.  Q-4  Did you consult with others about the decision of who to assign to Brockton?  If so, identify

20.  those individuals, and describe the input they provided.

21.  A-4  I consulted with the managers in the affected areas, that is, Boston (3 managers), Stoneham,

22.  Warwick, and Acting ASAC Peter Benevento.  We all discussed the Brockton situation, but

23.  ultimately the decision who to transfer to Brockton was mine.  We were in agreement on who to

24.  transfer to Brockton.

25.  Q-5  Did seniority play a role in the decision about who to assign to Brockton?  If so, respond to

26.  the Complainant's contention that Sullivan went to Brockton, and  he is less senior than Donahue,

27.  who also participated in Carrie Marra's EEO complaint.

28.  A-5  Yes, seniority played a role in my decision about who to assign to Brockton.  S/A Donahue is

29.  a computer specialist with equipment in Boston, and could not be transferred to another Post of

30.  Duty.  Donahue knew and accepted that.  I had no previous knowledge of Sibilia's participation in

31.  the EEO process.  I wasn't even in Boston in 1996, when the EEO complaint was filed.  I arrived in

32.  Boston in 1997.  I didn't know Sibilia was involved in the EEO process until EEO Officer Marti

33.  Melecio contacted me to tell me Sibilia had filed an EEO complaint based on retalliation.

34.  Q-6  The Complainant quotes the section of your email message about the Brockton reassignments

35.  in which you state not all Special Agents who want to work in Brockton can because new agents

36.  need to be exposed to experienced agents with diverse casework.  He questions the credibility of

37.  that statement because he alleges the Boston Special Agents who were not selected for Brockton were

38.  more senior than he.  Please respond to his allegation.

39.  A-6  This is the reason only 3 Special Agents are being transferred to Brockton.  Some senior agents

40.  have to remain in Boston to be with the new agents.

Initials _____

41.  Q-7 The Complainant alleges the SAC at the time the Brockton office was closed, SAC Aufiero,

42.  promised the four Special Agents assigned to Brockton (Yee, Sullivan, Donahue, & Sibilia) that

43.  you were aware of former SAC Aufiero's promise. Were you aware of this promise? Describe what

44.  consideration you gave to this promise. Did you give first choice for Brockton to Yee, Sullivan,

45.  Donahue & Sibilia? If not, why not?

46   A-7  SAC Aufiero did not promise that people would be transferred to Brockton if the POD

47.  reopened. He promised "priority consideration". I gave the four Special Agents consideration.

48.  I selected two of the four. I couldn't select Donahue, because of the computer issue mentioned

49.  previously. Sibilia was not transferred to Brockton because Mary Chin has seniority over him.

50.  Seniority was the deciding factor.

51.  Q-8 In connection with his retaliation claim, the Complainant brings up the Leadership Development

52.  Program (LDP). The Complainant alleges you did not want him in the program and that's why you

53.  told Phil Hall that the Complainant could not go to Brockton if he were in the LDP. The Complainant

54.  alleges you said he'd need to stay in Boston for 'exposure'. What did you tell Phil Hall about the

55.  Complainant's POD assignment in relation to participation in the LDP? When? Were other Special

56.  Agents allowed to participate in the LDP even though they weren't required to be in Boston for

57.  'exposure' purposes?

58.  A-8 I never said I didn't want Sibilia in the LDP Program. I said he would have more exposure in

59.  Boston, where there are three groups, than in Brockton, which is part of the Warwick group. I did

60.  not say he couldn't be in the LDP if he were in Brockton. I never told Phil Hall that I did not

61.  want Sibilia in the LDP.

Initials _L(U____

62    Q-9 The Complainant alleges ASAC Peter Benevento has told him to report to Boston and told him

63.   Special Agents can't work out of unassigned offices.  However, he alleges another Special Agent is

64.   allowed to work out of an unassigned office on a continuous basis.  Did you have any involvement in

65.   Mr. Benevento's direction to the Complainant to report to Boston?  If so, explain what involvement

66.   you had, the reasons for your decisions on this matter, and why other Special Agents were allowed an

67.   accommodation that the Complainant was denied.

68.   A-9 Anthony Sibilia has not complied with his manager's requests to report to the Boston Post of

69.   Duty, where he was assigned.  He would routinely report to the Brockton POD, which was officially

70.   closed but where Criminal Investigation still controlled the space the Special Agents had used.  On

71.   occasion, agents work out of other field offices, and people do it all the time, but not on a regular

72.   basis.  Sibilia seldom reported to Boston, although it was his assigned Post of Duty.


RE:   FOUR SETS OF GS-13 SELECTIONS FROM 2 VACANCY ANNOUNCEMENTS BETWEEN

      6/1999 AND 4/2000

73.   Q-10 The Complainant alleges you passed over him in each of these selection actions because of his

74.   involvement in the EEO process.  Therefore, for each set of selections, explain what documents and/or

75.   whose recommendations you considered in making the selection decisions, your reason(s) for

76.   choosing the candidates you selected, and why you didn't select the Complainant.

77.   A-10 I had no knowledge of Sibilia's prior participation in the EEO process.  Interviews were

78.   conducted for the GS-13 openings, and Sibilia had a weak interview the first time around.

79.   He improved on his interview for the next vacancy announcement, to the point where he was

80.   considered average.  He did not  get much support from his managers on either package.

81.   When he did get promoted to GS-13, there were no interviews held.


Initials  _____

83.  Q-11  The Complainant makes a point of explaining that for each of the selection actions subsequent

84.   to the initial selections from the first vacancy announcement, additional names were added to the BQ

85.   list?  Is it a standard procedure to expand the number of candidates on the BQ list for subsequent

86.   selections from the same vacancy announcement?  If such an explanation is NOT standard procedure,

87.   please explain why these selections were handled differently than the norm.

88.  A-11  Personnel policy provides for the opportunity to bring new names on to the Best Qualified List

89.   (BQ) as names are selected for promotion.  For every employee promoted, another employee moves

90.   up to the BQ, so the number of names on the BQ remains the same.

91.  Q-12  The Complainant reports that he met with you to discuss his concerns about why he wasn't

92.   selected in that group of five selections in Feb. 2000.  He alleges ASAC Gail Kenney attended the

93.   meeting and took notes.  Were the notes from the discussion maintained?  If so, please provide a

94.  copy.

95  A-12  I am not aware of Gail Kenney taking notes, and if she did, I have no idea where they could be.

96.  She transferred out of Boston in November 2001.  I don't specifically recall my conversation with

97.  Anthony Sibilia.  He did have a case which I do not feel was complicated and had more hours

98.  charged to it than I thought was necessary.  Sibilia's manager, Peter Benevento, was asked about this

99.  case and the hours charged to it, and he agreed that there were too many hours charged to that case.

100.  I don't feel Sibilia was treated differently than any other Special Agent would have been treated.

Initials _____

The Complainant reports what was discussed at the meeting, and he disagrees and/or rebuts several of your explanations of your decisions. [Refer to pages 5-8 of the narrative.] Please respond to each of his allegations that he was disadvantaged and/or you treated him differently than other applicants during the selection process. Or, if you disagree with what the Complainant reports of the content of your discussions give your version of what was said. The next few questions present various allegations and/or rebuttal arguments he reports from his discussion with you:

101.    Q-13 The Complainant alleges you went to his then current manager for input on the selection, but
102.    since Hank Chin had only been his manager for a couple of months, Chin didn't know about his
103.    work. Did you solicit input from the Complainant's manager at the time? Did you solicit the same
104.    kind of info on the other applicants? If not, why did you treat the Complainant differently? What
105.    allowance, if any, did you make for applicants who had only worked for their current managers for a
106.    very short time?
107.    A-13 I talked to every manager about every applicant from his group. I spoke to Phil Hall and Peter
108.    Benevento about Anthony Sibilia, since he had worked for Hank Chin for only a brief period of
109.    time. Neither was enthusiastic in their endorsement of Sibilia.

110    Q-14 The Complainant alleges you reviewed his time (CIMIS) reports which showed he charged alot
111.    of time to the OCDETF project and his inventory hadn't changed over the two prior years, which
112.    you considered as a shortcoming. The Complainant alleges his manager, Peter Benevento, was
113.    responsible for the unchanged inventory because he assigned him very few items for investigation/
114     analysis, and he didn't respond to the Complainant's repeated requests concerning a particular
115.    case initiation. The Complainant also reports that even though his inventory remained unchanged,
116.    he submitted prosecution reports, conducted search warrants, and participated on  a wiretap. Did you
117.    review the CIMIS reports and inventories of the other appplicants? If not, why did you treat the
118.    Complainant differently?

Initials _____

119.  A-14  Anthony Sibilia is responsible for his own inventory.  Managers in Criminal Investigation are

120.  not responsible for handing out work.  I do not remember if I checked every SA's CIMIS report, but

121.  I scrutinized every applicant.  A Grade 12 Special Agent is expected to develop cases on his/her

122.  own.  Sometimes the Agent is assisted by the U. S. Attorney's Office and/or other federal agencies in

123.  the development of cases, but ultimately it is the Agent's job to develop cases.

124.  Q-15  The Complainant alleges that during the discussion you told him that 1998 was the time he

125.  should have been promoted, and since then he hadn't accomplished much.  The Complainant alleges

126.  he doesn't understand such a statement, and alleges if he were qualified for GS-13 in 1998, he would

127.  also be qualified for GS-13 in 1999.

128.  A-15  I never said Sibilia should have promoted in 1998.

129.  Q-16  The Complainant alleges no other GS-12 Special Agent is expected to develop cases on his/her

130.  own.  He alleges his supervisors never told him he was responsible for developing cases.  He alleges

131.  you held him to a different standard (regarding case development) than the other applicants.  As an

132.  example he alleges you promoted a GS-12 Special Agent who hadn't submitted a case in four years

133.  to GS-13 in January 2000.

134.  A-16  All GS-12 Special Agents are expected to develop case on his/her own.  He was held to the

135.  same standard as the other applicants.  Mary Chin was promoted to GS-13 based on the fact that

136.  she had been a Special Agent since 1985 and had 6 years of experience over Sibilia, and had

137.  numerous investigations prior to her arrival in Boston.

Initials _____

137.  Q-17  The Complainant alleges one of your reason for not selecting him was that he had charged

138.  excessive hours to a case submitted for prosecution.  The Complainant alleges the hours were

139.  justified.  Further, he challenges your contention with his report that his supervisor never questioned

140.  the number of hours charged to the case and rated him above average for the period he handled the

141.  case.

142.  A-17  It was my opinion that Sibilia had excessive hours on the case.  I discussed the hours with his

143.  manager at the time, Peter Benevento,  who also thought the hours were excessive..

144.  Q-18  The Complainant alleges you promoted a GS-12 Special Agent to GS-13 in January 2000.  He

145.  alleges that Special Agent had a case with three times as many hours charged to it, and the case was

146.  over aged.

147.  A-18  This allegation is true.  However every case is different.  Some cases become overage and

148.  the hours charged are justified.  Some are not.  In this case, the hours charged were justified.

149.  Q-19  The Complainant alleges he distinguished himself between 1997 and 2001 by conducting

150  and/or assisting on three search warrants, multiple arrest warrants, a wiretap, and nine prosecution

151.  recommendations, and by receiving two above average evaluations.

152.  A-19  I am not specifically aware of every task that Sibilia completed.  His evaluations were not

153.  outstanding nor even well above average.  He did not distinguish himself during this period

153.  in my mind, nor in the minds of his managers.

154.  Q-20  The Complainant reports that he spoke to you after the first round of selections in 1999 and

155.  again after the third round of selections in February 2000.  He challenges the credibility of the

156.  reasons you gave him in February 2000 based on the fact that you did not give those same reasons

157  the first time he spoke to you in 1999.

Initials _____

**PG 66**

159. A-20  I do not recall when the time issue first came up.  It might not have been an issue in 1999, but

160. certainly stood out by February 2002.

161. Q-21  The Complainant alleges your reason for not selecting him in June 2001, under the second

162. announcement, was that he still had no new cases in his inventory.  Is that accurate?  If so, did the

163. inventories of the three selectees change during the same time period?

164.   A-21  Sibilia was non-selected not because of no new cases in inventory.  It was the totality of the

165. situation.  None of his managers gave a strong arecommendation.

166. Q-22  Were you aware of the Complainant's involvement in the EEO complaint process

167. (providing a statement for the Marra complaint, filing a complaint) at the time you made the

168. decisions at issue here (which date back to July or August 1999)?  If your awareness of his

169. involvement does NOT date back to July 1999, explain when and how you did become aware

170. of his involvement.  What effect did the Complainant's involvement in the EEO complaint

171. process have on your selection decisions and the decision of whom to assign to Brockton?

172. A-22  I was unaware of Sibilia's retaliation complain against his former manager Dan Nero.

173. I knew Sibilia was peripherally involved in the Dan Niro matter, but since I was not involved

174. in the Marra complaint, which was winding down when I arrived in Boston as ASAC, I did not

175. know the extent of his involvement.  His involvement in the EEO complaint process had no

176. no effect on my selection decisions nor my Brockton assignments.

Initials _____

177.  Q-23  The Complainant alleges you influenced Mr. Bellingreri to avoid having the Complainant act

178.  for Mr. Bellingreri in February 2000.  What involvement did you have in the decision about who

179.  would act for Mr. Bellingreri in February 2002?

180.  A-23  None.  I had no involvement in Bellingreri's decision as to who would act for him.


181.  Q-24  What influence did you try to assert with Mr. Bellingreri about how he should treat

182.  the Complainant?

183.  A-24  None.  I never spoke to Bellingreri about Sibilia.

Initials_____

I have read the above statement, consisting of 11 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.


Michael Lahey
(Affiant's Signature)


Subscribed and sworn to before me at Boston, Massachusetts

on this  18th  day of April 2002


Leonard J. Tashman
(Investigator's Signature)


Initials_____

PG 69

Telephone Contact with Michael Lahey

On May 14, 2002 at 10:40 a.m., a telephone conversation was held with SAC Michael Lahey in an attempt to clarify information contained in his affidavit.

Asked Mr. Lahey if the interview notes were available. Mr. Lahey indicated the interview notes no longer existed. He indicated that the other panel members (Bruce Traina and Gail Kenney) could probably remember the Complainant's interview, however there are no notes.

The reassignments to the Brockton POD was made based on both seniority as a grade 13 and total Special Agent time. He stated the Complainant and Sullivan came in together, however Sullivan received his 13 first. With regard to SA Chin, she received her 13 before the Complainant and she had 5 to 6 years more total time than the Complainant.

Clarified when SAC Lahey arrived in Boston. He stated that he came on board there June 9, 1997.

Stan Chavers
EEO Specialist
Treasury Complaint Center - Chicago

field a special agent needs to wear a sport coat or suit coat to cover his/her assigned firearm. A firearm should not be unnecessarily exposed. Also, when in the field a special agent is usually interviewing witnesses and making contacts with the general public. In my judgement, witnesses and the general public have the right to expect a neat and clean professional looking person representing the IRS, especially when one is a law enforcement officer. Also, Anthony P. Sibilia's presentation to the panelists was not organized and understandable. He was not well prepared to answer the questions. On one open ended question, he must have spoke for well over 45 minutes, but because he did not have a general outline -- an introduction, body and conclusion -- to his presentation, it was very difficult to understand what knowledge, skills and abilities he wanted to convey to the panelists. The selectees and many other non-selectees for this open ended question, were organized, concise and to the point. A special agent needs these qualities. For example, many times a special agent needs to convey complex evidence to a grand jury. A grand jury is a group of 18-24 randomly selected citizens. The special agent needs to explain the evidence in a non-technical manner because the members of the grand jury most likely do not have experience as criminal investigators or prosecutors and need to understand why the government believes an individual or individuals committed a crime or crimes.

**For example, what traits, qualifications, experience did the complainant <u>LACK</u> that the selectees had? Were the traits, etc., critical to the position? Please explain why and how they are critical.**

➤ Did you recommend to the selecting official, the selection of the persons for the above referenced vacancy announcements? No. I was only involved in the interview portion of the process. I only conveyed to the selecting official my opinions of the candidates concerning the interview portion of the process.

➤ Why wasn't the complainant recommended for any of these positions? I do not know why Anthony P. Sibilia was not selected for any of these positions because I was only involved in the interview portion of the process. However, based on his performance during the interview portion of the process, I am not surprised that he was not selected.

➤ Describe the method/procedures used in making the recommendations for the positions the complainant applied for. As previously stated, I do not know why Anthony P. Sibilia was not selected for any of these positions because I was only involved in the interview portion of the process. As previously stated, based on his performance during the interview portion of the process, I am not surprised that he was not selected.

➤ How were the selectees the better choices? As previously stated, I do not know why Anthony P. Sibilia was not selected for any of these positions because I was only involved in the interview portion of the process. As previously stated, based on his

PG 77

| Agent | Time as GS-13 | Time as Agent |
|---|---|---|
| Blackmore, Charles | 6/18/2000 | 10/16/94 |
| Chin, Mary | 1/30/2000 | 3/22/88 |
| Lemanski, Sandra | 7/1/2001 | 10/16/94 |
| Sibilia, Anthony | 7/1/2001 | 9/1/91 |
| Sullivan, Kevin | 1/30/2000 | 8/1/91 |
| Yee, Richard | 9/25/88 | 9/11/77 |

VACANCIES REGISTER                02/10/2000
NEW ENGLAND DISTRICT
NORTHEAST REGION

ANNOUNCEMENT #: 06 10 9NCI004      SERIES: GS-1811      GRADE/S.: 13                CLOSING DATE: 06/28/1999
POSITION TITLE: CRIMINAL INVESTIGATOR/SPECIAL AGENT                VACANCY TYPE:  PERMANENT
VACANCIES:  999
DIVISION: CID OFFICE OF THE CHIEF
BRANCH:
SECTION:
UNIT:
GROUP:

POST OF DUTY:
JFK FED BLDG-BOSTON, BOSTON, MA;

    TOUR OF DUTY: MON-FRI 8:00A-4:30P WEEKENDS OFF

    QUALIFIED APPLICANTS              APPLICANT DATA

| # | EMPLOYEE NAME | | SOCIAL SECURITY # | WS | QUAL CODE | PRESENT BRANCH | GRADE(S) ELIGIBLE | RATING TOTAL | ELMT TOTAL | AVG RATING | EVAL SCORE | P/EXP | AWDS | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | GIGUERE | RODNEY | | F | Q | 06 10 61161 | 13 | 42.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 42.00 ** |
| 2 | BLACKMORE | CHARLES | | F | Q | 06 10 61146 | 13 | 40.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 40.00 ** |
| 3 | KEENAN | ROBERTA | | F | Q | 06 10 61188 | 13 | 40.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 40.00 ** |
| 4 | RIDGLEY | JOSEPH | | F | Q | 06 10 61145 | 13 | 40.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 40.00 ** |
| 5 | CHIN | MARY | | F | Q | 06 10 61148 | 13 | 38.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 38.00 ** |
| 6 | KILBRETH | MARK | | F | Q | 06 10 61103 | 13 | 38.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 38.00 ** |
| 7 | MONAHAN | MICHAEL | | F | Q | 06 10 61103 | 13 | 36.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 36.00 ** |
| 8 | SIBILIA | ANTHONY | | F | Q | 06 10 61165 | 13 | 36.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 36.00 ** |
| 9 | SULLIVAN | KEVIN | | F | Q | 06 10 61145 | 13 | 36.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 36.00 ** |
| 10 | LANDON | JEFFREY | | F | Q | 06 10 61141 | 13 | 35.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 35.00 ** |
| 11 | RAGOSTA | ANN | | F | Q | 06 10 61140 | 13 | 35.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 35.00 ** |
| 12 | DONNELLY | PAUL | | F | Q | 06 10 61140 | 13 | 33.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 33.00 ** |
| 13 | LEMANSKI | SANDRA | | F | Q | 06 10 61145 | 13 | 33.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 33.00 ** |
| 14 | BELLINGRERI | STEPHEN | | F | Q | 06 10 61103 | 13 | 32.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 32.00 ** |
| 15 | KASPER | LANCE | | F | Q | 06 10 61165 | 13 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 32.00 ** |
| 16 | AKERS | MICHAEL | | F | Q | 06 10 61110 | 13 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 31.00 ** |
| 17 | COBB | MICHAEL | | F | Q | 06 10 61155 | 13 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 31.00 ** |
| 18 | GIANOUKOS | MICHAEL | | F | Q | 06 10 61145 | 13 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 31.00 ** |
| 19 | BURNS | PATRICK | | F | Q | 06 12 61075 | 13 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 30.00 * |
| 20 | CROCKER | JESSICA | | F | Q | 06 10 61141 | 13 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 30.00 * |
| 21 | VANT | LAUREL | | F | Q | 06 10 61103 | 13 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 30.00 * |
| 22 | FOYE | CHERYL | | F | Q | 06 10 61141 | 13 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 29.00 |
| 23 | NIRO | MARY | | F | Q | 06 12 61103 | 13 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 29.00 |
| 24 | ONEIL | JOHN | | F | Q | 06 10 61103 | 13 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 29.00 |
| 25 | DIPLO | ERIC | | F | Q | 06 12 61103 | 13 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 27.00 |

**PG 149**

| | ARRA | CARRIE | | F | Q | 06 10 61140 13 | | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 1.00 | 26.00 |
| 27 | CHLAPOWSKI | ALBERT | | F | Q | 06 10 61115 13 | | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 24.00 |
| 28 | IMPRESCIA | CAROL | | P | Q | 06 10 61145 13 | | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 |

*PG 150*

PROMOTION CERTIFICATE
NEW ENGLAND DISTRICT

DATE 08/12/1999                    CERTIFICATE NO:  06-10-9NCI004

POSITION TITLE: CRIMINAL INVESTIGATOR/SPECIAL      STATUS  PERMANENT
SERIES:  GS-1811                    GRADE:  13

DIVISION: CID OFFICE OF THE CHIEF      VACANCIES:  999
BRANCH:
SECTION:
UNIT:
GROUP:

POST OF DUTY:
JFK FED BLDG-BOSTON, BOSTON, MA;

TOUR OF DUTY: MON-FRI 8:00A-4:30P WEEKENDS OFF

PROMOTION CERTIFICATE
------------------------------------------------------------------
The knowledges, skills, abilities and other characteristics (KSAOs) of all
Highly Qualified candidates listed on the roster of Eligibles have been
carefully evaluated and the following candidates have been determined to be
Best Qualified.
------------------------------------------------------------------

| | | |
|---|---|---|
| BLACKMORE CHARLES | F | 06-10-61140 |
| CHIN MARY | F | 06-10-61145 |
| GIGUERE RODNEY | F | 06-10-61160 |
| KEENAN ROBERTA | F | 06-10-61155 |
| KILBRETH MARK | F | 06-10-61103 |
| LANDON JEFFREY | F | 06-10-6114C |
| MONAHAN MICHAEL | F | 06-10-61103 |
| RAGOSTA ANN | F | 06-10-61140 |
| RIDGLEY JOSEPH | F | 06-10-61145 |
| SIBILIA ANTHONY | F | 06-10-61165 |
| SULLIVAN KEVIN | F | 06-10-61145 |

I HAVE SELECTED THE FOLLOWING NAMED APPLICANT(S):    SELECTED DATE:   EFF. DATE:

Joseph Ridgley                                        8/19/99      9/12/99
Jeffrey Landon
Roberta Keenan
Rodney Giguere

SELECTING OFFICIAL SIGNATURE:              TITLE

_____              Acting Chief

If additional vacancies are filled from this certificate, or if an applicant
declines the position, the next highly qualified candidates(s) must be added
to this certificate and given proper consideration.  Please contact your
Personnel Staffing Specialist for assistance.

.ar 17 13:11 2000  06-10-MNCI006 Page 1

ANNOUNCEMENT: 06-10-MNCI006
REGION: NORTHEAST REGION
OFFICE: NEW ENGLAND DISTRICT
OPENING DATE: 03/20/2000          CLOSING DATE: 04/03/2000

---

POST OF DUTY: JFK FED BLDG-BOSTON, BOSTON, MA
DIVISION:  CID OFFICE OF THE CHIEF        UNIT:
BRANCH:                                   GROUP:
SECTION:
MINIMUM AREA OF CONSIDERATION:          NATIONWIDE

---

ANNOUNCED UNDER PROVISIONS OF: SERVICEWIDE PROMOTION PLAN

---

TITLE:  CRIMINAL INVESTIGATOR (SPECIAL AGENT)
SERIES and GRADE:  GS - 1811 - 13

---

VACANCIES: 2          PROMOTION POTENTIAL: No

---

WORK STATUS:  PERMANENT                        NON-SUPERVISORY POSITION

---

TOUR OF DUTY:  MON-FRI 8:00A-4:30P WEEKENDS OFF

---

This tour may be changed to another tour in the future as the needs of the
ervice may require.  If this position is covered under the AWS agreement the
.our of duty may be changed at the employees request.

---

DUTIES:
The agent plans and conducts tax evasion investigations which vary in
levels of complexity and scope. The majority of the time is spent on
investigations involving most or all of the following characteristics:
Evidence is hidden in complex organizational structure with large number
of subsidiary activities and may involve inquiries into transactions
and activities occurring in several states or throughout the country.

---

POSITION DESCRIPTION NUMBER:  91475        POSITION SENSITIVITY: MODERATE RISK
NOTE:  Selectees who change position sensitivity levels will be required to
complete appropriate investigation forms PRIOR to placement in this position.

---

EVALUATION METHODS:
MERIT EVALUATION FOR PROMOTION
    FORM(S):  6850
RELEVANT AWARDS
PAST EXPERIENCE AND TRAINING

Other relevant material as necessary.  Interviews may also be considered.

---

HOW TO APPLY:
The following form(s) are due in PERSONNEL Branch on or before close of
business 04/03/2000:
    Form 4536
    Form 9686 (Merit Program Questionnaire)
    CURRENT EVALUATION W/NARRATIVES

PG 642



VACANCIES REGISTER                    8 00 3000
NEW ENGLAND DISTRICT
NORTHEAST REGION

ANNOUNCEMENT #:   # 11 MNC0006      SERIES: GS-1811 ·     GRADE $ : 11              CLOSING DATE: 04/03/2001
POSITION TITLE:  CRIMINAL INVESTIGATOR SPECIAL AGENT              VACANCY TYPE: PERMANENT
VACANCIES    1
DIVISION: CID OFFICE OF THE CHIEF
BRANCH:
SECTION:
UNIT:
GROUP:

POST OF DUTY:
JFK FED BLDG-BOSTON, BOSTON, MA;

   TOUR OF DUTY: MON-FRI 9:30A-4:30P WEEKENDS OFF .

A.  Evaluation Methods used in Determining "Highly Qualified" and "Best Qualified":

       Performance Appraisals
          Form 6851
       Training Experience
       Awards (Relevant Awards
       Application Forms
          Form 4834
          Form 9636
          CURRENT EVALUATION W/NARRATIVES
       Pertinent Experience Not Used.
       Qualified Standards
              Qualification Standards Handbook

B.  Criteria Used in Determining "Highly Qualified" and "Best Qualified":

   1.  National Center Agreement quantitative ranking system for positions at GS-7 and below.
     2.  National Center Agreement for positions GS-8 and above. (See attached Critical Elements)
     3.  National Office, Regions and District Agreement.
     4.  Non bargaining position (See attached criteria).
     5.  Other _____

              30.00   * HIGHLY QUALIFIED CUT-OFF SCORE.

              33.00   * BEST QUALIFIED CUT-OFF SCORE.

·····································································

              SIGNATURE              TITLE           DATE

Evaluation   _____   _____   _____

Panel or     _____   _____   _____

Ranking      _____   _____   _____

Officials    _____   _____   _____


Non-Voting
  )
    .er     _____   _____   _____

**PG 647**

VACANCIES REGISTER                    05/00/2000
NEW ENGLAND DISTRICT
NORTHEAST REGION

ANNOUNCEMENT #:   #10 MOD0006      SERIES: GS-1811      GRADE 9 - 13                    CLOSING DATE: 04 05 2000
POSITION TITLE: CRIMINAL INVESTIGATOR SPECIAL AGENT                    VACANCY TYPE:  PERMANENT
VACANCIES:   2
DIVISION: CID OFFICE OF THE CHIEF
BRANCH:
SECTION:
UNIT:
GROUP:


POST OF DUTY:
JFK FED BLDG-BOSTON, BOSTON, MA;

    TOUR OF DUTY: MON-FRI 8:00A-4:30P WEEKENDS OFF


    QUALIFIED APPLICANTS          APPLICANT DATA

| # | EMPLOYEE NAME | | SOCIAL SECURITY # | WS | QUAL CODE | PRESENT BRANCH | GRADE S: ELIGIBLE | RATING TOTAL | ELMT TOTAL | AVG RATING | EVAL SCORE | P/EXP | AWDS | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BLACKMORE | CHARLES | ██████ | F | Q | 04 10 61140 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 42.00 ** |
| 2 | ONEIL | JOHN | ██████ | F | Q | 04 10 61145 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 41.00 ** |
| | KILBRETH | MARK | ██████ | F | Q | 04 10 61103 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 39.00 ** |
| | GIANOUKOS | MICHAEL | ██████ | F | Q | 04 10 61145 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 35.00 ** |
| 5 | LEMANSKI | SANDRA | ██████ | F | Q | 04 10 61145 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34.00 ** |
| 6 | SIBILIA | ANTHONY | ██████ | F | Q | 04 10 61145 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 34.00 ** |
| 7 | MARRA | CARRIE | ██████ | F | Q | 04 10 61140 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33.00 ** |
| 8 | RAGOSTA | ANN | ██████ | F | Q | 04 10 61140 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.00 * |
| 9 | FOYE | CHERYL | ██████ | F | Q | 04 10 61140 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 31.00 * |
| 10 | CROCKER | JESSICA | ██████ | F | Q | 04 10 61140 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 29.00 |
| 11 | DIDIO | ERIC | ██████ | F | Q | 04 10 61103 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 27.00 |
| 12 | ANNUNZIATA | LEILA | ██████ | F | Q | 04 10 61155 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 26.00 |
| 13 | IMPRESCIA | CAROL | ██████ | F | Q | 04 10 61145 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 26.00 |
| 14 | CHLAPOWSKI | ALBERT | ██████ | F | Q | 04 10 61115 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 26.00 |

PG 648



PROMOTION CERTIFICATE
NEW ENGLAND DISTRICT

DATE IS 22/2000                    CERTIFICATE NO:  06-10-MMCI004

POSITION TITLE  CRIMINAL INVESTIGATOR  SPECIAL    STATUS:  PERMANENT
SERIES   GS-1811                    GRADE:  13

DIVISION: CID OFFICE OF THE CHIEF    VACANCIES:  13
BRANCH:
SECTION:
UNIT:
GROUP:

POST OF DUTY:
JFK FED BLDG-BOSTON, BOSTON, MA:

TOUR OF DUTY: MON-FRI 8:00A-4:30P WEEKENDS OFF

PROMOTION CERTIFICATE
.............................................................
The knowledges, skills, abilities and other characteristics  KSAOs: of all
Highly Qualified candidates listed on the roster of Eligibles have been
carefully evaluated and the following candidates have been determined to be
best Qualified.
.............................................................

        BLACKMORE CHARLES        F   06-10-61140
        GIANOUKOS MICHAEL        F   06-10-61145
        KILBRETH MARK            F   06-10-61133
        LEMANSKI SANDRA          F   06-10-61145
        MARRA CARRIE             F   06-10-61140
        ONEIL JOHN               F   06-10-61165
        SIBILIA ANTHONY          F   06-10-61145

I HAVE SELECTED THE FOLLOWING NAMED APPLICANT(S):   SELECTED DATE:   EFF. DATE:

    CHARLES BLACKMORE        5/24/00    6/18/00
    MARK KILBRETH            5/24/00    6/18/00
    JOHN O'NEIL              5/24/00    6/18/00

SELECTING OFFICIAL SIGNATURE          TITLE
                                      Chief

If additional vacancies are filled from this certificate, or if an applicant
declines the position, the next highly qualified candidates # must be added
to this certificate and given proper consideration.  Please contact your
Personnel Staffing Specialist for assistance.

**PG 649**

# Internal Revenue Service
# **memorandum**

date:    May 14, 2002

to:    Stan Chavers, Department of the Treasury, Chicago Regional Complaint Center

from:    EEO Territory Manager, Boston AWSS-EEO&D

subject:    Request for Information

Thank you for your inquiry of May 13, 2002, requesting information of those individuals who have filed informal/formal EEO cases. We reviewed our files and determined that the following have had prior EEO involvement.

> Mary Chin
> Michael Cobb
> Cheryl Foye
> Carrie Marra

If you have any questions, please contact our office at (617) 316-2190.

*Carol Embriano*

Carol Embriano

DEPARTMENT OF THE TREASURY
TREASURY COMPLAINT CENTER
CHICAGO, ILLINOIS

PG 771

PROMOTION CERTIFICATE
CI NO ATLANTIC AREA FIELD OPS

CERTIFICATE NO:  23-73-01A1215

TITLE: CRIMINAL INVESTIGATOR          STATUS:  PERMANENT
                                 GRADE:  13

        FIELD OFFICE        VACANCIES:  12

CT; BRIDGEPORT, BRIDGEPORT, CT; COURT ST BLDG-NEW HAVEN,
NORWALK, NORWALK, CT; JFK FED BLDG-BOSTON, BOSTON, MA;
BOSTON, BOSTON, MA; NEW BEDFORD, NEW BEDFORD, MA; SPRINGFIELD,
MA; STONEHAM BLDG, STONEHAM, MA; COPLEY PLACE-BOSTON, BOSTON, MA;
WORCESTER, MA; SOUTH PORTLAND, SO. PORTLAND, ME; POR-HQ,
MANCHESTER, MANCHESTER, NH; WEST WARWICK BLDG, WARWICK, RI;

8:00A-4:30P WEEKENDS OFF

PROMOTION CERTIFICATE
------------------------------------------------------
skills, abilities and other characteristics (KSAOs) of all
qualified candidates listed on the roster of Eligibles have been
evaluated and the following candidates have been determined to be
rated.
------------------------------------------------------

| ROONEY | F | 23-73-51319 |
| RODGER JESSICA | F | 23-73-51313 |
| LODIO ERIC | F | 23-73-51313 |
| FITZGERALD MARGO | F | 23-73-51316 |
| FOYE CHERYL | F | 23-73-51316 |
| GAGO LISETTE | F | 23-73-51318 |
| GIANOUKOS MICHAEL | F | 23-73-51315 |
| GILDAY GARY | F | 23-73-51319 |
| MCCARTY ROBERT | F | 23-73-51320 |
| IVANOVICH DEBRA | P | 23-73-51318 |
| SANDRA | F | 23-73-51315 |
| MARRA CARRIE | F | 23-73-51312 |
| MCGOVERN AMY | F | 23-73-51319 |
| RAGOSTA ANN | F | 23-73-51316 |
| RENEHAN MICHAEL | F | 23-73-51319 |
| SCHUMACHER RICHARD | F | 23-73-51318 |
| SIBILIA ANTHONY | F | 23-73-51315 |
| TRAPP GEORGE | F | 23-73-51319 |

THE FOLLOWING NAMED APPLICANT(S):   SELECTED DATE:  EFF. DATE:

CARRIE MARRA
AMY MCGOVERN
AMY RAGOSTA
MICHAEL RENEHAN
RICHARD SCHUMACHER
TONY SIBILIA
GEORGE TRAPP

PG 776

VACANCIES REGISTER          06/14/2001
CI NO ATLANTIC AREA FIELD OPS
CRIMINAL INVESTIGATION

ANNOUNCEMENT #: 23 73 01A1215      SERIES: GS-1811      GRADE(S): 13                    CLOSING DATE: 04/16/2001
POSITION TITLE: CRIMINAL INVESTIGATOR                   VACANCY TYPE: PERMANENT
NUMBER: 12
LOCATION: BOSTON CI FIELD OFFICE

LOCATED AT: BRIDGEPORT, BRIDGEPORT, CT; COURT ST BLDG-NEW HAVEN,
NORWALK, NORWALK, CT; JFK FED BLDG-BOSTON, BOSTON, MA;
BOSTON, BOSTON, MA; NEW BEDFORD, NEW BEDFORD, MA; SPRINGFIELD,
STONEHAM BLDG, STONEHAM, MA; COPLEY PLACE-BOSTON, BOSTON, MA;
WORCESTER, WORCESTER, MA; SOUTH PORTLAND, SO. PORTLAND, ME; POR-HQ,
MANCHESTER, MANCHESTER, NH; WEST WARWICK BLDG, WARWICK, RI;
BURLINGTON, VT;

TOUR OF DUTY: MON-FRI 8:00A-4:30P WEEKENDS OFF

APPLICANTS          APPLICANT DATA

| NAME | | SOCIAL SECURITY # | WS | QUAL CODE | PRESENT BRANCH | GRADE(S) ELIGIBLE | RATING TOTAL | ELMT TOTAL | AVG RATING | EVAL SCORE | P/EXP | AWDS | TOTAL |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| | ALBERT | | F | Q | 23 73 51311 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 8.00 | 0.00 | 26.00 |
| | RODNEY | | F | Q | 23 73 51319 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 8.00 | 0.00 | 38.00 * |
| CROCKER | JESSICA | | F | Q | 23 73 51313 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 30.00 |
| | ERIC | | F | Q | 23 73 51313 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 8.00 | 0.00 | 29.00 ** |
| FITZGERALD | MARGO | | F | Q | 23 73 51316 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 29.00 ** |
| FONE | CHERYL | | F | Q | 23 73 51314 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 30.00 ** |
| | LISETTE | | F | Q | 23 73 51318 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 30.00 ** |
| | MICHAEL | | F | Q | 23 73 51315 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 35.00 ** |
| | GARY | | F | Q | 23 73 51319 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33.00 ** |
| | ROBERT | | F | Q | 23 73 51320 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 29.00 ** |
| | DEBRA | | P | Q | 23 73 51318 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.00 ** |
| | SANDRA | | F | Q | 23 73 51315 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33.00 ** |
| | CARRIE | | F | Q | 23 73 51312 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.00 ** |
| | AMY | | F | Q | 23 73 51319 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.00 ** |
| RIDGSTER | ANN | | F | Q | 23 73 51314 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.00 ** |
| PENERAN | MICHAEL | | F | Q | 23 73 51319 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.00 ** |
| SCHUMACHER | RICHARD | | F | Q | 23 73 51318 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33.00 ** |
| SEPULLA | ANTHONY | | F | Q | 23 73 51315 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 32.00 ** |
| | GEORGE | | F | Q | 23 73 51319 | 13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 30.00 ** |

**PG 779**

# EXHIBIT 3

1          ATTORNEY EDWARDS:  Objection.  Relevance.

2          ADMINISTRATIVE JUDGE CLARKE:  What is the

3    relevance of that?  No, sustained.  There's no relevance.

4    There's just no possible relevance.  Next question.

5          BY MR. SIBILIA:

6     Q    In regards to your affidavit dated 6 -- June 8,

7    2002, pertaining to an enforcement training class -- this is

8    the --

9          ATTORNEY EDWARDS:  Objection just to clarity.  You

10   referred to it, first, as June 3rd '02 and now June 8th '02.

11    May I suggest perhaps you just refer to the tabs?

12          MR. SIBILIA:  June of 2002.

13          ATTORNEY EDWARDS:  I think the tabs are 14 and 15,

14   or --

15          MR. SIBILIA:  Can I just say June of 2002 because

16   I don't have those references?

17          BY MR. SIBILIA:

18     Q    In regards to your affidavit in June of 2002,

19   pertaining to an enforcement training class that you

20   participated in or about June 11, 2002, you stated that you

21   left a voice mail message with the Acting SAC, Peter

22   Benevento, that three of the instructors -- three of the

23   other instructors and many of the SAs, Special Agents, were

24   disturbed by the presence of TV reporters that were on-site

22

1    during training and videotaping training.  Who told you that

2    they were upset?

3        A    I want to answer that question, but I think at the

4    beginning of the question you said I wrote an affidavit in

5    June of 2002.  I don't believe I wrote an affidavit in June

6    of 2002.

7        Q    You signed an affidavit.  I'm sorry.

8        A    I don't believe -- I don't --

9            ADMINISTRATIVE JUDGE CLARKE:  Well, that wasn't

10    the question anyhow, so we'll revisit that.

11            MR. TRAINA:  Okay.

12            ADMINISTRATIVE JUDGE CLARKE:  Just answer the

13    question.

14            MR. TRAINA:  Okay.  Um -- if I may, may I ask him

15    to restate the question?  I apologize.

16            ADMINISTRATIVE JUDGE CLARKE:  Okay.  No problem.

17            MR. SIBILIA:  Sure.

18            ADMINISTRATIVE JUDGE CLARKE:  I can distract

19    people really fast, so I'm sorry I did that.  Repeat the

20    question.

21            BY MR. SIBILIA:

22        Q    Okay.  You stated that you left a voice mail

23    message with the Acting SAC, Peter Benevento, that three

24    other instructors and many of the Special Agents were

23

1    disturbed by the presence of TV reporters that were on-site

2    during training and video taping training.  Who told you

3    that they were upset?

4        A    Specifically, the instructors.  And one of the

5    instructors approached me and asked me to make a phone call

6    to either the Assistant Special Agent in Charge or the

7    Special Agent in Charge.

8        Q    Can you identify those instructors?

9        A    The instructors at the time were Charles

10   Blackmore, Jeffrey Landen, and David Lazarus.

11       Q    So, did they all tell you they were disturbed by

12   the presence?

13       A    I -- uh -- yes, but Chuck Blackmore was the -- was

14   instrumental in me making the telephone call.

15       Q    Are you aware that I was the co-lead instructor on

16   that day of training?

17       A    Yes.  I would say yes, I was aware of that.

18       Q    As an SSA, why didn't you inform me that these

19   instructors and Special Agents were disturbed by the film

20   crew?

21       A    Traditionally, even though I was a supervisor, at

22   a training session everyone defers to the instructor of the

23   class because the instructor of the class is the person that

24   has the expertise in that subject matter.

24

1          Now, also, the SAC and the ASAC approve the

2    enforcement instructor's activities beforehand.  So I had no

3    reason on my own to conclude that TV Fox 25 being at the

4    site was an unapproved activity.  I had no reason to believe

5    that.

6          Q    According to your affidavit, you state that you

7    spoke -- your affidavit dated June of 2002 regarding this

8    incident, you stated that you spoke to Steve Bellingreri, my

9    SSA and PIO, regarding the approval for the TV crew.  Can

10   you explain what was said to Bellingreri?

11         A    Yes.  I informed the Public Information Office for

12   CI, Stephen Bellingreri, that TV Fox 25 was at our training

13   session and they were filming us, and if he was aware of it.

14    And Steve Bellingreri, the PIO, said he was.

15         Q    Did you ask Bellingreri if the front office was

16   notified of the situation?

17         A    No, I don't bel -- no, I don't.  No, I don't.

18         Q    Did you inform Bellingreri that the identified

19   instructors and Special Agents were disturbed by the media

20   crew?

21         A    No, I did not because the phone call happened

22   before.  After I talked to Steve Bellingreri, I believe

23   Charles Blackmore approached me, and that's probably when I

24   made the phone call to the -- to the ASAC, Peter Benevento.

25

1    Q    About what time did you contact Steve Bellingreri?

2    A    I do not remember if it was before lunch or after

3    lunch.  I don't remember at this time.

4    Q    Did you tell Steve Bellingreri that the co-lead

5    instructors, Jeff Landen and myself, were giving on camera

6    interviews?

7    A    I was not aware of that.

8    Q    Did Bellingreri express to you in any way that he

9    was concerned with a TV crew filming the training?

10   A    At the time or afterwards?

11   Q    During your conversation.

12   A    No, because he said he was aware of it.

13   Q    What is your knowledge regarding the approval for

14   media contacts?

15   A    Only my conversation with Steve Bellingreri, that

16   he was aware of it.

17   Q    In general, what is your knowledge regarding the

18   approval -- obtaining approval for media contacts?

19   A    At this time?

20   Q    Yes.  Or at that time, I should say.

21   A    At that time.  Um -- my general understanding

22   would be that you would work on the logistics and the

23   scheduling with the PIO.  But, generally, you would have the

24   ASAC and the SAC in the loop as to the final decision.

26

1      Q     Can a PIO, a Public Information Officer,
2   unilaterally authorize media contacts?

3      A     I do not know the answer to that question.

4      Q     According to your affidavit from June of 2002
5   regarding this incident, you stated that you were contacted
6   by the Acting SAC Peter Benevento during training.  Explain
7   what was discussed.

8      A     Peter Benevento contacted me after I initiated a
9   phone call to him based upon Special Agent Charles
10  Blackmore's request, who was a co-instructor on that day.
11  Pete Benevento asked me, "Is it true that Fox TV 25 is
12  filming our training session?"  And I said, "Yes."

13     Q     Was anything else discussed?

14     A     Um -- Pete -- um -- said he would get back to me.
15  Around 4:00, the training session ended.  I remember. --

16     Q     No, I'd like to just stick to that telephone call,
17  telephone conversation.

18     A     The original telephone call?

19     Q     Yes.

20     A     I believe it was just a confirmation what was
21  going on, is Fox TV 25 filming our training session.

22     Q     Did you ask --

23     A     He wanted a confirmation of that.  He was not
24  aware of it prior to our conversation.

27

1    Q    According to your affidavit, you stated that
2  during a telephone call that you had with the Acting SAC,
3  Peter Benevento, you informed him about an alleged statement
4  that I had made regarding the media incident being good for
5  American Firearms School, the facility where the training
6  was conducted.  Can you explain what you told Benevento?

7    A    That may have been the second conversation, but I
8  remember having that conversation with him.  I remember it
9  was during a lunch break.  The training facility, as you are
10  aware, has a lunch room with some vending machines and you
11  can have a sandwich.  I was sitting at the table with I
12  believe maybe three other Special Agents.  And I remember
13  there was some -- you walked -- you approached the table.
14  There was some kidding around and somebody mentioned, "Hey,
15  Tony, are you getting paid by American Firearms to have Fox
16  TV down here?"  And your comment to the group in general
17  was, "Well, it was be good for them.  It will be good for
18  American Firearms School."

19    Q    Can you identify the agents that were at that --
20  present for that interchange?

21    A    Yes.  It was one of the other instructors, Jeffrey
22  Landen, Special Agent Tom Wourgiotis, and Special Agent
23  Lauren Youngquist.

24    Q    Why do you think -- why did you think that I was

1    putting the interests of the American Firearms School before

2    the IRS?

3            ATTORNEY EDWARDS:  Objection.  Mr. Sibilia is

4    testifying for -- as to this thoughts.

5            ADMINISTRATIVE JUDGE CLARKE:  Sustained.

6            MR. SIBILIA:  Can I rephrase that question?

7            ADMINISTRATIVE JUDGE CLARKE:  Go onto the next

8    question.

9            BY MR. SIBILIA:

10    Q    According to your affidavit, you stated that you

11    initially spoke to Steve Bellingreri.  You told the

12    identified instructors that Bellingreri was aware of the

13    situation and you told the other identified instructors who

14    said they were upset with training.  You told Bellingreri --

15    I'm sorry.  Let me start that again.

16            According to your affidavit, you stated that after

17    you initially spoke to Steve Bellingreri, you told the

18    identified instructor, Charles Blackmore, that Bellingreri

19    was aware of the situation and that you had no authority to

20    stop filming.  As you are aware, I received approval by

21    Bellingreri regarding the TV crew.  As such, if I contacted

22    my -- contacted my Supervisory Special Agent and Public

23    Information Officer, why do you think I was putting the

24    interests of the American Firearms --

1    for this.

2          ADMINISTRATIVE JUDGE CLARKE:  I think that's

3    taking it that one step further away from relevance in this.

4    This document speaks for itself.  This is what he's saying.

5    If I were -- if I were to consider this as being his

6    attempt to stonewall your future attempts at moving forward,

7    that is not really before me.  No, you're stretching it too

8    far.

9          MR. SIBILIA:  Okay.

10          ADMINISTRATIVE JUDGE CLARKE:  I understand what

11   you mean.  It's a good point.  But it's not a good point in

12   the framework that I'll be writing my decision.  So, go onto

13   the next thing.

14          BY MR. SIBILIA:

15     Q     On December 12th, Bruce, you also provided me a

16   counseling memorandum relative to my GOV in parking.  What

17   evidence do you have to support that counseling memo

18   relative to parking -- unauthorized parking of my GOV in the

19   basement of the JFK?

20     A     My personal observations.

21     Q     Being?

22     A     I saw your car, or your assigned government-owned

23   vehicle, in the JFK garage.

24     Q     On what date?

1      A     And I -- it was -- it would be between the time

2    period of when I became your supervisor through the date of

3    the counseling memorandum.   And we had a discussion with

4    Peter Benevento at the beginning of August and you said you

5    would never do it again.   And you did, on a number of

6    occasions.

7      Q     What exactly did I say that I would never do

8    again?

9      A     You would -- you said at the meeting with Peter

10   Benevento that you would not park in the JFK garage unless

11   you had my authorization to do so before you needed to do

12   so.   We agreed that there are occasions where if somebody is

13   bringing in -- you are a firearms instructor.   If you needed

14   to bring in a large amount of ammunition, or if there was a

15   search warrant being conducted and there was a bunch of

16   records that needed to be brought into a secure area, what

17   we would do is people that have assigned spots would move

18   their cars across the street to the public lot so those

19   spaces would be available for agents that had ammunition to

20   deliver or vehicles that head search warrant documents.

21          ADMINISTRATIVE JUDGE CLARKE:   And would this be

22   something that would have to be arranged in advance, right?

23          MR. TRAINA:   Yes.

24          ADMINISTRATIVE JUDGE CLARKE:   Okay.

1            MR. TRAINA:  Yes.  We all have -- I'm sorry, but

2    we all have cell phones so we're always in communication

3    with one another.  So, it wouldn't be unusual to get a phone

4    call at night saying, "Hey, I need that space for tomorrow

5    morning.  Do you -- when you come in, do you mind parking

6    across the street?"  And I would say, "Oh, no problem.  Do

7    you just need it for a day?"  "Yes."  "Okay."

8            ADMINISTRATIVE JUDGE CLARKE:  All right.

9            BY MR. SIBILIA:

10    Q    Are you aware that I contacted you for approval

11    relative to parking my GOV in the basement of the JFK?

12            ATTORNEY EDWARDS:  Objection, Your Honor.  There's

13    no statement as to time, date, or relevance to this

14    particular memorandum.

15            ADMINISTRATIVE JUDGE CLARKE:  It's sustained.

16    You've got -- you've got to have dates.  You can't have a

17    general statement like that.  You've got to have -- you

18    know, are you aware that -- well, first of all, we don't

19    have specific dates that he's referring to.  He's referring

20    to a time frame.  But, if what you want to elicit from him

21    is, you know, on such and such a date, was this a date that

22    you saw my car there, and were you aware that I, you know,

23    got permission, did I ask -- do you recall that I asked, do

24    you recall that you gave -- that you gave me permission.

85

1    Q    So you have no documentary proof of exact dates
2    and times that my GOV was illegally parked in the basement
3    of the JFK?
4    A    I have -- yes, I do.  In the counseling
5    memorandum, I believe I state the exact date I determined
6    that that was your vehicle.  Now, that -- by determining
7    that that was your vehicle, I was able to determine on the
8    previous dates you had your vehicle.  I had been -- you had
9    been putting down incorrect -- your incorrect license plate
10   number on your monthly reports.  There was no way for me to
11   match your vehicle to you because you were providing
12   inaccurate reports.
13   Q    As a supervisor, Bruce, do you know what CIECS
14   Inventory is regarding CI equipment?
15   A    It's a database that has our investigate equipment
16   listed on it.
17   Q    Are you aware that CI's, Criminal Investigation's,
18   GOV's identification relative to CIECS pertains to the last
19   six digits of the vehicle's VIN?
20   A    I don't know the technicalities of that, but I
21   went to the property clerk that maintains that system and I
22   provided her with the license plate numbers and she was
23   unable to match the license plate numbers you were reporting
24   to the vehicle I saw parked down in the JFK Building.  So, I

ARLINGTON REPORTING CORPORATION
(781) 646-1730

1    A    Yes.  Um -- it's -- there are a limited amount of

2    spaces down there, so they're assigned to various persons.

3    And, also, there's -- you're essentially double parked.  So,

4    you could get -- you could get boxed in.  And, a lot of

5    times, unfortunately, the person that gets boxed in are the

6    SAC and the ASACs.  And, normally, there's a combination box

7    that has the keys in there.  And, over the course of time,

8    you learn whose vehicle and which keys go to which car and

9    it's very easy to switch cars in and out.

10        If somebody is parking down there unauthorized,

11    they may forget to put their keys there.  Or, if they do,

12    nobody knows whose vehicle is there.  And the person who is

13    boxed in doesn't know who to call on the cell phone.  So, it

14    could be hours before you get your car out.  And it's -- so

15    the easiest way to solve the problem is to have assigned

16    parking spaces.

17        The agents that have assigned vehicles that do not

18    have parking spaces in the JFK Building park in the public

19    lot across the street, and then they are reimbursed for that

20    parking expense.  So, there's no out-of-pocket expense for

21    the agent at all.

22        ATTORNEY EDWARDS:  May we take a short break?

23        ADMINISTRATIVE JUDGE CLARKE:  Sure.

24        (Whereupon, a brief recess was taken off the

that the defendants had since withdrawn their pleas and so the report had to be changed anyway, which he concurred.

The case in question involved a substantial amount of forfeitures, which had to be supported otherwise the forfeitures would be lost. When the targets decided to withdraw their plea we were not only faced with substantiation problems but more importantly, a deadline to criminally indict the case so as not to lose the forfeitures. As such, the Assistant U.S. Attorney had to indict the case by the end of June 2002. Since we were obtaining evidence up until the indictment, I was unable to change my original SAR to reflect such evidence. Additionally, I had previously scheduled a vacation at the end of June 2002.

Ed Delehanty became my acting supervisor during the last week on June 2002. Delehanty was acting for Bellingreri. Prior to Delehanty's acting assignment, I informed Bellingreri that the U.S. Attorney's office intended to indict the aforementioned targets by the end of June, and that I would discuss the indictment with Delehanty. Although I was scheduled for vacation, I reported to my office on Monday, the first day of Delehanty's acting assignment, in order to e-mail him a copy of my report, I had a meeting at the U.S. Attorney's office regarding the indictments on that morning. I e-mailed my original report to Delehanty for him to use as an informative narrative of the case since he was not familiar with the case. In that e-mail I informed Delehanty that I would contact him after my meeting to inform him of the situation concerning the report and the anticipated indictments scheduled for later that week.

PG 121

13 o f 21