UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
ANTHONY SIBILIA,                )
                                )
                                )
      Plaintiff,                )
                                )
      v.                        )       C.A. No. 05-10096-PBS
                                )
JOHN SNOW, SECRETARY OF THE     )
DEPARTMENT OF THE TREASURY,     )
                                )
      Defendant.                )
_____)
```

**STATEMENT OF MATERIAL FACTS**
**PURSUANT TO LOCAL RULE 56.1**

The defendant's Statement of Material Facts under Local Rule 56.1 are as follows:

1.  Plaintiff is currently employed by the Internal Revenue Service (Agency) as a GS-1811-13 Special Agent in the Agency's Criminal Investigation Division in Boston, Massachusetts (Exhibit 2,Investigative File 02-3051("IF") p. 11; and Exhibit 1, IF 02-3230 p. 7). Plaintiff was promoted to the GS-13 position on July 1, 2001. Plaintiff's prior protected activity occurred in October 1996 when he filed a formal complaint stating his then manager, Dan Niro had verbally threatened him. The complaint was dismissed in November of 1996 because it failed to set forth a claim (Ex. 2, IF p. 7). At approximately the same period, Plaintiff also provided a statement to an EEO investigator with respect to a

1

complaint filed by a co-worker (Carrie Marra) (Ex. 2, IF p. 13).

2.    Plaintiff has been a Special Agent since April 1992 and was first assigned to the Brockton, Massachusetts post of duty. In December of 1996, the Brockton post of duty was closed and Plaintiff, along with three other employees (James Donahue, Kevin Sullivan and James Yee), were assigned to the Boston office. According to Plaintiff, Frederick Aufierro, a former Chief, Criminal Investigation Division[1], promised that if the Brockton office ever reopened, the reassigned employees would be given first preference for reassignments back to that office (Ex. 2, IF pp. 13-14). Mr. Aufierro retired in December 1999.

3.    On June 19, 1997, Michael Lahey, reported for duty as the Assistant Chief, Criminal Investigation Division to Mr. Aufierro (Ex. 2, IF pp. 59-70). In October of 1999, Lahey became the Division Chief.[2] (The Assistant Division Chief position was later renamed the "Assistant Special Agent in Charge" or "ASAC".) Lahey averred in his affidavit, "I was unaware of

---

[1]    This position was later renamed "Special Agent in Charge" or "SAC".

[2]    Lahey is currently Director, Review and Program Evaluation, Criminal Investigation Division, effective June 17, 2002.

2

[Plaintiff's] retaliation complaint, *(sic)* against his former manager Dan Nero *(sic)*. I knew [Plaintiff] was peripherally involved in the Dan Niro matter, but since I was not involved in the *Marra* complaint, which was winding down when I arrived in Boston as ASAC, I did not know the extent of his involvement. His involvement in the EEO complaint process had no effect on my selection decisions nor my Brockton assignments" (Ex. 2, IF p. 67).

4. On June 14, 1999, the Agency posted vacancy announcement 06-10-9NCI004, advertising for one or more Criminal Investigator/Special Agents (GS-1811-13). The announcement was a roster that would be used to refer best-qualified applicants for a six-month period from the closing date of the announcement (June 29, 1999). Plaintiff submitted an application on or about June 23, 1999 and was one of 28 qualified applicants (Ex. 2, IF pp. 13-22).

5. Thereafter, a ranking panel was convened which assigned a Best Qualified (BQ) cutoff score of 31.00. Plaintiff achieved a score of 36.00 and was placed on the BQ list (Ex. 2, pp. 149-150). Between August 19, 1999 and February 28, 2000, a total of 12 selections were made for the announced vacancies. Plaintiff was not among those selected. Two of the selectees (Mary Chin and

Michael Cobb) had prior EEO involvement (Ex. 2, IF pp. 151 and 171).

6.  On March 20, 2000, the Agency posted vacancy announcement 06-10-MNCI006 advertising for two Criminal Investigators/Special Agents (GS-1811-13).  The announcement closed on April 3, 2000.  Plaintiff submitted an application package on March 31, 2000 and was one of 14 qualified applicants (Ex. 2, IF pp. 642, 647 and 648).

7.  On or about May 16, 2000, a ranking panel was convened which assigned a BQ cut off score of 33.  Plaintiff scored 34.00 and was placed on the BQ list (Ex. 2, p. 649).  On May 24, 2000, the SAC made three selections. Plaintiff was not selected.

8.  SAC Lahey, the selecting official, indicated that Plaintiff was non-selected for these promotions due to "a weak interview the first time around, he improved on his interview for the next vacancy announcement, to the point where he was considered average.  He did not get much support from his managers on either package.  When he did get promoted to GS-13, there were no interviews held" (Ex. 2, IF p. 62).  Bruce Traina, a Supervisory Special Agent who participated in the interview process, confirmed Plaintiff's weak interview, noting that Plaintiff's appearance was unprofessional" and his

4

presentation "not organized and understandable" (Ex. 2, IF p. 77).

9.  The Agency posted vacancy announcement CIN-01-A1-215 on April 2, 2001 for the position of Criminal Investigator, GS-1811-13.  On June 25, 2001, Plaintiff, along with six others, was selected for the promotion to GS-13 (Ex. 2, IF p. 776).  One of the selectees was Carrie Marra, who filed the prior EEO complaint in which Plaintiff provided a statement (Ex. 2, IF p. 779).

10. In October, 2001, a decision was made to reopen the Brockton post of duty.  At the same time, the New Bedford, Massachusetts POD was closed.  Lahey first solicited volunteers and then decided as to who would be selected for Brockton.  Three employees from the now closed New Bedford office were reassigned to Brockton. Three employees from the Boston office were also selected.  Plaintiff was not chosen.  Of the three chosen from the Boston office, two were originally from Brockton (Yee and Sullivan) and the third (Mary Chin) was not.  Of the three, only Mary Chin had prior EEO involvement.

11. Lahey stated that his decision as to which employees would be transferred to Brockton was based primarily on seniority.  The three selected were more senior than Plaintiff (Ex. 2, IF p. 85).  Plaintiff contacted an

5

EEO counselor on October 25, 2001 and filed his formal
administrative complaint of discrimination, TD 02-3051,
on December 8, 2001 with the Department of the
Treasury, Chicago Regional Complaints Center ("the
Center"), Investigative File (Ex. 2, IF p. 11). By
letter dated January 30, 2002, the Center notified
Plaintiff that the following issue was accepted for
investigation:

> Was the Complainant retaliated
> against for prior involvement in the
> EEO process when 1) he was not
> reassigned to the Brockton,
> Massachusetts post of duty, which he
> learned of on October 11, 2002; and,
> 2) he was not selected for the
> positions of Criminal Investigator,
> GS-1811-13, announced under vacancy
> announcement numbers 06-10-MNCI006
> and 06-10-9NC1004.

(Ex. 2, IF p. 45).

12. Plaintiff requested a hearing before the EEOC.
Thereafter, the Agency sought dismissal of Plaintiff's
complaint because he has not made a prima facie case of
retaliation.

13. On January 28, 2004 EEOC Administrative Judge (AJ)
Gladys Collazo granted summary judgment in favor of the
Agency. Plaintiff appealed the February 10, 2004 Final
Order (FO) of the Department of the Treasury
implementing the AJ's decision to the Office of Federal
Operations (OFO). OFO who issued a decision dated July
27, 2004 affirming the Agency's final order, "because

6

the Administrative Judge's issuance of a decision
without a hearing was appropriate and a preponderance
of the record evidence does not establish that
discrimination occurred."  On September 2, 2004,
Plaintiff filed a request for the EEOC to reconsider
its July 27, 2004 decision.  The EEOC denied
Plaintiff's request on October 20, 2004.

14.  In a subsequent EEO complaint filed August 15, 2002, TD
02-3230, Plaintiff claimed he was subjected to
harassment in retaliation for his prior EEO involvement
and cited the following incidents occurring between
June 2002 and January 2003:

(i)      On June 11, 2002, the Assistant Special Agent
         in Charge (ASAC) Peter Benevento[3] questioned
         Plaintiff about the presence of newspaper
         reporters at the mandatory firearms training
         site;

(ii)     On June 17, 2002, ASAC Benevento questioned
         Plaintiff's possession of a membership pass
         to the firearms training facility;

(iii)    On June 24, 2002, Supervisory Special Agent
         (SSA) Edward Delehanty[4] allegedly referred to

---

[3]    Mr. Benevento is now retired and provided testimony
during the administrative hearing on October 20, 2004.

[4]    SA Delehanty was Plaintiff's acting supervisor during
the last week of June 2002 (Ex. 1, IF p.121).  He also provided
testimony during the administrative hearing on October 20, 2004.

7

a Special Agent Report Plaintiff prepared as
a "piece of crap";

(iv)    On August 5, 2002 SSA Bruce Traina failed to
complete and submit Plaintiff's package for
vacancy announcement #CIM-02-LDP-ELP for the
Leadership Development Program (LDP) which
prevented Plaintiff from competing for
consideration for upcoming supervisory
positions;

(v)    On August 7, 2002 and January 30, 2003, ASAC
Benevento and SSA Traina subjected Plaintiff
to negative comments and/or statements
regarding his conduct and work performance;

(vi)    On December 12, 2002, ASAC Benevento and SSA
Traina did not certify Plaintiff for
eligibility for participation in the
Leadership Candidacy Identification program
(LCIP);

(vii)    On December 12, 2002, Plaintiff was issued
written counseling by SSA Traina regarding
parking his government owned vehicle (GOV) in
the basement of the JFK building and
submitting false/inaccurate monthly reports;

(viii)    On January 29, 2003, SSA Traina informed
Plaintiff that he would not be certifying him

8

for the current LDP; and

(ix)      On January 29, 2003, Plaintiff was issued
          written counseling by SSA Traina regarding
          seized currency and coins.

(Ex. 1, IF pp. 3-4).

**The Defendant's Legitimate Non-discriminatory Response**

15.   <u>Response to Allegation (i)</u>: In June 2002, Plaintiff
      performed collateral duties as a firearms instructor
      and coordinator which included obtaining qualified
      training facilities.  Plaintiff had obtained the use of
      a training facility in Attleboro, Massachusetts, the
      American Firearms School (AFS).  On June 11, 2002,
      Plaintiff and SA Jeffrey Landon (then Defensive Tactics
      Coordinator) were conducting mandatory firearms
      training at AFS.  AFS advised Plaintiff that a TV crew
      was coming down to do a story on law enforcement
      training and wanted to tape the IRS's training.
      Plaintiff contacted his then acting supervisor, Steven
      Bellingreri, who was then the Public Information
      Officer (PIO) to authorize the taping.  After several
      entreaties by Plaintiff, PIO Bellingreri, against his
      better judgment, granted the authorization (See October
      20, 2004 Hearing Transcript (Ex. 3, Tr. pp. 21-28).
      Acting Special Agent in Charge (SAC) Peter Benevento
      learned of the taping later that day and was very
      upset.  SAC Benevento asked to see Plaintiff and SA

9

Landon in his office after training was completed.  The incoming SAC, Joseph Galasso, was also present.  Both Plaintiff and SA Landon were advised of the problems that could have occurred with the media and the necessity for coordination with the front office. Acting SAC Benevento also questioned Plaintiff's whether his relationship with AFS remained purely professional and at 'arms length' (Ex. 1, p. 132). Plaintiff was not disciplined regarding this event.

16. <u>Response to Allegation (ii)</u>: According to Plaintiff, AFS had supplied him with two free passes as a good will gesture due to equipment malfunctions at the firing range.  Plaintiff gave one of the passes to a knife expert who had given a demonstration on knife attacks.  The second pass Plaintiff kept but made available to other agents at his post of duty. Benevento testified at the hearing before the EEOC that he orally counseled Plaintiff regarding his acceptance of the passes because his acceptance of the passes was inappropriate and Plaintiff failed to inform management that he had been given these passes (Ex. 3 Tr. at 22-23).  Plaintiff was not disciplined regarding this incident.

17. <u>Response to Allegation (iii)</u>: This allegation concerns an alleged harassing incident Plaintiff claims took place on June 24, 2002 in which then SSA Edward

Delehanty allegedly referred to a Special Agent Report (SAR) prepared by Plaintiff as a "piece of crap" (Ex. 1, IF p. 106). SSA Delehanty denies referring to the SAR as a "piece of crap" but did refer to the SAR as deficient and substandard. SSA Delehanty had a number of email exchanges regarding the SAR which are located in (Ex. 1, IF pp. 49-52, 400-403). SSA Delehanty also testified before the EEOC on October 20, 2004 regarding this allegation (Ex. 3, Tr. at 67-85).

18. <u>Response to Allegation (iv)</u>: SSA Bruce Traina became Plaintiff's manager effective July 28, 2002. Five days later, on August 2, 2002, Plaintiff emailed SSA Traina regarding his Leadership Development Program[5] (LDP) application. SSA Traina was surprised as he had had an in-depth meeting with Plaintiff the day before (Thursday, August 1, 2002), and Plaintiff had never mentioned that he intended to apply for the LDP.

SSA Traina covered two posts of duty in Boston and Brockton, Massachusetts. Plaintiff's POD is in Boston. On Friday, August 2, 2002, SSA Traina was at his desk

---

[5]    The LDP is an application process to establish a roster of eligible candidates for vacancies for managerial positions nation-wide that arise during the six month period. The names of qualified applicants are placed on a list, and when a managerial vacancy occurs during the six-month period covered in the announcement, the selecting official selects an applicant from the list. The applicant's managers must review and approve the application, and certify that the employee has the necessary qualifications for a management position.

in Brockton when at about 5:00 PM he saw Plaintiff's e-mail regarding his LDP application, a message Plaintiff sent Friday afternoon (Ex. 1, IF pp. 491-493). The closing date to submit an application was Monday, August 5, 2002.

On Monday, after unsuccessfully trying to contact Plaintiff, SSA Traina sent Plaintiff an e-mail explaining that one business day was insufficient time for him to review Plaintiff's qualifications for the LDP, and in addition, his form was not signed, as required (Ex. 1, IF, p. 494). On Tuesday, August 6, 2002, Plaintiff e-mailed SSA Traina criticizing him for not submitting his application (Ex. 1, IF p. 475). Plaintiff claims that SSA Traina refused to submit his application because Plaintiff stated he was filing an EEO Plaintiff against him. SSA Traina denied this, averring:

there was very little time to review his
application since he submitted it so late and it
was due the next business day, and I had no advance
notice that he was submitting the application.
Second, a manager's approval of an LDP application
is not some automatic rubber-stamp technicality, as
[Plaintiff] implies in his e-mail messages (Ex. 1,
IF pp. 474-475). It requires consideration of the
employee's work performance and leadership
qualities, and in a case like Plaintiff's where he
has not demonstrated strength in these areas, a
manager would need time to assess his readiness for
management. For example, I had just finished
reviewing the SAR that [Plaintiff] submitted, and
it was not a good report. My thought was that to
be qualified for management, you need to be
technically proficient *at a minimum*. In addition,

12

you need to be cooperative and able to get along
with others, and [Plaintiff] had demonstrated that
he was the opposite.  In addition, the fact that he
submitted his application without advising me, and
did so at the 11th hour, indicates to me a lack of
effective communication that shows me that he is
unprepared to be a good manager.

19.  <u>Response to Allegation (v)</u>: On August 6, 2002, SSA

Traina notified Plaintiff via voice mail and e-mail to

attend a meeting with him and ASAC Benevento on

Wednesday, August 7, 2002 (Ex. 1, IF p. 499).  At the

meeting SSA Traina told Plaintiff that in his judgment

Plaintiff had been rude, unprofessional and

insubordinate on several occasions.  SSA Traina cited

examples such as Plaintiff's issuing an e-mail to the

group inviting them to use his assigned government

parking space without proper authorization, his

statements to SSA Traina that an affidavit SSA Traina

had prepared for one of Plaintiff's prior EEO

complaints was out of line, Plaintiff's  response to

SSA Traina's email regarding his late LDP application,

and Plaintiff's failure to correct his incomplete SAR.

SSA Traina asked Plaintiff to come and talk to him and

be a team player, rather than avoiding contact or being

inconsiderate by sending SSA Traina last minute e-

mails.  SSA Traina told Plaintiff that he wanted to set

things straight and start fresh.  According to SSA

Traina, Plaintiff made a comment to the effect of, "I

know what this is all about," but did not explain what

he meant.  Plaintiff then requested a meeting with the
new SAC, Joseph Galasso, and was told by both managers
he could ask SAC Galasso to meet with him.  Both SSA
Traina and ASAC Benevento aver that the purpose of this
meeting was to discuss issues relating to Plaintiff's
conduct (Ex. 1, IF p. 139, 180-182; Ex. 3 Tr. 132).

20.    <u>Response to Allegation (vi)</u>: The Agency announced an
open season for applying for the Leadership Candidacy
Identification program (LCIP) on September 16, 2002.
This is an announcement for all Special Agents who have
performed satisfactorily at the GS-13 level for a
minimum of one (1) year and are interested in
participating in the LCIP.  The purpose of the LCIP is
to identify and develop candidates to successfully
compete for an entry level management position (Ex. 1,
IF p. 62).  Plaintiff e-mailed his application for the
LCIP to SSA Traina on Friday, October 11, 2002 (Ex. 1,
IF pp. 62 and 508).  The following Monday was a federal
holiday (Columbus Day) and the application was due on
Tuesday, October 15, 2002 (Ex. 1, pp. 62 and 189).  On
Wednesday, October 16, 2002, Plaintiff asked if SSA
Traina had seen his e-mail and application.  SSA Traina
said he had not seen it.  Plaintiff then questioned SSA
Traina as to why he had not forwarded his application
considering the due date was the previous day.
According to SSA Traina, he told Plaintiff that

14

Plaintiff had not verbally alerted him he would be e-mailing his application nor provided him with a "heads-up" as previously agreed to.  SSA Traina was frustrated because this issue regarding last minute submissions had been discussed with Plaintiff at the August 7, 2002 counseling session (Ex. 1, IF p. 189).  SSA Traina states in his affidavit that he told Plaintiff that he had been very busy during the past few days, including preparing for and meeting with an EEO investigator concerning the complaint Plaintiff had filed against him (Ex. 1, IF p. 189).  SSA Traina states that that this was his only reference to Plaintiff's EEO complaint.  _Id_.  SSA Traina told Plaintiff he would review his e-mail message later that day but at this time SSA Traina considered it to be a late submission. SSA Traina believed Plaintiff purposely submitted his LCIP application untimely in order to create another issue between them (Ex. 1, p. 189).  SSA Traina forwarded Plaintiff's original e-mail message to ASAC Benevento and discussed the situation with him (Ex. 1, IF pp. 189 and 508).  They decided that SSA Traina would provide substantive feedback to Plaintiff regarding his application for the LCIP after issuance of the new Critical Job Elements (CJEs) for the SA position, SSA Traina received the new CJE's on November 21, 2002 (Ex. 1, IF p. 511).  On November 27,

2002, SSA Traina completed and signed the LCIP
"Certificate of Eligibility."  SSA Traina marked the
"Not certified" box, and forwarded this document to
ASAC Benevento on Wednesday, December 4, 2002.  The
next day ASAC Benevento concurred with the
determination (Ex. 1, IF pp. 513-515).

On Wednesday, December 4, 2002, SSA Traina
contacted Plaintiff via e-mail to arrange a meeting.
(Ex. 1, IF pp. 509-510).   By email, December 11, 2002,
Plaintiff responded, "If you are asking me if I would
like to discuss my LCIP application with you, I do
not."  *Id.*  SSA Traina persisted and Plaintiff did meet
with him on December 12, 2002.  <u>Id</u>.

Due to SSA Traina's past experiences of
Plaintiff's confrontational demeanor and
misrepresentations of statements made to him, SSA
Traina prepared a written script titled "Reminders" for
the meeting (Ex. 1, pp. 516-518).  During the meeting,
SSA Traina told Plaintiff  that his LCIP application
had been both untimely and incomplete.  SSA Traina
advised Plaintiff that if he did not improve aspects of
his performance, future LCIP applications would not be
certified either.  SSA Traina then provided Plaintiff
with  specific feedback on his LCIP application and
examples of why he was not certified as ready for the
LCIP and went down the list of competencies on the

16

"Certificate of Eligibility":

<u>Adaptability</u> - I told him his write-up for the application was good, but he has had some problems in this area.  At the time he was informed he could no longer work from the Brockton, MA POD and needed to report to his official POD of Boston, MA he blew up at me.  I didn't think this was a good example of adaptability. This issue is explained in more detail on page 2 of the Affidavit I signed on Friday, November 8, 2002.

<u>Teamwork</u> - I told him that he never responds to my requests on time or keeps me informed, both less than acceptable examples of teamwork.

<u>Customer Focus</u> - I told him that his write-up was poor and he needed to develop this item further.

<u>Problem Solving</u> - I told him his write-up was good but he and I were still discussing the same issues as when I became his supervisor.

<u>Technical Credibility</u> - I told him that the only major work of his that I'd seen was a Special Agent's Report (SAR) and I previously told him that I didn't feel it was a good example of GS-1811-13 work.

<u>Partnering</u> – [Plaintiff] had gotten into an "e-mail war" with another SA, and I told him that I didn't think that indicated good partnering skills.  This issue is also discussed on page 17 of the Affidavit I signed on Friday, November 8, 2002.

<u>Communications</u> – [Plaintiff] doesn't communicate with me by talking directly to me; rather he communicates almost entirely by e-mail in order to document our communications.  Nearly everything has to be in writing; I've never had an employee like this before.  I told him that we have to be able to speak with each other, that everything can't be done via e-mail.  I consider this to be a serious weakness in [Plaintiff's] performance and told him that.

<u>Investigative Theory, Criminal Investigation, Organizational Knowledge & Tax Administration</u> - Plaintiff's write-up lumped these last competencies together making it difficult to address each one properly and individually.  The only item I had to

17

rely on was the above-mentioned SAR.  Plaintiff said
nothing at all about Organizational Knowledge and in
the five (5) months under my supervision, I don't
think he did anything indicating involvement or
knowledge with the other IRS Divisions and
functions.  Based on the lack of demonstrated
ability, I couldn't certify his readiness in these
competencies.

(Ex. 1, IF pp. 191-192).

21.     Response to Allegation (vii): SSA Traina met with

Plaintiff on December 12, 2002 and issued him a

counseling memorandum regarding the parking and

inaccurate monthly report issues (Ex. 1, pp. 522 and

517).  SSA Traina advised Plaintiff to obtain prior

supervisory approval before parking in the basement

of the JFK Federal Building.   Special Agents are

generally expected to park their Government owned

vehicles ("GOV") in commercial lots, and are

reimbursed for the expense.  (Ex. 3, Tr. P. 140).

Spots in the JFK Federal building are assigned

spots. Id.  As a manager, SSA Traina had been

allocated one of the parking spaces in the JFK

building.  SSA Traina decided that he would permit

Plaintiff to use his JFK parking spot since Traina

was only in Boston two (2) or three (3) days per

week, and Plaintiff was there every day and was the

senior Group 04-05 SA assigned to Boston.  SSA

Traina believed that it would resolve Plaintiff's

problem of parking without authorization.  On

18

Monday, August 5, 2002, SSA Traina sent an e-mail
informing his group, with a copy to others
authorized to park in the JFK Federal Building, that
he had assigned his parking space to Plaintiff.
(Ex. 1, IF p. 497).

The next day, Plaintiff sent an e-mail to SSA
Traina's group and offered them the use of the
parking space.  Id.  SSA Traina found Plaintiff's
action inappropriate and beyond his authority and
took the parking space back from him.  The following
day, SSA Traina issued an e-mail to his group
reiterating who was authorized to park in the
basement of the JKF Federal Building   (Ex. 1, IF p.
498).  SSA Traina testified he personally observed
Plaintiff continuing to park in the JFK building and
issued the December 12, 2002 counseling memorandum.
(Ex. 3, Tr. pp. 81 -83).   Plaintiff was further
counseled for putting down the wrong license number
on his monthly reports.  SSA Traina stated that he
was not initially aware that it was Plaintiff's
vehicle he had been observing in the JFK parking
area because Plaintiff had been providing inaccurate
reports. TR. at 85.  SSA Traina explained: SAs are
assigned GOVs and each person has to file two
monthly reports on the GOV; one deals with expenses
and the other is a vehicle log reporting instances

19

of commuting (home to office and office to home) and
the mileage associated with the commuting.  Reports
are all electronically submitted and filed and
include the vehicle make, model, year, license plate
number, and employee name.  Over a period of about
five months, on different occasions I noticed a
black 2002 Chevrolet Blazer (Blazer) parked in CI's
area in the basement of the JFK Federal Building and
it puzzled me because I didn't know anyone assigned
a black Blazer besides Plaintiff.  Eventually I
checked the license plate number of "4781 PY"
against Group 04-05's electronic administrative
files that contained the vehicle reports, but didn't
find a match for any of the group's SAs.  Plaintiff
reported "781IPY" on his vehicle reports.  At a
later date, I went to our property clerk and the
employee said the license plate number didn't match
any of our vehicles.  A few days later, I learned
that after the SAC had pulled into the basement of
the JFK Federal Building and could not park his
assigned GOV because all of CI's parking spaces were
full, he radioed the CI office upstairs to find out
what was going on.  It was reported that Plaintiff
was subsequently seen bolting from the office and
then seen rearranging GOVs in the basement.  Upon
learning of these events I requested a further

20

search by the property clerk and the employee concluded the black Chevrolet blazer with license plate number "4781 PY" was assigned to Plaintiff. For months, I had thought it was someone else's vehicle and would have certainly brought up the parking issue earlier if I'd know it was his assigned GOV.  (Ex. 1, IF pp. 194-195).  SSA Traina stated that he issued the counseling memorandum because  Plaintiff "ignored a directive prohibiting him from parking in the basement of the JFK Federal Building and because he had incorrectly identified his license plate number on the vehicle reports for months."  (Ex. 1, IF p. 195; see also Ex. 1,  IF, p. 145).

22.    Response to Allegation (viii): In an e-mail message to SSA Traina on Friday, January 24, 2003, Plaintiff asked me if he needed to be in the LCIP in order to apply for the LDP and two other questions (Ex. 1, IF p. 527).  SSA Traina responded by email on Wednesday, January 29, 2003, stating "in my judgment, you are not ready for management.  To date, in my judgment your level of readiness has not changed  [since Plaintiff applied for the LCIP]".  Id.

23.    Response to Allegation (xi): A copy of the January 31, 2003 counseling memorandum is located in the

investigative file at page 538 and sets forth in
great detail Plaintiff's erroneous practices with
respect to the seized cash (See Ex. 1, IF pp. 197-
198, and 538).  In brief, Plaintiff was counseled
regarding his failure to promptly notify SSA Traina
that he had adopted the seizure of over $7000 in
cash from the Weymouth Police Department, failed to
count the cash before taking control of it,
improperly stored the cash in a shotgun safe, and
failed to properly convert the cash to a bank check
in accordance with asset forfeiture procedures.
Plaintiff submitted a lengthy written rebuttal to
the memorandum (Ex. 1, IF pp. 93-103).

JOHN SNOW, SECRETARY OF THE
DEPARTMENT OF THE TREASURY,

By his attorneys,

MICHAEL J. SULLIVAN
United States Attorney


By:  /s/ Rayford A. Farquhar
     Rayford A. Farquhar
     Assistant U.S. Attorney
     1 Courthouse Way, Suite 9200
     Boston, MA 02109
     (617) 748-3100

## CERTIFICATE OF SERVICE

Suffolk, ss.                          Boston, Massachusetts
                                      March 6, 2006

   I, Rayford A. Farquhar, Assistant U.S. Attorney, do
hereby certify that I have served a copy of the foregoing

upon Anthony P. Sibilia, 10 Dean Street, Mansfield, MA
02048.

/s/ Rayford A. Farquhar
Rayford A. Farquhar
Assistant U.S. Attorney