5 CV/0096 PBS

## SUPPLEMENTAL AFFIDAVIT OF ANTHONY P. SIBILIA IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

### Relevant History

1.     From August 1996 to February 1998, I provided crucial testimony and extremely incriminating statements on behalf of a co-worker, Carrie Marra, in her sexual discrimination claim against our mutual supervisor at the time, Supervisory Special Agent (SSA) Donato Niro.  To fully appreciate the depth and significance of my involvement in Marra's case, one of my statements is attached hereto as **Exhibit 1**: Marra Statement.

2.     Within two months of giving my statement, the following occurred:  Marra's case exploded within CI (IRS Criminal Investigation) causing considerable upheaval within management, Niro retired, and the Brockton POD (post of duty) was closed.

3.     In November 1996, I filed an EEOC complaint against SSA Donato Niro as a result of harassment, threats on my life, threats to my job, harassment and intimidation  I experienced immediately after I provided my statement on behalf of Marra.  This complaint is attached hereto as **Exhibit 2**:  11/96 EEOC Complaint.

4.     Through the benefit of hindsight and the Defendant's perspective, as set forth in its Summary Judgement Memorandum at p. 6, it is clear that Aufiero was also implicated in my EEOC Complaint, although that was not my intent.  Niro was my only concern at the time, but, in hindsight, the reactions of both Niro and Aufiero to my EEO involvement were virtually identical: threats and intimidation to stop.

5.     I did not file an EEOC claim against Special Agent in Charge (SAC) Frederick Aufiero as implied by Defendant, (See Memorandum in Support of Defendant's Motion for Summary Judgement, p. 6, paragraph 1), nor did I ever consider a claim against Aufiero at that time.

6.      Upon information and belief, Aufiero needed to downplay my problems with Niro in light of Marra's claim. His treatment of me at that point was hurtful and self-serving but it did not go beyond an isolated verbal confrontation. In fact, after his initial meeting, and after Niro retired, I felt as if everything would blow over and I would be able to return to a 'normal' work environment. I was assured by Aufiero that I would be given priority consideration for retransfer to Brockton when the opportunity arose and I had no reason to question his promise.

7.      While my Marra Statement and my Complaint are lengthy, they provide a very clear picture of the dire circumstances in which I found myself at the time, as well as the particular "management loop" or "chain of command" I unintentionally implicated, offended and/or angered by involving the EEOC.

8.      This particular management loop began with SAC Aufiero and SSA Niro, and included Assistant Special Agent in Charge (ASAC) Michael Lahey, SSA Peter Benevento, SSA Bruce Traina and SSA Edward Delahanty. They sympathized with Niro and successively took over supervisory control of my career at various intervals after Niro's allegedly forced retirement. They were promoted through each other's acting assignments and recommendations and therefore they had access to and control of protected information relative to my EEO involvement. By there own admissions and inconsistent statements, their credibility and their articulated reasons for various management actions are pretextual. These actions and my supporting evidence are detailed below.

9.      In June 1997, Lahey was transferred to the Boston Field Office as the ASAC. On numerous occasions, Lahey assumed Aufiero's position as SAC during Aufiero's absence. Lahey eventually was promoted to SAC upon Aufiero's retirement (in or around 2000). SSA Benevento became the Organized Crime Drug Enforcement Task Force coordinator and ASAC under Lahey. On numerous occasions, Benevento assumed Lahey's position as SAC during Lahey's absence. SSA's Traina and Delahanty were promoted to their management positions (SSA) by Lahey.

2

10.    Upon information and belief, Marra's claim, my claim and the upheaval caused by my statements against Niro were the significant, if not the exclusive precipitating factors of Niro's retirement in December 1996, as well as the closing of the Brockton POD.

11.    After Niro's retirement, I did not pursue my November 1996 EEOC complaint any further since I was no longer going to be working with Niro.

12.    After Niro was gone and the Brockton office was closed (12/1996), I was transferred to the Boston POD along with three other agents (Richard Yee, James Donahue and Kevin Sullivan) who had been working out of Brockton. SAC Aufiero assured all of us priority consideration for reassignment to Brockton.

13.    I continued to assist with Marra's discrimination claim before the EEOC and Federal court. On or about February 1997, my comments relative to Marra's Civil Complaint (CA No. 97-10266-EFH) were published in the local newspaper, "The lawsuit also alleges that Niro retaliated against another IRS employee who was a witness for her when she filed a complaint with the federal Equal Employment Opportunity Commission. Niro allegedly told IRS agent Anthony Sibilia that he had "turned this into a war. Niro also allegedly told Sibilia that he had a "performance problem" and that he was going to conduct "continuous reviews" of Sibilia's cases." and I gave a formal deposition on or about February 1998. Marra's case was settled in or around December 1998. (See **Exhibit 3:** The Boston Herald article dated 02/10/1997 and Notice of Deposition dated 02/13/1998 (See prior Affidavit))

14.    In or around 04/1998, I applied for a promotion, GS-13 Special Agent position (Announcement # 8NCI013). My ranking score relative to my application for said promotion rendered me ineligible. I was first on the "Highly Qualified" list for the promotion. In order to be eligible for selection a "Best Qualified" score had to be attained. I was subsequently told by SSA Hank Chin (in or around 07/2001), that I

3

originally made the Best Qualified list relative to the aforementioned promotion. However, my scores were purposely lowered in order to remove me from the Best Qualified list and therefore, ineligible for said promotion. SAC Aufiero was the selecting official relative to the promotion and ASAC Lahey and SSA Benevento were part of the ranking panel. (See prior Affidavit)

### Discriminatory Motive

15.    While the period of time between the protected activity and the alleged retaliation can be telling, a prima facie case can be established by other evidence tending to establish retaliatory motivation. **Hochstadt**

16.    Any supervisor who was not a part of the Aufiero "loop" supported my professional growth and direction with open communication and guidance. Systematically, these supervisors were reassigned within relatively short periods of time:

| | | |
|---|---|---|
| SSA Scott Louthan | 12/1996 – 09/1997 | Received Performance Award |
| SSA Hank Chin | 08/1999 – 02/2000 | Received Managers Award |
| SSA Phil Hall | 02/2000 – 07/2001 | Received Performance Award |

(See prior Affidavit)

17.    The events alleged in my Complaint occurred exclusively when I was under the supervision of various members of Aufiero's management "loop". Initially, the pattern of discrimination was a subtle withholding of advancement and other work opportunities such as promotion and retransfer. It has progressed, however, to more overt hostility and aggressive efforts to discredit my professionalism, including physical force and counseling memoranda.

### Brockton POD

18.    By October 2001, after much controversy dating back to its closure and the chaos and management restructuring that took place surrounding the Marra case and Niro's

4

retirement, the Brockton POD was reopened. I was not selected for re-assignment to Brockton despite the following:

a. SAC Aufiero's promise to give those who were originally assigned to the Brockton POD (me) priority consideration;

b. I made my need to work from the Brockton POD known to my supervisors, including Aufiero, Lahey and Benevento. Upon information and belief, the reopening of the Brockton POD was due to this articulated need;

c. During the year immediately preceding the re-opening (2000), I had been unofficially working from the Brockton POD since 75% of my caseload required me to be at that location;

c. During 1999, 50% of my caseload required me to work from the Brockton POD;

d. In 1992, I was hired to work out of the Brockton POD—it was my originally assigned POD;

e. Because my workload required on-site work in or near Brockton, being required to work from the Boston POD created commuting obstacles, work environment changes, and reporting hardships that did not exist previously.

19. The only reason articulated by SAC Lahey for his decision not to retransfer me was that it was a seniority-based decision. (See Exhibit 4: 4/18/02 Lahey Affidavit). However, out of the four agents originally displaced from Brockton (Richard Yee, James Donahue, Kevin Sullivan and I), only two were transferred by Lahey back to Brockton upon re-opening (10/2001), Richard Yee and Kevin Sullivan. Importantly, James

5

Donahue and I were the only agents that provided testimony in Marra's Civil Action discrimination claim. Furthermore, James Donahue is senior to Kevin Sullivan and so, SAC Lahey's articulated reasons relative to his decision is contradictory. It should be noted that Donahue was eventually transferred back to Brockton by Lahey's successor, Joseph Galasso, which occurred sometime around 07/2002. Ultimately, I was the only agent that was not returned to Brockton upon re-opening. Additionally, I was also the only agent that filed an EEO claim (11/1996 and 10/2001).

20.     After SAC Lahey made his selection of who would be retransferred to Brockton upon its reopening on or about October 2001, I was the only agent (who had been transferred to Boston when the Brockton POD closed) that was not permitted to work from the Brockton POD, even though my workload demanded it. I was also the only agent with current and on-going EEO involvement (Marra's case).

21.     Lahey was aware of my EEO involvement at the time he made his selections through his communications with Aufiero, in taking over control of the Boston POD as Aufiero's successor, and by virtue of his need to approve the work time I devoted to the Marra case. He was aware of why the Brockton POD had closed and the subsequent controversy surrounding its unofficial use. Furthermore, my statements had been published in the major Boston newspapers. (See Exhibit__: newspaper articles)

22.     Lahey denied having knowledge of my EEO involvement in his 4/18/02 statement. **See Exhibit 4.**   Lahey denied having knowledge of my EEO involvement in his Answers to Interrogatories dated 2/28/03. **See Exhibit 5:**   Lahey Answers to Interrogatories. But Bruce Traina recalled being told all about my involvement in the EEO process by Lahey in March or April 2002 in a  conversation about the re-opening of the Brockton POD. **See Exhibit 6:** 6/3/02 Traina Affidavit.

23.     Lahey's asserted reasons for not selecting me for retransfer were pretextual and discriminatory where:

6

a.   One of the agents chosen (Kevin Sullivan) was not senior to one of the
agents not selected (James Donahue), so seniority could not have been a
factor;

b.   I demonstrated a strong need with an on-going caseload that required the
Brockton POD base, Brockton was my original POD where I had applied
for and had been hired to work. Additionally, Aufiero had promised all of
the displaced agent's priority consideration for retransfer;

c.   By the time the Brockton POD was officially re-opened, I was the only
agent (of those transferred to Boston in 12/96) who had been singled out
and was not allowed to work from the Brockton POD in an unofficial or
official capacity;

d.   Not only did Lahey know about my EEO participation in contrast with his
prior testimony, but he also openly discussed it with Traina relative to the
re-opening of the Brockton POD.

24.   On 10/25/2001 I contacted an EEO official relative to my realization of what I
believe was an ongoing pattern of discrimination based on retaliation, which has since
manifested into a hostile work environment.

### Promotion to GS-13

25.   Lahey asserted that the reasons for my non-selection were that my manager was
not supportive of my application for Vacancy Announcement NC1004 in June 1999 and
that I had a weak interview. (**See Exhibit $\frac{4}{}$:** Lahey Affidavit).

26.   In a memo dated June 9, 1999, Lahey stated that the interview process "will not
be used to eliminate someone from consideration...The quality of work done during the
respective period of time will be the most important factor...and the interview should

7

serve to enhance the position of those who have done the best work." **See Exhibit __:**
6/9/99 Memo

27.    Traina said my attire and presentation were unprofessional at the interview for the
NC1004 promotion.  (**See Exhibit _6_:**  6/3/02 Traina Affidavit);

28.    Benevento wrote a case appraisal for the time period preceding the NC1004
promotion that was both extremely supportive of my application as well as my
professional appearance and presentation on various work assignments.  For reasons
never identified to me, I was not given the appraisal until after the deadline for the
vacancy applications had passed, and therefore it was not used to support my candidacy.
(See prior Affidavit)

29.    Upon information and belief, Benevento's appraisal discredits both Lahey and
Traina's assertions as to non-support from supervisors and non-professional appearance.
Since Benevento did not provide me with the appraisal in time for me to be able to
submit it with my application, it could not be considered.  Upon information and belief,
Lahey and Traina specifically made those statements to merely incite me since I was not
able to submit Benevento's Appraisal and my frustration was apparent at the time.

30.    Lahey's asserted reasons for non-selection were pretextual where: Benevento's
appraisal is wholly inconsistent with the idea that he did not support my work abilities or
that I was unprofessional in any manner;

31.    Lahey's use of the interview process to deny my application was wholly
inconsistent with his previously articulated purposes of the interview.  Additionally, in or
around 02/2000, Lahey told SSA Chin that he wanted to make a statement relative to his
selections for promotion (At this time I was the only agent remaining from the original
Best Qualified list that was not promoted);

8

32.     Lahey's inaccurate and non-justifiable rating of my work and Benevento's failure
to provide my with a favorable appraisal and therefore, was not considered as a part of
my application due to its late submission (I received the appraisal in or around 03/2003).

### Physical Force and Counseling Memos

33.     Traina and I had been on friendly terms prior to my EEO involvement. Since my
EEO involvement, Traina has attacked me physically, when he lost control during a
training session and used excessive force against me, and professionally, when he
blatantly lied about my unprofessional appearance in an Affidavit and exacerbated
circumstances surrounding protocol errors in judgment to justify his counseling memos.

34.     It is also no secret around the office that I seek any and all advancement
opportunities. However, during his entire tenure as my supervisor, he was 'surprised'
every time I applied for admission into the leadership/management program.

35.     Traina's reasons for his actions are pretextual and discriminatory where:

   a.     Our relationship changed abruptly after my EEO involvement;

   b.     He completely lost control and used excessive force against me shortly
          after I sought EEO counseling with respect to his actions toward me that I
          felt were retaliatory for my EEO involvement and therefore his credibility
          and motive is highly suspect;

   c.     He used his supervisory position over me to create counseling situations
          after I, along with those responsible management officials who provided
          oversight relative to said actions, had made minor errors in protocol;

9

    d.      He was not equipped to handle my situation by his own admission, but instead of asking for help, he subjected me to insult and ridicule and counseling memos.

36.     Furthermore, Traina's bias toward my EEO involvement is evident through his statements, which were made to me during various counseling sessions intended to intimidate me relative to same;

37.     **Exhibit 7:** Reminders for Discussion with Special Agent Anthony P. Sibilia. In regards to this memo. Traina states that I should be spending less time on EEO matters and as a result, such activity will have an impact on my performance evaluation. He tells me, "It is your choice to file EEO complaints."

38.     **Exhibit 8:** Affidavit dated 02/05/2003, page 189 – third paragraph, Traina states, "Additionally, I told him that during the past few days I was very busy, including preparing for and meeting with an EEO investigator concerning his complain he filed against me."; page 196 – last paragraph, In responding to his statement, "I'm just dealing with shitty agents," purportedly made against me, Traina states that although he made the statement, I am only to blame if others believe said statement was intended for me because, "1) SA Sibilia has made false allegations against me to other SAs and employees claiming I am harassing him; 2) Other SAs and employees have independently concluded that SA Sibilia's performance and conduct are less than desirable."

39.     **Exhibit 9:** Affidavit dated 11/08/2002, page 181 – last paragraph, Traina states, "At the meeting I told SA Sibilia that in my judgement his behavior has been rude, unprofessional and insubordinate, and I cited some of the examples listed above to demonstrate my point, including his issuing of the e-mail about the parking space, his statements to me that my prior affidavit for EEO was "totally out of line." His response to my e-mail about his LDP application and his failure to correct his incomplete SAR. I told SA Sibilia he should come and talk to me, be a team player like everyone else in the group, rather than avoiding contact with me or being inconsiderate by sending last minute

e-mails." It should be noted that at no time during my career have I been rude, unprofessional or insubordinate.

40.     **Exhibit /0** Sworn Testimony dated 08/10/2004, Traina states that my involvement with EEO was a "distraction", he stated, "I was focusing in on my case work and I got a call out of the blue to provide an affidavit. And it wasn't—it's not part of my routine."

41.     Statements made by Edward Delahanty relative to his bias against my EEO involvement include;

42.     **Exhibit //**: Sworn Testimony dated 10/20/200, Delahanty states, "—I tended to support virtually every EEO action among people in my group that didn't involve me personally. So, I found it insulting personally to me. That's what I meant by that. It's -- it is a gross insult. And there are people who are retaliated against. There are people who are discriminated against. And those people deserve redress, as I testified on behalf of George Neal in a previous case. I thought he was unfairly treated. I don't think, certainly as it relates to me, I never treated you unfairly. And that's what I find insulting and very, you know, it makes me angry."

43.     Statements made by Peter Benevento relative to his bias against my EEO involvement include;

44.     **Exhibit /2** Affidavit, dated 11/09/2002, Benevento states, "The purpose of this meeting was to discuss certain issues with SA Sibilia regarding his performance and other actions. Myself and SSA Traina called the meeting. With one exception the comments above were made my SSA Traina. I however did state to SA Sibilia he was not a team player and that was one reason he is not considered for management.

45.     As I have stated, through my career I have received above average work appraisal, accolades for my work and performance and I have received other work related

11

recognition. At no time have I been rude, unprofessional or insubordinate. As a result of the negative actions identified, which have been unjustifiably documented, my career and advancement opportunities have ceased. Although the Respondent has articulated reasons for said actions, these reasons are merely pretextual where the reasons have changed over the course of the EEO investigation and where the asserted reasons are not credible.

Signed under the pains and penalties of perjury, this 16th day of May, 2006:

Anthony P. Sibilia

I, Anthony P. Sibilia, state that:

I reside at 25 North Main Street, Mansfield, MA, 02048,

I am employed with the Internal Revenue Service (IRS), Criminal Investigation Division (CID), as a Special Agent and have been so since April, 1992. I began my employment with the IRS on January 28, 1991, as a Revenue Agent (R/A) with the Examination Division. Although I was a R/A for approximately six months, I spent the majority of that time in training, completing R/A Training Phases I (2/11/91-3/22/91) and II (4/28/91-6/11/91). In July, 1991, I transferred from the Examination Division to the Criminal Investigation Division, pending a background investigation and training requirements as a grade GS-9.

I successfully completed all the requirements needed to become a Special Agent in April, 1992. On that date my pay grade was still GS-09 and I was assigned to work at the Brockton Post of Duty (POD). Since April, 1992 my direct supervisor has been Dan Niro, Group Manager, CID, Brockton.

During my career with CID I have worked with Special Agent Carrie Marra. Special Agent Marra returned to CID approximately the same time that I started working for CID. Special Agent Marra worked in the same office/POD (Brockton) that I have been assigned. I have worked with Special Agent Marra at various times during the past several years, assisting on various investigations that we were each assigned, as I have with all of the Agents in the Brockton and New Bedford PODs.

It has been made known to me that Special Agent Marra is involved in a sex discrimination, Equal Employment Opportunity (EEO), investigation involving Dan Niro. Regarding this matter the following is true:

During my first few years with CID, I had numerous conversation with Niro, outside of the work environment, during coffee breaks or while driving to various work related locations. Although the majority of these conversations were held among other Agents, I had several (more than twenty) conversations with Niro alone. It was during at least three of these conversations that Niro made statements to me regarding woman.

Niro's son recently graduated from law school. Prior to Niro's son graduating from law school, I asked Niro what his sons plans were after graduation. Niro told me that his son wanted to work for the Federal Bureau of Investigation (FBI), but was having difficulty because of the competition. Niro went on to explain that it is almost impossible for a white male to obtain employment in the Government, irregardless of his experience or education. Niro told me that I should be concerned about this because it is going to effect me and that I was going to get passed over for promotions based on my gender. Niro added that one of the biggest problems with the Government is that certain individuals are promoted to positions they are not qualified to be in, and I (Sibilia) will suffer, because I am a white male.

During another conversation that involved Niro's son and his employment progress, Niro told me that his son was considering working for CID, as a Special Agent. During this conversation Niro told me that I did not have a chance to compete for a management position, and he made a derogatory remark as a reason for this, which was, because I (Sibilia) do not wear a skirt. Niro explained that he had to earn his

*Anthony P. Sibilia*

management position, as compared to females who currently are promoted to management positions based on their gender as opposed to their qualifications. Niro stated that as a white male, he would not want to be starting his career at the present time because it is almost impossible to compete for a management position.

During another conversation with Niro, which was a result of information that had been made known to various Agents in the Brockton POD, regarding a CID group in Florida. It was said that this group, which consisted entirely of female Agents, had to conduct an arrest on a large male. The manager of this particular group requested to have the warrant transferred to another group, with male Agents, to conduct the arrest. Niro told me that these are the same individuals, referring to females, that I (Sibilia) was going to have to trust backing me up when I'm going "through the door" (referring to a Search Warrant), which he added, I (Niro) don't know about you, but I'm not comfortable with that situation.

I have had several conversations with various Agents in the Brockton and New Bedford PODs, regarding Niro's treatment of Special Agent Marra. Although Special Agent Marra had similar problems to me regarding work related issues, she was required to submit to much more scrutiny than I underwent. I am not the only Brockton/New Bedford Agent who believes that Niro did not treat Special Agent Marra in a manner similar to the way that I was treated. James Wallwork, a senior Grade 13 Special Agent with over twenty years in CID, told me the following: The Brockton/New Bedford Agents have said that he (Niro) would use you (Sibilia) as a defense to get Carrie by stating that he treated her the same way that he treated you, "and we know that's not true". Additionally, it was made known to me that in a meeting consisting of Special Agent's James Wallwork, Lawrence St.Onge, Donald LaPorte (all GS-13s), and Niro, Niro was told that if he truly wanted Special Agent Marra to become more productive all he had to do was "leave her alone" and "let her do her job". Special Agent LaPorte also told me and Special Agents Wallwork and Paul Donnelly that Special Agent Marra has a tough case (referring to her EEO complaint), and he added that "it's not like he (Niro) got caught "fucking" her (Marra) on his desk".

I had a conversation with Special Agent Wallwork regarding Special Agent Carol Imprescia. Special Agent Imprescia transferred out of the Brockton group early in my career. Special Agent Wallwork explained to me that Niro had him assist Special Agent Imprescia on a case that she was investigating. Special Agent Wallwork stated that he found out that Niro was using him to fire Special Agent Imprescia. Special Agent Wallwork told me that he asked Niro directly if he was trying to fire Special Agent Imprescia and Niro answered "yes". Special Agent Wallwork added that since Special Agent Imprescia has been out of Niro's group she has become a very productive Agent, in that she has submitted several prosecution cases. Special Agent Wallwork also stated that Niro was probably using Special Agent LaPorte the same way that he (Niro) used him (Wallwork) to fire Special Agent Imprescia, that is, as a tool to fire Special Agent Marra.

It should be known that all of my Annual Evaluations and/or case Evaluations from Niro have been satisfactory and/or above satisfactory. The majority of my direct investigative time has been from cases that I have been assigned. Since becoming a Grade 12 (June, 1994) I have been assigned/worked at least three subject cases per year. I have worked as many as six subject cases in one year. Additionally, since June, 1994, the majority of my direct investigative time, approximately 95%, has been on

2

subject cases that I have been assigned, as opposed to information items, referrals, ect., which represent only a small percent of me direct investigative time.

Upon becoming a Special Agent in April, 1992, I was assigned to work with Special Agent Carol Imprescia, as my on-the-job instructor (OJI). Special Agent Imprescia had volunteered to be an OJI. Subsequent to working with Special Agent Imprescia, Niro changed my OJI to Special Agent, Douglas Tilley. Niro told me that Special Agent Imprescia did not have enough experience to properly train a new Agent. Special Agent Tilley had not volunteered to be an OJI and at the time had an extensive case inventory, which eventually led to another re-assignment of my OJI. I was assigned by Niro to Special Agent Donald LaPorte. On more than one occasion, I was told by Special Agent LaPorte that he did not request nor want to be an OJI and that he was very busy with his own case load. I was taken off OJI status approximately the same time that I received my grade GS 12 (6/94) promotion.

During approximately my first two years (GS-9 & 11) as a Special Agent, Niro questioned my work on a continuos bases. At first Niro questioned the time it took me to do various case related activities, such as, preparing/typing memorandums of contact or preparing reports. Niro would tell me the number of hours that he thought it should take me to complete various tasks and expected me to meet these time limits. While I was a grade GS-9 and for a short period as a GS-11, I remember on many occasions leaving Niro's office, after meeting with him regarding my work and feeling so frustrated and hurt because he would make broad accusations concerning my work, appearance and performance, yet he would never tell me what I was actually doing that was wrong. In my opinion there is nothing more frustrating than being accused of a performance problem and never being given the opportunity to correct it because the specific problem/weakness is never identified by the manager (Niro) to the Agent (Sibilia). In retrospect, I was not doing anything wrong and on the contrary I was probably more successful than most of the newer Agents at the time. One of the ways that I was able to meet Niro's time constraints was to charge any excess time to other cases that I was working. The only reason I did this was to meet Niro's requirements, which Niro made clear to me was essential if I wanted to become a better/successful Special Agent. I was on probation during the first year of my employment with CID, as are all new Special Agents.

Unfortunately, I wasn't a good record/time keeper and because I was adjusting hours on cases to meet Niro's requirements, I made record keeping mistakes. At that time Agents were required to maintain chronological worksheets on all of their cases, which reflected the hours worked and the activities performed on any assigned cases. Agents were also required to maintain a diary which reflected on a daily basis cases worked, the hours charged to each case and any other information not included in a chronological worksheet. Additionally, each month a time report had to be submitted that summarized all of the hours worked and the activities (ie., cases) associated with that time for that particular month. I charged hours to cases on chronological worksheets and mistakenly reflected different hours in my diary entry and/or monthly time report.

Because of the problems that I had regarding my time keeping, Niro had several meetings with me to resolve this issue. On 1/22/93, Niro told me that the inconsistencies in my Diary and Chrono's were unacceptable. As a result, I had to meet with Niro and Special Agent Tilley (my OJI instructor at the time) to resolve the matter.

3

Niro's resolution was that he instructed me to record my daily activities on chronological worksheets as I perform them and to use that information at the end of the day to make diary entries, which was no different than what was normally done. On 3/29/93 Niro had me turn in my Diary and Chrono's. for a review. Niro made only minor comments regarding my Diary and Chrono's. and wrote "Not Bad" on the notes that he gave me regarding his review.

On 5/19/93 I had another review of my Diary and Chrono's. Niro made several pages of comments regarding this review. Although the majority of these comments were repetitive, questioning the time it took me to accomplish various tasks, Niro told me that these were recurring issues which had to stop. Niro's last comment on his notes to me regarding the 5/19/93 review was, "You are to submit your diary & chrono to me or your OJI once a week for review".

Although on 5/19/93 Niro required me to meet with him or my OJI on weekly basis to review my diary & chrono. entries, I can only remember one such review that was performed by Niro, a couple weeks after the 5/19/93 meeting . My OJI at this time was Special Agent Donald LaPorte. I met with Special Agent LaPorte very rarely because of his extensive case inventory. During my first two years with CID, Niro would require certain things from me regarding my time keeping, which he seldom enforced, such as daily contacts with my OJI to review my diary and chrono. entries. Because my OJI's were present for many of these requests and did not seem concerned that I meet such requirements, I did not think the requests were necessary. I believed that these issues would be resolved over time, which seemed to happen once I became a grade GS-12.

During approximately my first two years (4/92 - 6/94) under Niro's supervision as my Manager, I have had many meetings with him in his office regarding my work. These meeting were a result of pages of comments that he made on various work that I had submitted. Almost every item that I submitted to Niro during my first two years was returned to me with pages of notes/comments. In almost every case no matter how many comments he made, including diary and chrono. comments, Niro would give me a note informing me that my final work product was above average, making statements like "Nice Job", "Very well done" or "Excellent" ect., Additionally, after these various meetings with Niro regarding my Diary and Chrono's, he would end the meeting by telling me that he likes me, or he knows I'm trying and that my work is very good and I will become a successful Agent. On more than one occasion Niro shook my hand and told me that several years from now when I'm (Sibilia) a manager, I will look back on his treatment of me and agree that because of it I'm (Sibilia) a better Agent. Based on Niro's positive feedback I had no reason to believe that I was performing below average and nor did I think that any of the problems I had regarding my work was serious.

I had a conversation with Special Agent Marra regarding Niro. At that time Special Agent Marra was very upset regarding how she was being treated by Niro. Special Agent Marra told me that Niro was requiring her to have weekly meetings with him regarding her work performed during the week and to review her diary and chrono's. I remember thinking how stressful it must be for Special Agent Marra to be under that kind of review and at the same time being thankful that Niro did not hold me to similar requirements. Niro never made me turn in all of my workpapers on any case that I was working prior to its completion for review..

4

I had other conversations with Special Agent Marra, some occurring after she had met with Niro and was so emotionally upset that she was crying. During one of these conversations, Special Agent Marra told me that Niro was requiring her to write memo's. on drive-by's that she had conducted. I informed Special Agent Marra that although I originally was not writing any such memo's, Niro had told me that it is necessary to write memo's. of all contacts which were made during the course of an investigation. I also told Special Agent Marra that Niro later told me that contacts such as drive-by's or city records checks did not have to be formal memo's. and could be documented by briefly writing what was done on any piece of paper, or any document that is then included with the case file .

Special Agent Marra is currently working a case that is similar to one that I am presently investigating. Both cases target tax return prepares. On 8/9/95 Niro gave me a note advising me that the "SC" (I believe this refers to the Andover Service Center), is making my case a preparer case and included a project number. This particular case had originally been assigned a normal case number, which I was using to report my time. Starting in 2/96 I started charging all my time regarding this case to the project number provided by Niro. I continued to charge my hours to this project number for the months 3/96 through 7/96, which I recorded on my monthly time reports that Niro reviews and signs monthly. Sometime during the beginning of August, 1996, Niro contacted me and asked why I was charging my time to a project number. I told Niro that he gave me a note last year advising me that my case was changed from what it was originally set up as to a preparer project. Niro stated that he did not recall making any such statement. He then told me to stop charging my hours to a project and to only use the assigned case number. Additionally, in regards to Niro's note to me, Niro also wrote, "File this note in the ----- case file per Paul Donnelly". I recently asked Special Agent Donnelly if he remembered ever having such a conversation with Niro regarding this particular case. Special Agent Donnelly stated that he did not recall any such conversation with Niro and did not understand why Niro would have had me charge my time to a project instead of that particular case. It should be noted that project numbers are used by districts and do not appear on Agent's time on case reports (known as Cimis Tables).

Throughout the early years of my career Niro would tell me that to become a better Special Agent it takes anywhere between three and five years of work related experience. Niro told me on numerous occasions that he believed that I would become a successful Special Agent and that there is a progression that all Agents like myself have to undergo. Niro explained to me that as a grade GS-9 Special Agent, very little was expected from me and that I would spend the majority of my time assisting and learning from other Agents. Niro continued stating that when I become a grade GS-11 more would be expected from me and by the time I was a grade GS-12, I would understand this job well enough to be independent and at the same time have a certain amount of freedom to conduct investigations with little or no guidance from my supervisor. In retrospect, most of the problems that I had early in my career as a GS-9 and GS-11 did not seem to be an issue with Niro once I became a GS-12.

Niro withheld my grade GS-12 promotion for approximately three months. Niro told me that grade GS-12 promotions are not automatic and that only when I submitted my first prosecution report would he then consider promoting me to the GS-12 level. I submitted my first prosecution report in 6/94 and within a couple of weeks I was promoted to a grade GS-12 Agent. Since receiving my GS-12 promotion Niro has not

5

made an issue of any item(s) that he questioned concerning my diary and/or chrono. In fact, many of the same items that he used in delaying my GS-12 promotion are the same issues that he noted on a diary and chrono. review that he conducted in 8/95, I was a GS-12 at this time. Since 8/95 Niro has not commented on my diary and/or chrono. entries except to conduct semi-annual reviews as he does with all Agents. Additionally, since becoming a GS-12, Niro has allowed me to work in the New Bedford POD, giving me as much freedom as necessary to conduct my investigations.

Although my GS-12 promotion was officially withheld because of my diaries and chrono's., it should be noted that my GS-11 promotion was not withheld. In fact, I had more problems during my first year as a Special Agent regarding my diaries and chrono's., than subsequent to becoming a GS-11. And, upon becoming a GS-12, Niro has not questioned my work and/or hours charged nearly as much as he did when I was a GS-9 and GS-11. In my opinion the only difference I can see in my work currently as a GS-12, from when I was a GS-9 & 11, is the freedom that Niro allows me to complete my work in a time frame that I set, which allows me the opportunity to submit a better work product.

Recently I conducted a search warrant on an investigation. During the planning stages of the warrant I had to meet with Niro to review my raid plans. The only issue Niro had regarding my plan was to make sure that I picked the "correct" female Agent to assist on the warrant. Niro stated that if whoever I pick screws up (referring to the female Agent) I was going to be the one held responsible. He told me to give me the choice a lot of thought and to choose someone that I could trust. Although the majority of the Agents that I used for the warrant were male, Niro did not question any of their qualifications or if I could trust them.

I have never received a negative performance and/or conduct letter from Niro. Niro has told me that if I ever receive a type-written letter from him regarding a performance or conduct matter, he will be in the process of having me fired. Niro told me that he has fired senior Grade 13 Agents as well as secretaries. At no time during my career with CID have I ever thought that I was going to be fired.

Although the following statements concern me, I think they demonstrate what I feel are improper/inappropriate methods used by Niro to accomplish his goals: Early in my career, as a grade GS-11, Niro made the following statement to me regarding a request that I had submitted through to him for a transfer out of his group and into a Boston CID group: Niro told me that wile I was in Georgia during Special Agent Training, the chief of CID, Kenneth Claunch, contacted him regarding my employment background check and in particular my credit report that showed a delinquent account and some late payments. Niro stated that Claunch wanted to fire me because of my past credit problems. Niro told me that although Claunch wanted me fired, he (Niro) did not think this was right and wanted to give me a chance to explain myself. Niro told me that he went out on a limb to convince Claunch not to have me fired. Niro told me that although he didn't have to, he wanted to give me a chance, which no one else in CID would have done.

Niro convinced me to stay in his group. Niro also told me that I would not received the kind of help and support that is available to me in Brockton and that I would be lost in Boston because no one would be looking out for my interests. I decided not to go through with my requests to be transferred to Boston based on Niro's statements and his

6

positive feedback that I was doing an above average job and that in a short time I would be the one receiving work related awards.

Early in my career as a GS-9 or around the time I became a GS-11, Niro told me that although he did not know how, he believed that I was doing something behind his back and he stated that he would cut my "fucking" legs out from underneath me if I ever screwed him. I was offended by this statement because not only wasn't I doing anything wrong I was going out of my way to meet his requirements. Additionally, on more than one occasion Niro had me compare my salary to friends of mine that I had graduated college with and had me agree with him that I was making more money than the majority of them. Niro also had me break down my salary to an hourly wage amount to see what it was costing the taxpayers for various work that I had completed and would question me if I thought the taxpayers were getting their moneys worth from me. The majority of these statements were made to me while I was a GS-9 and GS-11 Agent. Once I became GS-12 Niro stopped making these types of negative comments to me and in fact told me that I had "turned the corner" and was on my way to becoming a Senior GS-12 Agent.

In addition to the aforementioned statements, Niro has written things about me which I have read that are not accurate and which are merely self-serving statements. I have read notes that Niro has written about me which although they are not substantially incorrect, were written in a negative way to mislead the reader of the true circumstances involved. Additionally, in some cases, Niro has never given me the opportunity to read these notes. I believe Niro creates "volumes" of paperwork on Agents which he saves, to use if necessary against those Agents. As far as I'm concerned Niro maintains a "second" personnel file on various Agents assigned to his group.

I have had conversations with Special Agent Marra where she told me various statements that Niro had made to her such as, if you go to EEO I'll have you fired in six months or if you screw me I'll cut you down, and that Niro was trying to fire her. I have talked to several senior grade GS-13 Agents who have told me that if their work was put under the same review as Special Agent Marra, they would have the same problems, if not more, than what Niro has identified.

I believe that Niro unfairly treated Special Agent Marra because of her gender. I can recall on numerous occasions Niro stating that he "can't figure them out", "I don't know how they think", referring to females. At one time (1994/1995) a female Tax Fraud Investigative Aid (TFIA) was assigned to the Brockton POD. It was made known to me that Niro told an Agent (Special Agent Brook Maclean) who had asked this female TFIA to accompany him and Niro to coffee for a morning break, never to ask this TFIA to coffee again. At that time, Special Agent Marra, the group secretary and the TFIA were the only females in the Brockton CID office. Niro takes daily coffee breaks in the AM and PM and most of the Agents in the POD accompany him for these breaks. The female TFIA has since been replaced by a male TFIA who regularly attends coffee breaks with Niro and the other Agents. It should also be noted that recently Niro nominated the current male TFIA, Ben Monteiro, for the Hispanic Employee of the Year (New England District). I was told by Monteiro, who is Portuguese, that upon discovering that Niro had nominated him, he went to Niro and told him that he was uncomfortable being nominated for the Hispanic Employee of the Year, because he (Monteiro) is Portuguese. Monteiro informed me that Niro told him not to worry and that he (Niro) would do anything to "stick it to John (referring to CID's Branch Chief)" for not

7

*Anthony P. Little*

promoting him (Monteiro) to a higher grade. I do not believe that the former female TFIA, who is Hispanic, was ever nominated by Niro for the Hispanic Employee of the Year or promoted to a competitive grade by Niro.

Although I feel that in the past Niro has treated me unfairly, I have never had to undergo the constant review that Special Agent Marra was required. I don't believe Niro has at any time tried to fire or transferred me out of his group. Additionally, since becoming a GS-12 Agent Niro has given me freedom to work my cases independently and has let me work almost exclusively on my cases. I have been assigned very few referrals/information items/ect., since becoming a GS-12, 6/94.

Under penalties of perjury, I declare that the foregoing statement consisting of eight (8) pages, each of which I have signed is true, accurate and complete to the best of my knowledge and belief.

I made this statement freely and voluntarily without any threats or rewards, or promises of reward having been made to me in return for it.

Anthony Sibilia, Special Agent

8

DEPARTMENT OF THE TREASUR

## INDIVIDUAL COMPLAINT OF EMPLOYMENT DISCRIMINATION

Based on

Race, Color, Religion, Sex, National Origin, Age, Physical or Mental Handicap, or Retaliation

| PLEASE TYPE OR PRINT | FOR OFFICE USE ONLY<br>COMPLAINT NO. |
|---|---|

PLEASE NOTE: INFORMAL PRE-COMPLAINT EEO COUNSELING IS A REQUIREMENT AND NO FORMAL COMPLAINT CAN BE ACCEPTED FOR INVESTIGATION WITHOUT IT.

1. _Anthony P. Sibilia_
Complainant's Name

_10 Dean Street_
Home Address—Street, RD, P.O. Box

_Mansfield_  _MA_  _02048_
City          State          Zip Code

Home Phone: Area Code (508) 337-8714
Work Phone: Area Code (508) 992-6505
FTS

Give area code and number where you can be reached during normal business hours if different from those above.

2. Designation of Representative. If you want someone other then yourself to represent you, you must sign and submit TD 62-03.2, "Designation of Representative and Limited Power of Attorney." (or a suitable alternative), with this Individual Complaint of Discrimination to the Regional Complaints Center processing your case.

If, after submitting this Individual Complaint of Employment Discrimination, you decide to have a Representative, you must IMMEDIATELY SIGN AND SUBMIT TD F 62-03.2. If having selected a Representative and having submitted this form you WISH TO CHANGE your Representative, you must sign and submit a new TD F 62-03.2 naming your choice.

3. Are you now working for the Dept. of the Treasury? Yes ☒ No ☐
Did you formerly work for the Dept. of Treasury? Yes ☐ No ☐
If yes, when? _____
Have you applied for employment with the Dept. of Treasury?
Yes ☐ No ☐  _Special Agent, 1811, 65-12_
If you responded Yes to either of the first two questions, give title, series, grade and organization unit. _I.R.S./C.I.D._

4. In what organization, office or unit of the Department do you believe discrimination/retaliation against you occurred?
_Internal Revenue Service, Criminal Investigation Division, Brockton, MA_

5. What was the date of the last alleged discriminatory/ retaliatory event or incident covered in counseling?
_9/3/96_

6. If you became aware of the alleged discriminatory/ retaliatory event or incident covered in counseling on a date substantially different from that shown in 5, show date and explain.
_See Attachment_

7. What was the date of your last interview with the EEO counselor? State name of counselor, where located, and telephone number.  11/1/96
_Donald J. Senna_
_New Bedford, MA_
_508-997-0998_

8. On this same matter have you filed a grievance under a negotiated grievance procedure? Yes ☐ No ☒
Under the Agency grievance system? Yes ☐ No ☒
Have you appealed to MSPB? Yes ☐ No ☒
State where and when filed or appealed, give identifying numbers and describe present status.

9. Check only the basis or bases on which you think you were discriminated against. Put information in the space provided only for the category or categories in which you are alleging discrimination. If alleging age discrimination, give date of birth. (To file a complaint based on age, you must have been at least 40 years old when the matter of concern occurred.)

☐ AGE          ☐ COLOR: _____          ☐ SEX _____          ☐ NATIONAL ORIGIN

DATE OF BIRTH _____
          M/D/Y

☐ RACE _____          ☐ RELIGION _____          ☒ RETALIATION/REPRISAL FOR INVOLVEMENT IN COMPLAINTS PROCESS

HANDICAP:

☐ MENTAL
☐ PHYSICAL

your complaint. Identify the specific acts, incidents or events which you believe wr discriminatory or in retaliation against
ow the dates on which these acts, ir      nts or events occurred. If you are alleging t.      you are perceived as being handi-
J, you should include a statement of the manner in which you feel you were discriminated against, e.g. failure to modify work
failure to offer opportunity for training or advancement. If you are handicapped and your complaint is concerned with a specific
training, etc., you should offer evidence that you were qualified for the position, training, etc. which you sought. If handicapped.
should also request the reasonable accommodation you prefer, if appropriate. If you feel this space is not adequate to provide
ient information to understand your complaint, you may use an extra sheet. If your complaint is accepted for processing, you will
e given the opportunity to provide a detailed affidavit.

$S E E \quad A T T A C H M E N T$

State the remedial or corrective action you are seeking to resolve your complaint.

$S E E \quad A T T A C H M E N T$.

You must sign and date this complaint.

_____
Signature

11/11/96
_____
Date

) F 62-03.5 (09-87)

♢ U S G P O  1944 − 207-004/81132

Equal Employment Opportunity (EEO) Complaint

Name: Anthony Sibilia, Special Agent (SA)
        Criminal Investigation Division (CID)
        166 Main Street
        Brockton, MA 02401
        508-559-5200

Subject: Retaliation

On Tuesday, September 3, 1996, I was threatened by my manager Dan Niro. Niro made the following statements to me, during a closed door meeting in his office: "you turned this into a war", "you don't know the consequences", "don't try and take me on", "I could have fired you before you ever became an Agent", "you have a performance problem", "I am going to hold you to the strict standards of a Grade 12 Agent", "I am going to conduct continuous reviews of your cases", "this is war", "you can be dead right".

Niro physically, financially and emotionally threatened me. I believe that Niro is retaliating against me for favorable statements that I made to SA Carrie Marra's in regards to her EEO complaint. I also believe that Niro is using me as a defense against SA Marra's EEO complaint. Additionally, I believe that Niro has used me in the past as a means for him to discriminate against SA Marra.

Immediately after my meeting with Niro on 9/3/96 I attempted to contact Frederick Aufiero, Chief, CID to inform him of Niro's threats. I was told that Aufiero was out of the office and that he was not expected back until 9/4/96. On 9/4/96 at approximately 6:00AM I arrived at the John F. Kennedy Federal Building, located in Boston, for an unscheduled meeting with Aufiero. I met with Aufiero and informed him that I had been "physically, financially and emotionally threatened by Dan Niro on 9/3/96 and that I feared for my well being and that of my family's. I informed Aufiero that I believe Niro is retaliating against me for favorable statements that I made to SA Carrie Marra in regards to her EEO complaint against Niro.

SA Marra has filed a formal EEO complaint against Dan Niro, for sexual discrimination. Although my name has not been mentioned in SA Marra's complaint/statement, she has referenced me in her statements by stating, "a similarly situated male agent" and "another male agent in the group who was having difficulties with Niro". To the best of my knowledge I am the only Agent in the Brockton/New Bedford post of duty's (POD's) who experienced similar work related issues to SA Marra regarding Niro. Importantly, my statements favor SA Marra's position.

I believe, Niro received SA Marra's EEO complaint/statement on or about August 15, 1996. I believe, Niro subsequently met with an EEO investigator regarding SA Marra's complaint/statements. I believe, Niro sent my drop file, which he maintains, to the EEO investigator for comparison purposes. I believe, no other Brockton/New Bedford Agents file was given to the EEO investigator for comparison purposes.

1

Since the beginning of 1996 Niro has allowed me to work in the New Bedford POD with little to no supervision. Since 1/96 up until 7/96, I would contacted Niro only when necessary. On average, during this period, I contacted Niro approximately once every two to three weeks, additionally, Niro contacted me just as infrequently.

Additionally, sometime during the beginning of 1996, I believe that SA Marra filed her formal EEO complaint against Niro. I believe that Niro was made aware that SA Marra filed a formal EEO complaint against him alleging sexual discrimination. During this period SA Marra was transferred out of the Brockton POD to a Boston POD, in response to her complaint.

During the period 1/96 to 7/96, while working full-time out of the New Bedford POD I submitted the following cases/work to Niro:

Special Agent Report (SAR) - Niro evaluated this SAR "very good", I received all 2's (exceeds fully satisfactory) on my appraisal. Niro also commented that my report was "very well done".

Affidavit for Search Warrant and Conduct search of premises - In a type written letter from Niro, he made the following comment, I have just completed reviewing your 50-page affidavit to obtain a search warrant, the quality of the affidavit is exceptional. Your discussion of the facts as they relate to probable cause is extremely detailed and well done. Your analysis of the facts as it relates to the various scheme is concise, informative. You have truly displayed the qualities of a developing Senior GS-12 Special Agent.

Referral Evaluation - Niro commented that this referral involved several very complicated issues which I handled very well. Niro also made the following comment, You did a very good job analyzing the issues and expressed them in a logical manner, your conclusion and recommendations were very well founded, the time charged was reasonable considering the complexity of the issues.

Sometime around March, 1996, I received an above average evaluation on a SAR that I had submitted to Niro. At that time Niro approached me to congratulate me regarding this SAR and he extended his hand to me for a hand shake. As I grasped Niro's hand he closed both of his hands around my hand and as he shook my hand, he commented that I had done an excellent job on my SAR and added that I had "turned the corner" and was on my way to becoming a successful Agent.

I believe that on or about the week of 8/5/96, Niro was contacted and told that an EEO investigator was coming to speak to him regarding SA Marra's EEO complaint.

On August 8, 1996, I had a pre-arranged meeting with Niro regarding my Annual Evaluation. Niro had previously contacted me by telephone and asked for my opinion regarding my Evaluation. At that time I told Niro that I disagreed with his narrative, and so, Niro set up this meeting to discuss any issues.

During my meeting with Niro on 8/8/96, I told Niro that although I believe I should be rated four (4)(Exceeds Fully satisfactory) in every category, I accept the fact that he gave me some three's (3's)(Fully satisfactory). I added that what I did not accept was his narrative attached to my Evaluation regarding those 3's. At the end of my meeting with Niro, he told me that he was not

2

going to change any of his ratings and/or narratives and that it was useless arguing to the contrary. At that time I told Niro that I was considering not signing my Evaluation. Niro told me that although it did not matter to him if I signed my Evaluation, he added that I shot myself in the foot last year by not signing my Evaluation and I was going to do the same thing this year. Additionally, during this meeting Niro stated that trust is important and that I should begin to realize which Agents in Brockton/New Bedford I can trust. I told Niro that I do not trust him or any other Agent in this division and that there are very few people that I do trust. Niro told me that he thinks that I have some kind of negative self esteem problem and added that it is not good.

On August 12, 1996, Niro gives me an above average case evaluation on a referral that I had completed.

I believe that on or about August 13, 1996, SA Marra met with an EEO investigator and provided this investigator a written statement regarding her allegations.

On or about the morning of August 14, 1996, Niro contacted me by telephone and asked me what could be done to resolve my Evaluation issue. Niro made changes to his narrative based on my input. Niro faxed me a copy of his new narrative and asked me if I agreed with his wording. I told Niro that I still did not agree with some of his wording/narratives. Niro told me that he was not going to make any more changes and said that he would not discuss the matter any further. Niro told me that the only reason he made any changes to my narrative was because he likes me and he added that he still believes his original statements. I told Niro that I would sign my Evaluation and have it on his desk the next day. I had no conversation with Niro regarding including an attachment with my Evaluation nor did Niro question me if I was still considering including an attachment with my Evaluation.

I believe that on or about August 14, 1996, Niro received a copy of SA Marra's EEO complaint/statement. I believe that Niro is able to deduce that certain statements, as written in SA Marra's complaint/statement (favorable to her position), were made by me.

On or about August 16, 1996, Niro contacted me by telephone looking for my signed Evaluation. I told Niro that although I was going to sign my Evaluation, as I said I would, I was going to attach a narrative, which was taking longer than I thought to prepare. Niro told me that he thought we had a deal and that I had told him I would sign my Evaluation and have it on his desk the next day. I told Niro that I would sign my Evaluation, but since he would not make all of the changes that I wanted, I decided to include an attachment with my Evaluation, which is my right. Niro became very upset and at various times throughout this conversation he took very long (uncomfortable) silent pauses before speaking. Niro ended the conversation by telling me that he would not have made any changes to his narrative if he had known that I was going to include an attachment with my Evaluation. Niro ended the conversation by "hanging up" the telephone, not allowing any further discussion.

I believe that on or about August 20, 1996, Niro sends my drop file to the EEO investigator for comparison purposes. I believe that my drop file is the only file sent to the EEO investigator from the Brockton/New Bedford groups.

On August 21, 1996, I am contacted by the EEO investigator regarding SA Marra's complaint.

3

On August 21, 22, 23 and 26, I prepare my statement regarding SA Marra's EEO complaint in the New Bedford and Brockton POD's.

On August 29, 1996, I had a telephone conversation with Niro regarding several cases that I had previously estimated a completion date of 8/30/96. I informed Niro that I did not think I could finish the cases by 8/30/96. I explained to Niro that I was advised by the Government's Attorney (GA) (who I am assisting on almost all of my cases) to work other cases which he (GA) had prioritized and that I also had to prepare a statement for the EEO investigator in regards SA Marra's complaint, which delayed my estimated completion dates. Niro told me that he was not satisfied with my conduct and that he wanted to see me in his office on Tuesday (9/3/96), first thing in the morning.

Prior to August 29, 1996, although I have had various problems/issues and disagreements with Niro, he had never told me that he was not satisfied with my conduct. On August 29, 1996, Niro told me that he was not satisfied with my conduct. At that time I did not understand what Niro meant by "conduct".

It should be noted that since becoming a SA and prior to August, 1996, I had submitted three prosecution reports (SAR's) and numerous other cases (ie., referrals, information items, collateral's, ect.,). Every SAR that I have submitted to Niro prior to 8/96, has been handed in later than I originally estimated. Estimated completion dates are just that, estimates and to the best of my knowledge SA's are not bond by such dates. Prior to 8/29/96 Niro has never told me that he was not satisfied with my conduct because I submitted an SAR later than I had originally estimated. In fact, the last SAR that I submitted to Niro, which I also gave to Niro later than I originally estimated, was evaluated by Niro at a level above fully satisfactory.

On August 29, 1996, I finished my attachment regarding my Evaluation and put it on Niro's desk that night, I was in the New Bedford POD during that day.

On September 3, 1996, I met with Niro in his office at approximately 1:30PM. Upon entering Niro's office, Niro closed his office door and sat down at his desk I sat directly in front of Niro's desk. I took notes throughout the meeting as did Niro.

Niro started the meeting by asking me if something was wrong. I told Niro that besides his narratives on my Evaluation, which I disagree with, there was nothing wrong. Niro then asked my why I signed each page of my attachment and crossed out the last page where I ended. I told Niro that I felt it was necessary.

I told Niro that that the reason I attached a narrative to my Evaluation was because I did not agree with his narrative. I explained to Niro that I met with him on August 8, 1996, to discuss my Evaluation and resolve the issues that I did not agree with, regarding his narratives. I stated, that as I told him then, I can accept the fact that I did not get all fours (4's-Above Satisfactory) on my Evaluation, but I disagreed with some of his wording in his narratives. I stated that at the conclusion of the meeting on 8/8/96, he told me that he was not going to changes any of his narratives and that it was useless to discuss the issue any further.

4

Niro brought up one of the issues that I disagreed with on his narratives. Niro stated that regarding the referral (which he wrote in his narrative that I that had troubles with), he had previously told me that he was not happy with the way I was resolving issues. Niro stated that he thought I was aware that he was unhappy with the way I was resolving issues. Niro stated that he did me a favor by not mentioning these problems on his appraisal of this referral. If Niro thought he was doing me a favor by not mentioning any problems that I had on a case appraisal then why does he make such comments several months later on my annual evaluation, which is reviewed and signed by upper management. The reason I believe is because it allows Niro the opportunity to rate an individual at levels of satisfactory or above and at the same time include broad negative comments in his narrative. The result is that because the individual receives satisfactory or above ratings they would be more inclined to sign their evaluation and in doing so accept Niro's comments.

Niro stated that he changed his wording regarding that comment as well as other comments on his narrative and added that I agreed with his new narrative and agreed to sign my Evaluation.

I told Niro that after he made some of my requested changes to his original narrative, he faxed me a copy to see if I agreed with his wording. I told Niro that after I read the new narrative I contacted him and told him that I still did not agree with some of his wording. I told Niro that he told me that the issue was closed and that he was not going to make any further changes and that he would not discuss the matter any further. I told Niro that he also told me that the only reason he made any changes was because he liked me and that he still believed his original statements are correct. I explained to Niro that although I told him that I would sign my evaluation and have it on his desk the next day, I never told him that I was not going to include an attachment with my Evaluation. I told Niro that the reason I did not have my Evaluation on his desk the next day was because my attachment took longer than I thought to prepare. I told Niro that the only reason I included an attachment to my Evaluation was because he refused to make any additional changes.

I told Niro that the reason I included his original narrative with the Evaluation that I signed was because he told me that he would not have made any changes to his narrative if had known that I was going to include an attachment.

Niro told me that I agreed to sign my Evaluation after he had agreed to make my changes to his narrative. Niro told me that I have serious miscommunication problems. He stated that as a Grade 12 Agent I should not have miscommunication problems. Niro stated that he can accept a lower grade Agent having miscommunication problems with a manager, but it is unacceptable for a Grade 12 Agent to be having this type of a problem with his manager.

Niro told me that when I strike a deal with him, I better not change that deal.

Niro told me that he wants me back in Brockton. I asked Niro why. Niro told me because of performance problems. I asked Niro what performance problems. Niro told me the problems that he had been discussing and that he was unsatisfied with my performance. Niro told me that I had also promised him several cases which I have not turned in and which are late. Niro showed me a piece of paper with several dates listed on it, which he stated represented dates that I told him these cases would be completed. I told Niro that during the last month the GA has taken me off these cases and had me involved with other cases which he prioritized because there is a

5

chance for a plea and, he told me that these cases took precedence over my other cases. I also told Niro that SA Marra's EEO investigator had contacted me for a statement, which took additional time away from my normal duties.

I told Niro that I have done nothing wrong and that for the last month he has not treated me fair. I told Niro that for the past few weeks, it seems no matter what I do or what I tell him, it turns into some type of major issue/problem. I told Niro that I am trying to get my cases to him as fast as I can but there other issues which are out of my control that are preventing me from working specific cases. I told Niro that he is not willing to take into consideration these issues and he is holding me to time lines which are only estimates.

Niro told me that I have serious problems. Niro said, "you turned this into a war". I told Niro that I have not and that I don't know what he is talking about. Niro told me that from now on he is going to hold me to the strict standards of a Grade 12 Agent. Niro added me that he is going to conduct continuous reviews of all my cases.

Niro said, "this is war" and stated that I did not know the consequences of what I had done. I told Niro that I am not at war with him and that I do not care what he, the Chief or Branch Chief do to me because I have done nothing wrong. Niro repeated that this is war and he said, "don't try and take me on". Niro stated that he could have fired me before I ever became a Special Agent. I repeated to Niro that I have done nothing wrong. Niro said, "you can be dead right" and that I better not come after him.

At this point of our meeting Niro was speaking in a very loud manner and staring/glaring at me. Niro had threatened me and I wanted to get of his office.

I asked Niro what I had to do to stop this treatment. Niro told me that I would have to make that decision on my own.

Niro then had me give him dates when certain cases that I was working would be completed.

Niro allowed me to review my drop file in his office. At this time he opened his office door. I quickly scanned the files and returned the files to Niro. I saw at least one note from Niro to me which was never shown to me before this date. I asked Niro if he would destroy the notes/documents that dealt with periods outside of my current Evaluation period. Niro said, "no", nothing further was said.

I returned to my office and as soon as Niro left the office I attempted to contact the Chief. I spoke to the Chief's secretary, she told me that the Chief was out of the office and was not expected back until tomorrow morning.

I told two SA's what had happened regarding my meeting with Niro. I was told that at various times during my meeting with Niro, his voice could be heard in a loud manner outside of his closed door.

Later that afternoon I observed Niro shredding papers, he was at the shredding machine for approximately fifteen (15) minutes.

I was physically, emotionally, and financially threatened by Niro. To the best of my knowledge this meeting, 9/3/96, it is the first meeting that I have had with Niro in which he closed his office door.

I met with Frederick Aufiero on 9/4/96. On 9/4/96 at approximately 6:00AM I arrived at the John F. Kennedy Federal Building, located in Boston, for an unscheduled meeting with the Chief of CID, Frederick Aufiero. I met with Aufiero and informed him that I had been physically, financially and emotionally threatened by Dan Niro on 9/3/96 and that I feared for my well being and that of my family's. I informed Aufiero that I believe Niro is retaliating against me for favorable statements that I made to SA Carrie Marra in regards to her EEO complaint against Niro. I informed Aufiero what had happen regarding Niro's threats. Aufiero told me that Niro might be under a lot of stress regarding SA Marra's complaint. Aufiero told me that I should not have to work under those conditions or that I should be expected to function normally under those conditions. Aufiero told me that he wanted to separate my issue from SA Marra's EEO complaint, he explained that SA Marra's case is a separate entity and he does not want to mix my ·problems with SA Marra's complaint. Aufiero told me that he would discuss the matter with John Drew and then contact Niro for his story and then he would have all the parties meet to resolve the issue in a manner that is acceptable everyone.

On or about 9/4/96 I received a note from Niro, dated 9/3/96, regarding a case evaluation that he had previously noted (on 8/12/96) that I did "a very good job analyzing the issues and expressed them in a logical manner" and which he noted that "the time charged was reasonable considering the complexity of the issues". In Niro's note (9/3/96) regarding the same case, Niro informed me that this case was handed in late and that meeting deadlines is essential to the efficient operation of the office. What Niro did not include in his current note was that two days prior to the due date of this referral, I contacted Niro and asked him if I had to prepare an extension for additional time. Niro told me that I did not, as long as I handed it in within a reasonable time frame.

On or about 9/5/96, I received a note from Niro, dated 9/4/96, requesting updated workplans on some cases that I am currently assigned. On previous notes regarding workplans (prior to 8/96), Niro only requested that I update my workplan and return to him. On this request, Niro wrote, "please update these and prepare detailed workplans outlining the issues to be resolved and an estimated completion date". I believe that I am the only Agent in Brockton/New Bedford that currently has to prepare detailed workplans, and outlining issues to be resolved.

On Monday, 9/9/96, Niro contacted me by telephone at approximately 8:30AM. Niro asked me if I had finished the cases which I had estimated completing by, Friday, 9/6/96. I told Niro that I was not able to complete the cases. I told Niro that I was trying to complete the cases and that they would be completed very shortly. Niro was very upset and told me that he wanted eight (8) of the cases completed and on his desk by Wednesday, 9/11/96 and that he wanted the last case on his desk by Friday, 9/13/96, and he added that he also wanted me in the Brockton POD on 9/13/96. Niro hung up without allowing me any further discussion.

On Monday, 9/9/96, I attempted to contact Frederick Aufiero by telephone regarding Niro's telephone contact. I was told that Aufiero had just left his office. I paged Aufiero and left the following message with his answering service, "there is a big problem with GM, please contact Tony", I also left the telephone number of the New Bedford POD.

7

I waited approximately one and a half hours for Aufiero to return my telephone call. Aufiero did not return my page. At this point I did not know if Niro was contacted by Aufiero and/or if anything was done regarding Niro's threats. I was very concerned and I felt it was necessary to protect myself. I contemplated contacting the Inspection division of the IRS, but instead decided to contact Glenda Pappillion, Director of Investigations. I had been previously made aware that Pappillion was made known of SA Marra's EEO complaint as well as my situation and that she commented that she wanted to discuss the situations with Marra and myself. I left a message with Pappillions office that I was threatened by my manager, Dan Niro and that I felt concerned for my well being and that of my family's. I also stated that I did not know what to do and that I had talked to my Chief, Frederick Aufiero, regarding the issue.

Later that morning (9/9/96), I was contact by Frederick Aufiero and was told that he wanted to meet with me regarding Dan Niro.

At approximately 1:30PM I met with Aufiero at his office. John Drew, Branch Chief, and Marty Melecio, EEO Coordinator, were also present. I was not told that Drew or Melecio were going to be present prior to the meeting nor was I told why Melecio was present.

The following are some of statements that were made to me by Aufiero or Drew:

I think you (Sibilia) may have an ethics problem.

I am upset that you did not tell me (Aufiero) that there was another narrative.

You (Sibilia) mislead me (Aufiero).

I (Aufiero) am upset that you (Sibilia) went over my head to call Washington and did not give me a chance to resolve the matter.

I (Aufiero) called Dan (Niro) on Friday (9/6/96) to discuss your (Sibilia's) issues (threats). Dan was angry and said that you misinterpreted his statements. Dan said that he made changes that you had requested, to his narrative and that you said you would sign your Evaluation and give it to him the next day. Dan said that two days later he called you and was then told that you were going to include a narrative with your Evaluation. He was upset that you had promised to sign your Evaluation and have it on his desk the next day, which you did not do.

It sounds like you (Sibilia) are paranoid.

It looks like you (Sibilia) are out of control.

You (Sibilia) are acting in an unprofessional manner.

You (Sibilia) should act like an Agent and pull up your boot straps and resolve any differences with Dan (Niro).

You (Sibilia) are on 24 hour availability pay and could have found time over the weekend to finish your cases.

It sounds like you (Sibilia) are afraid to talk to Dan (Niro) because of a personality conflict.

It is a lie to say that Glenda (Pappillion) knows about this situation.

Why do you (Sibilia) think you were retaliated against by Dan (Niro)? Why do you think Niro saw Carrie's (Marra's) statements? What if I told you that Niro did not see Marra's statements.

I (Aufiero) do not believe that this is retaliation. I think that you (Sibilia) have confined yourself for whatever reason, that it is, I think that you have a personality conflict with Dan (Niro). While I (Aufiero) have been Chief, no Agent has been transferred to another group based on a personality conflict.

You (Sibilia) may have taken Dan's (Niro's) statements out of contexts. Dan is from the old school and sometimes managers unknowingly make those kinds of statements. Dan was upset. I would probably have been upset too, if you had done what you did to Dan to me and if it was me, ·I would have you sitting next to me in my office analyzing everything that you handed in because if you are capable of misleading me, you are capable of misleading others.

You (Sibilia) will report to Brockton and you will resolve any differences that you may have with Dan (Niro).

The meeting lasted approximately two hours. At the conclusion of the meeting I felt emotionally devastated. I had been threatened and at that point I thought that the Chief and Branch Chief were not going to do anything in response to that threat. I had been made to feel that I was to blame for everything that had happened and that I was out of control and had an ethics problem. Additionally, I was humiliated in front of Marty Melecio.

Later that night, at approximately 5:30PM I was contacted by telephone by Aufiero at my residence. Aufiero stated that he had a chance to discuss the situation and had decided to act on some of the issues. Aufiero stated that he contacted Joe Fallen, Inspection, and reported Niro's threats, Aufiero said that I may be contacted by Inspection as may Dan. Aufiero stated that he contacted Dan and told him to cease and desist all paper to me that will make the situation worse, Aufiero added that he can not afford to have me transferred. Aufiero stated that he is going to contact Labor Relations (LR) and have someone meet with Dan's group, outside of Dan's presence, to resolve any attitude problems between Dan and the Agents. Aufiero said he was also going to have someone from LR meet with me and Dan to try and resolve my Evaluation issue. Aufiero added that he wanted me to prioritize my cases and contact Dan and give him completion dates.

On Tuesday 9/10/96, I contacted Marty Melecio for her comments as to why she was at the meeting on 9/9/96. Melecio stated that she did not understand why she was there and that she felt very uncomfortable being placed in that position. She explained that normally she only gets involved if there is an ongoing EEO investigation. She added that I (Sibilia) have not filed a complaint and she has not told Aufiero that I have filed a complaint. Melecio stated that she didn't think that she should have been in that meeting.

Melecio stated that after the meeting, Aufiero asked for her opinion/observations, She stated that she told Aufiero that I (Sibilia) feel Dan (Niro) threatened me and that he will reprise against me

9

based on those threats. Melecio explained that she told Aufiero that she shouldn't have to be telling him what to do and to set aside his (Sibilia's) Evaluation issues and act on the perceived threat. Melecio stated that she told Aufiero's that his (Aufiero's) perception is not the same as the employee (Sibilia) and that the employee feels threatened and as Chief, he should act on that threat.

Additionally, Melecio stated that she has been a manager. She stated that she would expect that an employee is able to review their drop file to see what basis a manager has regarding comments made in an Annual Evaluation.

Melecio stated that I (Sibilia) probably thought that she was at the meeting in support of management. I told Melecio that I did and that I would have liked someone there looking out for my interests. Melecio explained that she does not take sides in EEO matters and only acts as a neutral third party.

Although Aufiero stated that he believes that I have a personality conflict issue with Niro and that he did not think it is an issue of retaliation, he had Melecio sit in on our meeting. Furthermore, I am humiliated in front of a person (Melecio) who later informs me that she should not have been present. I believe that the only reason Aufiero acted on Niro's threats (six days after the incident), was because Melecio told him (Aufiero), as Chief, he should act on the perceived threat.

On Friday, I hand in eight of nine cases that I was working.

*Retaliation:*

I feel Niro is retaliating against me for favorable statements made in regards to SA Marra's EEO complaint. I also believe that Niro is using me as a defense against SA Marra EEO complaint. Additionally, I believe that Niro has used me in the past as a means for him to sexually discriminate against SA Marra.

In the process of writing a statement in regards to SA Marra EEO complaint, it has become apparent that Niro has used me and my inexperience as a new Agent to justify his treatment of SA Marra. I believe that Niro creates "volumes" of paperwork/notes against various employees which he uses against those employees if needed. I believe that Niro maintains a second personnel file on various employees. I have briefly seen my drop files which contains, from what I have seen, every note that Niro has given to me and some that he has not, and some of these notes date back to 1992. I also believe that Niro creates paperwork/notes which are merely self serving documents that mislead the reader of the true circumstance involved.

On Tuesday, September 3, 1996, Niro threatened me. To the best of my knowledge this meeting was the first meeting that I have had with Niro in which he closed his office door. Niro has never threatened me in the past. Frederick Aufiero, Chief, CID, stated that he spoke to Dan (Niro) on 9/6/96 (three days after the threat), and was told by Niro that he (Niro) was upset because I (Sibilia) had told him that I (Sibilia) was going to sign my Evaluation and have it on his (Niro's) desk the next day. Additionally, Aufiero stated that I had taken Niro's statements out of context.

10

I have worked under Niro's supervision since approximately April, 1992. At no time prior to 9/3/96 has Niro threatened me or told me that I have a conduct problem. Prior to 9/4/96, I have never gone to the Chief and/or Branch Chief in response to a threat or any negative statement made to me by Niro. Aufiero stated that Niro was upset and that I may have taken Niro's statements out of context. I have had disagreements with Niro in the past and at no time during any of those meeting have I taken Niro's comments out of context.

Additionally, to this date I have not signed my prior year Annual Evaluation that I received from Niro. I did not sign my prior year Evaluation for the same reason that I included an Attachment with my current Evaluation, which is, because I feel Niro makes broad, negative statements without reason and/or justification for such statements. Importantly, I was not threatened for not signing and/or advising Niro that I was going to include an attachment with my prior years Evaluation. And, it should be noted, that the package I received from the group's secretary regarding my prior year Evaluation, which should be the same package that is included in my official personnel file, did not include the page that I refused to sign.

Subsequent to my prior year Evaluation (9/95), Niro has allowed me to work out of the New Bedford POD, giving me as much freedom as necessary to conduct my investigations. Additionally, sometime during the beginning of January, 1996, after receiving an above average evaluation from Niro, on a report that I submitted, he shook my hand and told me that I had turned the corner and was on my way to becoming a successful Agent. I believe, SA Marra's formal EEO complaint was submitted around this same time. I believe that Niro was aware of SA Marra's complaint and because he intended to use me as a defense against SA Marra, he wanted my statements to be favorable to his position. Which is why, I believe, that he allowed me to work in New Bedford and made positive statements to me regarding my future as an Agent.

During my current Evaluation period I have not received an appraisal from Niro that has been anything less than fully satisfactory, and in fact the majority of my work submitted through Niro, has been rated by him above the fully satisfactory level. Currently (during this evaluation period, 10/95-9/30/96), I have turned in approximately nine prosecution reports, a discontinued report, a referral evaluation report and I have also submitted an Affidavit for a Search Warrant and executed that Warrant (I have also put in Grand Jury Expansion requests on two cases that I am assigned). In a type written letter from Niro, regarding my Affidavit for a Search Warrant, Niro wrote that I did an exceptional job and that I have truly displayed the qualities of a developing Senior GS-12 SA. I believe that I have had a very successful year which I base partly on Niro's appraisals regarding the quality of my work, which has been evaluated at a level of at least fully successful.

However, during the same period that I received my current year Evaluation, which Niro rated me 3's (fully successful) and 4's (Exceeds Fully Successful), I was contacted by an EEO investigator regarding SA Marra. I believe that during this time, Niro received SA Marra's statements and was able to attribute statements which I have made to SA Marra that are favorable to her complaint. Additionally, I believe that Niro wanted me to sign my current Evaluation because he intended to use it as a comparison against SA Marra and her complaint. I believe that Niro is aware of some of my statements which support SA Marra and threatened me because of those statements in an attempt, to either pursued me not to support SA Marra and/or to have me sign my Evaluation without including an attachment.

11

I believe that Niro intends to use my Annual Evaluations as a means of comparison against SA Marra's complaint. That is, I believe, Niro made broad negative comments on his narratives regarding my Annual Evaluations, in an attempt to show that I am experiencing similar work related issues as SA Marra. I believe that these broad negative comments, which Niro includes in his narratives are a means for him to have me acknowledge that these comments are accurate by having me sign these evaluations. Although I did not sign my prior year evaluation, I believe that Niro first discovered that SA Marra filed a formal EEO complaint sometime during my current evaluation period. I believe that only when I refused to sign my evaluation without a narrative at approximately the same time Niro is made aware of various statements that I have made favorable to SA Marra and her complaint, I am then threatened by Niro. I believe that Niro intended to use me as a defense against SA Marra as is evident by Niro sending only my drop to the EEO investigator for comparison purposes regarding SA Marra. In retrospect, I believe that I "foiled" Niro's plans by not agreeing to his narratives and at the same time supporting SA Marra's position. I believe that after Niro was not able to get me to agree to his narrative and he read some of SA Marra's complaint, he threatened me in a last effort attempt to intimidate me into supporting his defense against SA Marra.

In regards to my current year Evaluation, Niro's original narrative contained statements which I had disagreement, some of those statements are as follows: Most information is well developed but the final work product is sometimes delayed and not timely submitted. You need to remain focused in this area of your development. You had some difficulty with a more complex high level GS-12, Tittle 26, referral. You have reflected an ability to proceed logically. Your workplans are presented reflecting a degree of focus. You are focusing your inquires on material and relevant issues.

Note: Niro later changed his original narrative and omitted (regarding the above paragraph), You had some difficulty with a more complex high level GS-12, Title 26, referral and but the final work product is sometimes delayed and not timely submitted. The reason I included Niro's original narrative with my Evaluation was because Niro said he would not have made any of my changes had he known that I was going to include an Attachment. Additionally, after I told Niro that I still did not agree with some of the wording on his revised narrative he made no attempt to resolve my remaining issues, which were not many, instead, he told me that he was not going to make any more changes and that he would not discuss the matter any further. I believe that if Niro truly wanted to resolve my issues regarding his narrative he would have done so during our original meeting on 8/8/96.

Additionally, as I've previously stated, Niro has not rated me less than fully satisfactory on anything that I have submitted to him during my current evaluation period. During this period he has said that I have turned the corner and was on my way to becoming a successful Agent and that I have truly displayed the qualities of a developing Senior GS-12 SA. Knowing the aforementioned and the fact that that my work appraisals from Niro during my current evaluation period have been rated at fully satisfactory and above fully satisfactory levels, why then does Niro write in his narrative regarding my Evaluation, that most information is well developed or that I have reflected an ability and that my workplans reflect a degree of focus. And, knowing that I disagree with these few statements, why is he not willing to changes or omit his wording in regards to those statements. The answer, I believe, is that he wants me to sign my Evaluation (without including an attachment) and in doing so, have me acknowledge that some of my work

12

is not well developed and that I am only reflecting or focusing on relevant issues, so that he can then justify his voluminous self serving notes, as a comparison against SA and in support of his defense, which is, to say that although I have had similar work related problems as SA Marra, I have "turned the corner" where as SA Marra has not, which he justifies in his notes/comments/appraisals.

Although in the past I have signed Annual Evaluations from Niro, I have disagreed with various comments written by Niro in his narratives regarding those Evaluations. I signed these Evaluations because I received fully satisfactory ratings. Unknowingly, by singing these Evaluations I was also agreeing with Niro's broad, negative statements regarding my work.

I have never received a negative performance and/or conduct letter from Niro. Niro has told me that if I ever receive a type-written letter from him regarding a negative performance or conduct matter, he will be in the process of having me fired. Niro told me that he has fired senior Grade 13 Agents as well as secretaries.

I believe that the additional, following statements made by Niro to me, demonstrate what I feel are prohibited personnel practices that I allege are used by Niro to accomplish some of his goals:

Early in my career, as a grade GS-11, Niro made the following statement to me regarding a request that I had submitted through to him for a transfer out of his group and into a Boston CID group: Niro told me that while I was in Georgia during SA Training, the chief of CID, Kenneth Claunch, contacted him regarding my employment background check and in particular my credit report that showed a delinquent account and some late payments. Niro stated that Claunch wanted to fire me because of these past credit problems. Niro told me that although Claunch wanted me fired, he (Niro) did not think this was right and wanted to give me a chance to explain myself. Niro told me that he went out on a limb to convince Claunch not to have me fired. Niro told me that although he didn't have to, he wanted to give me a chance, which no one else in CID would have done.

Niro convinced me to stay in his group. Niro told me that if I went to Boston I would not received the kind of help and support that is available to me in Brockton. Niro also told me that I would be lost in Boston because no one would be looking out for my interests. I decided not to go through with my requests to be transferred to Boston based on Niro's statements and his positive feedback that I was doing an above average job. Additionally, Niro told me that in a short time I would be the one receiving work related awards. In retrospect, I believe that the only reason Niro wanted me to remain in Brockton was so that he could use me as a means to discriminate against SA Marra and/or so that he could use me as a defense of his action in regards to his treatment of SA Marra.

Early in my career as a GS-9 or around the time I became a GS-11, Niro told me that although he did not know how, he believed that I was doing something behind his back and he stated that he would cut my "fucking" legs out from underneath me if I ever screwed him. I was offended by this statement because not only wasn't I doing anything wrong I was going out of my way to meet his requirements. Additionally, on more than one occasion Niro had me compare my salary to friends of mine that I had graduated college with and had me agree with him that I was making more money than the majority of them. Niro also had me break down my salary to an hourly wage amount to see what it was costing the taxpayers for various work that I had completed and

13

would question me if I thought the taxpayers were getting their moneys worth from me. Additionally, I have witnessed Niro telling an Agent that he (Niro) would lie in order to accomplish a negative action against that employee.

In addition to the aforementioned statements, Niro has written things about me which I have read that are not accurate and which are merely self-serving statements. I have read notes that Niro has written about me which although they are not substantially incorrect, were written in a negative way to mislead the reader of the true circumstances involved. Additionally, in some cases, Niro has never given me the opportunity to read these notes. I believe Niro creates "volumes" of paperwork on Agents which he saves, to use if necessary against those Agents. As far as I'm concerned Niro maintains a "second" personnel file on various Agents assigned to his group.

I have had several conversations with various Agents in the Brockton and New Bedford PODs, regarding Niro's treatment of SA Marra. Although SA Marra and I had similar difficulties with Niro regarding work related issues, I believe that she was required to submit to much more scrutiny than I underwent. I am not the only Brockton/New Bedford Agent who believes that Niro did not treat SA Marra in a manner similar to the way that I was treated. A senior Grade 13 SA with over twenty years in CID, told me the following: We've (the Brockton/New Bedford Agents) said that he (Niro) would use you (Sibilia) as a defense to get Carrie by stating that he treated her the same way that he treated you, "and we know that's not true". Additionally, other Agents in the Brockton group have made similar statements to me regarding Niro's treatment of SA Marra and the fact that he (Niro) will use me as a defense against SA Marra.

I believe that Niro used my inexperience as an Agent as a tool to sexually discriminate against SA Marra. Niro created problems for me that enabled him to justify his mistreatment of SA Marra. I believe that Niro intended to use his notes regarding my past work as a comparison to use against SA Marra. That is, by comparing his past notes and evaluations regarding my work performance to those of SA Marra's, he would be able to show similar work related issues which he documented. In doing so, Niro would be able to show that while SA Marra and myself had similar work related issues, I overcame these issues where as SA Marra did not. However, I have never received a negative performance and/or conduct letter from Niro. Additionally, I do not agree with Niro's narratives regarding my last two year's annual evaluations and likewise, I do not believe that those narratives reflect an accurate description of my work product and/or performance. I believe that although I experienced some similar work related issues regarding record/time keeping as SA Marra, the majority of those issues were caused by Niro.

It should also be noted that during my meeting with Niro on 9/3/96, Niro told me that I have a performance problem, which he stated is miscommunication. Niro added that I do not meet time lines and he pulled out a piece of paper with several dates listed on it and told me that those dates represent dates that I had told him a particular case would be completed. Niro told me that it is this type of miscommunication with him, that is the reason for my performance problem. I believe that another male Agent in the Brockton group told Niro that a case he was working would be completed by 9/30/96, this Agent made this statement to Niro sometime around July, 1996, and importantly, Niro has not required this Agent to turn in this case by 9/30/96. The dates that I provide to Niro are estimated and because of the fact that I am working several cases simultaneously, these dates sometimes can not be met because of issues that are unforseeable.

14

Prior to 9/3/96, I have never been told by Niro that I have had a performance problem relative to miscommunication.

In conclusion, Niro has physically, emotionally and financially threatened me. In retrospect, I feel that Niro has unjustly used me in the past as a means to discriminate against SA Marra and/or to defend his actions against SA Marra. I have been told by the Chief of CID, Frederick Aufiero, that he believes I have taken Niro's statements out of context and that I have a personality conflict with Niro, which I have to resolve. Aufiero also stated that while he has been Chief, no Agent has been transferred to another group based on a personality conflict.

I have worked under Niro's supervision since April, 1992. At no time prior to 9/3/96, has Niro stated to me, "you turned this into a war", "you don't know the consequences", "don't try and take me on", "I could have fired you before you ever became an Agent", "you have a performance problem", "I am going to hold you to the strict standards of a Grade 12 Agent", "I am going to conduct continuous reviews of your cases", "this is war", "you can be dead right". In regards to my current annual evaluation that I have received from Niro, I received some above average ratings (4's), which I agree with and accept, the only issue I have regarding my current evaluation is some of the wording in Niro's narrative. I do not have to agree with every evaluation that I receive from Niro, I have not agreed with his evaluations in the past. Additionally, Niro does not have to make any changes to my evaluation just because I do not agree with some of his ratings/narratives. However, I do have the right to include an attachment, for whatever reason, with my evaluation. Niro has told me that he does not care if I include an attachment with my evaluations. If I have the right to include an attachment with my evaluation, the only issue that can be raised regarding my current evaluation, is that I gave it to Niro later than I originally predicted. Why then am I threatened by Niro? I believe that the reason Niro threatened me is because he is retaliating against me for favorable statements that I made in regards to SA Marra's EEO complaint. Additionally, by not signing and/or including an attachment to my last two years evaluations, I am in essence disagreeing with Niro's "voluminous, self-serving" documentation/notes.

Frederick Aufiero has told me that Niro may be under a lot of stress regarding SA Marra's EEO complaint. I believe this to be the case, but if Niro is under a lot of stress regarding an EEO matter, it does not give him the right to make threatening statements. Additionally, any actions that I may have taken regarding Niro's threats were not taken to embarrass certain people, but rather to protect my well being as well as the well being of my family, and that being said, I believe any statements that were made to me in regards to Niro's threats, that may or may not have been said to intentionally diffuse the situation or to try and intimidate me were inappropriate, unwarranted, and "out of line". If I am threatened by anyone and attempt to seek appropriate actions I expect that those individual(s) who are intrusted to certain positions, and who can speedily address and/or resolve such matters, do just that. As an Agent I am held to a certain standard/expectation and I expect that my supervisor(s) are held to similar standards/expectations. Additionally, I have been told that I have mislead certain individuals. I do not think that this is the case. I think that it is these same individuals who have mislead me and I also believe that these same individuals have been negligent in their responsibilities/duties. I work hard at my job and I enjoy and take pride in my work. I have aspired to become part of management, but because of what I have had to endure and from what I have seen, I would never become part of something that does not function for the good of the employee. Likewise, I find it difficult to work under those conditions.

During my current evaluation period my wife has given birth to our first child. Additionally my wife and I have purchased our first house. Because of Niro I have had to deal with a great deal of unnecessary stress. What is normally an exciting, yet stressful time (a new baby and house) has been turned into a overwhelmingly stressful experience because of Niro. Additionally, throughout my career under Niro's supervision, I believe that I have been unjustly used by Niro as a means for him to discriminate against SA Marra and because of that I have had to endure unnecessary pain/stress.

I believe there are grade 12 Agents in the Brockton group who Niro has allowed the freedom to work their cases with little concern for time, and who have been evaluated by Niro at levels of Exceeds Fully satisfactory and Outstanding. During my last evaluation period Niro has allowed me similar freedoms regarding independence/time and because of that I had the opportunity to submit a better work product, which can be seen in my evaluations that have been rated at levels above the fully satisfactory level by Niro. I believe that if Niro had allowed me the same freedom that he has given to other similarly situated Agents and if he had not attempted to use me as a means to accomplish various goals, then I too, would have been given the opportunity to receive evaluations above the fully satisfactory levels throughout my career.

I am at a point in my career where I should be concentrating on expanding and improving various aspects of my position as a Special Agent for developmental and promotional purposes. Instead I have been forced to get "bogged" down in something that was done to me, which I believe was in retaliation for favorable statements made in regards to an EEO complaint.

I was told by the EEO Counselor that Niro did not recall making the aforementioned threatening statements to me and that Niro said that I misinterpreted his comment, "you (Sibilia) can be dead right." Additionally, I was told that Niro said he did not "make the connection" regarding statements made by SA Marra which are attributable to me and favorable to her position. If that is true, why then did Niro send only my drop file to the EEO investigator for comparison purposes regarding SA Marra.

Likewise, I was told by the EEO Counselor that the Chief, Frederick Aufiero, said that he "regretted" not acting on the situation sooner. I believe that Aufiero did not act in a timely manner and has done very little to resolve my issue, at this time I am currently still working under Niro's supervision and I am in a very stressful situation.

Not only have I been physically, financially and emotionally threatened by Niro, I have also been humiliated in front of Marty Melecio. In retrospect I also believe that had Melecio not been present for my meeting on 9/9/96, Aufiero would not have acted on Niro's threats and because of that, I believe my advancement opportunities in this division are nonexistent.

*Remedies: (I want to be made hole again)*

I want Dan Niro disciplined/punished for alleged prohibited personnel practices.

I want to work in the New Bedford Post of Duty, under a new Supervisor.

I want to be compensated for my pain and suffering, as well as punitive damages.

I want a complete copy of Dan Niro's drop/personnel file on me and once I receive those documents, I want any and all documents in those files that do not directly involve my current evaluation period (10/1/95-9/30/96) destroyed.

Boston Herald    Daily News Tribune    MetroWest Daily News    Milford Daily News    Daily News Transcript



Archives
Basic Search
Advanced Search
Saved Search
About the Archive
Search Tips
Pricing
FAQ
My Account
Customer Service
Terms of Service
Other Archives
Logout
Home
News & Opinion
Business Today
Sports
Entertainment
Lifestyle

Classifieds
carfind.com
homefind.com
jobfind.com
merchandise
services
personals
Place an Ad

Features
Parents & Kids
Shop TownOnline
Tunes a Brewing
weather
horoscope
crossword
lottery results

Start a New Search
Back to Results

 Printer-Friendly Format

# IRS criminal investigator files civil rights suit vs. supervisor; [03 Edition]

*RALPH RANALLI*. **Boston Herald**. Boston, Mass.: Feb 10, 1997. pg. 017

## Abstract (Document Summary)

An IRS criminal investigator from Lakeville has filed a federal civil rights suit seeking to block her former supervisor from being transferred to Boston, claiming he discriminated against her because of her sex.

Special Agent Carrie Ann Marra, who has also worked for the U.S. Bureau of Alcohol, Tobacco and Firearms, charged that she unfairly received poor performance reviews and was placed on "punishment duty" by Donato Niro, the group manager of the IRS Criminal Investigation Division office in Brockton.

**Full Text** (294   words)

*Copyright Boston Herald Library Feb 10, 1997*

An IRS criminal investigator from Lakeville has filed a federal civil rights suit seeking to block her former supervisor from being transferred to Boston, claiming he discriminated against her because of her sex.

Special Agent Carrie Ann Marra, who has also worked for the U.S. Bureau of Alcohol, Tobacco and Firearms, charged that she unfairly received poor performance reviews and was placed on "punishment duty" by Donato Niro, the group manager of the IRS Criminal Investigation Division office in Brockton.

"The group manager consistently verbally harassed the plaintiff using subjective and non-quantifiable categories as his basis for criticisms, stating: questions of `trusting her,' unsubstantiated accusations of lying, `uncomfortable working relationship,' her not taking her job `seriously' ... and that she needed a long period of "informal counseling,'" the suit papers state.

Marra charges that she was singled out because she was the only female agent of 12 stationed in Brockton.

She began receiving positive reviews after being transferred to another IRS office in 1995, the suit papers allege.

The lawsuit also alleges that Niro retaliated against another IRS employee who was a witness for her when she filed a complaint with the federal Equal Employment Opportunity Commission.

Niro allegedly told IRS agent Anthony Sibilia that he had "turned this into a war."

Niro also allegedly told Sibilia that he had a "performance problem" and that he was going to conduct "continuous reviews" of Sibilia's cases.

Niro, Marra and Sibilia could not be reached for comment.

As part of her complaint, Marra has asked U.S. District Court Judge Edward F. Harrington for a preliminary injunction barring the IRS from transferring Niro to Boston.

The suit also asks Harrington to order all negative reviews expunged from her record and that she be promoted and awarded back pay.

Reproduced with permission of the copyright owner.

Further reproduction or distribution is prohibited without
permission.
Section:            *NEWS*
ISSN/ISBN:          07385854
Text Word Count     294
Document URL:



Copyright © 2006 The Boston Herald

[ Contact Us ] :: [ Print Advertising ] :: [ Online Advertising ] :: [ FAQ's ] :: [ News Tips ] :: [ Electronic Edition ] :: [ E

**Click here for home delivery** or call **1.800.882.1211**.  For Back Issues call 617.619.6523

© Copyright by Herald Interactive Advertising Systems, Inc.
No portion of BostonHerald.com or its content may be reproduced without the owner's written permission.  Privacy C

AFFIDAVIT          State of Massachusetts          County of Suffolk

RE:   POD ASSIGMENTS

1.   Q-1  State your name, position title, series, grade, business unit, and duty location.

2.   A-1  My name is Michael Lahey.  I am Special Agent in Charge (SAC) of the Boston Field

3.   Office, GS-1811-15, Criminal Investigation, Boston, Massachusetts

4.   Q-2 Describe the process you went through in order to decide which Special Agents would be

5.   assigned to Brockton. Did you limit consideration to Special Agents who volunteered to go

6.   to Brockton? If so, when and how did you canvas for volunteers? Provide a copy of the list

7.   of volunteers. Describe which factors you considered in making your decision (such as

8.   seniority, commuting distance, work load, performance, etc.)

9.   A-2  I brought all the Supervisory Special Agents (managers) together in order to decide who

10.  would be assigned to Brockton. I first solicited volunteers, and only those agents who

11.  volunteered were considered for transfer to Brockton. The entire group made the decision, based

12.  primarily on seniority. S/A Jim Donahue is a CIS (computer specialist). His equipment is in Boston,

13.  so he could not be moved, because he must have access to his equipment to do his job. The three

14.  agents the group recommended be assigned to Brockton are all senior to Anthony Sibilia, and

15.  I agreed with that recommendation and assigned these three agents to Brockton.

16.  Q-3 Explain your reasons for choosing the Special Agents who you assigned to Brockton.

17.  A-3 Volunteers for Brockton were sought, and the decision of which agents to  transfer to

18.  Brockton was based primarily on seniority.

Initials

19.  Q-4  Did you consult with others about the decision of who to assign to Brockton? If so, identify

20.  those individuals, and describe the input they provided.

21.  A-4  I consulted with the managers in the affected areas, that is, Boston (3 managers), Stoneham.

22.  Warwick, and Acting ASAC Peter Benevento. We all discussed the Brockton situation, but

23.  ultimately the decision who to transfer to Brockton was mine. We were in agreement on who to

24.  transfer to Brockton.

25  Q-5  Did seniority play a role in the decision about who to assign to Brockton? If so, respond to

26.  the Complainant's contention that Sullivan went to Brockton, and  he is less senior than Donahue,

27.  who also participated in Carrie Marra's EEO complaint.

28.  A-5  Yes, seniority played a role in my decision about who to assign to Brockton.  S/A Donahue is

29.  a computer specialist with equipment in Boston, and could not be transferred to another Post of

30.  Duty.  Donahue knew and accepted that.  I had no previous knowledge of Sibilia's participation in

31.  the EEO process.  I wasn't even in Boston in 1996, when the EEO complaint was filed.  I arrived in

32.  Boston in 1997.  I didn't know Sibilia was involved in the EEO process until EEO Officer Marti

33.  Melecio contacted me to tell me Sibilia had filed an EEO complaint based on retalliation.

34.  Q-6  The Complainant quotes the section of your email message about the Brockton reassignments

35.  in which you state not all Special Agents who want to work in Brockton can because new agents

36.  need to be exposed to experienced agents with diverse casework  He questions the credibility of

37.  that statement because he alleges the Boston Special Agents who were not selected for Brockton were

38.  more senior than he.  Please respond to his allegation.

39.  A-6  This is the reason only 3 Special Agents are being transferred to Brockton.  Some senior agents

40.  have to remain in Boston to be with the new agents.

Initials

41. Q-7 The Complainant alleges the SAC at the time the Brockton office was closed, SAC Aufiero,

42. promised the four Special Agents assigned to Brockton (Yee, Sullivan, Donahue, & Sibilia) that

43. you were aware of former SAC Aufiero's promise. Were you aware of this promise? Describe what

44. consideration you gave to this promise. Did you give first choice for Brockton to Yee, Sullivan,

45. Donahue & Sibilia? If not, why not?

46. A-7 SAC Aufiero did not promise that people would be transferred to Brockton if the POD

47. reopened. He promised "priority consideration". I gave the four Special Agents consideration.

48. I selected two of the four. I couldn't select Donahue, because of the computer issue mentioned

49. previously. Sibilia was not transferred to Brockton because Mary Chin has seniority over him.

50. Seniority was the deciding factor.

51. Q-8 In connection with his retaliation claim, the Complainant brings up the Leadership Development

52. Program (LDP). The Complainant alleges you did not want him in the program and that's why you

53. told Phil Hall that the Complainant could not go to Brockton if he were in the LDP. The Complainant

54. alleges you said he'd need to stay in Boston for 'exposure'. What did you tell Phil Hall about the

55. Complainant's POD assignment in relation to participation in the LDP? When? Were other Special

56. Agents allowed to participate in the LDP even though they weren't required to be in Boston for

57. 'exposure' purposes?

58. A-8 I never said I didn't want Sibilia in the LDP Program. I said he would have more exposure in

59. Boston, where there are three groups, than in Brockton, which is part of the Warwick group. I did

60. not say he couldn't be in the LDP if he were in Brockton. I never told Phil Hall that I did not

61. want Sibilia in the LDP.

Initials

62   Q-9 The Complainant alleges ASAC Peter Benevento has told him to report to Boston and told him

63.  Special Agents can't work out of unassigned offices. However, he alleges another Special Agent is

64.  allowed to work out of an unassigned office on a continuous basis. Did you have any involvement in

65.  Mr. Benevento's direction to the Complainant to report to Boston? If so, explain what involvement

66.  you had, the reasons for your decisions on this matter, and why other Special Agents were allowed an

67.  accommodation that the Complainant was denied.

68.  A-9 Anthony Sibilia has not complied with his manager's requests to report to the Boston Post of

69.  Duty, where he was assigned. He would routinely report to the Brockton POD, which was officially

70.  closed but where Criminal Investigation still controlled the space the Special Agents had used. On

71.  occasion, agents work out of other field offices, and people do it all the time, but not on a regular

72.  basis. Sibilia seldom reported to Boston, although it was his assigned Post of Duty.

RE:  FOUR SETS OF GS-13 SELECTIONS FROM 2 VACANCY ANNOUNCEMENTS BETWEEN
     6/1999 AND 4/2000

73.  Q-10 The Complainant alleges you passed over him in each of these selection actions because of his

74.  involvement in the EEO process. Therefore, for each set of selections, explain what documents
     and/or

75.  whose recommendations you considered in making the selection decisions, your reason(s) for

76.  choosing the candidates you selected, and why you didn't select the Complainant.

77.  A-10 I had no knowledge of Sibilia's prior participation in the EEO process. Interviews were

78.  conducted for the GS-13 openings, and Sibilia had a weak interview the first time around.

79.  He improved on his interview for the next vacancy announcement, to the point where he was

80.  considered average. He did not get much support from his managers on either package.

81.  When he did get promoted to GS-13, there were no interviews held.

Initials _____

83. Q-11 The Complainant makes a point of explaining that for each of the selection actions subsequent

84. to the initial selections from the first vacancy announcement, additional names were added to the BQ

85. list? Is it a standard procedure to expand the number of candidates on the BQ list for subsequent

86. selections from the same vacancy announcement? If such an explanation is NOT standard procedure,

87. please explain why these selections were handled differently than the norm.

88. A-11 Personnel policy provides for the opportunity to bring new names on to the Best Qualified List

89. (BQ) as names are selected for promotion. For every employee promoted, another employee moves

90. up to the BQ, so the number of names on the BQ remains the same.


91. Q-12 The Complainant reports that he met with you to discuss his concerns about why he wasn't

92. selected in that group of five selections in Feb. 2000. He alleges ASAC Gail Kenney attended the .

93. meeting and took notes. Were the notes from the discussion maintained? If so, please provide a

94. copy.

95. A-12 I am not aware of Gail Kenney taking notes, and if she did, I have no idea where they could be.

96. She transferred out of Boston in November 2001. I don't specifically recall my conversation with

97. Anthony Sibilia. He did have a case which I do not feel was complicated and had more hours

98. charged to it than I thought was necessary. Sibilia's manager, Peter Benevento, was asked about this

99. case and the hours charged to it, and he agreed that there were too many hours charged to that case.

100. I don't feel Sibilia was treated differently than any other Special Agent would have been treated.


Initials _____

__SEGMENT__
PG 63

The Complainant reports what was discussed at the meeting, and he disagrees and/or rebuts several of your explanations of your decisions. [Refer to pages 5-8 of the narrative.] Please respond to each of his allegations that he was disadvantaged and/or you treated him differently than other applicants during the selection process. Or, if you disagree with what the Complainant reports of the content of your discussions give your version of what was said. The next few questions present various allegations and/or rebuttal arguments he reports from his discussion with you:

101. Q-13 The Complainant alleges you went to his then current manager for input on the selection, but

102. since Hank Chin had only been his manager for a couple of months, Chin didn't know about his

103. work. Did you solicit input from the Complainant's manager at the time? Did you solicit the same

104. kind of info on the other applicants? If not, why did you treat the Complainant differently? What

105. allowance, if any, did you make for applicants who had only worked for their current managers for a

106. very short time?

107. A-13 I talked to every manager about every applicant from his group. I spoke to Phil Hall and Peter

108. Benevento about Anthony Sibilia, since he had worked for Hank Chin for only a brief period of

109. time. Neither was enthusiastic in their endorsement of Sibilia.

110 Q-14 The Complainant alleges you reviewed his time (CIMIS) reports which showed he charged alot

111. of time to the OCDETF project and his inventory hadn't changed over the two prior years, which

112. you considered as a shortcoming. The Complainant alleges his manager, Peter Benevento, was

113. responsible for the unchanged inventory because he assigned him very few items for investigation/

114 analysis, and he didn't respond to the Complainant's repeated requests concerning a particular

115. case initiation. The Complainant also reports that even though his inventory remained unchanged,

116. he submitted prosecution reports, conducted search warrants, and participated on a wiretap. Did you

117. review the CIMIS reports and inventories of the other appplicants? If not, why did you treat the

118. Complainant differently?

Initials _____

119. A-14 Anthony Sibilia is responsible for his own inventory. Managers in Criminal Investigation are

120 not responsible for handing out work. I do not remember if I checked every SA's CIMIS report, but

121. I scrutinized every applicant. A Grade 12 Special Agent is expected to develop cases on his/her

122. own. Sometimes the Agent is assisted by the U. S. Attorney's Office and/or other federal agencies in

123 the development of cases, but ultimately it is the Agent's job to develop cases.

124. Q-15 The Complainant alleges that during the discussion you told him that 1998 was the time he

125. should have been promoted, and since then he hadn't accomplished much. The Complainant alleges

126. he doesn't understand such a statement, and alleges if he were qualified for GS-13 in 1998, he would

127. also be qualified for GS-13 in 1999.

128. A-15 I never said Sibilia should have promoted in 1998.

129. Q-16 The Complainant alleges no other GS-12 Special Agent is expected to develop cases on his/her

130. own. He alleges his supervisors never told him he was responsible for developing cases. He alleges

131. you held him to a different standard (regarding case development) than the other applicants. As an

132. example he alleges you promoted a GS-12 Special Agent who hadn't submitted a case in four years

133. to GS-13 in January 2000.

134. A-16 All GS-12 Special Agents are expected to develop case on his/her own. He was held to the

135. same standard as the other applicants. Mary Chin was promoted to GS-13 based on the fact that

136. she had been a Special Agent since 1985 and had 6 years of experience over Sibilia, and had

137. numerous investigations prior to her arrival in Boston.

Initials

137. Q-17 The Complainant alleges one of your reason for not selecting him was that he had charged

138. excessive hours to a case submitted for prosecution. The Complainant alleges the hours were

139. justified. Further, he challenges your contention with his report that his supervisor never questioned

140. the number of hours charged to the case and rated him above average for the period he handled the

141. case.

142. A-17 It was my opinion that Sibilia had excessive hours on the case. I discussed the hours with his

143. manager at the time, Peter Benevento, who also thought the hours were excessive..

144. Q-18 The Complainant alleges you promoted a GS-12 Special Agent to GS-13 in January 2000. He

145. alleges that Special Agent had a case with three times as many hours charged to it, and the case was

146. over aged.

147. A-18 This allegation is true. However every case is different. Some cases become overage and

148. the hours charged are justified. Some are not. In this case, the hours charged were justified.

149. Q-19 The Complainant alleges he distinguished himself between 1997 and 2001 by conducting

150 and/or assisting on three search warrants, multiple arrest warrants, a wiretap, and nine prosecution

151. recommendations, and by receiving two above average evaluations.

152. A-19 I am not specifically aware of every task that Sibilia completed. His evaluations were not

153. outstanding nor even well above average. He did not distinguish himself during this period

153. in my mind, nor in the minds of his managers.

154. Q-20 The Complainant reports that he spoke to you after the first round of selections in 1999 and

155. again after the third round of selections in February 2000. He challenges the credibility of the

156. reasons you gave him in February 2000 based on the fact that you did not give those same reasons

157 the first time he spoke to you in 1999.

Initials

159. A-20 I do not recall when the time issue first came up. It might not have been an issue in 1999, but
160. certainly stood out by February 2002.

161. Q-21 The Complainant alleges your reason for not selecting him in June 2001, under the second
162. announcement, was that he still had no new cases in his inventory. Is that accurate? If so, did the
163. inventories of the three selectees change during the same time period?
164.   A-21 Sibilia was non-selected not because of no new cases in inventory. It was the totality of the
165. situation. None of his managers gave a strong arecommendation.

166. Q-22 Were you aware of the Complainant's involvement in the EEO complaint process
167. (providing a statement for the Marra complaint, filing a complaint) at the time you made the
168. decisions at issue here (which date back to July or August 1999)? If your awareness of his
169. involvement does NOT date back to July 1999, explain when and how you did become aware
170. of his involvement. What effect did the Complainant's involvement in the EEO complaint
171. process have on your selection decisions and the decision of whom to assign to Brockton?
172. A-22 I was unaware of Sibilia's retaliation complain against his former manager Dan Nero.
173. I knew Sibilia was peripherally involved in the Dan Niro matter, but since I was not involved
174. in the Marra complaint, which was winding down when I arrived in Boston as ASAC, I did not
175. know the extent of his involvement. His involvement in the EEO complaint process had no
176. no effect on my selection decisions nor my Brockton assignments.

Initials _____

PG 67

177. Q-23  The Complainant alleges you influenced Mr. Bellingreri to avoid having the Complainant act

178. for Mr. Bellingreri in February 2000.  What involvement did you have in the decision about who

179. would act for Mr. Bellingreri in February 2002?

180. A-23  None.  I had no involvement in Bellingreri's decision as to who would act for him.

181. Q-24  What influence did you try to assert with Mr. Bellingreri about how he should treat

182. the Complainant?

183. A-24  None.  I never spoke to Bellingreri about Sibilia.

Initials _____

PG 68

I have read the above statement, consisting of 11 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

Michael Lahey
(Affiant's Signature)

Subscribed and sworn to before me at Boston, Massachusetts

on this 18th day of April 2002

Leonard J. Tashman
(Investigator's Signature)

Initials_____

Telephone Contact with Michael Lahey

On May 14, 2002 at 10:40 a.m., a telephone conversation was held with SAC Michael Lahey in an attempt to clarify information contained in his affidavit.

Asked Mr. Lahey if the interview notes were available. Mr. Lahey indicated the interview notes no longer existed. He indicated that the other panel members (Bruce Traina and Gail Kenney) could probably remember the Complainant's interview, however there are no notes.

The reassignments to the Brockton POD was made based on both seniority as a grade 13 and total Special Agent time. He stated the Complainant and Sullivan came in together, however Sullivan received his 13 first. With regard to SA Chin, she received her 13 before the Complainant and she had 5 to 6 years more total time than the Complainant.

Clarified when SAC Lahey arrived in Boston. He stated that he came on board there June 9, 1997.

Stan Chavers
EEO Specialist
Treasury Complaint Center - Chicago

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE

*************************

Anthony P. Sibilia,                    EEOC Hearing No.
                                       160-A2-8515X
          Complainant,

     v.                                Agency Case No.
                                       02-3051

John Snow, Secretary,
Department of the Treasury      Date: February 28, 2003

          Agency.
*****************************

### AGENCY RESPONSE TO COMPLAINANT'S INTERROGATORIES

     Complainant served Interrogatories on the Agency, which,
were received on January 30, 2003. The responses and/or
objections provided herein are limited to the knowledge and
information currently available to and located by the Agency.

### RESERVATION OF RIGHTS

     In responding to these Interrogatories (collectively
referred to as "Requests"), the Agency hereby reserves the
right to supplement, clarify, revise or correct any or all of
the responses herein at any time. Moreover, in providing
these responses, the Agency does not waive and hereby reserves
its right to assert any and all objections to the
admissibility into evidence, at the hearing of this matter or
in any other proceeding, of any response or any documents
referred to herein, on any and all grounds, including but not
limited to, competency, relevancy, materiality and privilege.
In addition, the Agency does not in any way admit or imply
that it considers any of the Requests to be relevant to the
subject matter of this action.

     These responses to the Requests are accurate to the best
of the Agency's knowledge as of this date. The Agency may,
however, obtain additional information relevant to the subject
matter of this action subject to further review of the
documents which it has produced and may produce in this

-2-

action. The Agency expressly reserves the right to rely in this action on subsequently discovered information or documents if and when such information or documents become available. Finally, these responses refer to and/or are in addition to materials in the Agency File or other EEO Investigative Files that have been made available to Complainant.

### GENERAL OBJECTIONS

1. The Agency objects to the Requests to the extent that they seek documents or information neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of evidence that would be admissible at the hearing of this action.
2. The Agency further objects to the Requests to the extent that they fail to specify a reasonable limitation as to the period for which such documents are sought or are otherwise vague as to time.
3. The Agency further objects to the Requests to the extent that they are overly broad, vague, ambiguous, unduly burdensome and cumulative, or that they fail to describe a category of documents with reasonable particularity.
4. The Agency further objects to the Requests to the extent that they call for the production of records, the disclosure of which is prohibited under the Privacy Act of 1974, 5 USC § 552a(b).
5. The Agency further objects to the Requests to the extent that they call for the production of information, the disclosure of which is prohibited under the 26 USC § 6103.
6. The Agency objects to the Requests to the extent that they, or any one of them, ask for privileged information, including but without limitation, attorney-client, attorney-work product and/or official (governmental) privilege with respect to all such privileged documents encompassed by Complainant's document requests. Any inadvertent production of any document protected by such privilege shall not be construed as an admission that the document is not privileged nor as a waiver of the right to assert the privilege and reclaim the document and all copies.
7. The Agency objects to the Requests to the extent that they, or any of one of them, ask for identification of "all" documents, records, communications and the like on the grounds that such requests are overly broad and burdensome.
8. Any response set forth hereafter is made solely for the purposes of this action. Each response is subject to all

-3-

objections as to competence, relevance, materiality and
admissibility, and to any and all other objections that would
require the exclusion of any statement were it made by a
witness present and testifying at hearing, all of which
objections are reserved and may be interposed at the time of
hearing or in response to any motion or submission filed by
Complainant or in response to any order of the Equal
Employment Opportunity Commission. Subject to and without
waiver of the foregoing objections, the Agency will respond to
such Requests to the full extent that it is currently aware of
the existence of a responsive document in its possession,
custody or control.

## Interrogatories directed to Michael Lahey

1) In regards to Special Agent Carrie Marra's discrimination
complaint (EEO complaint and/or federal lawsuit) filed in or
about 1996, when did you first become aware of Special Agent
Anthony Sibilia and/or James Donahue's participation in
Marra's discrimination complaint (to include any media
coverage)? Explain

**Response:** Mr. Lahey was unaware that Complainant had any
involvement in Ms. Marra's discrimination lawsuit. The Agency
objects to responding to this interrogatory to the extent that
it seeks information regarding James Donohue. *See* general
objections 1 and 4.

2) You have indicated (EEO Investigative File) that your
selections for the Brockton POD assignment (October 2001) were
based on seniority. Furthermore, you indicated that although
Special Agent James Donahue, a computer specialist, had
seniority over at least one of your selections (Special Agent
Kevin Sullivan), he was not selected because of his current
position as a Computer Investigative Specialist (CIS), which
required him to remain in Boston. Additionally, you have
indicated that agent Donahue knew and accepted these reasons.
What was discussed with agent Donahue in regards to his
situation, that is, his position as a CIS, regarding his
potential selection/non-selection for Brockton? Explain

**Response:** Mr. Lahey recalls being told that Agent Donahue was
informed by his supervisor that he had a large office in
Boston that had been set up specifically for the Computer
Investigator Specialist position, which could not be

-4-

duplicated in Brockton and this was the primary reason he was not selected for the Brockton POD. Mr. Lahey's understanding at the time was that Agent Donahue comprehended this and did not have a problem with it. Mr. Lahey recalls speaking casually to Agent Donohue about this issue at a Special Agent Committee meeting in Worcester shortly before Mr. Lahey's departure from Boston in 2002. Mr. Lahey's impression was that Agent Donohue accepted management's position on the decision not to transfer him.

3) On or about 10/11/2001, you sent an e-mail to the Boston Field Office, stating among other things, that although it would have been nice to accommodate everyone interested in Brockton, it was essential that senior agents remain in Boston to assist with the development of newer agents. Additionally, the following agents were the only individuals that expressed an interest for Brockton and likewise, were the only agents considered for that POD: Richard Yee, Mary Chin, Kevin Sullivan, James Donahue, Anthony Sibilia, Sandy Lamanski, Charles Blackmore and Ann Cotellesso. If you exclude agent Donahue because of his position as a CIS, why were the most senior agents selected for Brockton?

**Response:** After disseminating the e-mail Complainant references to the Field Office, Mr. Lahey met with Criminal Investigation managers to discuss all of the interested candidates for the Brockton POD. Insuring that the new agents were exposed to experienced agents with a diverse workload was certainly a concern. However, as Mr. Lahey and his management team discussed the assignment of agents, a consensus was reached agreeing that seniority was the fairest manner of selection. The management team as a whole felt the agents who would be assigned to Boston would be excellent role models for the new agents as the experienced agents possessed active and diverse workloads. Mr. Lahey was also aware at that time that the Service was contemplating hiring former agents as re-employed annuitants to assist with the training and knew there were two outstanding former agents who were interested in the positions. All of these issues factored into the decision to utilize seniority as the determinative factor for the POD selections.

4) On or about 10/02/2001, you attended a group meeting (group 05) in Boston. At that meeting you were informed of an obligation that the former SAC, Frederick Aufiero, made to

-5-

agents that were transferred from the Brockton POD when that office was closed. In particular, you were told that Aufiero stated to those effected (sic) agents, if Brockton were ever to re-open, they would be given priority consideration for re-assignment. At that time, did you indicate that it would be hypercritical if you did not honor an obligation made by a former Chief and at the same time expect future Chief's to honor your obligations/promises? If so, in your selection process, what consideration/weight did you give those agents who were originally transferred from Brockton, as opposed to those agents who were not originally transferred out of Brockton yet chosen for that assignment, when that POD was re-opened?

**Response:** *See* general objection 1. Notwithstanding such objection and without waiving such objection, Mr. Lahey spoke to Mr. Aufiero regarding the claimed offer of priority consideration and was advised Mr. Aufiero did not make any specific promises to any of the agents who were transferred out of Brockton when the POD was closed.

5) What conversation(s) did you have with Peter Benevento and/or Phil Hall regarding Agents Kevin Sullivan, Richard Yee and Sibilia working out of the Brockton POD while they were assigned to a Boston POD?

**Response:** *See* general objections 1 and 3. Notwithstanding such objection and without waiving such objection Mr. Lahey does not recall such conversations.

6) Sometime around July 1998, a vacancy announcement (#8-NC-CI-013) for GS-1811-13 was announced in Boston and shortly thereafter, those promotions were announced. Were you part of the ranking panel that evaluated the applicant's for potential promotion? In regards to that promotion package, were you aware of any conversations/discussions that took place relative to agent's Sibilia and/or Michael Akers relative to their positions on the 'ranking roster'? Explain.

**Response:** Mr. Lahey does not have specific recollection of that package or discussions regarding Agent Sibilia or Aker's ranking by the panel.

7) In regards to vacancy announcement number 06-10-MNCI006, for a GS-1811-13, that was announced in 1999, a six-month roster was utilized. As part of that promotion package all applicants who made Best Qualified were interviewed. Did you

-6-

inform agents in the Boston Field Office that said interviews could not hurt an applicant's chance for promotion? Explain.

**Response:**  Mr. Lahey does not recall informing "agents in the Boston Field Office that said interviews could not hurt an applicant's chance for promotion"

8) In regards to the above vacancy announcement (06-10-MNCI006), did you say in any way, that you wanted to make some kind of "statement" through your selections regarding the promotions?

**Response:**  Mr. Lahey does not recall making such an assertion.

9) In regards to the above vacancy announcement (06-10-MNCI006), what agent(s) CIMIS reports were looked at (reviewed) by you and/or Peter Benevento and why?

**Response:**  Mr. Lahey does not recall which agents' CIMIS reports were reviewed.

10) In regards to the above vacancy announcement (06-10-MNCI006), what conversations did you have with Peter Benevento concerning agent Sibilia relative to said promotion?

**Response:** Mr. Lahey recalls discussing Mr. Benevento's overall perception of Complainant's performance but does not recall the specifics.  As set forth in Mr. Lahey's declaration located in the Investigative File at Tab 6, Mr. Lahey recalled that Mr. Benevento was not "enthusiastic in his endorsement" of Complainant.

11) In regards to the above vacancy announcement (06-10-MNCI006), did you tell agent Mary Chin, that her work-related accomplishments, prior to her transfer to the Boston Field Office, would not be considered by you for the promotion selection? Explain.

**Response:** See General Objection 1 and 4.

12) In regards to the above vacancy announcement (06-10-MNCI006), you have indicated (EEO Investigative File) that agent Sibilia turned in a case that you didn't feel was complicated and had more hours charged to it than necessary. Additionally, you indicated that you discussed this case with Peter Benevento, who concurred with your opinion.  Why do you feel that too many hours were charged to this case and how many hours should have been charged to this case? Did you review Sibilia's diary entries regarding the case in question? Provide any and all documents to substantiate your claims.

-7-

**Response:** Mr. Lahey's perception of Complainant's performance on the referenced case was based on a review of Complainant's case report, along with a discussion with Complainant's supervisor, Supervisory Special Agent (SSA), Peter Benevento. Mr. Lahey did not unilaterally make the determination that excessive time was spent on the investigation. Rather, Mr. Lahey's suspicions were confirmed by SSA Benevento who managed the investigation and who was in a better position to make that assessment

13) In regards to the above vacancy announcement (06-10-MNCI006), you indicated (EEO Investigative File) that agent Sibilia submitted a case that you didn't feel was complicated and had more hours charged to it than necessary. The closing date for said announcement (06-10-MNCI006) was 06/28/99, (*sic*) as such, all applicants for said promotion submitted packages that reflected their accomplishments up until that time (06/28/99). Do work-related accomplishments, submitted subsequent to closing dates for such promotions, such as in this instance, get considered/evaluated for said promotions? If so, what work-related accomplishments, submitted subsequent to 06/28/99, were evaluated by you, regarding said announcement (pertaining to the applicant's)?

**Response:** Mr. Lahey does not have specific recollection of what was or was not evaluated before or after the closing date for this promotion package.

### Interrogatories directed to Peter Benevento

14) In regards to Special Agent Carrie Marra's discrimination complaint (EEO complaint or federal lawsuit) filed in or about 1996, when did you first become aware of Special Agent's Anthony Sibilia and/or James Donahue's participation in that complaint (to include any media coverage)?

**Response:** Mr. Benevento was not aware of Complainant's prior participation in the EEO process. The Agency objects to responding to this interrogatory to the extent that it seeks information regarding James Donohue. *See* general objections 1 and 4.

15) What conversations did you have with Dan Niro regarding agents' Marra, Sibilia or James Donahue relative to Marra's discrimination complaint? In regards to Marra's discrimination/EEO complaint, what assistance did you provide to Niro regarding Marra, Sibilia or Donahue?

-8-

**Response**: Mr. Benevento was not aware of Complainant's prior participation in the EEO process. The Agency objects to responding to this interrogatory to the extent that it seeks information regarding Carrie Marra or James Donohue. *See* general objections 1 and 4.

16) What conversations have you had with Frederick Aufiero, John Drew or Michael Lahey, regarding agent's Marra, Sibilia or Donahue's participation in the EEO process?

**Response**: Mr. Benevento was not aware of Complainant's prior participation in the EEO process. The Agency objects to responding to this interrogatory to the extent that it seeks information regarding Carrie Marra and/or James Donohue. *See* general objections 1 and 4.

17) Sometime around July 1998, a vacancy announcement (#8-NC-CI-013) for GS-1811-13 was announced in Boston and shortly thereafter, those promotions were announced. Were you part of the ranking panel that evaluated the applicant's (*sic*) for potential promotion? In regards to that promotion package, were you aware of any conversations that took place regarding agent's (*sic*) Sibilia and/or Michael Akers' position on the ranking order? Explain

**Response**: Mr. Benevento does not recall being involved in the ranking panel for this promotion action. The Agency objects to responding to this interrogatory to the extent that it seeks information regarding Michael Akers. *See* general objections 1 and 4.

18) In regards to vacancy announcement 06-10-MNCI006, what conversation did you have with Michael Lahey concerning a case that agent Sibilia turned in for prosecution? Did you ever document these issues in a case review(s) that you conducted with agent Sibilia? Explain and provide any and all review documentation.

**Response**: See general objection 1 and 3.

## Interrogatories directed to Paul Donnelly

19) What conversations did you have with Special Agent James Wallwork regarding a conversation that he (Wallwork) had with Dan Niro, in reference to threatening statements that he (Niro) made to agent Sibilia?

*See* General Objection 1.

-9-

## Interrogatories directed to Phillips Hall

20) What conversation did you have with Michael Lahey regarding Sibilia's participation in the Leadership Development Program (to include whether agent Sibilia would be allowed to transfer to the Brockton POD if he participated in that program)? Explain.

**Response:** *See* general objections 1 and 3 with respect to that part of the interrogatory regarding Complainant's participation in the Leadership Development Program. Mr. Hall recalls participating with other managers in a general meeting to determine those agents that would be assigned to the Brockton Post of Duty. Mr. Hall does not recall the specific discussions in this meeting or if the Leadership Development Program was brought up as an issue.

## Interrogatories directed to Gail Kenney,

21) In regards to vacancy announcement (06-10-MNCI006), were you aware in any way that Michael Lahey wanted to make some kind of "statement" through his selections regarding said promotions? Explain

**Response:** *See* General Objection 1 and 3.

## Interrogatories directed to Edward Delahanty

22) What conversations did you have regarding Special Agent's Paul Donnelly and/or Carrie Marra needing to be in a supervised POD, that is, agent's Donnelly and/or Marra should not be in a POD without a supervisor? Explain.

**Response:**  *See* general Objection 1.


ELLIOT M. CARLIN
Area Counsel
General Legal Services, Manhattan

By:

Bonnie S. Edwards
Agency Representative

INVESTIGATIVE FILE
OF
EEO COMPLAINT

FILED BY
ANTHONY P. SIBILIA
TD Case #02-3051
Volume 1 of 2

Issue of complaint filed by Anthony P. Sibilia:

## NONSELECTIONS

DEPARTMENT OF THE TREASURY
TREASURY COMPLAINT CENTER
CHICAGO, ILLINOIS

Selections for vacancy announcement 06-10-9NCI004 = Special Agent, GS-1811-13 in the Boston Field Office. This 6-month roster opened 6/14/99 and closed 6/28/99. The following questions pertain to your role as an interviewing official.

Was the Complainant retaliated against for prior involvement in the EEO process when: 1) he was not reassigned to the Brockton, MA post of duty, which he learned of on October 11, 2001; and 2) he was not selected for the positions of Criminal Investigator, GS-1811-13, announced under vacancy announcement numbers 06-10-MNCI006 and 06-10-9NCI004?

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

In accordance with the provisions of 28 U.S.C. 1746, I, Bruce R. Traina do hereby make the following unsworn declaration, under penalty of perjury, pertinent to the above stated subject:

➢ State your name; current position title, series and grade; length of time in that position; and duty location. Bruce R. Traina, Supervisory Special Agent, GS-1811-14, since March 2000, Warwick, RI post-of-duty.

➢ What was your supervisory relationship to complainant and the duration of this relationship? I never had a supervisory relationship with Anthony P. Sibilia.

➢ Were you aware of the complainant's prior EEO involvement? If so, when (date) did you become aware? Do you recall how you became aware of his involvement? Yes. In March or April 2002. In a conversation with CI Boston Field Office's Special Agent in Charge Michael P. Lahey concerning a discussion about the re-opening of the Brockton, MA post-of-duty.

➢ Describe your involvement in the interview process. At the time I was an Investigation Report Review (GS-1811-13) for the CID's former New England District and Connecticut-Rhode Island District.

➢ Did the complainant pass/fail the interview for the position? Please be specific. I did not judge the interview process in a pass/fail context. The interview was a chance for the candidates to show and tell the panelists why they were qualified for a Grade 13 special agent position. Anthony P. Sibilia did not wear a sport jacket or suit coat to the interview. Every other candidate did, both male and female. In addition, his attire was not pressed and cleaned. Every other candidate's attire was pressed and cleaned. In summary, Anthony P. Sibilia's appearance was unprofessional. In the

field a special agent needs to wear a sport coat or suit coat to cover his/her assigned firearm. A firearm should not be unnecessarily exposed. Also, when in the field a special agent is usually interviewing witnesses and making contacts with the general public. In my judgement, witnesses and the general public have the right to expect a neat and clean professional looking person representing the IRS, especially when one is a law enforcement officer. Also, Anthony P. Sibilia's presentation to the panelists was not organized and understandable. He was not well prepared to answer the questions. On one open ended question, he must have spoke for well over 45 minutes, but because he did not have a general outline -- an introduction, body and conclusion -- to his presentation, it was very difficult to understand what knowledge, skills and abilities he wanted to convey to the panelists. The selectees and many other non-selectees for this open ended question, were organized concise and to the point. A special agent needs these qualities. For example, many times a special agent needs to convey complex evidence to a grand jury. A grand jury is a group of 18-24 randomly selected citizens. The special agent needs to explain the evidence in a non-technical manner because the members of the grand jury most likely do not have experience as criminal investigators or prosecutors and need to understand why the government believes an individual or individuals committed a crime or crimes.

**For example, what traits, qualifications, experience did the complainant LACK that the selectees had? Were the traits, etc., critical to the position? Please explain why and how they are critical.**

➤ Did you recommend to the selecting official, the selection of the persons for the above referenced vacancy announcements? No. I was only involved in the interview portion of the process. I only conveyed to the selecting official my opinions of the candidates concerning the interview portion of the process.

➤ Why wasn't the complainant recommended for any of these positions? I do not know why Anthony P. Sibilia was not selected for any of these positions because I was only involved in the interview portion of the process. However, based on his performance during the interview portion of the process, I am not surprised that he was not selected.

➤ Describe the method/procedures used in making the recommendations for the positions the complainant applied for. As previously stated, I do not know why Anthony P. Sibilia was not selected for any of these positions because I was only involved in the interview portion of the process. As previously stated, based on his performance during the interview portion of the process, I am not surprised that he was not selected.

➤ How were the selectees the better choices? As previously stated, I do not know why Anthony P. Sibilia was not selected for any of these positions because I was only involved in the interview portion of the process. As previously stated, based on his

performance during the interview portion of the process, I am not surprised that he was not selected.

**What traits, qualifications, experience did the complainant LACK that the selectees had?  Were the traits, etc., critical to the position?  Please explain why and how they are critical.**

➤ What documentation was relied upon in making your recommendation to the selecting official?  Provide copies.  I remember taking notes during the interviews of each candidate.  I remember that every candidate was asked the same questions.  I do not have retained copies of my interview notes.

➤ Are there any personal notes or records made to show what considerations were made during the recommendation stage?  Provide copy of interview notes and other personal recordations.  As previously stated, I remember taking notes during the interviews of each candidate.  I remember that every candidate was asked the same questions.  I do not have retained copies of my interview notes.

➤ Were the recommendations of others relied upon in making the recommendation to the selecting official?  If so, what were the recommendations and from whom? Obtain copy if written.  No.  I conveyed to the selecting official my independent judgement of each candidate's performance during the interview portion of the process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on <u>June 3, 2002</u> at <u>Brockton, Massachusetts</u>
      (Date)              (City/State)

Bruce R. Traina _Bruce R. Traina_

(Name/title/address)

Supervisory Special Agent _____

IRS Criminal Investigation _____

60 Quaker Lane - Suite 68 - 4th Floor__

Warwick, RI  02886-0110 _____

Exhibit HHH

Reminders for Discussion with Special Agent Anthony P. Sibilia

January 31, 2003 @ 10:00AM

1. SA Sibilia's e-mail message of January 24, 2003 - "Requests"

- Inform him his rating period will end 02/15/2003.
- Tell him EPF and Drop File should be available in the near future.
- Yes - Participation in LCIP is linked to LDP. Share with him CI Director, Strategy Tyrone G. Barney's memorandum of February 21, 2002. You did not sign the LCIP's "Certificate of Eligibility" so how can I help you improve. We need a starting point, a base line. You consider my guidance harassment, so I really don't know were we go from here. It's a plus for me to develop employees into future managers. There is zero incentive on my part from preventing anyone who is qualified from getting into management.

2. SA Sibilia's e-mail message of January 23, 2003 - "Case Reviews"

- You asked me questions concerning my managerial oversight of a particular investigation assigned to you. I my e-mail response of January 29, 2003 I attempted to answer your questions and provide you with the feedback you were looking for.

3. SA Sibilia's e-mail message of January 30, 2003 - "FW: Case Reviews"

- My managerial oversight of your investigations is not harassment. Constructive criticism is not harassment. Based on your experience and grade level, I treat you no differently than anyone I currently manage or have previously managed with the same qualifications. I have high standards and my highest standards are reserved from GS-1811-13s.

- Yes - I agree with you on the point that you should be sending more time on "direct investigative time." I was going to bring this up at the future meeting concerning your Performance Appraisal. However, CJE V (Business Results -Efficiency), in particular 5A (Workload Management) and 5C (Workload Implementation) are very important. You are a GS-1811-13. You should be working independently. I am not harassing you. It is your choice to file EEO complaints. Additionally, you are on LEAP, which is a "minimum" of 2 hours extra per day. The time is available to you.

- Your e-mail message to me was disrespectful and insubordinate. For example - my boss will critique my Form 6083, not you. I asked you previously to follow the chain of command. You sent a "cc" to SAC Joseph Galasso - my boss's boss. Share with him my e-mail message to SA Sibilia

PG 530

of December 19, 2002 requesting that he not do this. These are conduct
issues, do not do them again.

- This e-mail message will also have a negative impact on my evaluation of
  your performance in the CJEs. At the minimum CJE I (Employee Satisfaction
  - Employee Contribution) in particular 1A (Workplace Interaction) and 1C
  (Workplace Environment). These are performance issues, please do your
  best to improve.

4. Investigative issues.

- Any trial date on the P-C investigation?
- Have you spoken to SSA Hank Chin about the potential OCDETF case?
- Have you made arrangements to interview the prisoner that may have
  information.

5. Counsel SA Sibilia concerning the currency and coin issue.

- Now that I have gathered all the pertinent facts, explain the issues to him.
- Provide him with a copy of the counseling memorandum.
- Explain the memorandum to him.
- Have him sign acknowledgement of receipt.

Complaint of Anthony Sibilia and
J( ～w, Secretary of the Treasury
TD Case Number: 02-3230

The attachments to Mr. Traina's statement were
removed from this exhibit and filed separately
under Exhibit 22 to avoid duplication.

*PG 187*





# Declaration

Subject: Discrimination Complaint of *Anthony Sibilia* V. Kenneth Dam, Acting, Secretary of the Treasury, TD Case Number *02-3230*

DECLARATION UNDER PENALTY OF PERJURY

In accordance with the provisions of 28· U.S.C. 1746, I, the undersigned, *Bruce Traina* do hereby make the following Unsworn Declaration, under penalty of perjury, pertinent to the above stated subject:

My name is Bruce R. Traina and I am a Supervisory Special Agent (SSA) with the Internal Revenue Service (IRS), Criminal Investigation (CI) function, Group 04-05, Boston Field Office, post of duty (POD) Boston, MA. I have supervised the Complainant (Special Agent (SA) Anthony P. Sibilia) since Sunday, July 28, 2002.

I understand that SA Sibilia has alleged that he has been subject to continuing retaliation and harassment as a result of his participation in the EEO process. As evidence, he has cited his non-selection (Thursday, December 12, 2002) into the Leadership Candidate Identification Program (LCIP), counseling received (Thursday, December 12, 2002) regarding parking his assigned government owned vehicle (GOV) and the associated monthly reports, his non-selection (Friday, January 31, 2003) into the Leadership Development Program (LDP), counseling received (Friday, January 31, 2003) regarding seized currency and coin, and an alleged harassing comment allegedly about him made by me (Thursday, January 30, 2003). I have not retaliated or harassed or discriminated against SA Sibilia in any way.

1. The Complainant has stated that he submitted an application for the LCIP to you on 10/11/02. In a follow-up conversation with you a few days later, he states that you questioned his motivation for applying for the program and referred to his pending EEO complaint.

   He also states that on 12/2/02 he emailed you a request for a status update on his LCIP application. At a meeting on 12/12, he learned that he was not certified for eligibility and was told by you that he hadn't submitted his application timely. The Complainant further states that at this 12/12 meeting, you "insulted" him, stated he showed "animosity towards others," did not "act like a Grade 13 agent," that the Complainant did not follow rules, and submitted inaccurate work. He also stated that an SAR recently submitted to him "was not grade 13 material and did not communicate the charges correctly."

   Please describe the circumstances related to the Complainant's LCIP application. Was it submitted timely? Why or why not? Please respond to these allegations. Address the Complainant's characterization of the discussion and indicate whether or not you

page 1 of 13 pages

**PG 188**

made the statements attributed to you by the Complainant.

There are two supervisory developmental programs in CI, the LDP and the LCIP. The LDP is a national program and the LCIP is a local program that is generally announced every 6 to 12 months. CI requires that in order to be considered for entry level supervisory positions under the LDP, an applicant must be a participant in the LCIP.

I don't consider SA Sibilia's application for the LCIP to have been timely based on our prior discussions. I became SA Sibilia's supervisor on Sunday, July 28, 2002 and shortly after that, he e-mailed to me an application for the LDP, giving me only one business day to review it. At the time, I told him that this was insufficient time for me to review an application like that and he agreed in the future he would give me advance notice of his intention to apply for such a program. He also agreed to submit his applications earlier than the last day under an announcement. This issue is explained in more detail on pages 14 - 16 of the Affidavit I signed on Friday, November 8, 2002.

SA Sibilia e-mailed his application for the LCIP to me on Friday , October 11, 2002 (Exhibit XX). The following Monday was a federal holiday (Columbus Day) and the paperwork was due on Tuesday, October 15, 2002. He had done exactly what he'd agreed not to do during a meeting with my supervisor, Assistant Special Agent in Charge (ASAC) Peter R. Benevento, and me on Wednesday, August 7, 2002. On Wednesday, October 16, 2002 SA Sibilia asked if I'd seen his e-mail and application. I said that I had not and I was unaware that he had sent it to me. SA Sibilia demanded to know why I had not forwarded his paperwork considering the due date was the previous day. I told SA Sibilia he did not verbally warn me he would be e-mailing his application to me as to provide me with a "heads-up" as he had previously agreed to do. Additionally, I told him that during the past few days I was very busy, including preparing for and meeting with an EEO investigator concerning his complaint he filed against me. That would have been my only reference to his pending complaint. I told him I would review his e-mail message later that day but at this time I consider it to be a late submission. I also asked him that in order for me to better understand his written application, what was his major motivation for applying to the LCIP. SA Sibilia appeared to be offended by the question and did not answer it. I further explained to SA Sibilia that it was a question asked of myself when I first expressed an interest in a management career and I believe it to be an important question. I also reminded SA Sibilia that he and I were probably asked a similar question (So why do you want to be a SA?) when applying for employment with CI. I still did not get an answer to my question from SA Sibilia. As I stated in page 23 of the Affidavit I signed on Friday, November 8, 2002, in my judgement, SA Sibilia purposely sent the LCIP paperwork to me late in order to create another issue between us.

I often get many e-mail messages each day, but later that day I located his e-

mail and attempted to open the two (2) attachments. For unknown reasons, I couldn't open one of the attachments. Per an e-mail to SA Sibilia I sent later that day I asked him to re-send it to me (Exhibit XX). He did on Thursday, October 17, 2002 and I informed him the following Tuesday that I was able to open the file in question (Exhibit YY).

I forwarded SA Sibilia's original e-mail message to and discussed the situation with ASAC Benevento (Exhibit XX). We concluded that although I considered the original application to be incomplete and when eventually completed late, I should provide substantive feedback to SA Sibilia regarding his application for the LCIP. However, because of the imminent issuance by CI Headquarters of the new Critical Job Elements (CJEs) for the SA position I should hold in reserve my final recommendation and the related feedback until the new CJEs were issued. Eventually on Thursday, November 21, 2002 I received the new CJEs for SAs (Exhibit ZZ). On Wednesday, November 27, 2002 I completed and signed the LCIP "Certificate of Eligibility." The "Not certified" box was marked (Exhibit AAA). I forwarded this document to ASAC Benevento on Wednesday, December 4, 2002 and the next day ASAC Benevento concurred with my decision (Exhibit AAA).

On Wednesday, December 4, 2002 I contacted SA Sibilia via e-mail to arrange a meeting and at first, he did not want to meet with me (Exhibit YY). In a response to my e-mail, on Wednesday, December 11, 2002 SA Sibilia stated: "If you are asking me if I would like to discuss my LCIP application with you, I do not" (Exhibit YY). I responded to him that same day via e-mail and I insisted that we should meet and we did get together on Thursday, December 12, 2002 (Exhibit YY). I also had other issues I needed to discuss with SA Sibilia at this meeting. Based on my experience of supervising SA Sibilia I knew he was going to be confrontational at the meeting. I also knew that SA Sibilia would take what I said out of context and claim I said things I never said. Because of this, I prepared written "Reminders" for the meeting (Exhibit BBB). The "Reminders" were my script for the meeting. In my experience as a SSA, I have never done such a thing as this for any other SAs or support employees I have managed. At the meeting I tried to give him examples of why I didn't believe that he should be in a supervisory position at this time, and the reasons I had not certified him for LCIP.

I told SA Sibilia that, in my opinion, he doesn't take constructive criticism well, and I may have told him things that offended him, but I don't believe that they would have offended most other SAs in the situation. He submitted his application incomplete and when complete late but I still felt he needed to know that if he didn't improve aspects of his performance, future LCIP applications wouldn't be certified either. It was certainly not my intention to insult SA Sibilia, but to provide him with truthful and specific feedback on his application.

Please see my response to Question 2 for details on the Thursday, December

12, 2002 discussion I had with SA Sibilia regarding the reasons for his non-certification for the LCIP.

2. Was the Complainant "certified" for the LCI Program? Please explain why you rated the Complainant as you did for his LCIP application.

I did not give SA Sibilia written feedback on his LCIP application, but I did prepare my own notes ("Reminders") on the issues I wanted to discuss with him (Exhibit BBB). I wouldn't normally do that, but I've found that with SA Sibilia, he tends to argue about everything, and I felt I needed to have notes so I could make sure I provided guidance to him on all the necessary points. I have provided the EEO Investigator with a copy of my notes (Exhibit BBB).

I told SA Sibilia that his LCIP package I originally received was incomplete and when completed late, as mentioned above. In addition I provided SA Sibilia with information and examples on why he was not certified as ready for the LCIP and went down the list of competencies on the "Certificate of Eligibility":

Adaptability - I told him his write-up for the application was good, but he has had some problems in this area. At the time he was informed he could no longer work from the Brockton, MA POD and needed to report to his official POD of Boston, MA he blew up at me. I didn't think this was a good example of adaptability. This issue is explained in more detail on page 2 of the Affidavit I signed on Friday, November 8, 2002.

Teamwork - I told him that he never responds to my requests on time or keeps me informed, both less than acceptable examples of teamwork.

Customer Focus - I told him that his write-up was poor and he needed to develop this item further.

Problem Solving - I told him his write-up was good but he and I were still discussing the same issues as when I became his supervisor.

Technical Credibility - I told him that the only major work of his that I'd seen was a Special Agent's Report (SAR) and I previously told him that I didn't feel it was a good example of GS-1811-13 work.

Partnering - SA Sibilia had gotten into an "e-mail war" with another SA, and I told him that I didn't think that indicated good partnering skills. This issue is also discussed on page 17 of the Affidavit I signed on Friday, November 8, 2002.

Communications - SA Sibilia doesn't communicate with me by talking directly to me; rather he communicates almost entirely by e-mail in order to document our communications. Nearly everything has to be in writing; I've never had an employee like this before. I told him that we have to be able to speak with each other, that everything can't be done via e-mail. I consider this to be a serious weakness in SA Sibilia's

PG 191

performance and told him that.

Investigative Theory, Criminal Investigation, Organizational Knowledge & Tax Administration - SA Sibilia's write-up lumped these last competencies together making it difficult to address each one properly and individually. The only item I had to rely on was the above-mentioned SAR. SA Sibilia said nothing at all about Organizational Knowledge and in the five (5) months under my supervision, I don't think he did anything indicating involvement or knowledge with the other IRS Divisions and functions. Based on the lack of demonstrated ability, I couldn't certify his readiness in these competencies.

In summary, during the Thursday, December 12, 2002 meeting, I provided oral feedback to SA Sibilia on his application, including the above specifics. At the end of the discussion SA Sibilia stated to me he would never apply for management again. Subsequent to the meeting, SA Sibilia has refused to sign the "Certificate of Eligibility" (Exhibit CCC). This has prevented us from coming to an agreement on a starting point in order for me to provide SA Sibilia with additional guidance on ways to improve his performance on the required competencies.

3. The Complainant has stated that he received a counseling memo from you concerning parking and monthly reports; he submitted a "Rebuttal to Memorandum dated 12/12/02…In Regards to Parking and Monthly Reports." In his rebuttal, the Complainant denied that he had been "repeatedly informed" that he had been "ignoring a directive" issued to the employees in the group about parking GOVs. He further states that he learned of this parking policy via an email on 8/7/02 and that this was the only time he was informed of the policy.

The Complainant also states that during the counseling, you told him he could have avoided the parking problem if he had accepted your prior offer to park the Complainant's GOV in your assigned place in the JFK building. The Complainant stated:

> "SSA Traina lists a corrective action, which I need to follow to resolve this issue. SSA Traina states, 'You are prohibited from parking your assigned GOV in the basement of the JFK Federal Building with (sic) my prior permission.' This corrective action is not clear to me. Furthermore, SSA Traina has failed to follow his own directive, which states, 'The employee(s) found to be in violation of the policy will be counseled at which time I will explain to the employee(s) the penalties associated with future violations.' During my counseling, SSA Traina did not explain to me the penalties associated with future violation."

Did you have a counseling meeting with the Complainant on 12/12/02 which you confirmed with a counseling memo? If so, describe the meeting you had with the Complainant, including the purpose of the discussion, the issues involved, and what you told him. Please address the Complainant's characterization of the discussion and indicate whether or not you made the statements attributed to you by the Complainant.

Yes, I had a counseling meeting with SA Sibilia on Thursday, December 12,

PG 192

2002 and issued him a counseling memorandum regarding the parking and
report issues (Exhibits BBB & DDD). I provided him with the counseling
memorandum and explained it to him. On Thursday, December 19, 2002, SA
Sibilia and I made a pen and ink change to a typographical error and changed
the word "with" to the word "without" (Exhibit DDD). Related issues preceding
this event are explained in more detail on pages 17 - 19 of the Affidavit I signed
on Friday, November 8, 2002. It is supported by previously submitted Exhibits
NN, OO & PP.

However, by way of background, the Brockton, MA POD was closed around 1996
and all of the SAs at this POD were reassigned the Boston, MA POD. CI
retained the space and for several years after its closing individual SAs
"squatted" in the Brockton, MA POD unofficially. It is my understanding when the
new SAC (f/k/a Chief) replaced the SAC that had closed the office, the new SAC
gave official permission for SAs to go to the office on occasion for good business
reasons. This SAC then decided to reopen/remodel the Brockton, MA POD
effective Sunday, November 4, 2001 under my supervision. Only three (3) SAs
were assigned to me in the Brockton, MA POD and all the other SAs were told to
work from their officially assigned office, the Boston, MA POD, including SA
Sibilia. On Sunday, July 28, 2002, because of a realignment in the CI Boston
Field Office, I also picked up additional SAs in the Boston, MA POD, including
SA Sibilia. While the Brockton, MA POD is being remodeled, the SAs assigned
to the Boston, MA POD, including SA Sibilia, were told they could not work in the
Brockton, MA POD. This is issue also explained on pages 1 & 2 of the Affidavit I
signed on Friday, November 8, 2002.

When I became his supervisor at the end of July, 2002, there were outstanding
issues with SA Sibilia from his prior supervisors, which ASAC Benevento wanted
me to deal with directly. One of these old issues was that he had been parking
in the basement of the JFK Federal Building and I told him he couldn't do that
without prior supervisory approval. He had a variety of excuses about why he
needed to park in the building, including loading or unloading ammunition. The
alternative was to park in the public lot across the street and be reimbursed. He
told me he understood he couldn't park in the building every day. Since I'm only
in the Boston, MA POD two (2) or three (3) days per week, and SA Sibilia works
from there every day and is the senior Group 04-05 SA assigned to the Boston,
MA POD, I gave him my parking pass. He didn't want to take it and I pretty
much insisted he take it. I felt it would meet his needs and eliminate the problem
of him parking in the building without authorization. On Monday, August 5, 2002
I sent an e-mail informing Group 04-05 employees, with a "cc" to others
authorized to park in the JFK Federal Building, that I assigned my parking space
to SA Sibilia (Exhibit OO).

The next day, Mr. Sibilia sent an e-mail to all the other SAs in the group and
offered them the use of the parking space (Exhibit OO). This was completely

inappropriate and beyond his authority and I took the parking space back from him. The following day I issued an e-mail to the same audience per my Monday, August 5, 2002 e-mail, reiterating who was authorized to park in the basement of the JKF Federal Building (Exhibit PP).

In my judgement, SA Sibilia appears to want his own way all the time and seems to thrive on turmoil. I have no other explanation as to why he behaves the way he does. His prior managers had told him about not parking in the basement of the JFK Federal Building; this was not a new issue (Exhibit NN). Other people who had permission to park in the building had told me they frequently saw him parked there.

4. The Complainant has stated that in the 12/12/02 counseling meeting, you told him that he has filed "false/inaccurate monthly reports." He also says that you explained that he had incorrectly listed his GOV license plate on his monthly GOV reports. He responded by stating:

> "I have filed monthly reports relative to this GOV since approximately May 2002. At no time has anyone told me that I have incorrectly recorded my license plate number, if they had, I would have corrected the number immediately. I did not intend to mislead anyone..."

Please describe in detail the conversation you had with the Complainant regarding the accuracy of his monthly reports.

All SAs are assigned GOVs and each person has to file two monthly reports on the GOV; one deals with expenses and the other is a vehicle log reporting instances of commuting (home to office and office to home) and the mileage associated with the commuting. Reports are all electronically submitted and filed and include the vehicle make, model, year, license plate number, and employee name.

Over a period of about five months, on different occasions I noticed a black 2002 Chevrolet Blazer (Blazer) parked in CI's area in the basement of the JFK Federal Building and it puzzled me because I didn't know anyone assigned a black Blazer besides SA Sibilia. Eventually I checked the license plate number of "4781 PY" against Group 04-05's electronic administrative files that contained the vehicle reports, but didn't find a match for any of the group's SAs. SA Sibilia reported "781IPY" on his vehicle reports. At a later date, I went to our property clerk and the employee said the license plate number didn't match any of our vehicles. A few days later, I learned that after the SAC had pulled into the basement of the JFK Federal Building and could not park his assigned GOV because all of CI's parking spaces were full, he radioed the CI office upstairs to find out what was going on. It was reported that SA Sibilia was subsequently seen bolting from the office and then seen rearranging GOVs in the basement. Upon learning of these events I requested a further search by the property clerk and the employee concluded the black Chevrolet blazer with license plate number "4781 PY" was assigned to SA Sibilia. For months, I had thought it was

someone else's vehicle and would have certainly brought up the parking issue earlier if I'd know it was his assigned GOV.

Before I prepared the counseling memorandum I contacted a CI Labor Relations (LR) specialist for guidance. Following the LR specialist's advice, I later completed the counseling memorandum and in person I provided it to ASAC Benevento for review. Upon his permission I then counseled SA Sibilia and confirmed it in writing on Thursday, December 12, 2002 (Exhibits BBB & DDD). The counseling memorandum was issued because he ignored a directive prohibiting him from parking in the basement of the JFK Federal Building and because he had incorrectly identified his license plate number on the vehicle reports for months. As a GS-13 SA, it's his obligation to file accurate reports, including GOV reports, not to wait until someone else notes an error and corrects him.

On Wednesday, December 18, 2002 I e-mailed a final copy of the counseling memorandum to the LR specialist with a "cc" to ASAC Benevento (Exhibit EEE). Shortly thereafter I was made aware of my aforementioned typographical error and corrected it with SA Sibilia on Thursday, December 19, 2002.

> 5. The Complainant has stated that in the email and a meeting 1/31/03,
> you will not certify his eligibility for the LDP (Leadership
> Development Program). Please describe the circumstances related to
> the Complainant's LDP application. Did you have meeting to discuss
> this on 1/31/03? Address the Complainant's characterization of the
> discussion and indicate whether or not you made the statements
> attributed to you by the Complainant.

In an e-mail message to me on Friday, January 24, 2003, SA Sibilia asked me if he needed to be in the LCIP in order to apply for the LDP and two other questions (Exhibit FFF). I responded to him on Wednesday, January 29, 2003 and said to him that to date, in my judgement, his level of readiness has not changed since he applied for the LCIP and that we should schedule a meeting to discuss the LDP and I answered his other two questions (Exhibit FFF). In this e-mail I also scheduled a meeting with him on Friday, January 31, 2003.

On Thursday, January 23, 2003 I sent a separate e-mail to every Group 04-05 SA, to include SA Sibilia, that contained attachments of their latest case reviews concerning their active workloads (Exhibit GGG). In response to my e-mail message, on Friday, January 24, 2003 SA Sibilia sent to me an e-mail that asked questions concerning one of his assigned investigation (Exhibit GGG). His e-mail message also contained an inaccurate interpretation of comments I recorded in Form 6083 (SSA's Investigation Progress Record) concerning the investigation in question. The comments he questioned is as follows: "SSA Traina reviewed the SAR and related paperwork, made corrections, and it [sic] submitted it to ASAC Peter Benevento for review and approval." In a follow-up to his message, on Wednesday, January 29, 2003 I sent an e-mail to SA Sibilia explaining the following issues (Exhibit GGG). I said at the close of an

investigation I complete a Form 6082 (Assessment of Closed Investigation) which provides feedback to the SA. However, since he raised questions to me concerning the investigation at this time, I would provide him feedback in this e-mail message. I also stated that in his e-mail message to me I believe he drew an erroneous conclusion based on his initial reading of the Form 6083 and I asked him to please re-read the form. In the message I informed him that despite previous guidance, the related paperwork he submitted with his SAR required major revisions on my part. I told him his performance in this area was inadequate for a GS-1811-13. My e-mail message to him contained the revised related paperwork and I requested that he compare the revised related paperwork to the related paperwork he originally submitted to me. I also said I wished to discuss this issue at the previously scheduled meeting with him on Friday, January 31, 2003. On Thursday, January 30, 2003 SA Sibilia responded with a very nasty e-mail message and sent a "cc" to SAC Joseph Galasso in violation of the chain of command (Exhibit GGG). For example he states the Form 6083 in question did not effectively communicate what exactly I did. Please note, Forms 6083 are documents I produce in a large part based on what the SAs tell me about their assigned investigations. I provide the forms to the SAs for their review and to make sure I accurately recorded what they told me. In my experience as an SSA, on occasion SAs will point out in a professional and polite manner any discrepancies and we come to a mutual agreement and the Forms 6083 are amended. The main purpose of the Form 6083 is to document my managerial oversight of an investigation and is reviewed by my superiors, mainly the ASAC and the SAC. SA Sibilia is in no position to critique my communication skills on this form, that is the job of the ASAC and SAC. Further he states: "Additionally, I do not appreciate the condescending 'tone' to your remarks." He informs me that I am continuing to harass him based on his participation in the EEO process. He also states he does not want to meet with me on Friday, January 31, 2003. I responded to SA Sibilia on Thursday, January 30, 2003 stating the meeting was still scheduled (Exhibit GGG).

Our scheduled meeting occurred at the appointed date and time. Prior to the meeting I once again prepared "Reminders" for the discussion because once again I knew SA Sibilia was going to be confrontational (Exhibit HHH). We discussed the following issues:

- SA Sibilia's e-mail message of January 24, 2003 - "Requests" (Exhibits FFF & HHH). I informed SA Sibilia the LCIP is linked to the LDP. I provided him with a February 21, 2002 memorandum from CI Director of Strategy Tyrone G. Barney concerning the LCIP that states: **"Please be sure that your employees understand that in order to be considered highly qualified for entry level management positions, they must participate in the LCIP."** (Exhibit III). Please note, SA Sibilia would have already received this memorandum on Wednesday,

February 27, 2002 via an e-mail message to all CI Boston Field Office GS-1811s from SSA Dennis J. Wlodyka, the administrator of the LCIP for the CI Boston Field Office (Exhibit III-A).

- SA Sibilia's e-mail message of January 23, 2003 - "Case Reviews" (Exhibits GGG & HHH) (Please note the date is incorrect on Exhibit HHH; the correct date is January 24, 2003 per Exhibit GGG.) I explained to SA Sibilia that he asked questions concerning my managerial oversight of a particular investigation assigned to him and I attempted to provide him with feedback in my January 29, 2003 e-mail message to him (Exhibit GGG).

- SA Sibilia's e-mail message of January 30, 2003 - "FW: Case Reviews" (Exhibits GGG & HHH). I explained to him that my managerial oversight of his assigned investigations is not harassment, that he should be spending more time on "direct investigative time," that this e-mail message to me was disrespectful and insubordinate. For example he was disrespectful because if needed my boss (ASAC Benevento) will critique my Forms 6083, not him and insubordinate because he sent a "cc" of his e-mail to SAC Galasso, my boss's (ASAC Benevento) boss. I previously asked SA Sibilia to follow the chain of command in a Thursday, December 19, 2002 e-mail message of which I provided him with a hardcopy (Exhibit JJJ). I also explained to him the message will have a negative impact on my evaluation of his performance in particular CJEs.

- Investigative issues (Exhibit HHH) - These are not germane to this Affidavit.

- Counsel SA Sibilia concerning the currency and coin issue (Exhibit HHH) - Please refer to the next section of this Affidavit for more details.

6. The complainant alleges that your memo dated 1/31/03 (Subject: Seized Currency and Coin) shows a "continuing pattern of harassment/retaliation" and that whatever he submits to you is "scrutinized and used against (him) negatively." Please address the Complainant's allegation and explain the reason for the memo.

Prior to issuing the counseling memorandum concerning the subject of "Seized Coin and Currency" to SA Sibilia on Friday, January 31, 2003 there were a number of things I needed to accomplish. I first learned that SA Sibilia had a large amount of cash in his possession on Friday, December 13, 2002. I was able to consult with ASAC Benevento on Monday, December 16, 2002 and we determined I needed to obtain all the facts concerning this very serious matter. By reviewing administrative and investigative documents and speaking to both SA Sibilia and SSA Hall at least a couple of times each I believe I was able to develop an accurate chronology of events. I concluded that SA Sibilia's

performance was inadequate for a GS-1811-13. I consulted with a LR specialist with the writing of the counseling memorandum. I provided a draft of the counseling memorandum to the LR specialist via e-mail on Thursday, January 16, 2002 (Exhibit KKK). Based on the LR specialist's guidance I revised the counseling memorandum. The LR specialist determined that since the issues in question were related to both performance and conduct, the counseling memorandum should eventually be placed in SA Sibilia's Employee Performance File (EPF) and his Drop File as well. I had some conversations with ASAC Benevento concerning the subject and eventually on Friday, January 24, 2003 I e-mailed to him the final draft of the counseling memorandum (Exhibit LLL). Shortly thereafter I had a conversation with ASAC Benevento and he concurred with the counseling memorandum's contents and its findings and he stated he would provide it to SAC Galasso for his review. I eventually had a conversation with SAC Galasso, I believe the date was Tuesday, January 28, 2003, and SAC Galasso told me he concurred with the findings in the memorandum along with its content and that it should be issued to SA Sibilia.

On Friday, January 31, 2003 I had a meeting with SA Sibilia and discussed a number of issues with him to include the counseling session concerning the issue of seized currency and coin (Exhibit HHH). Please refer to the previous section of this Affidavit for the other issues. At the meeting I explained the issues to him, provided him with a copy of the counseling memorandum and its attachments, explained the counseling memorandum to him, and had him sign an acknowledgement of receipt (Exhibits HHH & MMM). The counseling memorandum is seven (7) pages in length with eight (8) pages of attachments (Exhibit MMM). Because of this I will not restate its contents in this Affidavit. But the major point I stressed to SA Sibilia was that, per Internal Revenue Manual (IRM) 9.7.6.14: "...The security, budgetary, and accounting problems caused by retention of large amounts of cash has caused great concern within CI, the Department of the Treasury, and Congress..." and that his performance and conduct in this situation were inadequate for a GS-1811-13.

7. The complainant alleges that you made a harassing comment to an unnamed Agent "I'm just dealing with shitty agents." He further alleges that you directed this statement at him. Did you make such a statement? If so, was it directed at the Complainant? Please briefly explain this exchange, including the purpose, what was said, who was involved, and what, if anything, it had to do with the Complainant.

On Friday, January 31, 2003, prior to our scheduled meeting, SA Sibilia sent to me an e-mail message asking me if I made the statement in question. The e-mail message jumped to the conclusion that the statement was directed at him and it followed with three bold questions and a demand (Exhibit NNN). SA Sibilia shows a similar example of jumping to conclusions and making bold statements in his Friday, January 24, 2003 and Thursday, January 30, 2003 e-mail messages to me, respectively. At the start of the meeting, SA Sibilia asked

me to open the e-mail message he sent. I did and i read it. He asked me if I made the statement. I said I did. He asked me if I directed it at him. I said no. I then told him we needed to get back to the business at hand.

On Thursday, January 30, 2003, SA James P. Donahue came into my office in his usual fashion and with his usual opening line: "Hey BT, how's management treating you?" It's SA Donahue's way of harassing me. I most likely respond to SA Donahue's question with a nasty remark or an expletive and did so on this occasion with the statement: "Hey JD, (pointing at myself with two hands) just dealing with shitty agents." Neither one of us is serious, SA Donahue is not really harassing me and I am not really mad at him. Our conversation normally proceeds to some hot topic of discussion concerning CI or politics and it did so on this occasion. In a usual conversation with SA Donahue, I at times use an expletive before the word "agents" and "employees" or just use an expletive to refer to "agents" and "employees." My comments are never directed at anyone in particular. I never mention anyone's name. I am never serious. My comments on the day in question were not directed at SA Sibilia or anyone else in particular. Likewise in our conversations SA Donahue at times uses an expletive before the words "mangers" and "management" or he just uses an expletive to refer to "managers" and "management." SA Donahue's comments are never directed at anyone in particular. He never mentions anyone's name. He is never serious. I have know SA Donahue for close to 15 years and as far as I understand he nor I are offended with this type of exchange. However, normally an exchange of this type occurs after business hours. On a number of occasions since I returned to the Boston, MA POD in July 2002, SA Donahue and I are the last ones in the office and before one of us heads out for the night we check in on the other so the alarm is not set prematurely. We often end up in a no-holds barred conversation. The exchange on the day in question occurred in the afternoon during business hours. I had lost track of time and thought it was later than it was and it was an inappropriate time of day to respond to SA Donahue's question with an expletive before the word "agents." I regret saying it at this time of day in the event other SAs or employees heard it and I regret that I placed SA Donahue in the current position he is in concerning this Affidavit and Complaint.

I have never mentioned to any SA or non-managerial employees that SA Sibilia has filed EEO complaints against me. I understand the EEO complaints SA Sibilia has filed against me are very serious in nature and deserve privacy. If SA Donahue or any other SAs or employees that may have overheard my comment on that day believe I directed it at SA Sibilia, in my judgement there can be only three logical explanations and SA Sibilia has only himself to blame. 1) SA Sibilia has made false allegations against me to other SAs and employees claiming I am harassing him; or 2) Other SAs and employees have independently concluded that SA Sibilia's performance and conduct are less

than desirable; or 3) a combination of reasons 1 and 2.

Please note, before becoming a manager, as an SA I was elected and for many years re-elected by employees of my former group to be their representative on the CI Boston Field Office's (f/k/a CI New England District's) Special Agents' Committee (Committee). Each group sent an elected representative to a quarterly meeting with the SAC. I was elected and re-elect because I fairly fought for issues important to the agents and employees. For about two years, I was elected and then re-elected by the other representative to be chairman of the Committee because they knew I could back up the agents' and employees' positions with facts. I have only the highest respect for the SAs and employees of the CI Boston Field Office and once regret making the remark in question.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___02/05/2003___ at ___Boston, MA_____
                    (Date)                         (City/State)

(Signature Below)

*Bruce R. Traina*

(Name/title/address)
___Bruce R. Traina, Supervisory Special Agent___
___Internal Revenue Service - CI Boston Field Office___
_____25 New Sudbury Street___
_____Boston, MA   02203___

**PG 200**

Complaint of Anthony Sibilia and
John W. Snow  Secretary of the Treasury
TD Case Number: 02-3230

The attachments to Mr. Traina's statement were

removed from this exhibit and filed separately

under Exhibit 21 to avoid duplication.

**Affidavit    State of Massachusetts    County of Suffolk**

Complaint of Anthony Sibilia    TD Case #02-3230

I, Bruce R. Traina, employed by the Internal Revenue Service (IRS) as a Supervisory

Special Agent (SSA), Group 04-05, in the Criminal Investigation (CI) function, Grade

14, in the Boston Field Office, Boston, MA, state: I am the Complainant's current

manager. I have not harassed him or discriminated against him in any way.

***Are you aware of the Complainant's prior EEO involvement? If so, how did you
become aware? And when did you become aware? Where you involved in the
Complainant's prior EEO activity? If so, what was your involvement?***
Yes, I was aware of Special Agent (SA) Sibilia's prior EEO complaint because

I gave a statement to an EEO Investigator on or about June 3, 2002. I was not

involved in the prior complaint.

***What was your supervisory relationship to the Complainant at the time of
the alleged events (June to August, 2002) and the duration of this
relationship? What is your supervisory relationship to the Complainant at
this time?***
I have worked for the IRS for over 14 years. I have been in CI for the same amount

of time. For the past three years I have been a SSA. Prior to that, for one year, I was

an Investigation Report Reviewer (IRR). I have known SA Sibilia and been on friendly

terms with him for a few years. I was a manager in the Warwick, RI post of duty (POD),

Group 04-02, along with PODs in New Bedford, MA and Brockton, MA, before being

assigned to the Boston, MA and Brockton, MA PODs, Group 04-05, because of a

realignment in the Boston Field Office. After the realignment Group 04-02 consists of

the Warwick, RI and New Bedford, MA PODs and no longer covers the Brockton, MA

POD. Sometime in the Spring of 2001 during a conversation concerning obtaining a

firearm for a new SA, I even asked SA Sibilia if he wanted to work in the Warwick, RI

POD. He declined because the Warwick, RI POD received less geographical pay than

the Boston, MA POD. I became SA Sibilia's manager in the Boston, MA POD effective
July 28, 2002, and I am currently his first line manager.

Through November 3, 2001, the Brockton, MA POD was closed but had been used
by about six or seven SAs assigned to the Boston, MA POD as an unofficial office, per
the approval of prior Special Agent in Charge (SAC) Michael Lahey. Through that date
there was no supervision of that site. After that date, my responsibilities as SSA of
Group 04-02 expanded and I became the manager of an official Brockton, MA POD.
Because this office is in dire need of renovations and functioning office furniture, I
commonly refer to the Brockton, MA POD as the "Brockton, MA floor space." Only
three SAs were allowed to stay there and were officially transferred from the Boston,
MA POD. The other SAs who now had to report to their official Boston, MA POD were
angry that they could not stay in Brockton, MA. SA Sibilia was one of the SAs that used
the Brockton, MA office as an unofficial POD. The first day I went to the Brockton, MA
POD was November 6, 2001. When I arrived at the office, SA Sibilia was in the process
of packing his belongings. Before I could even take off my coat SA Sibilia blew up at
me in front of two other SAs, raising his voice and displaying insubordinate behavior. I
did not take any action against SA Sibilia for that outburst. He was not an employee
that reported to me at that time, and I gave him the benefit of the doubt that this would
not happen again. Ever since that time, SA Sibilia has been uncommunicative with me.

**Allegation One** – *The Complainant alleges on June 11, 2002, The acting SAC
and the incoming SAC questioned him about the presence of television reporters
at the mandatory firearms training site. The Complainant alleges that the acting
SAC contacted him on the telephone, indicated he was "out of line", asked to see
him as soon as training ended, and hung up on him.*

**Please describe the circumstances surrounding this claim. Is it normal for
reporters to show up at a firearms training site? When reporters do show**

*up, what is the procedure (if any) that's followed? If there is a set procedure, did the Complainant follow it? If reporters don't normally show up unless advance notice is provided, are you aware if the Complainant had been notified that the reporters would be there? Rather, were the circumstances such that when the reporters showed up, the Complainant did not take the right course of action or follow the right protocol?*

I was not SA Sibilia's manager at that time, so I do not know everything that

took place that day with him and his managers. I was, however, present at the

training that day at the American Firearms School (AFS), North Attleboro, MA.

AFS is a privately owned company and they rent their facilities to the IRS-CI.

When I attend training, I am there as a student. I was the only manager there

that day, but during training sessions, managers let the instructors, who are SAs,

run the firing range or any other events because they are the subject matter

experts. The main instructors that day were SA Sibilia and SA Jeffrey Landon,

however SAs Charles Blackmore and David Lazarus were instructors also

participating with the training. Before training started, SA Sibilia announced that

Fox TV 25 was coming to film some of our training exercises. Everyone

assumed that he had received the proper permission and clearance for the

media coverage, since we know that contacts with the media are supposed to be

monitored and approved by upper management and the Public Information

Officer (PIO).

One of the three instructors came to me and asked me to intervene by calling

the SAC's Office, stating that SA Sibilia did not inform the other instructors that

the reporters were coming and that they and many of the SAs did not like this

situation. This instructor came to me because I am a manager. I called the PIO,

Acting SSA Stephen Bellingreri, who was also SA Sibilia's manager at that time,

but I got no answer and left a voice mail message. I called the Acting Special Agent in Charge (SAC), Peter Benevento, and left a voice mail message for him that there were television reporters on site with video cameras and the three other instructors and many of the SAs were disturbed by their presence. I received a call back from PIO/Acting SSA Bellingreri and he said SA Sibilia had previously spoken to him about the filming and he was aware of the situation. I then spoke to the instructor that had previously approached me and told him that PIO/Acting SSA Bellingreri was aware of the situation and I had no authority to stop the filming. During lunch, I was sitting at a table in the lounge area of AFS along with one instructor (not the instructor that had approached me earlier in the day) and two SAs. SA Sibilia approached the table for some small talk and someone said to him in a joking manner if AFS was paying him to get them on television. SA Sibilia laughed, but said in all seriousness, "This will be good for American Firearms." I thought it was odd that SA Sibilia didn't say he believed it would be good for the IRS and his statement in my judgement showed that he was putting the interests of AFS before the IRS. Shortly after lunch I was eventually able to speak to Acting SAC Benevento, and he wanted to know about the reporters and the filming for TV, and he was upset that the instructors did not stop it. I also informed him about SA Sibilia's statement about the filming for TV being good for AFS. After training ended and before driving to my residence, I called Acting SAC Benevento to inform him that I believed the training session was going to be on the evening news. I based this on a one-sided telephone

conversation I overheard between the TV reporter at the site and most likely his

boss or an editor.

### *Were you present at the meeting that took place in Boston after training ended?*

No, I was not at the meeting. I was not SA Sibilia's manager. I heard that

there was a meeting at the office of the SAC. I was not surprised, because the

matter of contact with the press is a serious concern, especially if TV cameras

are filming our SAs and our procedures. These contacts are usually cleared

through the SAC's Office.

**Allegation Two** – *The Complainant alleges on June 17, 2002, he was questioned about his possession of a membership pass that was obtained from a facility that CI used for firearms/defensive tactics training.*

### *Were you involved in this matter? If so, describe the circumstances surrounding this claim. Where did the Complainant get the pass? When did the Complainant get the pass? When did you become aware that the Complainant possessed the pass?*

I was not involved in any discussions about the free membership passes to

AFS that took place in June 2002. After I became SA Sibilia's manager in late

July, my manager, Assistant Special Agent in Charge (ASAC) Benevento, asked

me to speak to SA Sibilia about outstanding matters that had not been resolved

by SA Sibilia's previous managers, Acting SSA Bellingreri and SSA Edward

Delehanty. The outstanding matters turned out to include some of the issues in

this EEO complaint. One of the issues ASAC Benevento and I discussed was

SA Sibilia's acceptance of two free membership passes from AFS. As ASAC

Benevento explained to me, it was his understanding that SA Sibilia gave one

pass to a guest combat knife instructor and SA Sibilia made the other pass

available for other SAs to use. It was also ASAC Benevento's understanding that

SA Sibilia never informed his supervisor or any other IRS-CI manager that he had received the two free membership passes. ASAC Benevento's concerns were that the guest combat knife instructor could be representing himself to be an IRS employee when presenting the membership pass to AFS and that SA Sibilia only made the other pass available to a limited number of SAs. We reviewed a portion of the Interim Handbook of Employee Conduct and Ethical Behavior (Handbook), in particular the section "Issuance 7 -- Guide for Penalty Determination, 8. Conflicts of Interest" (Exhibit A). ASAC Benevento and I determined not to refer the matter to the Treasury Inspector General for Tax Administration (TIGTA) because in our judgement it was not SA Sibilia's intent to violate the Handbook and he did not keep the passes exclusively for himself. However, ASAC Benevento suggested that I obtain a memorandum from SA Sibilia to be placed in his employee drop file. The memorandum would give SA Sibilia the opportunity to explain the facts and circumstances concerning the two free membership passes in his own words in the event anyone made allegations against him in the future. My experience with SA Sibilia had been that he was difficult, defensive and uncommunicative. ASAC Benevento asked me to talk to SA Sibilia and to see if we could resolve some of the outstanding matters and attempt to determine what was bothering him. I met with SA Sibilia on Thursday, August 1, 2002 and one of the issues we discussed was his acceptance of the two free membership passes from AFS.

*Are you aware of any ethical policy or practice that the Complainant may have violated regarding his possession of a membership pass? If so, please explain.*

PG 168

In my conversation with him on August 1, 2002, SA Sibilia did not seem to think accepting the free membership passes from AFS was serious or important. I reminded him that he accepted a gratuity from a business contact, and that this is prohibited by the Interim Handbook of Employee Conduct and Ethical Behavior (Handbook). I explained to him that ASAC Benevento and I discussed referring the matter to the TIGTA, but did not because we did not think he intentionally violated the Handbook. This is a basic rule that all IRS employees should know. IRS employees receive ethics training on an annual basis. A review of SA Sibilia's drop file indicates on March 13, 1995 he signed an "Acknowledgement of Receipt" of the Handbook and it states in part, "I am aware that it is my obligation to familiarize myself with its contents, abide by rules contained therein, and refer questions concerning the interpretation or application of the rules to my immediate supervisor" (Exhibit B). A portion of the Handbook, titled "Issuance 7 - - Guide for Penalty Determinations, 8. Conflicts of Interest" has been given to the EEO Investigator during our meeting, and it states, "An employee is involved in a conflict of interest when a private interest, usually of an economic nature, conflicts or appears to conflict with public duties and responsibilities. These include ... solicitation or acceptance of a gift, gratuity, or other thing of monetary value from someone in performance of official duties..." (Exhibit C). SA Sibilia felt that since he made one free pass available to a limited number of SAs to use and gave the other free pass to the guest combat knife instructor, there was nothing wrong with it. I asked SA Sibilia to return one pass to AFS and to make sure that the pass he gave to the guest combat knife instructor did not link that

individual to the IRS. I asked SA Sibilia to write a memorandum documenting what happened. I told him the memorandum would be placed in his drop file in the event anyone made future allegations against him. SA Sibilia provided me with the memorandum on August 7, 2002 (Exhibit D).

As of the date of this affidavit, a review of SA Sibilia's drop file showed it contained documentation he received periodic ethics and conduct related materials and training. 1) An "Acknowledgement of Receipt" signed by SA Sibilia, undated, states, "I have received a copy of the Office of Government Ethics (OGE) Government-Wide Standards of Ethical Conduct for Employees of the Executive Branch and a copy of the "Self-Study Guide" to those Standards. I am aware that it is my obligation to familiarize myself with their contents" (Exhibits E, F & G). 2) An "Acknowledgement of Receipt" signed by SA Sibilia on January 15, 1998, states in part, "I have received a copy of the 1997 ETHICS TRAINING for INTERNAL REVENUE SERVICE and am aware that it is my obligation to familiarize myself with its contents" (Exhibit H). 3) An "Acknowledgement of Receipt" signed by SA Sibilia on November 6, 1998, states in part, "I have received a copy of the 1998 ETHICS BRIEFING for INTERNAL REVENUE SERVICE and am aware that it is my obligation to familiarize myself with its contents" (Exhibit I). 4) An "Administrative Assessment Certification" initialed by SA Sibilia on January 11, 2000 states, "Rules of Conduct - Criminal Investigation employees have been briefed on the Rules of Conduct as set forth in Title 31 CPR [sic], Section 0.735-10" (Exhibits J & K). 5) A "Mandatory Briefing Certification" signed by SA Sibilia on August 21, 2002 states, "I certify

that I have read the above briefing materials for which I have entered dates in the "Date Completed" column. All corrective action required has been taken or is under way to ensure compliance with these standards." The "Briefing Topics" included "Conduct" and "Ethics" and "08/21/02" was written as the date completed (Exhibit L). Additionally, after SA Sibilia completed a power point presentation on ethics on August 21, 2002, I received a computer generated e-mail message which stated, "This notice is to inform you that Anthony Sibilia has completed the Ethics Awareness Briefing and doesn't have Ethics questions to discuss with you" (Exhibit M).

SA Sibilia and I discussed several other matters that day (Thursday, August 1, 2002), including a substandard Special Agent's Report (SAR) that he submitted, his participation in an "e-mail war" with other SAs that got out of hand and almost resulted in a fist fight (Exhibit N), the unauthorized use of a parking space at the John F. Kennedy Federal Building, the location of the Boston, MA POD, and my consideration of allowing SA Sibilia to periodically work out of the Brockton, MA POD.

At the end of the meeting, I asked SA Sibilia if there was anything else he would like to discuss. He said he was filing a new EEO complaint against me based on the statements I made in an affidavit I provided in his previous EEO complaint. SA Sibilia told me that I had no business writing what I wrote in the affidavit, that his unprofessional attire is not my concern and that in general I was "totally out of line." We did not discuss the issue any further and the meeting ended.

**Allegation Three** – *The Complainant alleges on June 24, 2002 a Supervisory Special Agent (Mr. Delehanty) referred to his Special Agent Report (SAR) as a "piece of crap".*

### Were you aware of this allegation? If so, describe the circumstances surrounding this claim.

SSA Delehanty was the temporary manager of Group 04-05 after Acting SSA

Stephen Bellingreri left, and before I became the manager of this group. I am not

aware of SSA Delehanty calling SA Sibilia's SAR a "piece of crap," however,

SSA Delehanty forwarded to me a courtesy copy of a string of e-mail messages

where SA Sibilia made that claim (Exhibit O). After I became SA Sibilia's

manager, I reviewed the SAR, and it was lacking in several required areas, and

needed to be fixed before forwarding it to upper management (ASAC Benevento

and new SAC Joseph Galasso) for review and approval. I discussed this with SA

Sibilia at our meeting on August 1, 2002. At that meeting SA Sibilia claimed to

me that SSA Delehanty referred to the SAR as a "piece of crap." I did not

respond to this allegation but did clearly inform SA Sibilia the SAR did not prove

the elements of the crime of money laundering.

### What exactly is a "special agent report (SAR)"? Is there a certain policy, practice or procedure that should be followed when preparing a SAR? If so, is there anything in writing regarding these procedures? Are you aware if the Complainant followed the procedure (if any)? Please explain.

There are basic points of information that are required for an SAR, and they

were missing in SA Sibilia's report. The procedures are covered in Internal

Revenue Manual (IRM) Part 9 (Criminal Investigation), in particular IRM 9.5

Chapter 8 , Investigative Reports (Exhibits P & Q). As a Grade 13 employee, SA

Sibilia is required to be intimately aware of the details of this manual section.

The report as written, showed the defendants were involved in bookmaking, a

specified unlawful activity for money laundering and a charge under the jurisdiction of the Federal Bureau of Investigation (FBI). However, the report did not contain the required sections to prove the money laundering, the charge under the jurisdiction of the IRS-CI. I confirmed with Acting SSA Bellingreri and SSA Delehanty that the SAR SA Sibilia forwarded to me was the same report he forwarded to them (Exhibit R). All SARs are required to be submitted before the defendants are indicted. SARs concerning criminal tax charges are referred by the SAC to the Department of Justice - Tax Division (DOJ-Tax Division). If the DOJ-Tax Division agrees with the recommendations in the SAR, they refer it to the appropriate United States Attorney's Office (USAO). The USAO must have the DOJ-Tax Division's approval before asking a federal grand jury to indict an individual on criminal tax charges. SARs concerning money laundering charges are referred by the SAC directly to the appropriate USAO. The USAO can ask a grand jury to indict an individual on money laundering charges without the referral from the SAC. However, in my experience as an SA, IRR and SSA, the Assistant United States Attorneys (AUSAs) assigned to present evidence to the federal grand juries, will use the SARs whether it concerns criminal tax or money laundering charges to organize and draft their indictments. The SAR is the product the IRS produces for its customers, the USAOs and its AUSAs. The AUSAs expect money laundering SARs from the SAs of the IRS-CI before the defendants are indicted, not after. That is one of the main reasons the USAOs invite IRS-CI into federal grand jury money laundering investigations. The USAOs could work these types of cases with just the FBI, or just the Drug

Enforcement Administration (DEA), or just the United States Secret Service (USSS), however, they invite IRS-CI to participate for our financial investigative expertise which is highlighted by the SACs' referrals of our factual, organized and very detailed SARs. SAs from other law enforcement agencies do not manufacture products of this type. SARs are the exclusive products of IRS-CI and AUSAs seek out our products. Additionally, a money laundering SAR shows IRS management if the SA used his/her time efficiently and if he/she understands the elements of the crimes that were committed or if the SA was riding on the coat tails of another agency. In my judgement, based on a review of SA Sibilia's SAR, it did not appear as though he used his time efficiently and he did not understand the elements he need to prove the crimes of money laundering. It appeared to me that the FBI and other law enforcement agencies did most of the work in this investigation.

At a meeting I had with SA Sibilia on Thursday, August 8, 2002 I provided him with photocopies of reference material directly related to money laundering and asset forfeiture criminal investigations. I was quickly able to gather this information from the CI Intranet, sites on the Internet, and CI Document Manager. Every SA has immediate access to these computer based materials. As a Grade 13 employee, SA Sibilia is required to be able to do the same. I provided SA Sibilia hardcopies of 1) IRM 9.5.5.3.5 - Legal Applications - 18 USC 1956(h) (Conspiracy) (Exhibits P & S); 2) IRM 9.2 Delegated Authority to Seize and Forfeit Assets (Exhibits P & T); 3) the United States Code (USC) - 18 USC Section 1956, 1957 and 982 (Exhibits U, V, W, X & Y); 4) U.S. Attorney's Manual

- Jury Instructions for 18 USC Sections 1956(h), 1956(a)(1)(A)(i), 1956(a)(1)(B)(i)
and 1957 (Exhibits U, Z, AA, BB, CC & DD); and Sample SARs for 18 USC
Sections 1956 and 1957 charges (Exhibits EE & FF). I explained to SA Sibilia he
needed to expand the SAR he wrote beyond the bookmaking charges to include
his explanation of the evidence that proved the defendants violated the money
laundering statutes. SA Sibilia agreed to provide me with a revised SAR by
August 31, 2002.

I also reviewed with SA Sibilia the administrative paperwork he needed to
complete when forwarding the SAR to me. As a Grade 13 employee, SA Sibilia
is required to know what administrative paperwork he needed to complete. I
provided SA Sibilia hardcopies of 1) Check List for Grand Jury Prosecution
Report (Exhibit GG); 2) SAC's Referral Letter to USAO (Exhibit HH); 3) Form
4930 (Exhibit II); and 4) Form 3714 (Exhibit JJ).

The revised SAR was acceptable, but not great. I needed to revise the
administrative paperwork. The defendants had already been indicted in June
2002, so SA Sibilia's SAR was not critical to the case. Prior to the submission of
the revised SAR, on August 21, 2002 I was instructed by the new SAC, Joseph
Galasso, to accept SA Sibilia's latest revision of the SAR as is, and I did.

### What witnesses have first hand knowledge of this event and what knowledge do they have?

I do not know what part any of SA Sibilia's other managers had in this, but as
stated previously I was aware that SA Sibilia handed in the same SAR to his two
previous managers based on conversations I had with each of them (Exhibits O

& R). Any manager would be well within their rights to reject the SAR in its

original form.

**Allegation Four** – *The Complainant alleges on August 5, 2002 a Supervisory Special Agent, you (SSA Traina) failed to complete and submit his application package for vacancy announcement #CIM-02-LDP-ELP for the Leadership Development Program (LDP) which prevents the Complainant from competing for consideration for upcoming supervisory positions.*

***Describe the circumstances surrounding this claim. Specifically, what happened? When did the vacancy open? When did the vacancy close? When did the Complainant submit the vacancy information to you? How did the Complainant submit it? Is LDP necessary or required for consideration for management positions?***

I became SA Sibilia's manager on Sunday, July 28, 2002, five days prior to

the Friday he e-mailed me regarding the Leadership Development Program

(LDP) application. I had an in-depth meeting with him the day before (Thursday,

August 1, 2002), and he never mentioned that he planned to apply for the LDP. I

asked at the end of the meeting if he had anything else he wanted to discuss,

and he did not bring up his LDP application. No one else in Group 04-05

applied, so I was not immediately aware of the LDP closing date. SA Sibilia does

not communicate in person. He uses e-mail, which is not always the best or

most effective means to contact someone. All the other SAs will stop in my office

and tell me what is going on, or advise me they sent me an e-mail that they want

me to see. SA Sibilia is the only SA who doesn't do this.

I cover two PODs in both Boston, MA and Brockton, MA. SA Sibilia's POD is

Boston, MA. On Friday, August 2, 2002, I was at my desk at the Brockton, MA

POD at about 5:00 PM when I saw SA Sibilia's e-mail regarding his LDP

application, a message he sent Friday afternoon (Exhibit KK). I was surprised to

see it, since he did not mention it at all during the meeting we had the day before.

14  of  24

PG 176

The closing date was Monday, August 5, 2002. This did not allow me any time to review his application or handle his e-mail, so I waited until Monday, August 5, 2002 to reply to him. On Monday I telephoned him, however he did not answer and the call went into his voice mail. I hung up without leaving a message. I then sent SA Sibilia an e-mail explaining that one business day was not sufficient time for me to review his qualifications for the LDP, and that in addition, his form was not signed, as required (Exhibit LL). I invited SA Sibilia to drop by my office to discuss this issue. Previous to this I had contacted SA Sibilia's prior managers (Acting SSA Bellingreri and SSA Delehanty) to see if SA Sibilia had discussed applying for the LDP with them (Exhibit R). On Tuesday, August 6, 2002 SA Sibilia wrote me back a nasty e-mail message criticizing me for not submitting his application (Exhibit LL). None of the other SAs under my supervision assume this rude and insubordinate tone with me.

SA Sibilia claims that I refused to submit his application because he told me he was filing an EEO complaint against. This is not true. First and foremost, there was very little time to review his application since he submitted it so late and it was due the next business day, and I had no advance notice that he was submitting the application. Second, a manager's approval of an LDP application is not some automatic rubber-stamp technicality, as SA Sibilia implies in his e-mail messages (Exhibits LL & MM). It requires consideration of the employee's work performance and leadership qualities, and in a case like SA Sibilia's where he has not demonstrated strength in these areas, a manager would need time to assess his readiness for management. For example, I had just finished

reviewing the SAR that SA Sibilia submitted, and it was not a good report. My

thought was that to be qualified for management, you need to be technically

proficient *at a minimum*. In addition, you need to be cooperative and able to get

along with others, and SA Sibilia had demonstrated that he was the opposite. In

addition, the fact that he submitted his application without advising me, and did

so at the 11th hour, indicates to me a lack of effective communication that shows

me that he is unprepared to be a good manager. At this time, I find him to be a

mediocre SA, which is not helped by his abrasive manner and attitude.

### *What exactly is a "leadership development program (LDP)"? How often are the LDP positions announced? Have the Complainant applied for LDP before? What happened? Please explain.*

The LDP started this year (2002) and it is announced every six months. The

LDP is an application process to establish a roster of eligible candidates for

vacancies for managerial positions nation-wide that come up over the six month

period. The names of qualified applicants are placed on a list, and when a

managerial vacancy comes up during the six-month period covered in the

announcement, the selecting official selects an applicant from the list. The

applicant's managers must review and approve the application, and certify that

the employee has the necessary qualifications for a management position.

My handling of this matter was based on sound managerial procedure, and

was in no way "harassment" or "retaliation" as SA Sibilia claims.

**Allegation Five** – *The Complainant alleges on August 7, 2002 ASAC Benevento and you subjected him to negative comments and/or statements regarding his conduct and work performance.*

*The Complainant alleges during the meeting on August 7, 2002 he was told that he was "rude", "inconsiderate", "out of line", "insubordinate", and not a "team player". Describe the circumstances surrounding this claim.*

16 of 24

### Specifically, what happened? Who called the meeting? Why was a meeting called? Who made what comments?

SA Sibilia's unacceptable behavior was escalating, and as his manager, I felt it was time to talk to him about it and lay some ground rules. First, there is some important background information that led up to my request for this meeting.

1) In November 2001, SA Sibilia lost his temper and blew up at me in front of other SAs in the Brockton, MA POD when he found out he could no longer use Brockton as an unofficial post of duty. SA Sibilia was not my employee at the time, and I tolerated his outburst. I could have pursued some disciplinary action against him for his insubordinate behavior, but giving him the benefit of the doubt that this may have been an isolated incident, I decided to let it go.

2) After I became his manager, SA Sibilia resisted my direction to correct his SAR on the money laundering case. This is the same SAR that his two prior managers and the ASAC agreed was insufficient.

3) SA Sibilia's behavior regarding his LDP application was rude and insubordinate.

4) SA Sibilia had engaged in an e-mail war with another employee that had gotten way out of hand and came to the attention of management. The matter was discussed with him, and he assured me that the matter was closed.

5) There was the matter of SA Sibilia's continued unauthorized use of a parking spot at the JFK Federal Building in Boston, MA. Since at least the year 2000, SA Sibilia has been disregarding management's requests not to park there. SA Sibilia's drop file contains an e-mail dated October 26, 2000 to SSA

17    o f  24

Phillips Hall, a former manager of his, concerning the same issue (Exhibit

NN). He states to SSA Hall, "I regret any inconvenience that this has caused

and I will no longer park in unauthorized space." SA Sibilia continued to do

the complete opposite of this statement. I divide my time between the

Boston, MA and Brockton, MA PODs.   In an attempt to defuse the situation,

and as a goodwill gesture to SA Sibilia, I formally gave him permission to use

my parking space since he was Group 04-05's senior SA assigned to the

Boston, MA POD. On August 5, 2002, I sent an e-mail to all Group 04-05

employees, with a courtesy copy to the SAC, ASAC and Boston-based SSAs,

advising that I assigned my parking spot to SA Sibilia, and that no one but SA

Sibilia was to use the spot without prior approval from me (Exhibit OO). This

way, if anyone saw SA Sibilia parking in the JFK Federal Building, they'd

know he had authorization to use it. The next day, SA Sibilia sent an e-mail

to everyone in Group 04-05 saying that he would share the spot with other

SAs, and they should notify him and they could set up a schedule (Exhibit

OO). I was angered by this for a number of reasons: the spot was not his to

give, I assigned it to SA Sibilia so that there would not be any question as to

who has the right to use it, and SA Sibilia's message went directly against my

message the previous day stating that no one else was to use the parking

spot without my prior approval. This was a disruptive action, and one that SA

Sibilia deliberately took without consulting me first. It was just another

example of SA Sibilia's habit of doing what he pleased and expecting it to go

unquestioned. In addition, it caused me to send out an additional e-mail on the subject (Exhibit PP).

I was losing my patience with SA Sibilia's behavior, and I wanted to counsel him before things got any more out of control. I would have done the same for any employee who did this. None of my other SAs or employees go to these extremes. I contacted my boss, ASAC Benevento, and said I wanted to set up a meeting with SA Sibilia to clarify some issues and to lay out some ground rules, because things that would be obvious to others did not seem to be obvious to SA Sibilia. ASAC Benevento agreed, and I notified SA Sibilia via voice mail and e-mail to attend a meeting with me and ASAC Benevento on Wednesday, August 7, 2002 (Exhibit QQ).

At the meeting I told SA Sibilia that in my judgement his behavior has been rude, unprofessional and insubordinate, and I cited some of the examples listed above to demonstrate my point, including his issuing of the e-mail about the parking space, his statements to me that my prior affidavit for EEO was "totally out of line," his response to my e-mail about his LDP application, and his failure to correct his incomplete SAR. I told SA Sibilia he should come and talk to me, be a team player like everyone else in the group, rather than avoiding contact with me or being inconsiderate by sending me last minute e-mails. ASAC Benevento asked SA Sibilia if there were other issues outside of work that were driving him to these extremes at the office. SA Sibilia's attitude was nasty and adversarial, and he didn't offer much in his own defense. I told him that I wanted to set things straight and start fresh so that we wouldn't keep having these

19  o f  24

problems. SA Sibilia made a comment to the effect of "I know what this is all about," but he did not explain what he meant. SA Sibilia said he wanted to have a meeting with the new SAC, Galasso, and ASAC Benevento and I told him that he should request one. SA Sibilia did not seem receptive to what we were saying, but we restated that he should try to be more communicative, and he should talk to me if he had concerns. At a minimum, he should advise or consult his managers when these situations arise.

The next thing I heard was that he was filing another EEO complaint against me. I did not call this meeting or make the statements I made to harass SA Sibilia. I saw an employee with a problem, and as his new manager, I wanted to set things straight right from the outset and explain what I expect from him. My hope was that SA Sibilia would understand that a number of his actions have been inappropriate and were causing problems for him, his managers, and the Service.

### *What witnesses have first hand knowledge of this event and what knowledge do they have?*
ASAC Benevento, SA Sibilia and I were the only ones at the meeting.

### Harassment

*In the complaint, the Complainant alleges a hostile working environment. He provides the specified events of this complaint as examples of the alleged events which constituted harassment by management. He alleges that management is harassing him as a direct result of his filing an EEO complaint.   Did the Complainant demonstrate that your behavior or actions were unwelcome, harassing or unacceptable?  If so, please explain.*
Except in the case where SA Sibilia told me he was filing an EEO complaint against me (i.e. he didn't like what I said in my affidavit for his prior EEO complaint and said I was "totally out of line"), he did not indicate that he thought

this behavior was harassment. He often complained about things, which appears

to be his normal manner, but he has not stated that he felt he was being

"harassed."

*Are you aware if the Complainant ever reported the alleged harassment to upper level management? If so, what did management do after the Complainant complained about your (management's) behavior or actions? What did they say to you? Were you counseled? Reprimanded? Disciplined? Investigated?*

I was aware that SA Sibilia requested a meeting with our new SAC, Galasso,

and that SA Sibilia complained about a lot of work situations (Exhibit RR). SA

Sibilia has had problems taking direction from most of his managers. SA Sibilia

cannot accept constructive criticism, and resists any comments about his work or

behavior that do not support his view that he is always right (Exhibits N & O). As

an additional example of this, in SA Sibilia's drop file is a copy of an e-mail he

sent on February 20, 2001 to SSA Hall. In response to SSA Hall's request to

sign his Workload Review, SA Sibilia responds, "I decline based on the fact that I

disagree with several of your statements. You make broad accusations without

substantiation" (Exhibit SS). I was not advised that he considered feedback

from me as "harassment." ASAC Benevento and I met with SAC Galasso on

Wednesday, August 21, 2002. SAC Galasso discussed with us the meeting he

had with SA Sibilia on or about August 13, 2002. SAC Galasso advised me, as

previously stated, to accept SA Sibilia's revised SAR as written, and not to

respond to SA Sibilia's e-mails with e-mails if at all possible. SAC Galasso also

stated that he would be announcing a full-time Use of Force Coordinator position

and if as expected SA Sibilia applied, to forward his application. I was not

counseled or reprimanded by SAC Galasso.

PG 183

21 • ₹ 24

**Have any of the other employees under your supervision ever complained about you harassing them? If so, specify the date the event(s) occurred, who was involved and what happened?**

To the best of my knowledge, no.

**Were any of the above actions taken as a means of harassing the Complainant or subjecting him to a hostile working environment? Were any of the above actions taken because of the Complainant's participation in the EEO process?**

No, none of my actions were taken to harass SA Sibilia, or as a result of his

EEO complaints. They were responses to improper behavior from an employee,

and any other employee who did the same things would have been treated the

same way.

**Were any of the above actions or allegations discussed with Labor Relations or upper level management? Specify the date this occurred, what was discussed, and who was contacted.**

I did not discuss any of these matters with Labor Relations. I advised my

manager, ASAC Benevento of SA Sibilia's actions, and some were discussed

with SAC Galasso. I think is it is important to note that in spite of the poor

judgement and insubordinate behavior he has demonstrated, no disciplinary

actions, formal or informal, have been taken against SA Sibilia, not by me or by

other managers. We have tried to deal with his mistakes by talking to him about

them, giving him an opportunity to explain his actions, and then explaining to him

how he could have handled it better. In spite of all these efforts to guide him, SA

Sibilia takes an increasingly hostile position against the very managers who have

tolerated some consistently inexcusable behavior from him over a period of time.

**Is there anything further you would like to add?**

Yes. On August 23, 2002 SA Sibilia submitted his application for the Use of

Force Coordinator position (Exhibit TT). I forwarded his application in a timely

manner because I was expecting it. Eventually SA Sibilia was not selected for

the position. I did not have any input with that decision. On September 18, 2002, SA Sibilia submitted to me his essay concerning the Education Mentorship Program (Exhibit UU). The standard procedure requests a recommendation from the employee's manager. I recused myself from providing a recommendation and forwarded SA Sibilia's essay to ASAC Benevento. I do not know the results of this matter. On Friday, October 11, 2002 SA Sibilia forwarded to me his application for the Leadership Candidate Identification Program (LCIP) (Exhibit VV). The LCIP is used by the all the CI Field Offices to identify local SAs for local Acting SSA assignments and it is my understanding that it is tied into the LDP. The open season for the LCIP ended Tuesday, October 15, 2002. SA Sibilia did not inform me he would be applying for LCIP or warn me he would be sending me an e-mail message. Since Monday, October 14, 2002 was Columbus Day, he only provided me with one business day to review his application. In addition, I could not open the "Certification of Eligibility" attached to his original e-mail message (Exhibits VV). The circumstances surrounding the LCIP were the same issues surrounding the discussion ASAC Benevento and I had with SA Sibilia on August 7, 2002 concerning the LDP. In my judgement, SA Sibilia purposely sent the LCIP paperwork to me late in order to create another issue between us. As of the date of this affidavit, SA Sibilia has not received a formal response from me concerning his application to the LCIP (Exhibit WW).

I have read the above statement, consisting of 24 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

_Bruce N. Manin_
Deponent's Signature

Subscribed and (sworn to) (affirmed)
before me at ___Boston, MA___
on this _8th_ day of _November_, 2002.

_Christine Reynolds_
Investigator's Signature

INTERNAL REVENUE SERVICE


- - - - - - - - - - - -
IN THE MATTER OF:          )
                          )  EEOC Hearing No.: 1602003-08601X
Anthony P. Sibilia        )
        v.                )  Agency Case No.:  02-3230
John W. Snow, Secretary   )
  Department of Treasury  )
- - - - - - - - - - - - -


DATE:          August 10, 2004

BEFORE:        Kathleen Mearn Clarke
               Administrative Judge
               United States
               Equal Employment Opportunity Commission
               John F. Kennedy Federal Building
               Room 475, Government Center
               Boston, MA  02203-0506


APPEARANCES:

On behalf of the Internal Revenue Service:

Bonnie S. Edwards, Senior Counsel
Office of Chief Counsel
Internal Revenue Service
33 Maiden Lane, Fourteenth Floor
New York, NY  10038


On behalf of Anthony P. Sibilia:

Anthony P. Sibilia appeared pro se


                ARLINGTON REPORTING CORPORATION
                     8 Farrington Street
                     Arlington, MA 02474
                      (781) 646-1730

2

## I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Bruce R. Traina | | | | |
| (by Mr. Sibilia) | 7 | | 148 | |
| (by Atty. Edwards) | | 109 | | 156 |

1    the summer of 2001?

2              MR. TRAINA:  Yes, but nothing official.

3              ADMINISTRATIVE JUDGE CLARKE:  Okay.  Thank you.

4              MR. TRAINA:  You're welcome.

5              BY MR. SIBILIA:

6         Q    Can you explain what was discussed with that EEO

7    investigator when she contacted you in the summer of 2001?

8         A    I filed an affidavit.  And my response to his or

9    her questions were in the affidavit.

10        Q    During this time, were you my Supervisory Special

11   Agent?

12        A    No.  No, I was not.

13        Q    Did the SAC at the time, Michael Leahey, tell you

14   that I was involved in an EEO investigation?

15        A    I assumed you were.  I mean not assumed -- I knew

16   you were because I was asked to give an affidavit.

17        Q    Did Michael Leahey, the SAC at the time, inform

18   you that I was involved in an EEOC matter?

19        A    I do not believe I had any discussions concerning

20   this matter with Michael Leahey.

21        Q    Were you upset in any way by being involved in an

22   EEO matter concerning myself?

23        A    I wasn't upset.  I mean it was a distraction, but

24   I wasn't upset.

18

```
1       Q    Why was it a distraction?

2       A    I was focusing in on my case work and I got a call

3   out of the blue to provide an affidavit.  And it wasn't --

4   it's not part of my routine.

5       Q    It's an employee's right though.

6            ATTORNEY EDWARDS:  Asked and answered.

7            ADMINISTRATIVE JUDGE CLARKE:  He answered the

8   question.  You don't make a comment.

9            BY MR. SIBILIA:

10      Q    Okay.  Prior to your contact -- excuse me -- the

11  EEO official, do you remember her name?

12           ATTORNEY EDWARDS:  Objection.  Relevance.

13           ADMINISTRATIVE JUDGE CLARKE:  Why is the name

14  relevant?  What is the relevance of the name?

15           MR. SIBILIA:  It would make it easier -- it would

16  just make it easier for me to refer back to it in the

17  future.  I have more questions.

18           ADMINISTRATIVE JUDGE CLARKE:  It's not relevant,

19  the name of the -- you can refer to the investigation,

20  certainly.  But the name of the investigator is irrelevant.

21           BY MR. SIBILIA:

22      Q    Prior to your contact with that EEO official, did

23  you discuss my complaint with anyone else?

24      A    I don't believe so.  I didn't know it was
```

60

1   cooperate with your manager, do you share your knowledge
2   with other individuals. So, it's -- it's part of our
3   critical job element as a Special Agent.

4       Q   Could you explain, again, that sentence? It goes
5   on. It says, "Rather than avoiding contact with me or being
6   inconsiderate by sending last minute emails." As an agent,
7   am I allowed to communicate by email to my supervisor, to
8   you?

9       A   I think what it -- I'm sorry -- I think what I was
10  doing was I put it into context. I gave you examples at
11  that meeting as to why I didn't consider you to be a team
12  player and the late emails. The issues were, one, you
13  weren't being very cooperative with revising your Special
14  Agent's report, a prosecution report. Number two, you sent
15  me the LDP application one day before it was due and I was
16  unaware of that. So, that's a very late email. Number
17  three, you were parking in the JFK garage unauthorized.
18  And, when I provided you with the parking pass so you could
19  park there, you sent an email to the group saying it was up
20  for grabs. That's -- that was inappropriate.

21          You claimed that I was totally out of line in my
22  affidavit that I provided. I mean I didn't ask to provide
23  an affidavit, but when it was requested of me to provide it
24  I had to put down the facts as I saw them -- as I saw them.

160

# C E R T I F I C A T E

I, Judith A. Luciano, do hereby certify that the foregoing record is a true and accurate transcription of the proceedings in the above-captioned matter to the best of my skill and ability.

Judith A. Luciano

** ALL NAMES NOT PROVIDED WERE SPELLED PHONETICALLY TO THE BEST OF MY ABILITY.

INTERNAL REVENUE SERVICE

```
- - - - - - - - - - - - -
IN THE MATTER OF:        )
                         )  EEOC Hearing No.: 1602003-08601X
Anthony P. Sibilia       )
       v.                )  Agency Case No.:  02-3230
John W. Snow, Secretary  )
  Department of Treasury )
- - - - - - - - - - - - -
```

DATE:           October 20, 2004

BEFORE:         Kathleen Mearn Clarke
                Administrative Judge
                United States
                Equal Employment Opportunity Commission
                John F. Kennedy Federal Building
                Room 475, Government Center
                Boston, MA  02203-0506


APPEARANCES:

On behalf of the Internal Revenue Service:

Bonnie S. Edwards, Senior Counsel
Office of Chief Counsel
Internal Revenue Service
33 Maiden Lane, Fourteenth Floor
New York, NY  10038


On behalf of Anthony P. Sibilia:

Anthony P. Sibilia appeared pro se


                ARLINGTON REPORTING CORPORATION
                     8 Farrington Street
                    Arlington, MA 02474
                      (781) 646-1730

2

**I N D E X**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Peter Benevento<br>(by Mr. Sibilia)<br>(by Atty. Edwards) | 11 | 52 | 65 | |
| Edward Delehanty<br>(by Mr. Sibilia)<br>(by Atty. Edwards)<br>(by Mr. Sibilia) | 67 | 79 | 81<br>85 | 83 |
| Stephen Bellingreri<br>(by Mr. Sibilia)<br>(by Atty. Edwards) | 87 | 107 | 110 | |
| Joseph Galasso<br>(by Mr. Sibilia)<br>(by Atty. Edwards) | 112 | 119 | | |

1  no sense and you basically said that this wasn't, you know,

2  that you -- um, you didn't agree with me that your report

3  needed any revision.

4      Q    In regard -- on that same page --

5      A    Uh huh.

6      Q    -- actually, the last sentence in that -- on that

7  page, where it starts, "This complaint is completely

8  groundless," could you explain that statement, that

9  sentence?

10     A    Yes.  As it relates to me, your complaint is

11 completely groundless.  These accusations are unbelievably

12 ridiculous.  They have no merit.  Anyone who knows me, and I

13 think, you know, this is common knowledge in the field

14 office that I am not a nitpicker, that I want to get things

15 done as quickly as possible with a minimum amount of trouble

16 as possible.  And this -- this allegation indicates that I

17 am -- that I was somehow picking on you for reasons that had

18 nothing to do with your insufficient report, but it makes --

19 it makes untrue allegations that I was somehow picking on

20 you because you had filed a -- um, that you'd submitted

21 Carrie Murra or somebody in previous EEO actions.  And

22 that's not true.  In fact, as Carrie, or George Neal, or

23 anybody else will tell you, I -- I tended to support

24 virtually every EEO action among people in my group that

1   didn't involve me personally.

2          So, I found it insulting personally to me.  That's

3   what I meant by that.  It's -- it is a gross insult.  And

4   there are people who are retaliated against.  There are

5   people who are discriminated against.  And those people

6   deserve redress, as I testified on behalf of George Neal in

7   a previous case.  I thought he was unfairly treated.  I

8   don't think, certainly as it relates to me, I never treated

9   you unfairly.  And that's what I find insulting and very,

10  you know, it makes me angry.

11       Q    What do you mean by this is a gross insult?

12            ATTORNEY EDWARDS:  Objection.

13            ADMINISTRATIVE JUDGE CLARKE:  I think he's --

14  yeah, I think he's explored that.  He just has answered that

15  and answered that again.  So I would go on to the next

16  question if I were you.

17            BY MR. SIBILIA:

18       Q    In regards to this affidavit that was dated --

19  your affidavit that was dated November 25th, 2002, were you

20  upset at having to participate in this EEO --

21       A    Yes.

22            ATTORNEY EDWARDS:  Objection.  Asked and answered.

23            ADMINISTRATIVE JUDGE CLARKE:  He asked and

24  answered yes.  He already answered it.  He answered it

124

## C E R T I F I C A T E

I, Judith A. Luciano, do hereby certify that the foregoing record is a true and accurate transcription of the proceedings in the above-captioned matter to the best of my skill and ability.

Judith A. Luciano

**\*\* ALL NAMES NOT PROVIDED WERE SPELLED PHONETICALLY TO THE BEST OF MY ABILITY.**

### Affidavit State of Massachusetts    County of Suffolk

Complaint of Anthony Sibilia TD Case #02-3230

I, Peter Benevento, employed by the Internal Revenue Service (IRS) as an Assistant

Special Agent in Charge (ASAC) in the Criminal Investigations (CI) Division, GM-1811,

Grade 15, in the Boston Field Office, Boston, MA,  state:  I am the Complainant's

second level manager.

*Are you aware of the Complainant's prior EEO involvement? If so, how did you*
*become aware?  And when did you become aware?  Where you involved in the*
*Complainant's prior EEO activity?  If so, what was your involvement?*
Yes, I was aware of his prior complaint because I gave a statement to an EEO

Investigator on or about April 2002.  I was not involved in the prior complaint.

*What was your supervisory relationship to the Complainant at the time of*
*the alleged events (June to August, 2002) and the duration of this*
*relationship?  What is your supervisory relationship to the Complainant at*
*this time?*
I have worked for the IRS for 27 years.  I have been in CI for 25 years.  I was the acting

Assistant Special Agent in Charge (ASAC) from November 2001 to January 2002.  I

was selected permanently to the position of ASAC in January 2002.  I have known

Special Agent (SA) Anthony Sibilia since about 1997 when I came to the Boston post of

duty (POD).  I was his manager for approximately two years from 1997 to 1999.  I am

currently his second line supervisor.

**Allegation One** – *The Complainant alleges on June 11, 2002, you and the*
*incoming SAC questioned him about the presence of television reporters at the*
*mandatory firearms training site.  The Complainant alleges that you contacted*
*him on the telephone, indicated he was "out of line", asked to see him as soon as*
*training ended, and hung up on him.*

*Please describe the circumstances surrounding this claim.  Is it normal for*
*reporters to show up at a firearms training site?  When reporters do show*
*up, what is the procedure (if any) that's followed?  If there is a set*
*procedure, did the Complainant follow it?  If reporters don't normally show*
*up unless advance notice is provided, are you aware if the Complainant*

1   o f 12

***had been notified that the reporters would be there?  Rather, were the
circumstances such that when the reporters showed up, you feel the
Complainant did not take the right course of action or follow the right
protocol?***

SA Sibilia is the firearms training coordinator for CI.  The IRS rents time at a

private firing range, American Firearms School (AFS), and uses this facility for

training. The facility is not an IRS property.

On June 11, 2002, SA Sibilia and another Special Agent, Jeff Landon, were

conducting training in firearms and defensive tactics.  At about noon that day,

S/A Stephen Bellingreri informed me that the instructors had allowed television

crews to film their training at AFS.  This is an unusual situation. The agents know

that they are supposed to be cautious when dealing with the media.  There are

disclosure and security matters that could be compromised.  Moreover the

service could be depicted in a very unfavorable manner.  I was upset and

concerned about the presence of camera crews filming our agents, especially

since I was being notified after the fact.  Senior management at the SAC / ASAC

level should have been informed well in advance of any contact of this type with

the media.

Once informed about the incident I telephoned SA Sibilia expressing my

dissatisfaction and concern about the television crews filming our agents.  I told

him he was out of line allowing the media to film our agents.  I told him I wanted

to see him and SA Landon as soon as possible.  SA Sibilia said they could not be

in Boston until later in the day, i.e. five or six o'clock.  I told him I would see them

at that time.  The conversation ended.  I did not hang up on him.  I telephoned

SA Sibilia and not SA Landon since SA Sibilia was the lead firearms instructor at

2  o f  1 2

**PG 131**

the time. He is also the individual who originally established the relationship with AFS and procured the AFS facility. He is the individual who contacts AFS to schedule periodic firearms qualifications at the facility. He is the individual who arranges payment with AFS.    He is the primary contact with AFS.

It is not normal for the media to show up at a training site. Such contacts are to be scheduled well in advance to ensure the Service is depicted in a favorable light. Such contact must be coordinated through the Public Information Officer (PIO) and approved by upper management. S/A Sibilia did contact the PIO, Stephen Bellingreri, when he was informed that the media was going to be present. I believe S/A Sibilia was informed that the media was going to be present when he arrived at the training site (AFS) on the morning of the training. The PIO informed me that S/A Sibilia was very insistent on allowing the training to be filmed. The PIO informed me that he initially voiced his disapproval for the reasons cited above. The PIO stated that S/A Sibilia persisted and that he reluctantly agreed. S/A Sibilia should have used better judgement. He should have told AFS and the reporters that the filming cannot take place. As the lead Firearms Instructor he should have known better. I believe S/A Sibilia's motivation in this matter was to please the owners of AFS and not disappoint them. He was not considering the best interests of the Service.

It should be noted that at the meeting on June 11, 2002 SA Sibilia accepted the responsibility for his poor judgement and acknowledged that it was his fault for allowing the media to film the training. SA Landon also accepted the responsibility and admitted it was wrong.

PG 132

3  of  12

PRB

***What witnesses have first hand knowledge of this event and what knowledge do they have? Were others present when you questioned the Complainant about the reporters being present at the firearms training site? If so, who were they?***
Those present at the meeting on June 11, 2002, were incoming SAC Joseph

Galasso, SSA Dennis Wlodyka, SA Sibilia, SA Landon, and me.

**Allegation Two** – *The Complainant alleges on June 17, 2002, you questioned his possession of a membership pass that was obtained from a facility that CI used for firearms/defensive tactics training.*

***Describe the circumstances surrounding this claim. Where did the Complainant get the pass? When did the Complainant get the pass? When did you become aware that the Complainant possessed the pass? What exactly did you state to the Complainant when you became aware of the situation? Was the pass issued in the Complainant's name or CI's name? Was the pass issued for personal or business use? Are the passes normally complimentary or is there a fee to possess the pass?***
Acting SSA Stephen Bellingreri informed me that he had heard that SA Sibilia

received some free passes to AFS from the owner, Mr. Lamont. This occurred a

few days prior to the June 17th meeting.    As IRS employees, we are not allowed

to accept gifts or gratuities of that value. We must also avoid circumstances that

might result in negative perceptions by the public. I spoke to SA Sibilia's

manager at the time, Acting SSA Stephen Bellingreri, and asked him to find out if

SA Sibilia had possession of these passes and how he obtained them. SSA

Bellingreri reported back to me that SA Sibilia was in possession of a free pass.

This is a potentially serious matter. I then asked to meet with SA Sibilia and his

Acting Manager, Stephen Bellingreri.

At the meeting SA Sibilia explained that he was given two free passes to use the

firing range facilities at AFS. He stated that the owners gave him the passes. He

indicated that the owners were embarrassed by several mechanical failures at

PG 133

PRB

4  o f  1 2

the range. The mechanical failures occurred during CI qualifications and the passes were intended to make up for it.

SA Sibilia stated that he gave one pass to an individual who operated a school that taught tactics to defend against knife attacks. SA Sibilia knew this individual and had arranged for him to give a presentation at a firearms session at AFS in March 2002. SA Sibilia kept the second pass. He stated that he made it available to agents who wanted to use the AFS facility to practice shooting and improve their qualification scores.

At no time did SA Sibilia apprise management that he was offered the passes. At no time did SA Sibilia apprise management that he had accepted the passes. At no time did SA Sibilia apprise management that he had given a pass to the knife instructor.

At no time did SA Sibilia inform the Special Agent populace that the passes were available to anyone who wanted to improve their score. SA Sibilia has conducted extra firearms training at a firing range in Braintree, MA. He does this to help agents improve their scores. He informs the agents and management that he is conducting the sessions by sending an e-mail. To my knowledge no e-mail of this type was sent informing the agents and managers that an opportunity to practice at AFS free of charge existed. SA Sibilia's reticence about the passes presented a perception he was trying to conceal the fact the passes existed. His reticence created the perception that the passes were only available to him and a select few.

PG 134

5 of 12

PRB

I informed SA Sibilia that he exercised bad judgement in accepting the passes. I

informed SA Sibilia that he exercised bad judgement by not informing

management he had accepted the passes. I informed him that we are not

permitted to accept items of that value since it creates a negative perception. It

makes it appear we are not conducting an arms length transaction. It

compromises the integrity of the Service.

Upon inspecting the pass I learned the pass was issued to IRS-CI.

According to SA Sibilia the pass was to be used to allow agents to practice

shooting to improve their scores. Therefore the pass was issued for a business

purpose.

To my knowledge the passes are not complimentary. I believe each pass has a

value exceeding $200.00.

**Are you aware of any ethical policy or practice that the Complainant may have violated regarding his possession of a membership pass? If so, please explain. Are you aware of any other employee's that may have been given complimentary passes for this facility? If so, who were they?**
Yes. The IRS Rules of Conduct and Office of Government Ethics (OGE)

Standards of Ethical Conduct prohibit accepting gifts exceeding a certain value.

We are not allowed to accept gifts and gratuities exceeding $20.00 in value or

$50.00 in a calendar year from one source. Recently another Boston Field Office

employee was given a gift certificate for dinner at a local restaurant. The value of

the gift certificate was $100.00. The Special Agent was given the gift certificate

for giving a presentation before a local bankers association. The Special Agent

properly informed his/her manager that he/she had received the gift. The

manager informed the agent that he/she was not sure if the agent could accept it.

PG 135

6 of 12

The manager researched the issue and determined that the gift exceeded the

$20.00 threshold and the gift was returned. This is exactly what I would have

expected of SA Sibilia. He should have notified management when he was

offered the passes to determine if he could have accepted them.

I am not aware of any other employees who were given passes.

**Was the Complainant disciplined for his possession of the membership pass? If so, what was the reason given? If not, does the Complainant still possess the pass?**
There was no formal disciplinary action against SA Sibilia. I counseled him

verbally at this meeting, and advised him that he continued to demonstrate poor

judgement for the reasons I outlined above.

I asked SA Sibilia to turn over the pass, and he did.

**The report of counseling indicates that during the meeting concerning the membership pass, you again indicated that the Complainant used bad judgement regarding the television reporter situation and indicated that he should have never called Mr. Bellingreri about the situation. Please explain what happened and what was said specifically.**
Yes, I brought up the issue of the reporters again to show SA Sibilia that he

continues to show a lack of proper judgement. I wanted to emphasize to him that

allowing the reporters to film our training under the given circumstances and then

accepting the passes shows a pattern of poor judgement and that it cannot

continue.

**Allegation Three** – *The Complainant alleges on June 24, 2002 a Supervisory Special Agent (Mr. Delehanty) referred to his Special Agent Report (SAR) as a "piece of crap".*

**Describe the circumstances surrounding this claim. Specifically, what happened? Did the event occur face to face, via e-mail, telephone, etc.?**
I am not aware of acting SSA Delehanty using those words to describe the SAR.

As of June 24, 2002 I had not read the report. Staff Assistant Michael Monahan

PG 136

*PNB*

and Acting SSA Stephen Bellingreri, however had both read the report and both

had stated the report was deficient and did not present the requisite evidence to

prove the recommended violations.

*What exactly is a "special agent report (SAR)"? Is there a certain policy,
practice or procedure that should be followed when preparing a SAR? If
so, is there anything in writing regarding these procedures? Are you aware
if the Complainant followed the procedure (if any)? Please explain.*
A Special Agent Report is a factual report that specifies the evidence obtained by

the agent to sustain the agent's recommendation that an individual be prosecuted

for a criminal violation. There are certain standard report formats that should be

followed. There are numerous references in writing that outline report formats

and procedures, including Document Manager. Document Manager is a

computer program on every agent's computer hard drive. Document Manager

contains SAR formats. The report formats include sections on Evidence of

Violation and Evidence of Intent as well as other necessary sections. It is my

understanding that the report presented to SSA Delehanty, Acting SSA

Bellingreri and Staff Assistant Monahan did not contain the evidence necessary

to support the recommendation. I was informed that the report did not address

the elements of the criminal violations.

*What witnesses have first hand knowledge of this event and what
knowledge do they have?*
I do not know anyone who is aware of the alleged statement made by SSA

Delehanty. Managers, however, are well with their rights to review reports and

are obligated to make sure that the SAR addresses the elements of the crime

and is accurate before passing it up the chain of command for approval.

*PRB*

8  of 12

**Allegation Four** – *The Complainant alleges on August 5, 2002 a Supervisory Special Agent (SSA Traina) failed to complete and submit his application package for vacancy announcement #CIM-02-LDP-ELP for the Leadership Development Program (LDP) which prevents the Complainant from competing for consideration for upcoming supervisory positions.*

*Describe the circumstances surrounding this claim. Specifically, what happened? When did the vacancy open? When did the vacancy close? When did the Complainant submit the vacancy information to SSA Traina? How did the Complainant submit it to SSA Traina? Is LDP necessary or required for consideration for management positions?*
SSA Traina had become SA Sibilia's manager on the Monday prior to the Friday

when SA Sibilia e-mailed his application to SSA Triana. The application was e-

mailed to SSA Traina the last day of the filing period. It is my understanding that

SA Sibilia did not verbally discuss the application with SSA Traina despite the

fact they work within feet of each other. SA Sibilia waited until the next to last

possible day to submit the application. He e-mailed it to SSA Traina on a Friday

and it was due the following Monday. The LDP is necessary for selection to a

management position.

*What exactly is a "leadership development program (LDP)"? How often are the LDP positions announced? Have the Complainant applied for LDP before? What happened? Please explain.*
The LDP accepts applications every 6 months. It is an application process for all

managerial positions that open over the 6-month period covered in the

announcement. Managers must review and approve applications submitted by

their employees, and certify that they feel the employee is ready for a

management position. The names of qualified applicants are placed on a list,

and when a managerial vacancy opens, the selecting official selects an applicant

from the list.

9 of 12

SSA Traina talked to me about receiving SA Sibilia's application on the day

before it was due. Neither of us felt we could recommend SA Sibilia for

management. There was no need for SSA Traina to rush to review the

incomplete application, because I would not, in good conscience, have approved

it based on SA Sibilia's performance, judgement and attitude.

**Allegation Five** – *The Complainant alleges on August 7, 2002 ASAC Benevento and SSA Traina subjected him to negative comments and/or statements regarding his conduct and work performance.*

*The Complainant alleges during the meeting on August 7, 2002 he was told that he was "rude", "inconsiderate", "out of line", "insubordinate", and not a "team player". Describe the circumstances surrounding this claim. Specifically, what happened? Who called the meeting? Why was a meeting called? Who made what comments?*
The purpose of this meeting was to discuss certain issues with SA Sibilia

regarding his performance and other actions. Myself and SSA Traina called the

meeting. With one exception the comments above were made by SSA Traina. I,

however did state to SA Sibilia he was not a team player and that this was one

reason he is not considered for management.

The other comments were made relative to SA Sibilia's failure to follow

procedures, the manual, and his assignment of an indoor parking space that he

was not entitled to or authorized to assign.

*What witnesses have first hand knowledge of this event and what knowledge do they have?*
The only individuals present at this meeting were myself, SSA Traina, and SA

Sibilia.

## Harassment

*In the complaint, the Complainant alleges a hostile working environment. He provides the specified events of this complaint as examples of the alleged events which constituted harassment by management. He alleges*

*that management is harassing him as a direct result of his filing an EEO complaint. Did the Complainant demonstrate that your behavior or actions were unwelcome, harassing or unacceptable? If so, please explain.*
The complainant did not agree with the positions stated about his performance

and attitude. He made a point of stating that he could not work for either SSA

Traina or myself.

*Are you aware if the Complainant ever reported the alleged harassment to upper level management? If so, what did management do after the Complainant complained about your (management's) behavior or actions? What did they say to you? Were you counseled? Reprimanded? Disciplined? Investigated?*
I am aware of the fact that SA Sibilia spoke to SAC Joseph Galasso in private.

I have not been counseled, reprimanded, disciplined or investigated.

*Have any of the other employees under your supervision ever complained about you harassing them? If so, specify the date the event(s) occurred, who was involved and what happened?*
No.

*Were any of the above actions taken as a means of harassing the Complainant or subjecting him to a hostile working environment? Were any of the above actions taken because of the Complainant's participation in the EEO process?*
No.

*Were any of the above actions or allegations discussed with Labor Relations or upper level management? Specify the date this occurred, what was discussed, and who was contacted.*
The above events were discussed at times with SAC Joseph Galasso. The

purpose of the discussion was to inform SAC Galasso of the various events

transpiring.

*MMB*

(continued)

11 0 € 12

I have read the above statement, consisting of 12 pages, and it is true and complete to the best of my knowledge and belief.  I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

_Peter R. Benevent_
Deponent's Signature

Subscribed and (sworn to) (affirmed)
Before me at Boston, MA
On this _9th_ day of _November___, 2002.

_Christine Reynolds_
Investigator's Signature

PG 141

12 of 12