UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
ANTHONY SIBILIA,               )
                               )
            Plaintiff,         )  CIVIL ACTION NO. 05-10096-PBS
                               )
      v.                       )
                               )
JOHN SNOW, SECRETARY OF THE    )
DEPARTMENT OF THE TREASURY,    )
                               )
            Defendant.         )
_____)
```

**MEMORANDUM AND ORDER**

October 20, 2006

Saris, U.S.D.J.

**INTRODUCTION**

Pro se Plaintiff Anthony P. Sibilia, a special agent with the Internal Revenue Service ("IRS") Criminal Investigation Unit ("CI"), alleges that the Defendant unlawfully retaliated[1] against him because he testified against his supervisor who had been sexually harassing a co-worker and filed various complaints with the Equal Employment Opportunity Commission ("EEOC") in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

Defendant moves for summary judgment on the ground that his

---

[1] Count I alleges retaliation based on events occurring from August 1996 to May 2002; Count II alleges retaliation based on events occurring from June 2002 to February 2004; and Count III alleges retaliation based on events occurring in April and May 2004.

administrative complaints were not timely filed with respect to some of the alleged misconduct and without merit as to the other alleged retaliation.  After hearing and review of the briefs, Defendant's motion for summary judgment is **ALLOWED IN PART** and **DENIED IN PART**.

## II. FACTS

The incidents alleged in this action span a ten-year time period during which Plaintiff has had at least seven direct supervisors, filed multiple EEOC complaints, and challenged a myriad of agency actions.  The record is often confusing, and the sequence of events unclear.  Since this case involves a pro se plaintiff, the Court will attempt to interpret the facts liberally in favor of Plaintiff.  Plaintiff has submitted evidence of the following facts, most of which are hotly disputed.

### A. The First EEOC Complaint (October 1996)

Sibilia has been an employee of the IRS since 1992.  He is currently a special agent in the Criminal Investigation - Boston Field Office.  In 1996, he was located in the Brockton office, where his supervisor was Donato Niro.  A female co-worker, Carrie Marra, brought a complaint of gender-based harassment against Niro.  Sibilia assisted Ms. Marra in her sexual harassment litigation by providing statements on her behalf in 1996.  As a result, both Niro and Special Agent in Charge (SAC) Frederick

Aufiero harassed him.  Niro informed Sibilia that Sibilia had "turned this into a war . . . don't try to take me on . . . I'm going to conduct continuous reviews of your cases."  Aufiero informed Sibilia that if he had done to Aufiero what he had done to Niro, Aufiero "would have [Plaintiff] sitting next to [Aufiero] . . . to analyze everything [Plaintiff] turned in." It is not clear when Aufiero made this statement.

In October 1996, Plaintiff filed a complaint with the EEOC against Niro, who retired in December 1996.  Plaintiff did not pursue the complaint after Niro's retirement.  It was dismissed in November 1996.  Since 1997, no management official has spoken to him about this EEOC complaint.

### B.  Job Actions Under Aufiero (1997-1999)

After Niro's retirement in December 1996, the Brockton office was closed, and Plaintiff, together with three other agents, were transferred to the Boston office with the assurance from Aufiero they would be given priority consideration to return if the Brockton office were re-opened.  The Marra litigation was continuing, and Plaintiff was quoted publicly about it.  In 1998, Peter Benevento became Plaintiff's supervisor.  Marra's case settled in January 1999.

From 1997 until Aufiero's retirement in December 1999, Plaintiff applied for promotion on two separate occasions. Both promotions were denied.  One member of the promotion

committee was Michael Lahey who was in charge of approving the work time that plaintiff had spent on the Marra litigation. Another member of the committee was Bruce Traina who would later become Plaintiff's supervisor, and a key player in this dispute.

### C. The Second EEOC Complaint (October 25, 2001)

When Aufiero retired as SAC of the Boston office in December 1999, Michael Lahey replaced him, and Phil Hall became Plaintiff's supervisor and remained his supervisor until July 2001. On June 14, 1999, the agency posted a vacancy notice advertising for one or more criminal investigation/special agents. Plaintiff continued to get excellent evaluations from his supervisors, and was one of 28 qualified applicants, but was continually passed over. Plaintiff was the only senior agent on the best qualified list who was not promoted. In March 2000, another vacancy announcement was posted, and Plaintiff applied. Three selections were made, but Plaintiff was again not selected. Finally, on June 25, 2001, Plaintiff was promoted to GS-13 along with six others, including Carrie Marra. Hank Chin became Plaintiff's supervisor in August 2001.

In October 2001, the Brockton office reopened, and Plaintiff applied. Plaintiff and another agent, Donahue, who also assisted Marra in her litigation, were not transferred back to Brockton. The employees transferred back to Brockton were more senior than Plaintiff. On October 25, 2001, he contacted an EEOC counselor

and on December 8, 2001, he filed a new EEOC complaint against Lahey and Benevento, alleging that he was not transferred to the Brockton post of duty in retaliation for his initial complaint against Niro.  He also protested that Lahey did not promote him to a GS-13 on two different occasions in retaliation for this EEOC involvement.  Lahey was aware of Plaintiff's involvement in the Marra matter and his filing an EEOC complaint against Niro at the time he denied the requested transfer to Brockton.  However, he had no direct role in either matter.

### D. The Third EEOC Complaint (August 15, 2002)

In July 2002, Bruce Traina became Sibilia's first level supervisor.  Plaintiff applied for various leadership development programs, which were stepping stones to promotion.  He submitted his paperwork for approval to Traina on Friday, August 2, 2002.  Because the application was due on Monday, August 5, 2002, Traina refused to certify the application telling Sibilia he had one business day in which to review the material.  Because he had only been Plaintiff's supervisor for a week, he said he needed to further review his performance.  The application also lacked Plaintiff's signature.  Traina would also later state that he was surprised at Plaintiff's interest in the program, had found Plaintiff's work to be lacking in some areas, and thought Plaintiff did not qualify because of bad communication skills.  This disagreement prompted Plaintiff to request a meeting with

new SAC Galasso.

On August 15, 2002 Plaintiff filed an EEOC complaint claiming he was subjected to harassment in relation to his prior EEOC involvement.  A copy of the complaint is not in the record, and it is unclear what the exact allegations were.

As examples of harassment, plaintiff now cites a number of incidents occurring between June 2002 and January 2003 including:

> 1) On June 11, 2002, SAC Peter Benevento questioned Plaintiff about the presence of media at a mandatory IRS firearms training;
> 2) On June 17, 2002, Benevento questioned Plaintiff's possession of a membership pass to the firearms training facility;
> 3) On June 24, 2002, Delehanty allegedly referred to Plaintiff's Special Agent Report (SAR) as a "piece of crap;"
> 4) On August 5, 2002, Traina failed to complete and submit Plaintiff's application for a leadership program;
> 5) On August 7, 2002, Traina and Benevento subjected Plaintiff to negative comments regarding his conduct and work performance;
> 6) On December 12, 2002, Benevento and Traina failed to certify Plaintiff for participation in a leadership program;
> 7) On December 12, 2002, Plaintiff was issued written counseling by Traina regarding parking and submitting false/inaccurate monthly reports;
> 8) On January 29, 2003, Plaintiff was not certified for a leadership program by Traina; and
> 9) On January 29, 2003, Plaintiff received written counseling by Traina regarding seized currency and coin.

**E.   Leadership Program**

Plaintiff submitted a new application to Traina for a second leadership program on October 11, 2002.  The application was due on October 15, 2002, and Traina had one business day to review the application (the 12th was a Friday and the 14th was Columbus Day).  Traina did not open the email with Plaintiff's application

until October 16, 2002 and subsequently informed Plaintiff that his application would be considered late.  Explaining why he had not seen Plaintiff's email, Traina responded that he had been busy preparing for and meeting with an EEOC investigator concerning Plaintiff's complaint against him.  Traina scheduled a meeting with Plaintiff to discuss why he would not be certified for the leadership program as well as other outstanding issues concerning Plaintiff's job performance.  In his notes for this meeting, Traina included a comment that he "agree[s] with [Plaintiff] on the point that [Plaintiff] should be sending (sic) more time on 'direct investigative time,'" and it was "[Plaintiff's] choice to file EEO complaints."  (Pl. Aff. May 16, 2005, ¶ 37, Ex. 7.)  Traina allegedly told Plaintiff that "the more time I spend addressing EEO issues will negatively affect my performance in this area, concerning my evaluation."  Traina denies this statement.

From January 2003 until the filing of this action, Plaintiff was denied promotion or acting supervisory assignments on eight separate occasions, once by Traina, and the rest by other supervisors.  Traina also refused to certify him for other leadership programs stating he was not ready.

    **F.**   **EEOC Ruling**

In January of 2004, an EEOC Administrative Law Judge granted summary judgment for the agency on all of Plaintiff's claims.

The opinion is not in the record, and it is unclear which claims were included in the judgment.  On appeal, the judgment was upheld by the EEOC on October 20, 2004.  Once again the opinion is not in the record.  This action was timely filed on January 4, 2005.

## II.   DISCUSSION

**A.   Summary Judgment Standard**

"Summary Judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law.'"  Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position."  Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1996).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'"  Barbour, 63 F.3d at 37 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  "There must be

'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" Rogers, 902 F.2d at 143 (quoting Anderson, 477 U.S. at 249-50) (citations and footnote in Anderson omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour, 63 F.3d at 36.

**B. Timeliness**

Defendant argues Plaintiff should have been aware of the retaliation prior to filing his October 25, 2001 EEOC complaint, and that all allegations before September 10, 2001 are time-barred.

As a federal employee, the applicable time period for Plaintiff to complain about unlawful discrimination is within 45 days of the discriminatory event. 29 C.F.R. § 1614.105(a)(1) (providing that "an aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory"). Plaintiff argues that his claims were timely under a continuing violation theory even though most of the alleged violations occurred prior to this 45-day limitation period. To prevail on a continuing violation theory, Plaintiff must reach back and establish a "substantial relationship" between the timely and untimely acts in order to recover for

those prior acts.  Sabree v. United Bhd. of Carpenters and Joiners Local, 921 F.2d 396, 401 (1st Cir. 1990).

Plaintiff contends he was denied promotion or supervisory assignments seventeen times over seven years and alleges this pattern of retaliation involved a management loop that began with Niro and Aufiero, and expanded to include Lahey, Benevento, Traina, and Delahanty.  Courts examine several factors to determine whether violations occurring before the time limitations are actionable including:

1. Did the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation?
2. Were the alleged acts reoccurring or more in the nature of an isolated work assignment or employment decision? and
3. Did the act have the degree of permanence which should trigger an employee's awareness of the duty to assert his or her rights?

Smith v. Bath Iron Works Corp., 943 F.2d 164, 166 (1st Cir. 1991).

With respect to the third prong, "[p]ermanence is basically an inquiry into what the plaintiff knew or should have known at the time of the discriminatory act."  Sabree, 921 F.2d at 402.  "What matters is whether, when and to what extent the plaintiff was on inquiry notice."  Jensen v. Frank, 912 F.2d 517, 522 (1st Cir. 1990) (citing Olson v. Mobil Oil Corp., 904 F.2d 198, 203 (4th Cir. 1990)).  Thus if the Plaintiff knew or should have known he was being retaliated against, he had a duty to assert his rights or lose the opportunity to bring a claim.  See Sabree,

921 F.2d at 402 ("A claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the . . . limitation period.") (citation and quotation marks omitted).

Defendant argues that Plaintiff should have known he was being retaliated against prior to filing his second EEOC complaint in October 2001, and that his allegations of harassment and retaliatory denials of promotion prior to Sept. 10, 2001 (forty-five days before the complaint) are time-barred. Plaintiff's primary theory is that the impetus for this retaliation was his involvement with the Marra sexual harassment claim against Niro in 1996.  At that time, Niro and Aufiero made the allegedly threatening comments to Plaintiff.  While Aufiero remained as SAC (until 1999), Plaintiff was allegedly being passed over repeatedly for promotional opportunities.  By 2000, Plaintiff had knowledge that he was the only senior agent on the "Best Qualified" list used for allotting promotions who had not received a promotion.  Between January and March 2000, eleven agents were promoted ahead of him.  By 2000 at the latest, Plaintiff was on notice of the alleged pattern of retaliation. Therefore, any claims of retaliation arising from conduct prior to 2001 are time-barred.[2]

---

[2] In an effort to circumvent his timeliness problem, Plaintiff alternatively argues the court should use its estoppel

C.  **Standard for Retaliation**

The government concedes that the claims arising out of the requirement to transfer to Brockton and the post September 2001 employment actions are timely, but challenges the sufficiency of the evidence.  To make out a prima facie case for retaliation, Plaintiff has the initial burden of demonstrating retaliation by "presenting evidence that (1) he engaged in protected conduct, (2) he was thereafter subjected to an adverse employment action, and (3) a causal connection existed between the protected conduct and the adverse action."  Chungchi Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003).  Plaintiff correctly asserts that his testimony in favor of his co-worker in her sexual harassment claim is protected conduct.  See 42 U.S.C. § 2000e-3(a).[3]  He also correctly points out that filing an EEOC

---

powers.  Plaintiff asserts that Niro's retirement led him to believe the potential for retaliation had ended.  Under the theory of equitable estoppel, a plaintiff is entitled to equitable relief and a modification of the limitations period "if he reasonably relies on an employer's misleading representations and evidence of the employer's improper purpose is demonstrated." Mack v. Great Atlantic and Pacific Tea Co., 871 F.2d 179, 185 (1st Cir. 1989).  In Title VII cases, the First Circuit "hew[s] to a 'narrow view'" in which an exception to the time limitation "'is appropriate only where the employer actively misled the employee.'"  Id. (citing Earnheart v. Commonwealth of Puerto Rico, 691 F.2d 69, 71 (1st Cir. 1982)).  Because there is no evidence of misleading misrepresentations by the IRS, the equitable estoppel argument is not viable.

[3]  "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [subchapter]."

complaint is protected conduct. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 269 (2001).

To establish an adverse employment action, the employer must:

> (1) take something of consequence from the employee, say, by discharging or demoting [him], reducing [his] salary, or divesting [him] of significant responsibilities, or
>
> (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering [him] for promotion after a particular period of service.

Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996) (citations omitted). An employer's inaction can deprive an employee of a privilege he had reason to anticipate he would receive. Id. at 726. Under the standard recently set by the Supreme Court, a plaintiff must show that a reasonable employee "would have found the challenged action materially adverse," specifically that it would dissuade a "reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe R.R. Co. v. White, 126 S. Ct. 2405, 2415 (2006).

The third element of a causal connection may be demonstrated by, among other things:

> evidence of differential treatment in the workplace, statistical evidence showing disparate treatment, temporal proximity of an employee's protected activity to an employer's adverse action, and comments by the employer which intimate a retaliatory mindset.

Mesnick v. General Electric Co., 950 F.2d 816, 828 (1st Cir.

13

1991) (internal citations omitted). The First Circuit, however, has been reluctant to find a causal connection when there is a "long period of delay" between the protected activity and the adverse employment action. Id.; accord Pettiti v. New England Tel. & Tel. Co., 909 F.2d 28, 33 (1st Cir. 1990). With these legal standards in mind, the Court addresses the Plaintiff's three claims of unlawful retaliation.

1.  **Transfer Request**

Defendant argues that the denial of transfer to the Brockton office is not an adverse employment action because it did not involve a change in salary or responsibility. Lateral transfers are not necessarily actionable. See Marrero v. Goya of P.R. Inc., 304 F.3d 7, 24 (1st Cir. 2002) (temporary but minor increase in workload as a result of transfer not actionable). However, in White the Supreme Court found that moving the plaintiff from her job operating a forklift to a job as a track laborer was an adverse employment action since it entailed an increase in time performing more arduous tasks, and her first job required more qualifications, was "more prestigious," and was "objectively considered a better job," even though the duties attached to both positions fell within the same general job description. 126 S. Ct. at 2417; see also Rodriguez v. Bd. of Educ., 620 F.2d 362, 364-65 (2d Cir. 1980) (holding that a transfer from a junior high to an elementary school teaching

position could constitute an adverse employment action where the "art programs at the elementary level were so profoundly different from those in the junior high school as to render utterly useless her twenty years of experience and study in developing art programs for middle school children."); Brown v. F.L. Roberts & Co., 419 F. Supp. 2d 7, 14 (D. Mass. 2006) (finding, though a "close question," that a reasonable jury could deem a lube technician's lateral transfer to an isolated work station a "sharp diminution in the quality and substance of [his] job" due to a lack of customer contact and evidence of an "unappealing work environment[]."). In White and the cases cited above, the employer actions all involved some materially adverse impact on the nature or quality of the plaintiff's employment.

Plaintiff argues that the denial of transfer was an adverse employment action because his current commute to Boston is seventy miles while the commute to Brockton would only be ten minutes. As a father of young children, plaintiff contends that this significantly longer commute is a hardship. However, an overwhelming number of courts have determined that a lateral transfer that results in a longer commute does not rise to the level of an adverse employment action. See, e.g., Sanchez v. Denver Pub. Sch., 164 F.3d 527 (10th Cir. 1998) (holding that reassignment which increased employee's commute time from five or seven minutes to between thirty and forty minutes does not amount to an adverse employment action); Burnette v. Northside Hosp.,

15

342 F. Supp. 2d 1128, 1136-1137 (D. Ga. 2004) (lateral transfer that increases commute one to one-and-a-half hours fails to qualify as an adverse employment action); Johnson v. Eastchester Union Free Sch. Dist., 211 F. Supp. 2d 514, 517-18 (S.D.N.Y. 2002) (plaintiff's "mere dissatisfaction" with reassignment, based on "inconvenience of the change in location," was not actionable as adverse employment decision).[4]  In fact, one court has held that a lateral transfer which required the employee to relocate his residence across state lines did not constitute an adverse employment action.  See Montandon v. Farmland Indus.,

---

[4] See also Anzaldua v. Chi. Transit Auth., No. 02-02902, 2002 WL 31557622, *4 (N.D. Ill. Nov. 15, 2002) (holding reassignment that "added up to an hour and a half each way to [the plaintiff's] daily commute" was insufficient to establish adverse employment decision); Baker v. Ala. Dep't of Pub. Safety, 296 F. Supp. 2d 1299, 1308 (M.D. Ala. 2003) ("Where the changed work location does not even require one to change residences, these transfers generally merely create an inconvenience, which for purposes of Title VII is not actionable."); Grande v. State Farm Mut. Auto. Ins. Co., 83 F. Supp. 2d 559, 563-64 (E.D. Pa. 2000) (holding lateral reassignment of employee to another location did not rise to the level of adverse employment action even if it increased employee's commute: "While the court does not minimize the effect of a lengthened commute . . ., without some evidence of actual harm to the plaintiff's career or some indication that he could no perform the job, these factors do not create a prima facie case."); Darnell v. Campbell County Fiscal Court, 731 F. Supp. 1309, 1313 (E.D. Ky. 1990) (holding that a transfer to a job requiring additional twenty-minute commute does not constitute an adverse employment action); see also Slay v. Glickman, 137 F. Supp. 2d 743, 752 (S.D. Miss. 2001) (holding that reassignment requiring a three-hour commute did not constitute a "tangible employment action" in Title VII sexual harassment context); 1-8 Wages & Hours: Law and Practice § 8.04 ("[A] reassignment or transfer that results in an increased commute, without more, objectively fails to meet the threshold of materiality [in the context of an adverse employment action].").

Inc., 116 F.3d 355, 359 (8th Cir. 1997) (holding that "however unpalatable the prospect may have been to [the employee]," a reassignment which required employee to move from Denison, Iowa to Omaha, Nebraska did not rise to the level of an adverse employment action).  While some of this caselaw may not survive scrutiny under White, where the longer commute time results from a denial of a transfer request, there is little justification for finding the employment action materially adverse.  Moreover, Plaintiff has failed to present sufficient evidence that the denial of a transfer request involving a modest difference in commute time of less than an hour would deter a reasonable worker from making a retaliation charge.

Even if such hardships were actionable, Plaintiff has failed to establish a causal connection existed between the protected conduct and the adverse action.  Because five years elapsed between the Niro incident and the denial of transfer, no reasonable inference of a causal connection can be drawn.  See, e.g., Mesnick, 950 F.2d at 828 (nine month delay between protected activity and adverse action fails to suggest causal connection).  Moreover, even assuming Lahey was the person who denied the transfer request, he was not the target of Plaintiff's EEOC Complaint in 1996 nor was he involved in the Marra litigation.  Therefore, there is no reasonable inference that he had a retaliatory motive.  Finally, plaintiff has not disputed that any other employee with less seniority was transferred to

17

Brockton instead of him.  Therefore, there is insufficient evidence to create a disputed fact question that his protected conduct caused the denial of the transfer request.

   **2.   <u>Leadership Program</u>**

   Plaintiff argues that Defendant failed to certify him for the leadership programs at the time he had two ongoing EEOC investigations.  On July 9, 2002, in the EEOC complaint, he says he named Bruce Traina as one of the persons responsible for workplace harassment and retaliation.[5]  On July 28, 2002, Traina became his supervisor.  On August 25, 2005, Traina failed to submit Sibilia's package for the leadership program.  On December 12, 2002, he again refused to certify his application.  Plaintiff has presented some evidence that Traina is retaliating against him because of his participation in the EEOC process.  Specifically, Traina referenced Plaintiff's EEOC complaint as the reason he refused to certify him for the leadership program, pointing out that plaintiff should spend more time on his investigations rather than filing EEO complaints.  Sibilia also said that Traina told him he should be spending less time on EEO matters and such activity will have an impact on his performance evaluation.  In addition, Sibilia alleges Traina made other derogatory comments about his EEO involvement.  These comments were made shortly after Plaintiff filed his EEO complaint against

---

   [5] I could not find this allegation in the record.

Traina.  Traina disputes some of these statements and introduced evidence to show why Sibilia was not qualified for the leadership program.  Nonetheless, Mr. Traina's alleged comments raise a fact question with respect to the true reason for refusing to certify training for the leadership programs, which are necessary to compete for entry-level management positions.

### 3. 2004 Claims

In a scattershot approach, Plaintiff argues that his EEOC involvement has continued to result in retaliation and alleges a myriad of disconnected events (ranging from parking disputes to disagreements on asset forfeiture procedures) occurring in April and May of 2004.  There is insufficient evidence in this record that any of these other events rise to the level of an adverse action, involved a pattern of retaliation, or were impermissibly motivated.  Accordingly, these claims are dismissed.

**ORDER**

Defendant's motion for summary judgment (Docket No. 26) is **ALLOWED** on Counts I and III and **DENIED** on Count II.

                                        **S/PATTI B. SARIS**
                                        United States District Judge